COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

KIMBERLY STOYLE,        )
        Complainant    )
                       )
        vs.            )  DOCKET NO.
                       )  02BEM04039
TOWN OF MANSFIELD      )
MUNICIPAL ELECTRIC     )
DEPARTMENT, ET AL,     )
        Respondents    )

DEPOSITION of JACK BELIVEAU,

called as a witness by and on behalf of the

Complainant, pursuant to the applicable

provisions of 804 CMR 1.00 and the

Massachusetts Rules of Civil Procedure,

before Teresa E. Costello, Registered

Professional Reporter, Certified Shorthand

Reporter No. 145289, and Notary Public

within and for the Commonwealth of

Massachusetts, at the Meeting Room of Breads

N Bits of Ireland, 530 Main Street, Melrose,

Massachusetts on Tuesday, September 23,

2003, commencing at 10:00 a.m.

G & M COURT REPORTERS AND ASSOCIATES
617 338 0030

---

APPEARANCES:

LAW OFFICE OF LYNN A. LEONARD
   (by Lynn A. Leonard, Attorney-at-Law)
   527 Main Street
   Suite 8
   Melrose, Massachusetts 02176
   for the Complainant.

PIERCE, DAVIS & PERRITANO, LLP
   (by John J. Davis, Esq.)
   10 Winthrop Square
   Boston, Massachusetts 02110-1257
   for the Respondents.

Also Present: Kimberly Stoyle

G & M COURT REPORTERS AND ASSOCIATES
617 338 0030

---

| DEPONENT | PAGE |
|---|---|
| JACK BELIVEAU | |
| Examination by Ms. Leonard | 5 |
| Examination by Mr. Davis | 192 |
| Examination by Ms. Leonard | 209 |

EXHIBITS

| NO. | | PAGE |
|---|---|---|
| 1 | Deposition Subpoena | 7 |
| 2 | Staffing Recommendations dated 12-12-98 | 24 |
| 2A | Proposed Organization One | 26 |
| 2B | Organizational Structure | 28 |
| 3 | Job Description | 33 |
| 4 | Memo dated 2-24-00 | 44 |
| 4A | Memo | 183 |
| 4B | Memo | 183 |
| 5 | E-Mail | 71 |
| 6 | E-Mail | 100 |
| 7 | E-Mail | 103 |
| 8 | Complaint | 124 |
| 9 | E-Mail | 126 |
| 9A | Handwritten Page | 172 |
| 10 | Memo dated 2-13-02 | 138 |
| 11 | Memo dated 11-27-02 | 150 |
| 12 | Memo dated 8-13-03 | 158 |
| 13 | Handwritten Notes of Interview | 165 |
| 13A | Letter dated 2-11-03 | 173 |
| 14 | Handwritten Notes dated 1-9-03 | 169 |
| 15 | Personnel Policy | 176 |
| 16 | E-Mail | 180 |
| 17 | Policy | 181 |
| 18 | Memo dated 11-20-02 | 185 |
| 19 | Document | 187 |
| 20 | Memoranda dated 1-21-03 | 188 |

EXHIBITS RETAINED BY COUNSEL.

G & M COURT REPORTERS AND ASSOCIATES
617 338 0030

---

STIPULATIONS.

It is agreed by and between counsel for the respective parties that the deponent will read and sign the deposition within thirty (30) days from receipt, and the signing before a Notary Public is waived.

It is further agreed that all objections, except as to form and motions to strike, are reserved for the time of trial.

MS. LEONARD: I'll just put our stipulations on the record. That is, Attorney Davis, that we have agreed to reserve all objections except as to the form of the question and motions to strike until the time of the hearing, and Mr. Beliveau will read and sign the deposition transcript, and I'll ensure that he gets that within a reasonable period of time to allow him an opportunity to do that.

Can we agree that if it's not signed within 30 days after he receives it, that it's deemed waived?

MR. DAVIS: Sure.

G & M COURT REPORTERS AND ASSOCIATES
617 338 0030

**Page 85**

```
1   about that conversation, what the Board of
2   Light Commissioners, you say, talked to one
3   light commissioner, McCarter?
4  A. I think he said something to the effect I
5   talked to the other light commissioners, but
6   then he said I spoke with David meaning
7   McCarter and related the comments and that
8   David's reply, Well, he is the F'ing
9   manager.
10 Q. What about the conduct of Mr. D'Agostino to
11   Caroline Fitton? Did he respond to that?
12 A. I don't know that that issue was raised by
13   Mr. Wills, at least in the conversation we
14   had. It centered around remarks, foul
15   language remark.
16 Q. Did he say anything else to you about his
17   conversations with the Board of Light
18   Commissioners on these issues besides he is
19   the F'ing manager?
20 A. No. I think it was so tacitly understood
21   that he was frustrated by the response.
22 Q. What made you think that?
23 A. There was probably subsequent conversation
24   that suggested that nobody wanted to do
          G & M COURT REPORTERS AND ASSOCIATES
                    617 338 0030
```

**Page 86**

```
1   anything about it so to speak.
2  Q. When was the subsequent --
3  A. Well, I mean, it would have been all part of
4   that same conversation. I just came away
5   with that impression of our conversation
6   that nothing was going to happen and that
7   Mr. Wills was somewhat frustrated and why
8   I -- I knew Mr. Wills was very upset over
9   that particular incident.
10 Q. The foul language?
11 A. Yes, because he raised that subject with me
12   repeatedly.
13 Q. On other occasions?
14 A. Yes.
15 Q. Mr. D'Agostino's use of foul language?
16 A. Well, referring to the specific incident,
17   yes.
18 Q. So he expressed to you in numerous
19   conversations that he, himself, that is
20   Mr. Wills, was upset by Mr. D'Agostino's use
21   of foul language with Kimberly?
22 A. Yes. Mr. Wills is a devout Christian so I
23   suspect his reaction reflected his
24   background.
          G & M COURT REPORTERS AND ASSOCIATES
                    617 338 0030
```

**Page 87**

```
1  Q. What brought us to this to begin with was
2   that I was asking you if at any time you
3   reported Miss Stoyle's complaints about
4   harassment or inappropriate conduct on
5   Mr. D'Agostino's part to anybody else, and
6   you started by saying in March of 2001 or
7   thereabouts you reported it to Brad Wills.
8   Did you ever report her complaints on any
9   other occasion?
10 A. Yes.
11 Q. And when was that?
12 A. In late October of 2001.
13 Q. And who did you report it to?
14 A. Mr. Amoruso.
15 Q. Who was Mr. Amoruso?
16 A. He was, at the time, the chairman of the
17   Board of Light commissioners, so he did take
18   over Mr. Wills' seat at some point in time.
19   I apologize. He was the chairman of the
20   board of selectmen at the time.
21 Q. Did he also sit as a member of the Board of
22   Light Commissioners?
23 A. Yes.
24 Q. And what was -- did you speak with him on
          G & M COURT REPORTERS AND ASSOCIATES
                    617 338 0030
```

**Page 88**

```
1   the phone, in person?
2  A. I asked him to come in and meet with myself,
3   Miss Stoyle and Gary D'Ambra, line foreman.
4  Q. And did that meeting actually take place?
5  A. Yes.
6  Q. Did you tell him before the meeting what the
7   subject matter would be?
8  A. I believe I did in generalities.
9  Q. And what was the essence of your
10   conversation regarding the subject matter?
11 A. That there seemed to be attacks, so to
12   speak, going on by the town manager towards
13   some of the employees in the department and
14   that it had felt that this should be brought
15   to his attention, that it was inappropriate.
16   In the meeting I related some of the past
17   events, the foul language, Miss Fitton.
18 Q. Where did this meeting take place?
19 A. Light Department office conference room.
20 Q. And Mr. D'Ambra, Miss Stoyle, yourself and
21   Mr. Amoruso were present?
22 A. Yes.
23 Q. And you raised the foul language?
24 A. Yes.
          G & M COURT REPORTERS AND ASSOCIATES
                    617 338 0030
```

89

```
 1  Q. What else did you raise?
 2  A. Well, about Miss Fitton, that that had
 3     occurred.
    Q. What, exactly, did you state about Miss
       Fitton?
 6  A. I probably was very short to the effect that
 7     there had been what I considered
 8     inappropriate advances towards Miss Fitton.
 9  Q. Did he respond to that?
10  A. No.
11  Q. He was silent?
12  A. At least I don't recall his response if
13     there was one.
14  Q. Did you relate to him -- strike that.
15     Anything else about Miss Fitton?
16  A. Not that I recall.
17  Q. Did you relate to him any other complaints
18     that had been made by Miss Stoyle other than
19     the foul language?
20  A. Not at -- I don't recall other things in
21     that time frame that had happened before
22     that meeting. There was sort of an
23     atmosphere of tension going on that caused
24     me to call him in to have the meeting.
            G & M COURT REPORTERS AND ASSOCIATES
                     617 338 0030
```

90

```
 1  Q. Well, --
 2  A. And I'd have to go back and look at what
 3     some of the specific things were that
 4     occurred that led up to that.
 5  Q. Okay. Do you have documents with you that
 6     would refresh your recollection?
 7  A. No.
 8  Q. Well, you've testified about complaints made
 9     to you by Miss Stoyle and that included the
10     first thing that you referenced was a
11     sexually charged e-mail in or about August
12     of 2000. Did you raise that at the meeting?
13  A. Not at that particular meeting. I raised it
14     at a subsequent meeting.
15  Q. So there was a second meeting?
16  A. Actually four meetings.
17  Q. So this is the first one in late October,
18     2001?
19  A. Yes.
20  Q. Did you raise the comment made by
21     Mr. D'Agostino that Miss Stoyle looked
22     delicious --
23         MR. DAVIS: Objection.
24  Q. -- at the October, 2001 meeting?
            G & M COURT REPORTERS AND ASSOCIATES
                     617 338 0030
```

91

```
 1  A. No, because it hadn't occurred.
 2  Q. Oh, that's right. Thank you. Let me ask
 3     you. Do you recall other than the foul
 4     language comment anything else in
 5     discussions regarding Miss Fitton, anything
 6     else that was raised at that meeting?
 7  A. I don't recall them. That's not to say that
 8     there weren't. The meeting went on for over
 9     an hour.
10  Q. Is there anything that would refresh your
11     recollection?
12  A. I made some notes.
13  Q. Did you bring those notes with you?
14  A. No, I did not.
15  Q. So you have notes of the October, 2001
16     meeting?
17  A. I have a diary I keep at home.
18  Q. You keep a diary? And the diary that you
19     keep, do you keep it daily?
20  A. No.
21  Q. What kind of diary is it?
22  A. Maybe weekly. Sort of sit down and I record
23     things that occur during the week that I
24     think typically of a personal nature to help
            G & M COURT REPORTERS AND ASSOCIATES
                     617 338 0030
```

92

```
 1     me recall if I have to.
 2         MS. LEONARD: I'm going to make a
 3     request for that diary, but there are a
 4     number of things as a result of this
 5     deposition that I'm going to ask for, so
 6     I'll supplement my document request that I
 7     gave to you.
 8         MR. DAVIS: We'll respond to that.
 9         MS. LEONARD: Okay.
10  A. I'd like to put on the record that it's my
11     understanding that personal notes that are
12     not part of the company's property are
13     completed on the company's computer are not
14     discoverable. We may disagree, but that's
15     why I did not come here with them.
16  Q. And do you keep in that diary events
17     regarding your personal life?
18  A. Yes. Many matters.
19  Q. Well, we can tailor that request so that
20     it's for notations regarding the workplace.
21     So is that -- so other than your diary is
22     there anything else that would refresh your
23     recollection on the events of the meeting of
24     late October, 2001? ,What was the topics of
            G & M COURT REPORTERS AND ASSOCIATES
                     617 338 0030
```