EXHIBIT K

TO

PLAINTIFF'S MOTION TO COMPEL
PRODUCTION OF DOCUMENTS FROM DEFENDANTS TOWN OF MANSFIELD
ELECTRIC DEPARTMENT AND JOHN D'AGOSTINO

```
                                                    1
              Volume IV
              Pages 1 - 168
              Exhibits per index

          UNITED STATES DISTRICT COURT
            District of Massachusetts


DR. JOHN J. BELIVEAU,          )
              Plaintiff        )
                               )
vs.                            )  Civil Action
                               )  No. 04-11329-BPW
TOWN OF MANSFIELD MUNICIPAL    )
ELECTRIC DEPARTMENT, JOHN O.   )
D'AGOSTINO,                    )
              Defendants       )

        CONTINUED DEPOSITION OF JOHN O. D'AGOSTINO, a
witness called by and on behalf of the Plaintiff, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Sandra L. Bray,
Registered Diplomate Reporter, CSR Number 103593, and
Notary Public in and for Commonwealth of Massachusetts,
at the offices of Wolf Block, One Boston Place, Boston,
Massachusetts, on Tuesday, January 11, 2006, commencing
at 10:21 a.m.

              REPORTERS, INC.
        GENERAL & TECHNICAL COURT REPORTING
        23 MERRYMOUNT ROAD, QUINCY, MA 02169
        617.786.7783/FACSIMILE 617/786.7723
```

---

**APPEARANCES:**

JULIANE BALLIRO, ESQUIRE
WOLF BLOCK
One Boston Place
Boston, Massachusetts 02108
on behalf of the Plaintiff

LEONARD H. KESTEN, ESQUIRE
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Place
Boston, Massachusetts 02116
on behalf of the Defendant Town of Mansfield Municipal Electric Department

SUSAN JACOBS, ESQUIRE
VOLTERRA, GOLDBERG, MANGIARATTI & JACOBS
Three Mill Street
Attleboro, Massachusetts 02703
on behalf of the Defendant John O. D'Agostino

ALSO PRESENT:

Dr. John J. Beliveau

---

                    I N D E X

WITNESS:                                   EXAMINATION
JOHN O. D'AGOSTINO
 (By Ms. Balliro)                               5

                   E X H I B I T S

NO.                                 FOR IDENTIFICATION

No. 33   Ad, dated 2-29-04, and Ad,
         dated 6-12-98, and Notes              5

No. 34   Notice of Taking the Continued
         Deposition of John O. D'Agostino
         Pursuant to Federal Rules of
         Civil Procedure 30(b)(6)              9

No. 35   Memorandum to Board of Selectmen
         from Mr. D'Agostino, dated 1-6-04    25

No. 36   Minutes of Light Commissioners
         Meeting, August 11, 2003             32

No. 37   Copy of E-mails                      37

No. 38   Copy of E-mail and Reply,
         dated 4-5-02                         43

No. 39   Copy of E-mails                      50

No. 40   Memorandum to Mr. Beliveau, et
         al., from Mr. D'Agostino, dated
         5-29-02                              56

No. 41   Copy of Greeting Card                63

No. 42   Copy of Card Envelope                64

No. 43   Copy of E-mail, dated 12-3-03        68

No. 44   Copy of E-mail, dated 3-6-00         69

              E X H I B I T S, Continued

NO.                                 FOR IDENTIFICATION

No. 45   Response of John O. D'Agostino to
         Allegations Contained in Charge
         of Discrimination by John J.
         Beliveau                            105

No. 46   Article                             108

No. 47   Copy of E-mail, dated 5-9-03        123

No. 48   Memorandum to Mr. D'Agostino
         from Mr. Beliveau, dated 2-25-02    129

No. 49   Memorandum from Mr. D'Agostino,
         dated 1-21-03                       130

No. 50   Affidavit of Eileen Plant           133

No. 51   Letter to Mr. Walsh from
         Mr. D'Agostino, dated 2-23-99       141

No. 52   Copy of E-mails                     144


              (EXHIBITS RETAINED BY COUNSEL.)

**Page 9**

1  Q.  But was it your understanding --
2  A.  So he had some managerial experience.
3  Q.  But was it your understanding he headed up the
4      Light Department in Wellesley?
5  A.  It was my understanding he had that
6      experience, yes.
7           MS. BALLIRO: Mark this.
8           (Notice of Taking the Continued
9           Deposition of John O. D'Agostino
10          Pursuant to Federal Rules of Civil
11          Procedure 30(b)(6) was marked Exhibit
12          Number 34 for identification.)
13 Q.  Okay. Mr. D'Agostino, you have before you the
14     notice of the continued deposition addressed
15     to you for today's deposition, and attached to
16     that notice is a list of documents entitled
17     Schedule A, Documents to be Produced. Do you
18     see that on Page 3?
19 A.  Yes.
20 Q.  Okay. And just for informational purposes,
21     some of the documents on this list were also
22     contained or set forth on the list attached to
23     your first appearance at deposition. And my
24     question for you is did you make any effort to

**Page 10**

1      locate additional documents responsive to the
2      schedule contained in Exhibit Number 34?
3  A.  No.
4  Q.  Okay. And why not?
5  A.  I assumed that legal counsel was providing
6      that information to you.
7  Q.  Okay.
8           (Cellular telephone call interruption)
9           THE WITNESS: I'm sorry. I'll shut
10     this off.
11 Q.  On what basis did you believe that legal
12     counsel was going to provide me with any and
13     all tapes of the Town of Mansfield meetings
14     from 1998 to present?
15 A.  Because they had equal access to that
16     information as I did.
17 Q.  Okay. Did you have -- okay. Well, let the
18     record note that I have not received any tapes
19     of Town of Mansfield meetings from 1998 to
20     present in response to Number 19.
21 A.  The tapes that you're looking for are
22     selectmen tapes, there's town meeting tapes.
23     There's all kinds of tapes that we have.
24 Q.  And they exist, correct?

**Page 11**

1  A.  I don't know if all tapes exist because I'm
2      not the custodian of tapes.
3  Q.  But you know that some of the tapes exist,
4      correct?
5  A.  I'm assuming that they do, yes. When you mean
6      tapes, you're talking about selectmen
7      meetings -- there's town meeting tapes.
8      There's all kinds of different taped meetings,
9      but you're looking for light commissioner or
10     selectmen meetings or both?
11 Q.  I'm looking for both. But regardless of what
12     I'm looking for, none have been produced,
13     correct?
14 A.  If you say so, I would concur with that.
15 Q.  Number 20 was copies of all telephone calls
16     made by you on your work, residential, and
17     cell phones. Did you produce those records in
18     preparation for today's deposition?
19 A.  No.
20 Q.  And why not?
21 A.  Again, I assumed that those records would be
22     produced through counsel.
23 Q.  You thought your counsel would have access to
24     your residential phone records?

**Page 12**

1  A.  No, but certainly work and cell phone.
2  Q.  So what did you do to attempt to produce the
3      residential records set forth in Number 20?
4  A.  I don't have the residential records, all of
5      those phone records from that period of time
6      in my possession.
7  Q.  Do you have any of your phone records?
8  A.  I have some but not all.
9  Q.  And is it your testimony that you turned your
10     work and cell phone records over to your
11     counsel?
12 A.  The work records are at Town Hall, and the
13     cell phone records are at Town Hall; and I
14     would assume that the due diligence of counsel
15     would have provided that information.
16 Q.  I see. Number 21 are publicly filed records
17     in connection with your divorce, including
18     affidavits filed in connection with your
19     divorce. Did you think your lawyer was going
20     to produce those records as well?
21 A.  No.
22 Q.  Did you undertake any effort to assemble those
23     records in preparation for today's deposition?
24 A.  No.

**Page 13**

1  Q. Who has the filings made in connection with
2     your divorce? Who has possession of those
3     filings?
4  A. I believe it would be the Court.
5  Q. Did you have a lawyer in connection with that
6     proceeding?
7  A. Yes, I did.
8  Q. And who was your lawyer?
9  A. Jim Goldberg.
10 Q. Jim Goldberg?
11 A. Uh-huh.
12 Q. Do you think Mr. Goldberg might have kept a
13    copy of your divorce documents?
14 A. I believe so.
15 Q. So he would have possession of them, correct?
16 A. That's correct.
17 Q. Did he provide you with any copies of your
18    divorce documents?
19 A. Yes.
20 Q. So you have possession of them?
21 A. I do.
22 Q. You do?
23 A. Yes.
24 Q. You didn't bring them with you to this

**Page 14**

1     deposition; did you?
2  A. No.
3  Q. And I take it you don't have any e-mail
4     communications between Lou Amoruso, you, and
5     Jack Beliveau that haven't already been
6     produced?
7  A. I don't believe so.
8  Q. And how about Request Number 23? Do you have
9     any of those that you haven't produced?
10 A. It is my understanding that the information
11    that has been produced is -- I don't know what
12    information has been produced versus what new
13    information you're looking for that may not
14    have been produced in Number 23.
15 Q. So you don't know --
16 A. I don't know if there's any different
17    information available.
18 Q. Well, have you provided counsel with copies of
19    any of the e-mails listed in 23, 24, 25 in
20    advance of this deposition?
21 A. I believe that this information was available
22    to counsel.
23 Q. Okay. And when was that information made
24    available to counsel?

**Page 15**

1  A. I don't know the date.
2  Q. Was it before your first deposition session?
3  A. I believe so.
4  Q. Number 26 was a request for the police logs.
5     I believe those were produced at yesterday's
6     deposition.
7  A. And I will note that that was produced by
8     counsel.
9  Q. And Number 27 as well, more records of copies
10    of police logs, correct?
11 A. I believe so, yes.
12 Q. Do you have any e-mail communications between
13    you and Mr. Babin from January 23 --
14    January 1, 2003 to the present?
15 A. I believe so.
16 Q. Did you produce those?
17 A. No.
18 Q. Why not?
19 A. I believe that those are being assembled.
20 Q. By whom?
21 A. I believe either by counsel or by Mr. Babin or
22    both.
23 Q. Is there any reason why they weren't assembled
24    in advance of today's deposition?

**Page 16**

1  A. I don't know.
2  Q. You don't know?
3  A. I don't have any reason why. I don't know why
4     they haven't been produced.
5  Q. How about Number 29, which would be all e-mail
6     communications between Gary Babin and members
7     of the Board of Light Commissioners from
8     January of 2003 until present? Are those also
9     being assembled?
10 A. That's my understanding.
11 Q. When you had to come to the deposition
12    yesterday, did you tell Mr. Babin, you know,
13    "Where are those e-mails? I need those
14    e-mails. My deposition is on Tuesday,"
15    anything like that?
16 A. No.
17 Q. Have you had any conversations with Mr. Babin
18    at all about assembling those e-mails?
19 A. Other than a brief discussion that he was
20    working on them.
21 Q. Okay. And when was that discussion?
22 A. A brief discussion. I'd probably say it was a
23    couple weeks ago.
24 Q. A couple weeks ago.

17

1  A.  But I'm not sure the time frame.
2  Q.  Obviously, you haven't produced Gary Babin's
3      phone records, correct, Number 30?
4  A.  His residential and cell phone?
5  Q.  Uh-huh.
6  A.  No.
7  Q.  How about the documents contained in Item
8      Number 31, the studies, analysis, and
9      documents concerning the purchase power cost
10     adjustment made in 2003, 2004, and 2005?
11 A.  No.
12 Q.  And why not?
13 A.  I think Mr. Babin would be able to produce
14     those for you.
15 Q.  But you certainly have the authority to
16     produce those documents, correct?
17 A.  I believe so, yes.
18 Q.  And this is a subpoena that was directed to
19     you, and you haven't produced them?
20 A.  No.
21 Q.  Okay. What is a PPCA?
22 A.  Purchase protocol cost adjustment.
23 Q.  I understand what it stands for, but what is
24     it?

18

1  A.  It is the amount that the utility can charge
2      to capture the cost of -- the increased cost
3      of electricity due to power adjustment, an
4      increase in power costs.
5  Q.  So it's the amount --
6  A.  That can be passed on to the rate payer.
7  Q.  Have there been increases to the PPCA during
8      the years 2003, 2004, and 2005?
9  A.  Yes, there has.
10 Q.  Do you know what the increases were during
11     2003?
12 A.  I'm not quite sure, but it could have been
13     anywhere from half a cent to a penny.
14 Q.  And how about 2004?
15 A.  I believe the same.
16 Q.  And how about 2005?
17 A.  I believe there was one increase in 2005.
18 Q.  And were you provided with any studies,
19     analyses or documents concerning or supporting
20     the increases?
21 A.  I believe the Board of Light Commissioners
22     were.
23 Q.  Well, did you receive any copies of those
24     studies?

19

1  A.  I may have.
2  Q.  Were you satisfied with the studies?
3  A.  I didn't have any reason to object to them.
4  Q.  Okay. Number 32 is copies of any studies,
5      reports or analyses concerning internal
6      charges received from the Town of Mansfield in
7      2004 and 2005. Do you know if any such
8      studies, reports or analysis of internal
9      charges for 2004 and 2005 exist?
10 A.  I don't.
11 Q.  Did you undertake any efforts to determine
12     whether they exist prior to your deposition
13     yesterday?
14 A.  No.
15 Q.  And why not?
16         MR. KESTEN: I'm going to put on
17     the record, Juliane, that counsel have been
18     handling all this. You keep asking him.
19     That's how it's been going.
20         MS. BALLIRO: Well, why didn't
21     counsel do it then? Why don't we have the
22     records?
23         MS. JACOBS: A lot of them, we're
24     working on getting them to you. This is

20

1  incredibly voluminous.
2          MS. BALLIRO: But you didn't even
3      say you weren't going to have them, nothing.
4      This is a subpoena.
5          MS. JACOBS: I understand. A lot
6      of them are duplicates of ones that are
7      directed to other witnesses.
8          MS. BALLIRO: But we subpoenaed
9      this witness, so --
10         MS. JACOBS: I understand.
11         MS. BALLIRO: -- the idea was to
12     try to finish with this witness and not bring
13     this witness back. We don't know what the
14     other witness is going to say about these
15     records. So when do you think you'll have
16     these records for us?
17         MS. JACOBS: We've been working on
18     getting them together. We're working on it.
19     Hopefully, we'll have them to you within the
20     next few weeks. I mean some of them, like the
21     tapes, are -- I mean those are at the cable
22     company. It's not as if we have any special
23     access to them.
24         MR. KESTEN: I will personally

21

1  apologize. I thought this had been dealt
2  with.
3          MS. BALLIRO: You thought what?
4          MR. KESTEN: This had been dealt
5  with. So I apologize. I thought that between
6  Christine and Susan and Deb, they had dealt
7  with the document requests, all of them. I
8  have not been directly involved. John has not
9  been directly involved.
10          MS. JACOBS: I have been.
11          MS. BALLIRO: I'm only going to
12  bring the witness back if I need to.
13          MR. KESTEN: I understand.
14          MS. BALLIRO: But I'm not going to
15  be able to complete the deposition today
16  without the documents. Some of these
17  documents, only he can speak to.
18          MR. KESTEN: I understand the
19  caveat, and I can find out the status. Let's
20  do the deposition.
21          MS. BALLIRO: We're almost through
22  the list. I'll continue through the list just
23  to identify what documents have and haven't
24  been produced, and we'll go from there.

22

1  Q.  Number 34 was copies of legal bills charged to
2      or paid by the Mansfield Electric Department
3      from January 1, 2003 through the present. Do
4      you know if those documents have been
5      produced?
6  A.  I know they exist. I don't believe they've
7      been produced.
8  Q.  But they do exist?
9  A.  That's what I said, yes.
10 Q.  Do you know where they're kept?
11 A.  Usually with the town accountant and with the
12     department here. In this case, it would be
13     the Light Department as well.
14 Q.  Okay. Number 35 is copies of bills from PLM,
15     including all detailed summaries charged to or
16     paid by the Mansfield Electric Department from
17     January 1, 2003 through the present. What is
18     PLM?
19 A.  I believe it's a consultant firm.
20 Q.  What does the acronym stand for? Do you know?
21 A.  I have no idea.
22 Q.  What kind of consulting firm?
23 A.  It may be Mayhew Seavey's here.
24 Q.  I see. What do they do?

23

1  A.  If this is the acronym for the correct
2      consultant under the circumstances, that
3      individual is the person who provides the
4      analysis for the Light Department on the cost
5      of purchasing power as well as the individual
6      who works with the Light Department in
7      determining how much money is appropriate to
8      be kept in escrow for accounting, power
9      contracts. This is our consultant for that
10     purpose.
11 Q.  Do those bills exist?
12 A.  I'm assuming they do. I don't have direct
13     knowledge that they do.
14 Q.  Do you know where they're maintained?
15 A.  I believe at the Light Department.
16 Q.  Do you know if any effort has been made to
17     copy the e-mail archives from the Electric
18     Department's e-mail server from February 2004
19     to --
20          MS. JACOBS: I will speak to that.
21  We are making efforts to do that.
22 Q.  Number 37 is a copy of rate comparisons
23     published by the MMWAC for typical 500-
24     kilowatt-hours-per-month customers for the

24

1      fourth quarter of 2003 and the most recent
2      quarter of 2005. Do you know if those have
3      been provided?
4  A.  I don't believe so, but I'm not quite sure.
5  Q.  And do you know if the American Express bills
6      have been provided from January 2000?
7  A.  I know that they exist, and I don't know if
8      they have been provided at this point.
9  Q.  Okay. Did you have a -- strike that. Did you
10     take issue with Mr. Beliveau's handling of the
11     North Main Street pole project in late 2003 or
12     early 2004?
13 A.  I don't know if it was an issue directly with
14     either the Light Department or Mr. Beliveau,
15     but with respect to Verizon. I think there
16     was more of an issue with Verizon than there
17     was with Mr. Beliveau.
18 Q.  And what was your understanding of the issue
19     with Verizon?
20 A.  I believe there was quite a lengthy delay and
21     difference in costs between what was agreed to
22     and what the actual cost was to remove those
23     poles.
24          MS. BALLIRO: Let's mark this as