# EXHIBIT C

## TO

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION TO AMEND ANSWER TO ADD COUNTERCLAIMS

```
              Volume   IV
              Pages    1 - 168
              Exhibits per index
```

UNITED STATES DISTRICT COURT

District of Massachusetts

```
DR. JOHN J. BELIVEAU,         )
        Plaintiff             )
                              )
                              )
vs.                           )   Civil Action
                              )   No. 04-11329-BPW
TOWN OF MANSFIELD MUNICIPAL   )
ELECTRIC DEPARTMENT, JOHN O.  )
D'AGOSTINO,                   )
        Defendants            )
```

CONTINUED DEPOSITION OF JOHN O. D'AGOSTINO, a witness called by and on behalf of the Plaintiff, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Sandra L. Bray, Registered Diplomate Reporter, CSR Number 103593, and Notary Public in and for Commonwealth of Massachusetts, at the offices of Wolf Block, One Boston Place, Boston, Massachusetts, on Tuesday, January 11, 2006, commencing at 10:21 a.m.

REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617/786.7723

Draft Copy

Page 102

1   A. No, I don't think that was his charge.
2   Q. Well, why did you send him over there?
3   A. To make sure the process they had engaged in
4       was a legitimate one and that they weren't
5       hiring -- hiring practices were not flawed. I
6       wanted somebody to take a look at it.
7   Q. And did he come back and say their hiring
8       practices were flawed?
9   A. I don't believe so. I don't believe.
10  Q. Okay. Have you read Kara Cook's deposition in
11      the case?
12  A. No, I have not.
13  Q. Do you recall having a discussion with anyone
14      other than Jack Beliveau regarding your belief
15      or your suspicion that Kara Cook was the
16      individual within the Light Department that
17      was spreading these nasty rumors about you and
18      owing gambling debts to Hottleman?
19          MR. KESTEN: You mean at the time?
20  Q. Well, at the time. Well, other than your
21      counsel, obviously, but at or about the time.
22  A. I may have.
23  Q. And who do you believe you talked to?
24  A. I believe I may have talked to some members of

Page 103

1       the Board of Selectmen about it.
2   Q. Okay. And --
3   A. Because I was concerned that they would hear
4       something in the rumor mill and would often
5       wonder what was going on.
6   Q. And who did you talk to on the Board of
7       Selectmen?
8   A. I don't remember specifically. I know it
9       was -- I may have spoken to all of them
10      collectively or I may have spoken to some of
11      them individually. I don't remember.
12  Q. Did you register any complaints with the board
13      during any of your discussions with them about
14      these rumors concerning Jack Beliveau's role
15      in the Andrea Hottleman hiring process?
16  A. No.
17  Q. Now, Mr. D'Agostino, when I first asked you to
18      tell me your side of the story on the Andrea
19      Hottleman affair, you started out by saying,
20      "I believe that Andrea Hottleman had applied
21      for the position in response to an
22      advertisement in the newspaper." How did you
23      learn that Andrea Hottleman was interested in
24      that position?

Page 104

1   A. I think Mr. Hottleman might have mentioned it
2       to me, that she had applied.
3   Q. And did Mr. Hottleman ask you if you could do
4       what you could for her to see that she got the
5       job?
6   A. Based on my recollection of that discussion,
7       he had indicated to me that his wife would be
8       interested in working in this position, to
9       stay home, close to the kids and that if there
10      was anything I could do to help, to see what I
11      could do. And my response to him was, "If
12      she's qualified for the position, you know,
13      she can get in -- I'm sure she'll be able to
14      get an interview."
15  Q. Did you tell him you'd do what you could for
16      him to help him out?
17  A. I didn't promise that Andrea Hottleman would
18      get hired for that job.
19  Q. Is that what I asked you? Did I ask you if
20      you promised that Andrea Hottleman would get
21      hired for the job?
22  A. Yes.
23  Q. I asked you, did you tell him you would do
24      what you could to help?

Page 105

1   A. I told him I would look into it.
2   Q. Okay. Has Andrea Hottleman applied for any
3       other positions with the town since she was
4       not hired for this one?
5   A. I don't know. I don't know.
6   Q. All right. Mr. D'Agostino, I'm going to move
7       on to your response to Mr. Beliveau's charge
8       of discrimination.
9           (Response of John O. D'Agostino to
10          Allegations Contained in Charge of
11          Discrimination by John J. Beliveau was
12          marked Exhibit Number 45 for
13          identification.)
14  Q. Mr. D'Agostino, you're looking at what's been
15      marked as Exhibit Number 45 to this
16      deposition. It is response of John D'Agostino
17      to allegations contained in charge of
18      discrimination by John Beliveau. I'd just ask
19      you to turn to the last page of that exhibit,
20      which is marked Page Number 9, has a number 9
21      at the bottom.
22  A. Yes.
23  Q. Could you tell me, is that your signature?
24  A. Yes, it is.

27 (Pages 102 to 105)

Page 106

1  Q. It's dated February 26th, 2004?
2  A. That's correct.
3  Q. Did you read this document before you signed
4     it?
5  A. Yes.
6  Q. Okay. Did you assist at all in the drafting
7     of this document? Did you write it or did
8     you -- did someone else write it and you read
9     it and signed it?
10 A. It was, I believe, a collaboration between
11    myself and counsel.
12 Q. When was the last time you reviewed this
13    document?
14 A. Probably at about the time I signed it.
15 Q. Okay. Now, I just want to direct your
16    attention to Paragraph 6 of your response,
17    Page 2. It says, "6, Allegation. Shortly
18    after the filing of the Stoyle charge,
19    Mr. D'Agostino held a press conference denying
20    Miss Stoyle's allegations and threatening to
21    sue other unnamed employees. Upon information
22    and belief, I was one of the employees
23    Mr. D'Agostino was threatening to sue." Now,
24    that is a -- that simply reiterates

Page 107

1     Mr. Beliveau's allegation against you,
2     correct?
3  A. It appears that way.
4  Q. And then there's your response to that
5     allegation. Do you see that?
6  A. I do.
7  Q. And you responded, "After you learned of
8     Miss Stoyle's allegations, I stated I would
9     take whatever action necessary to clear my
10    name. I didn't threaten to sue other
11    employees, and I certainly never explicitly or
12    implicitly threaten to sue Mr. Beliveau. In
13    fact, more than one year has passed since
14    Ms. Stoyle has filed her charge of
15    discrimination, and I have not sued any
16    employee." Do you see that?
17 A. That's correct.
18 Q. Did you give a press statement -- a press
19    interview to Meredith Holford?
20 A. Holford.
21 Q. So you know who Meredith Holford is?
22 A. Yes.
23 Q. Did you grant Meredith Holford a press
24    interview following Miss Stoyle's filing of

Page 108

1     her charge of discrimination?
2  A. Yes.
3     (Article was marked Exhibit Number 46
4     for identification.)
5  Q. Okay. Mr. D'Agostino, you have before you a
6     copy of an article written by Meredith
7     Holford, a staff writer for what newspaper?
8  A. The Mansfield News.
9  Q. The Mansfield News. It's been marked Exhibit
10    Number 46 to this deposition, and in the first
11    few paragraphs, she writes, "Town manager John
12    D'Agostino says the charges of sexual
13    harassment levied on him by Electric
14    Department employee Kimberly Stoyle may well
15    result in legal action in court, but he
16    predicts the tables will turn. Quote, if
17    there is litigation, it will be litigation I
18    initiate, unquote, he said in a press
19    interview last week. Quote, I will include
20    some citizens as well as some employees, end
21    quote."
22 A. That's correct.
23 Q. Do you deny saying that to Meredith Holford?
24 A. No.

Page 109

1  Q. So how is that or why is that not a threat to
2     sue other employees?
3  A. My intent here, the individuals that I was
4     referring to were Carl Clemmey, George
5     Dentino, and others who may have been involved
6     in initiation of this lawsuit.
7  Q. So you believe that somehow George Dentino was
8     involved in Kimberly Stoyle's MCAD charge
9     against you?
10 A. That's my belief.
11 Q. What do you base that belief on?
12 A. On the fact that that gentleman has spent most
13    of the last five years trying to take my
14    property right away from me and my employment
15    opportunity with the Town by doing whatever he
16    can to hurt my reputation, to try to remove me
17    from my position, and this, I believe in his
18    perception, could be a convenient way to
19    achieve that.
20 Q. So let me make sure I have this right for the
21    record. It's your testimony that you believe
22    that somehow George Dentino, Carl Clemmey, and
23    Kimberly Stoyle and some unnamed employees
24    conspired together to file a false charge of

28 (Pages 106 to 109)

Page 110

```
 1   discrimination against you to get you fired as
 2   the Light Department -- as the town manager?
 3 A. Yes.
 4 Q. To your knowledge, did Kimberly Stoyle have
 5   any kind of a personal, social, professional
 6   relationship with George Dentino?
 7 A. I know that Mr. Dentino spent a lot of time at
 8   the Electric Light Department.
 9 Q. Do you think he was there because of Kimberly
10   Stoyle?
11 A. I think he was there for information purposes.
12 Q. Do you think he was there to get Kimberly
13   Stoyle and make up a charge of discrimination
14   against you?
15 A. I believe that people are influenced by other
16   people.
17 Q. So you think Kimberly Stoyle was influenced by
18   Mr. Dentino's request for information against
19   you and that's why she filed a charge of
20   discrimination?
21 A. No, that an individual citizen who is in the
22   Light Department on a consistent, regular
23   basis with his feet upon the desk as if he
24   belonged there is of concern to me. I just
```

Page 111

```
 1   don't know --
 2 Q. What's the connection between Mr. Dentino
 3   being at the Light Department with, as you
 4   said, his feet upon the desk and Kimberly
 5   Stoyle filing a charge of discrimination
 6   against you? What's the conspiracy there?
 7 A. I think the issue is one in which if they can
 8   file these harassment charges and enough of it
 9   may or may not stick that it would be enough
10   to get me either to leave -- force me to leave
11   on my own or force the board to take action if
12   any of the allegations are true.
13 Q. Well, who other than Kimberly Stoyle at that
14   point had filed harassment charges against you
15   in Mansfield?
16 A. She was the only one.
17 Q. And what about Carl Clemmey? What did you
18   think Carl Clemmey's role in this conspiracy
19   was? Was he a mastermind or was he just a
20   small player?
21 A. Everything of an evil consequence that happens
22   in the Town of Mansfield to some measurable
23   degree happens because of Mr. Clemmey.
24 Q. Okay. So Kimberly Stoyle filed the charge of
```

Page 112

```
 1   discrimination against you, so Mr. Clemmey
 2   must be somehow responsible for that charge?
 3 A. I'm sure that he was aware of it. I'm sure
 4   that he knew it. As a matter of fact, long
 5   before this ever came out, Mr. Clemmey, who
 6   can't keep his mouth shut -- I think it was
 7   around Eastertime prior to this -- approached
 8   me. I was waiting for my mother-in-law in the
 9   parking lot or -- in the lot that he had
10   owned. He'd come up, rolled down his window,
11   and he said, "I wanted to bury the hatchet."
12   I said, "Yeah, Carl. You're not going to bury
13   it in my back." He said, "There are a lot of
14   things that are going to happen to you over
15   the next couple of months," and then he just
16   drove away.
17 Q. And you interpreted that to mean Kimberly
18   Stoyle's charge of discrimination?
19 A. That and other issues, sure.
20 Q. I see. Okay. So who else -- who are the some
21   employees that you believe are involved in
22   this big conspiracy to get you fired by
23   collaborating on a charge of discrimination
24   against you?
```

Page 113

```
 1 A. I believe that there might be some employees
 2   at the Light Department.
 3 Q. I know, but who? Who do you think was
 4   involved?
 5 A. I think Mr. D'Ambra, I think Mr. Beliveau. I
 6   think there were others.
 7 Q. So when Mr. Beliveau said he believed that you
 8   were one of the employees that you were
 9   threatening to sue in this quote where you
10   said, "If there's going to be litigation, it
11   will be litigation I initiate," he was right,
12   correct?
13 A. Yes.
14 Q. Did you suggest to Kimberly Stoyle that she
15   come up to your hotel room to check out the
16   view?
17 A. No.
18 Q. Now, you said that Mr. Clemmey approached you
19   or drove up to -- I think you said he rolled
20   down the window and you had that hatchet
21   conversation sometime in the spring --
22 A. What conversation did you say?
23 Q. About burying the hatchet.
24 A. That is a very appropriate conversation to
```

# Harassment suit names D'Agostino

## Light worker files complaint with MCAD

**By Meredith Holford**
STAFF WRITER

Town Manager John D'Agostino says the charges of sexual harassment levied on him by Electric Department employee Kimberly Stoyle may well result in legal action in court, but he predicts the tables will turn.

"If there is litigation, it will be litigation I initiate," he said in a press interview last week. "I will include some citizens as well as some employees."

D'Agostino said he was surprised, angry, and hurt by the allegations, filed by Stoyle with the Massachusetts Commission Against Discrimination. The complaint was filed by Stoyle's lawyer, Lynn Leonard on Dec. 3.

"I intend to take whatever legal action necessary to exoner-

ate my name and my family," he said. "If this isn't a setup, I don't know what is."

The charges date back to August of 1999, and include several incidents a year through November 2002.

Stoyle's complaint states that in August of 1999 at a Northeast Public Power Association conference, D'Agostino suggested that Stoyle come to his hotel room to "check out the view."

She also said that D'Agostino sent her a sexually charged audio e-mail message in 2000, that he made a derogatory comment about women in April 2002 and made comments about her appearance on several occasions during 2002.

Stoyle also stated that D'Agostino took retaliation

**HARASSMENT, page 6**



# Sex harassment suit filed

**HARASSMENT, from page 1**

against her by attempting to retract a salary increase; by reprimanding her in a way that was "contrived and retaliatory," and by falsely accusing her of failing to provide information he requested.

Stoyle is the chief financial officer of the town's municipal Light Department, a post she has held since March of 1999.

She states in her written testimony that the harassment has been ongoing and is not limited to the five harassment charges and three retaliation charges detailed in the account. She states in the complaint she intends to seek "emotional distress damages and other compensatory damages," and is filing her complaint against the Town of Mansfield Municipal Electric Plant, the town manager, and the town itself.

D'Agostino said the charges are an attempt to damage him and his family, contrived by a small group of residents who have banded together for the express purpose of driving him out of town. The filing of the com-

plaint comes at the same time selectmen are discussing the renewal of D'Agostino's contract.

"These incidents are supposed to have started in 1999 — but I was never notified by the selectmen, the Light Department, or anyone else," he said. "It's no small wonder all of this was timed to coincide with the contract renewal."

Stoyle said in her written statement she told D'Agostino she was offended by his conduct and that on "numerous occasions" reported each incident to the director of the electric plant, Jack Beliveau, who then reported the complaints to the Light Commissioners, who are the selectmen.

Monday night, Selectmen Chairman Daniel Donovan, on his way into a Light Commission meeting, said he was very disturbed by the action.

Asked for comment, Donovan said, "I think it's a fabrication."

Donovan said not one light commissioner had ever indicated he had been informed of any complaints of this nature against D'Agostino. He said he had spoken past Light Commission chairmen Lou Amoruso and Brad Wills who told Donovan they had not been informed of any harassment complaints against D'Agostino.

Donovan also noted actual contact between the two parties is limited because of the physical locations of the Town Hall on Park Row and the Light Department offices on High Street.

The selectmen have hired an independent investigator, Attorney James Lamke of Hingham, to track the allegations and interview people involved in the issue.

The town's sexual harassment policy dictates that the selectmen hold a confidential and independent investigation of such claims, D'Agostino said.

D'Agostino said he has not met Lamke, and said he thinks the objectivity of the investigator is critical to the outcome of the case. He also said that he would cooperate fully.

Donovan said the investigator had only just begun the process because of the intervening holidays, and predicted the whole process may take some time.

D'Agostino denied all of the charges, calling the them "felonious accusations perpetrated by a few individuals."

He stated his constitutional rights have been violated, and vowed to set the record straight.

Complaints filed with the MCAD result in a complex and often lengthy series of investigations and hearings, and can result in compensatory damages awarded to the complainant.

Donovan said he was saddened that even if exonerated, D'Agostino will bear the mark of the investigation, because it will likely appear on his job history wherever he goes.

When contacted, Stoyle said she declined to comment while investigation is ongoing.

*Staff writer Donna Whitehead contributed to this report*