# EXHIBIT D

to

# PLAINTIFF'S OPPOSITION TO DEFENDANTS' RENEWED MOTION TO COMPEL THE PLAINTIFF TO PRODUCE JOURNAL

108                                   KESTEN

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2                  C.A. NO. 04 11329 DPW
 3
 4    -----------------------------------
                                         )
 5    DR. JOHN J. BELIVEAU,              )
          Plaintiff,                     )
 6                                       )
                vs.                      )
 7                                       )
      TOWN OF MANSFIELD MUNICIPAL        )
 8    ELECTRIC DEPARTMENT AND            )
      JOHN D'AGOSTINO,                   )
 9        Defendants.                    )
                                         )
10    -----------------------------------
11
12          DEPOSITION OF JOHN BELIVEAU, taken on
13    behalf of the Defendant, pursuant to the applicable
14    provisions of the Massachusetts Rules of Civil
15    Procedure, before June N. Poirier, Shorthand Reporter
16    and Notary Public within and for the Commonwealth of
17    Massachusetts, at the offices of Brody, Hardoon,
18    Perkins & Kesten, One Exeter Plaza, Boston,
19    Massachusetts, commencing on Monday, March 20, 2006,
20    at 10:20 a.m.
21
22          DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
                        One State Street
23                 Boston, Massachusetts 02109
                        (617) 742-6900
24
```

0109

Page 1

KESTEN

4  A. Mr. McCarter claimed he learned about the issue
5     from the bills, that he was going through the
6     bills.
7  Q. Did he tell you anything else?
8  A. No.
9  Q. Did you not discuss with Mr. McCarter your
10    deteriorating relationship with John D'Agostino,
11    which you perceived to be your deteriorating
12    relationship with D'Agostino?
13 A. Not at all. Mr. McCarter raised the issue.
14 Q. He raised it?
15 A. Hm-hm.
16 Q. What did he say?
17 A. Mr. McCarter raised an issue about John
18    D'Agostino's relationship with Brad Wills.
19 Q. What did he say?
20 A. This is all
21    chicken-shit-kindergarten-sort-of-stuff.
22 Q. Did you discuss what he was referring to?
23 A. I think he said something about Brad Wills'
24    evaluation of John D'Agostino, that Brad had

0212

1     given John a low evaluation.
2  Q. Did the discussion contain any mention of you
3     believing or someone believing that's why John
4     was picking on you?
5  A. I don't recall that.

Page 96

KESTEN

6  Q.  Didn't you ask David McCarter as to why John was
7     out to get you?
8         MS. BALLIRO: Mr. Kesten, are you
9     looking at a document that you have not produced
10    to us?
11        MR. KESTEN: I've offered to produce
12    this to you.
13        MS. BALLIRO: When?
14        MR. KESTEN: I talked to -- I have
15    about 10,000 documents on his computer.
16        MS. BALLIRO: All right. Are you
17    looking at a document that is responsive to one
18    of our discovery requests that you have not
19    produced to us?
20        MR. KESTEN: I have 10,000 such
21    documents. I told an associate of yours, why
22    don't you guys just clone the computer hard
23    drive?
24        MS. BALLIRO: No. You asked us for

0213

1     computer documents and we spent a lot of time
2     going through every document and Bate-stamping
3     it and putting it together in a fashion that is
4     compliant with the Rules.
5         MR. KESTEN: If you want to ask me
6     for -- there has been 10,000 document requests.
7     We're trying to figure out when you asked for.
8     I told an associate is why don't you guys clone

Page 97

KESTEN

9   his computer and you can have everything on it;
10  there is about 10,000.
11          MS. BALLIRO: I thought you couldn't
12  get into his computer.
13          MR. KESTEN: We have.
14          MS. BALLIRO: Oh, okay.
15          THE WITNESS: When were you going to
16  tell us that? You said this in deposition that
17  you were unable to get into my computer.
18          MS. BALLIRO: Wait.
19          MR. KESTEN: I told her associate this
20  last week.
21          MS. BALLIRO: I see. So last week
22  while I was away on vacation?
23          MR. KESTEN: I didn't know you were
24  away on vacation.

0214

1           MS. BALLIRO: Okay. Well, I'd like a
2   copy. If that document that you're using to
3   cross-examine my client is responsive to a
4   document request I would like to have a copy of
5   it before you continue any further.
6           MR. KESTEN: It is a version of his
7   log; sure. We actually have two versions of his
8   log on his work computer.
9           MS. BALLIRO: I'd like both versions
10  if you have them here today.

Page 98

```
                                    KESTEN
11              MR. KESTEN: I'd be happy to. Off the
12      record.
13              MS. BALLIRO: On the record.
14              MS. BALLIRO: For the record, I've
15      just been handed two separate documents entitled
16      "Logs." They're not numbered or dated. They're
17      not the same. I haven't had a chance to flip
18      through them and I'm not going to mark them
19      because they may be a portion or otherwise
20      somehow related to the log or the journal that
21      Mr. Beliveau was keeping for purposes of
22      communicating with his counsel.
23              I would note for the record that
24      Mr. Kesten has represented in the past that he

0215

 1      was unable to retrieve any information from
 2      Mr. Beliveau's computer in that the defendants
 3      have been in possession of Mr. Beliveau's work
 4      computer since he left the light department. In
 5      fact, the computer was actually placed in the
 6      custody of the police department at the
 7      defendants' request shortly upon Mr. Beliveau's
 8      leaving or shortly thereafter. It wasn't until,
 9      apparently, last week that Mr. Kesten revealed
10      to my associate that they now do have the
11      contents of Mr. Beliveau's computer, the
12      responses to the document request that was
13      served on them are long overdue. The documents
                              Page 99
```

KESTEN

14  have not been produced in any fashion, that's --
15  they haven't been produced at all and they
16  certainly haven't been produced consistent with
17  the Rules. That it appears just from documents
18  that Mr. Kesten has laid out on his table that
19  he has other documents that my client marked
20  "attorney/client privilege" that may have been
21  retrieved from his work computer. And rather
22  than suspend this area of the questioning, what
23  I'm going to suggest as an interim resolution is
24  that Mr. Beliveau continue to answer questions

0216

1   as long as he's not asked what he wrote in his
2   log. Subject to a claim of privilege,
3   attorney/client privilege, as to all questions
4   related to this log or related to any other
5   attorney/client-privilege materials that
6   Mr. Kesten may have in his possession or
7   potentially attorney/client privilege material
8   and that then the parties can at a later point,
9   either side, bring a motion before the court to
10  determine whether or to what extent you'd
11  actually be able to use any of the information
12  that you have in your possession that you
13  haven't turned over to us in a timely manner and
14  that may otherwise be privileged.
15           MR. KESTEN: Now could I say

Page 100

                              KESTEN
16    something?
17            MS. BALLIRO:  Sure.
18            MR. KESTEN:  For example, what you're
19    looking at upside down is a document that you
20    produced to me.  There is nothing I have here
21    other than this that isn't Bate-stamped from
22    you; it's all in the archives.  As to the log,
23    we found it was in his work computer because you
24    produced to us emails on a disk labeled

0217

1     "Emails."  And on November 20th email there is a
2     disc labeled "Emails" and on your disk is
3     labeled "Attachments."  And there is a
4     November 20th, 2002, email from Jack Beliveau in
5     his work email to Jack Beliveau I-triple-E, the
6     attachment and the log.  And I looked at the
7     list of attachments that had been removed.
8     Every other attachment was there except that
9     one.  There was no listing that this was
10    removed.  We then went back and looked at his
11    computer and found it, that the attachment was
12    mailed from his work and when we searched the
13    computer -- I hired a new expert school vacation
14    week who delivered the hard drive to him and
15    looked to see and asked him to see if there are
16    any other iterations of this document that was
17    created on his computer and the best as we can
18    ascertain there was.  The one you're looking at

KESTEN

19    is created quite a bit earlier. I don't know --
20    it is not finished -- as to when it was first
21    created on his computer. Everything we found so
22    far on his computer, other than his log, you
23    also produced back to us, including stuff which
24    is attorney/client communications. This is his,

0218

1    for example. You guys went through it and this
2    was -- if it's on his work computer, it ain't.
3            MS. BALLIRO: That's your argument.
4    And if, in fact -- as I said, I haven't compared
5    this to the log. If this is in fact a portion
6    of or version of the log then our position is
7    going to be that this is a case of inadvertent,
8    likely case of inadvertent disclosure. I don't
9    know what position I'm going to take; I haven't
10   had a chance to read it.
11           However, the issue is there has been a
12   discovery request outstanding for quite some
13   time. You just indicated to me that during
14   school vacation week, which was President Day's
15   week in February, you hired an expert, you knew
16   you had the contents of his drive in your
17   possession. The fact that you didn't have an
18   expert go through it is not my responsibility.
19   But when your expert came up with these logs,
20   which you had to have assumed were logs that

KESTEN

21  were somehow related to the logs the court
22  already ruled you couldn't have, you didn't
23  disclose that to us; you didn't provide us with
24  copies of it, and you've been using it to

0219

1   question the witness at the deposition without
2   such disclosing. I consider that to be
3   problematic. What I'm saying is in the interest
4   of moving our case forward, our discovery
5   deadline expires next week, I'm proposing that
6   we go ahead but that we do so without waiver of
7   Mr. Beliveau's right to claim at a later date
8   that these are privileged materials, to raise
9   questions and issues regarding your access to
10  these materials and your failure to disclose
11  these materials.
12          So it may all turn out to be for
13  naught. I may after reviewing it and reviewing
14  the deposition have no problem with it
15  whatsoever.
16          I'm suggesting we go forward and I
17  want to know if you're agreeable to that. If
18  you're not, then I'm going to at this point
19  instruct the witness not to respond to any
20  questions that appear to be derived from these
21  materials until we can take a closer look at it.
22          MR. KESTEN: Mr. Balliro, it's
23  impossible to ask questions that may appear

Page 103

KESTEN

24    since the log contains incidents of which we all

0220

1     know about anyway so we can't separate them.
2     You're free to do whatever you like. I agree
3     you're not waiving it. I agree you're not
4     waiving your objections you have to the log.
5             MS. BALLIRO: What I'm specifically
6     addressing is waiver of the attorney/client
7     privilege by virtue of his answering your
8     questions. Okay?
9             MR. KESTEN: Yes.
10            MS. BALLIRO: In other words, I don't
11    want you to come in and say, well, Judge, if
12    they were going to raise the privilege they had
13    to do it before he answered the questions. The
14    fact that he answered the questions constitutes
15    a waiver of the privilege.
16            MR. KESTEN: I agree. There is no
17    implied or other waiver.
18            MS. BALLIRO: And as to these, what
19    you've represented appear to be different
20    documents that came with different dates, I
21    notice there are no footers or headers on the
22    copies you've given me so I'd like the
23    information that goes with them.
24            MR. KESTEN: I can tell you that the

KESTEN

0221

```
 1    one that begins with "The NEPPA conference,"
 2    that version --
 3            MS. BALLIRO:  August 1999?
 4            MR. KESTEN:  -- I represent to you my
 5    best memory is that is the exact attachment
 6    which, if you look at your email disk --
 7            MS. BALLIRO:  -- the November 20th
 8    email.
 9            MR. KESTEN:  -- where he sends it from
10    work to the I-triple-E address, that is the
11    attachment.
12            MS. BALLIRO:  We didn't give you the
13    attachment because --
14            MR. KESTEN:  One may say it was never
15    identified that anything was being withheld from
16    a work email. So that's possible that somebody
17    knew that, that this was the log.
18            MS. BALLIRO:  So what's --
19            MR. KESTEN:  The other one I will
20    represent to you -- I don't know yet -- that
21    upon discovery the expert did not do any work on
22    President's Day, that's when I was looking at
23    emails and noted it. I was at my mother's condo
24    and I noted it, the log; I wondered if it's the
```

0222

KESTEN

1   log.  The other one, my expert has indicated to
2   me when I asked him to see if there were any
3   other iterations on the log of the hard drive he
4   came up with that one.
5           MS. BALLIRO:  What's the date?
6           MR. KESTEN:  I don't know yet.  You
7   can see it ends in February; the other one ends
8   in November.
9           MS. BALLIRO:  I really don't think
10  there is any excuse that you can put forth and
11  certainly none that you have put forth that
12  would explain why you haven't produced copies of
13  documents that you're using at the deposition
14  when your production is overdue and you knew
15  this document was a point of contention where
16  you're using it to question the witness, so...
17          MR. KESTEN:  Can I tell you, you have
18  the document, I don't.  In terms of producing,
19  it's simply letting him know he left it on his
20  work computer.  You have these documents; he has
21  these documents.  These are not documents we
22  created or hid from you; these are documents
23  that he has.
24          MS. BALLIRO:  You don't know that and

0223

1   neither do I because I just got them.
                    Page 106

KESTEN

2  MR. KESTEN: Well, I was comfortable
3  in seeing that he had emailed this particular
4  document about a week before it came to a final
5  lawsuit from his work to his home, so he had it.
6  MS. BALLIRO: Well, it may exist on
7  his work computer today but it may not have
8  existed on his home computer and that means --
9  MR. KESTEN: It came from the disks --
10 the disks came from -- it was an email
11 attachment to the home.
12 MS. BALLIRO: Yes.
13 MR. KESTEN: The document produced to
14 court was the log.
15 MS. BALLIRO: Well, you don't know if
16 the document we produced to the court is either
17 one of these.
18 MR. KESTEN: I don't.
19 MS. BALLIRO: That's what I'm saying.
20 I haven't had a chance to compare them. I don't
21 know if it's an attachment or not that's on his
22 home computer; we know the attachment was on his
23 work computer so you're saying, that one of
24 these corresponds to the attachment. we don't

0224

1  know if it remained on his home computer or if
2  it was deleted; we just don't know before this
3  whole thing started or how many versions.
4  MR. KESTEN: That's the interesting
Page 107

KESTEN

```
 5       question is how many different versions of
 6       events exist on these various logs.
 7              MS. BALLIRO:  The point today is that
 8       I'd like to proceed without a claim of waiver of
 9       the attorney/client privilege.
10              MR. KESTEN:  Done.
11   Q.  (By Mr. Kesten)  When did you first learn about
12       the NEPPA conference in '99; the '99 incident?
13   A.  I don't know the exact time.  It might have been
14       after Kim filed her lawsuit or before.
15   Q.  You see the version, it's marked --
16              MR. KESTEN:  I think we should mark
17       them.
18              MS. BALLIRO:  No.  No, I disagree.
19       well, have you shared these with your client?
20              MR. KESTEN:  No.
21              MS. BALLIRO:  Okay.  So I would agree
22       to marking them as long as we agree that the
23       testimony concerning them will not be revealed
24       to your client and the documents will not be
```

0225

```
 1       revealed to your clients, and I notice
 2       Mr. Mangiaratti is not here to agree with the
 3       Town.
 4              MR. KESTEN:  It's a habit so far for
 5       the very reason -- the testimony as to when this
 6       log was created.  I believe he did do it at work
```

Page 108

KESTEN

7   and that he emailed it to his house and tried to
8   re-create it knowing the work stuff is not
9   privilege.
10              MS. BALLIRO:  I understand your
11  argument.
12              MR. KESTEN:  I understand he got
13  advice from Town counsel to keep a log.
14              MS. BALLIRO:  Okay; that's fine and
15  good.  I don't want to debate the issue right
16  now.  All I'm trying to find procedural --
17              MR. KESTEN:  I think they should be
18  marked just so we know what we're talking about.
19              MS. BALLIRO:  I think they should be
20  marked but stamped "For Counsel's Eyes Only."
21              MR. KESTEN:  We don't have that stamp.
22              MS. BALLIRO:  Then mark them as the
23  next two exhibits.
24              MR. KESTEN:  This one being the next

0226

1   one and this one being the second one.
2               MS. BALLIRO:  The NEPPA conference
3   first?
4               MR. KESTEN:  No; NEPPA conference
5   later.
6               MS. BALLIRO:  We're going to take
7   Exhibits 24 and 25 and mark them "For Counsels'
8   Eyes Only."  (Attorney Balliro writes.)  We're
9   stipulating and agree that any questions that
                        Page 109

KESTEN

```
10      Mr. Beliveau would respond to taken from
11      Exhibits 24 and 25 would not constitute a waiver
12      of his privilege and both parties reserve the
13      right to argue the issue at a later date.
14              MR. KESTEN: Yes, I agree.
15              (Whereupon the Stenographer marked as
16      Exhibit No. 24 - For Counsels' Eyes Only NEPPA.)
17              (Whereupon the Stenographer marked as
18      Exhibit No. 25 - For Counsel's Eyes Only Document).
19   Q. (By Mr. Kesten) Now, Mr. Beliveau, which one is
20      the NEPPA conference one?
21              MS. BALLIRO: 25.
22   A. 24.
23   Q. (By Mr. Kesten) Is it possible or do you recall
24      that Kim told you about the NEPPA conference of
```

0227

```
1       '99 prior to her filing at the MCD?
2    A. If it was prior it would have been a month prior
3       or two month's prior.
4    Q. Do you have multiple versions of your log
5       somewhere?
6    A. No.
7    Q. So you would erase each time you changed it?
8    A. Yes.
9    Q. Why would you go back and change past events?
10   A. It was intended to be a document to discuss with
11      my attorney and I was best trying to put things
```

Page 110