**U.S. Department of Labor**    **Office of Administrative Law Judges**
**800 K Street, NW, Suite 400-N**
**Washington, DC  20001-8002**



**(202) 693-7500**
**(202) 693-7365 (FAX)**

Dated:   June 29, 2000

Case Nos.:  97-SDW-1
            97-SDW-4

In the Matter of

JOHN J. BELIVEAU JR.
        Complainant

        v.

NAVAL UNDERSEA WARFARE CENTER
        Respondent


For the Complainant:

        Sarah L. Levitt, Esq.
        Richard E. Condit, Esq.
            Washington, DC

For the Respondent:

        Andrea Heffernan Brisbin, Esq.
        Anthony R. Crouse, Esq.
            Washington, DC

        Neaclesa P. Anderson, Esq.
            Arlington, VA

        Beth A. Carlson, Esq.
        Christopher J. Biglin, Esq.
            Newport, RI

2

Before: JEFFREY TURECK
     Administrative Law Judge

## RECOMMENDED DECISION AND ORDER[1]

## I. Background

### a. Procedural History

This is a case arising under the employee protection provisions of the Clean Air Act, 42 U.S.C. 7622 ("CAA"); the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. 9610 ("CERCLA"); the Safe Drinking Water Act, 42 U.S.C. 300j-9(i)) ("SDWA"); and the Water Pollution Control Act, which is also known as the Resource Conservation and Recovery Act, 33 U.S.C. 1367 ("WPCA" or "RCRA").[2] Complainant John J. Beliveau, Jr. initially filed a complaint against the respondent Naval Undersea Warfare Center Division Newport ("NUWC")[3] on February 15, 1995. That complaint was resolved by a consent agreement entered into between the parties on June 15, 1995, and therefore any acts of discrimination occurring prior to June 15, 1995 are not part of this proceeding. Nevertheless, that complaint and settlement agreement have a bearing on this proceeding, and will be discussed in detail later on in this decision.[4]

---

[1]Citations to the record of this proceeding will be abbreviated as follows: CX – Complainant's exhibit; RX – Respondent's exhibit; ALJX – Administrative Law Judge's exhibit; TR – Hearing Transcript. The hearing transcript includes the April 14, 1998 post-hearing conference, but not the May 2, 1997 pre-hearing conference.

[2]Complainant dropped any claim under the Toxic Substances Control Act, 15 U.S.C. 2622. *See Order* dated May 13, 1997.

[3]There is also a Naval Undersea Warfare Center Division Keyport (Washington State). In this decision, "NUWC" will be used to designate only the Naval Undersea Warfare Center Division Newport. The acronym "NUWC" is sometimes erroneously transcribed as "Newark" in the transcript of this proceeding, particularly in the post-hearing conference held on April 14, 1998.

[4]Complainant moved to reopen the February 15, 1995 complaint and void the settlement agreement. That motion ultimately was assigned a docket number, 97-SDW-6, and was assigned to me for disposition. I recommended that the motion be dismissed on jurisdictional grounds, and that decision was affirmed by the Administrative Review Board. However, the U.S. Court of Appeals for the First Circuit reversed, and ordered the Secretary to review the 1995 settlement agreement to determine if it should be approved. *See Beliveau v. U.S. Department of Labor*, 170 F.3d 83 (1st Cir. Mar. 10, 1999). On June 30, 1999, the ARB issued an order remanding 97-SDW-6 to me for that purpose. In its remand order, the ARB pointed out that the settlement

3

Complainant filed the first of the complaints that would be consolidated into this proceeding on October 10, 1996. He filed supplemental complaints on February 28, 1997, March 17, 1997, March 31, 1997, April 2, 1997 and August 22, 1997. He also filed *Complainant's Clarification of Relief Requested* on August 20, 1997. Respondent contests all of the substantive allegations in each complaint. An on-the-record pre-hearing conference was held on May 2, 1997.[5] After a lengthy and contentious period of trial preparation, a formal hearing was held in Providence, Rhode Island from October 20 to 29, 1997. The record was closed at the conclusion of the hearing,[6] and the parties filed their post-hearing briefs in early February, 1998.

Unfortunately, the case history does not end there. On January 27, 1998, complainant filed a motion to reopen the record, alleging that it had just come to his attention, through a meeting with agents from the FBI and EPA, that respondent failed to turn over documents which had been sought through discovery. These documents related to respondent's dealings with complainant's former counsel, Thomas McAndrew. On January 28, 1998 I held a conference call with the parties to address complainant's motion, and I ordered respondent's counsel to file a report regarding these documents. In a letter from respondent's then-lead counsel, Andrea Heffernan Brisbin,[7] dated January 30, 1998, it was admitted that at least some copies of bills from complainant's previous attorney, McAndrew, were not turned over during discovery. One of these bills noted that Ms. Brisbin met with McAndrew on April 24, 1997. In response to these admissions from respondent, complainant filed his *Second Motion for Post-Trial Relief* in which he requested additional discovery, that respondent pay his attorney's fees associated with such discovery, a default judgment against respondent for withholding evidence, and other relief. Respondent filed a lengthy response to this motion consisting of 44 pages of text and hundreds of pages of attachments. At the same time, respondent filed a two-volume pleading entitled *Respondent's in camera Submission and Partial Response in Opposition to Complainant's Second Motion for Post-Trial Relief.* This pleading consisted of individual affidavits from Ms. Brisbin, Neaclesa Anderson, Christopher Biglin, and Beth Ann Carlson, all of whom were

---

agreement is binding on the parties until it is approved or disapproved by the Secretary.

[5]At the time the pre-hearing conference was held, the subject matter appeared to be confidential. Accordingly, the hearing was closed to the public, *see* 29 C.F.R. §18.43(a), and the transcript was sealed. However, at the hearing, the parties no longer maintained that the hearing should be closed (*see* TR at 5-6), and there is no longer any reason to seal the transcript of the May 2, 1997 pre-hearing conference.

[6]The record was reopened briefly for the receipt of CX 129, the respondent's response to complainant's workers' compensation claim, which was not turned over to complainant by the respondent until December, 1997. This document was admitted into evidence at a conference call on January 28, 1998.

[7]For the sake of consistency, complainant's former lead counsel will be referred to throughout this decision by her current last name, Brisbin.

4

respondent's counsel at the time; Kelly Klimkiewicz, an attorney at the Naval Sea Systems Command ("Navsea" or "NAVSSC"); and Ann Gallagher, an investigative specialist for Navsea who put together the documents submitted to the FBI by Navsea in connection with the FBI's investigation of "the Beliveau matter."

On April 14, 1998, I conducted an on-the-record conference with the parties to consider complainant's motions to reopen the record. At that conference, respondent informed me that Mr. Biglin was no longer assigned to this case, and was being replaced by Anthony Crouse (TR 1986). During the conference, it became clear that respondent had failed to turn over several documents which complainant had sought through discovery, and I ordered respondent to turn these documents over to the complainant. I also ordered the respondent to turn over the affidavits that had been submitted to me *in camera*. In addition, at that conference complainant produced documents he obtained from the Department of Labor under the Freedom of Information Act. These documents included an August 7, 1997 cover memo from Carole James of NUWC to the Department of Labor's Office of Workers' Compensation Programs[8] forwarding complainant's claim for compensation for work-related stress; a report from complainant's psychiatrist, Dr. Zimmerman; and respondent's comments regarding the compensation claim. I have marked these documents jointly as Complainant's Exhibit 131. Then, late in the afternoon on May 7, 1998, Ms. Brisbin filed a *Notice of Withdrawal* as counsel for NUWC, stating in a cover letter that she was resigning from the Navy Litigation Office the next day. She further stated that Mr. Crouse was taking over as lead trial counsel. During a conference call I held with the parties on May 14, 1998, Mr. Crouse stated that he had known of Ms. Brisbin's plans for a week and a half; Ms. Anderson admitted knowing Ms. Brisban was leaving since April 14. Yet no notice was provided either to the court or opposing counsel until the afternoon before she left the Navy's employ. This late notice of Ms. Brisbin's withdrawal creates the impression that NUWC was attempting to shield Ms. Brisbin from testifying in this case.[9]

Subsequently, in accordance with my order at the post-hearing conference, complainant filed his recommended post-hearing procedures. Essentially, complainant argued that he was entitled to a default judgment on the entire case due to respondent's failure to turn over evidence

---

[8] The Department of Labor's Office of Workers' Compensation Programs administers the Federal Employees Compensation Act, among other things.

[9] On May 8, 1998, complainant moved for me to deny Ms. Brisbin permission to withdraw as counsel. Although agreeing that Ms. Brisbin's withdrawal as counsel was appropriate, complainant nevertheless requested that I deny her permission to withdraw as a means of retaining control over Ms. Brisbin's availability as a witness in this case (in light of the Department's lack of subpoena power in environmental whistleblower cases). That motion is denied, since it is clear Ms. Brisbin had to withdraw as counsel at that time. First, Ms. Brisbin had become an essential fact witness in this case, making it impossible for her to remain as counsel. Second, as she had left the employ of the Navy, I could see no justification for ordering the Navy to retain her as counsel.

5

during discovery. Respondent, of course, opposed this action. Various motions, letters and responses to these motions and letters were filed through the end of May, 1998. At that time, I began reviewing the record to determine whether a default judgment against respondent was appropriate, something which is far more difficult and time-consuming than simply drafting a decision on the merits, and/or whether to again reopen the record. On July 1, 1998, I received a letter from complainant's counsel informing me that another of respondent's attorneys, Beth Carlson, had left the Navy's employ, and that Capt. Logue, the Commanding Officer of NUWC and a key witness in this case, was scheduled to retire from the Navy in August. All of these resignations, retirements and reassignments were of great concern to the complainant. For the Department of Labor has no subpoena power in environmental whistleblower cases and thus former employees of the Navy, unless somehow still within the Navy's control, are probably beyond my authority to compel to testify if the record were to be reopened.

Another twist occurred when, on November 10, 1998, the Special Agent in Charge of the Environmental Protection Agency's Criminal Investigation Division in Boston, Michael Hubbard, wrote to inform me that part of the testimony one of his Special Agents, John Gauthier, provided at the hearing was incorrect because an EPA attorney upon whose information Gauthier relied lied to him. According to Hubbard, Gauthier's testimony was directly influenced by the lies the attorney told him, and if Gauthier knew the truth "his appearance as a witness for the Complainant would not have been sought." Letter from Michael E. Hubbard to Judge Jeffrey Tureck dated November 10, 1998. According to Hubbard's letter, four memoranda of interviews EPA conducted with the complainant (CX 94) were in the possession of respondent's counsel as early as May, 1997 but were neither acknowledged by respondent in its responses to complainant's discovery nor turned over to complainant's counsel until the first day of the hearing despite the fact that they were clearly responsive to complainant's discovery filed months earlier. Moreover, based on Hubbard's letter, respondent's counsel lied to Gauthier about how they obtained CX 94, and permitted Gauthier to testify incorrectly about this matter at the hearing. Needless to say, Hubbard's letter added fuel to complainant's contention that sanctions against NUWC are appropriate.

Following my receipt of Hubbard's letter and complainant's response to that letter, I held a conference call with the parties on November 23, 1998. At that conference, I encouraged the parties to attempt to settle this case. I added that if a settlement was not reached, then Hubbard's letter would be admitted into evidence. The parties agreed to attempt to settle the case. To that end, NUWC even appointed another attorney, Anne M. Brennan, an associate counsel with Navsea, to handle the negotiations. When counsel were unable to reach a settlement, Ms. Brennan requested the appointment of a mediator. With the parties' consent, on February 1, 1999 a settlement judge was appointed pursuant to 29 C.F.R. §18.9(e). The parties met with the settlement judge in Pittsburgh, Pennsylvania on February 5, 1999, and on February 8 the settlement judge reported that a settlement could not be reached. Since no settlement was reached, and no objections were made to admitting Special Agent Hubbard's letter into evidence, it is admitted as Administrative Law Judge's Exhibit 1.

6

Then came a dispute concerning complainant's proffer of a grand jury subpoena served on the Navy in regard to complainant's relationship with respondent and documents related to this case, including documents relating to complainant's former attorney, McAndrew. I have marked this document as Complainant's Exhibit 130. While conceding that "[i]t is well known for more than a year that the Environmental Protection Agency (EPA) and the Federal Bureau of Investigation (FBI) are conducting an investigation ... [of NUWC]" (Letter to Judge Jeffrey Tureck from Anthony Crouse dated April 21, 1999), respondent objected to the admission of the subpoena into evidence on the ground that the subpoena adds nothing to the record before me. I sustained the objection and excluded the subpoena from the record in an *Order* dated May 11, 1999.

Finally, on June 2, 2000, respondent filed a motion requesting that I recuse myself from both this case and 1997-SDW-6, contending that I have "issued inconsistent rulings and rulings that conflict with the applicable substantial law." *Respondent's Motion to Recuse Presiding Administrative Law Judge* at 1. This motion was filed at an unusual stage of this proceeding -- 2 ½ years after the hearing and at a point when my decision was imminent (I had previously informed the parties that I expected I would issue my decision by the end of June). Further, respondent does not allege any prejudice or other appropriate basis for recusal; it merely disagrees with several of the innumerable rulings I have issued in both this case and 1997-SDW-6. The proper remedy for respondent's contentions of error is to appeal those rulings after the issuance of this decision, not through recusal of the presiding judge less than a month prior to the issuance of the decision in this extraordinary complex and protracted case. Accordingly, the motion for recusal is denied.

Subsequent to the hearing, numerous documents were produced by the respondent which were responsive to complainant's discovery and should have been produced in response to that discovery. Respondent also produced numerous documents relevant to its compliance with complainant's discovery, including affidavits or sworn statements from counsel and others, excerpts from depositions, and correspondence. These documents are contained primarily in *Respondent's Answer in Opposition to Complainant's Second Motion for Post-Trial Relief* (*"Respondent's Answer"*) and *Respondent's in camera Submission and Partial Response in Opposition to Complainant's Second Motion for Post-Trial Relief* ("*Respondent's in camera Submission*"). I have marked these submissions as ALJX 2 and 3, respectively. Other documents falling into these categories are another version of the April 24, 1997 bill from Thomas McAndrew (the so-called "lost bill"), which was filed on May 5, 1998, together with the cover letter by Ms. Brisbin (ALJX 4); the *Affidavit of Andrea Heffernan Brisbin* dated April 17, 1998 (ALJX 5); a letter from Andrea Heffernan Brisbin to Honorable Jeffrey Tureck dated April 23, 1998 (ALJX 6); *Respondent's Report in Response to Complainant's Motion to Reopen the Record* dated January 30, 1998 (ALJX 7); letters from Andrea Heffernan to Sarah L. Levitt, Esq. dated September 22 and September 25, 1997 faxed to this Office on September 25, 1997 by Ms. Brisbin (ALJX 8); *Respondent's Reply and Limited Motion Joining in Complainant's Request to Reopen the Record to Take Post-Hearing Testimony at the Navy's Expense* dated May 18, 1998 (ALJX 9); and *Respondent's Combined Supporting Memorandum and Opposition to*

*Complainant's Motion to Compel, Renewed Motion to Compel, Motion for Discovery Orders and Motion for Sanctions* (ALJX 10). These documents are admitted into evidence as Administrative Law Judge Exhibits solely in regard to the issue of respondent's non-compliance with complainant's discovery. I also admit into evidence, for the same limited purpose, CX 131, complainant's claim for workers' compensation and related documents. Finally, since respondent's non-compliance with complainant's discovery is so overriding an issue in this case, it makes sense to include complainant's discovery in the record. Accordingly, I have marked and admit into evidence: *Complaint's [sic] First Request for Production of Documents* (ALJX 11); *Complaint's [sic] First Set of Interrogatories* (ALJX 12); *Complainant's Second Request for Production of Documents* (ALJX 13); *Complainant's [Second] Interrogatories* and *Complainant's [Third] Request for Production of Documents,* both dated *May 8, 1997* (ALJX 14); *Notice of [May 14, 1997] Deposition* and *Schedule of Documents* (ALJX 15); *Notice of [June 19, 1997] Deposition* and *Schedule of Documents* (ALJX 16); and *Notice of Deposition for the Custodian(s) of Records for the U.S. Navy Concerning Matters Involving the Naval Undersea Warfare Center* and *Schedule of Documents* (ALJX 17).

   b.  *Complainant's work for NUWC*

        The complainant, John J. Beliveau, Jr., is 52 years old. He graduated from the University of Rhode Island with a Bachelor of Science degree in Electrical Engineering in 1970, and received an M.B.A. degree in Management from Bryant College in Rhode Island in about 1975. He started working for the Navy in a civilian capacity in 1977, when he went to work as an electrical engineer for the Naval Education and Training Center ("NETC") in Newport, Rhode Island. Eventually, he became the supervisor of both mechanical and electrical engineering at NETC. He left NETC in March 1994 to become the first environmental manager at NUWC. His title in that position was "Supervisory Environmental Engineer" which was further identified as "Head, Environmental Staff" (RX 1). The position was in the Facilities Department. Complainant's immediate supervisor at NUWC was Lt. Cmdr. Brad Beisswanger, who was the head of the Facilities Department. It was Beisswanger and his deputy who interviewed the highest rated applicants for the position of environmental manager and recommended that the complainant be hired to fill it (TR 816-17).

        NUWC is the organization within the United States Navy which is responsible for the research and development – but not manufacture – of weapons used by our submarines and against enemy submarines, including torpedoes, sonar equipment and periscopes (TR 422-23). NUWC has facilities in five states -- Rhode Island, Connecticut, New York, Virginia and Florida -- as well as the Bahamas (*e.g.,* TR 575). NUWC is situated on the Newport (Rhode Island) Naval Complex along with NETC. NETC and NUWC are separate entities.

        In the fall of 1993, Navsea, which is NUWC's parent organization, conducted an Environmental Compliance Evaluation ("ECE") of NUWC's operations. According to Beisswanger, this evaluation turned up "a whole host of findings [deficiencies], somewhere in the

8

neighborhood of 100, 150 ...." (TR 813)[10] The ECE recommended that NUWC hire an environmental manager; ergo, a position was created and complainant was hired to fill it.

When complainant began working for NUWC, the environmental group was part of the Facilities Department, which was responsible for the care of the physical plant of NUWC (TR 809-10). As the environmental manager for NUWC, complainant was responsible for maintaining compliance with environmental laws for all of NUWC (TR 820-21). When he began, he had a staff of eight, and a budget of between $700,000 and $800,000 (TR 573). His priorities at that time were to address the points raised in the ECE and to organize and develop the environmental program at NUWC (TR 575, 825-26).

Complainant had problems with the position from the beginning. On April 18, 1994, only a month and a half after he started, he wrote a memo to Beisswanger[11] discussing his frustrations with the position. At that time, complainant was already worried about his personal liability, and noted that "I suspect that there are those that would like to sabotage my position as quickly as possible." (RX 2, at 1) In this memo, he complained about his organizational status, the budget, and space allocations, and added that he "is struggling with office furniture, new personnel, training, and a lack of computers. It's a bit overwhelming ...." (*Id.* at 2) Things had not gotten any better by May 15, when complainant wrote another memo to Beisswanger. If anything, complainant's problems were mushrooming. He stated that

> I'm finding myself terribly bogged down with budget reports, BRAC [Base Realignment and Closure], time cards, ECE status reports, Quarterly reports, weekly reports, computer justifications, five year plans, ISSA's, etc.... What I am not doing a good job [at] is contracting work out, personnel matters ..., training plans, POC mtgs, POC training, PMR's five year plans and motivating non-producers. Most importantly, I am not having luck establishing good management systems to make work flow more smoothly and logically.

(RX 4, at 1). He went on to complain that his staff is overworked, and admitted that they are not making good progress in remedying the deficiencies raised in the ECE (*id.*) Complainant then stated:

> I'm afraid of two scenarios. The first is that we do not pursue compliance in several program areas and we don't tell anyone. When the ax falls, it will be my fault. The

---

[10]Complainant testified that 293 deficiencies were identified in the ECE (TR 575). However, in a May 23, 1994 memo, complainant stated there were 171 findings of deficiency. RX 5, at 1. Regardless of the exact number, it is undisputed that many deficiencies were identified in the ECE.

[11]In NUWC parlance, complainant was identified as "Code 52E"; Beisswanger was "Code 52".

9

second is that we tell someone about the problems and they cloud the situation by moving
things around with musical chair responsibility until the ax falls and then they point the
finger back at me.

(*Id.* at 2) Then in a memo dated May 23, 1994 in which the complainant discusses the difficulties
in achieving even minimal compliance with the environmental laws, he again discusses his fear of
criminal prosecution and liability to civil suit if NUWC failed to comply with environmental laws
(RX 5, at 1-2).

Things came to a head on August 29, 1994, when complainant wrote another memo to
Beisswanger in which he stated he is "totally demoralized and ready to throw in the towel,"
adding that he is seeking to go back to NETC (RX 7, at 1). The memo is very critical of NUWC's
management, noting that his office is understaffed, under-budgeted and under-supplied.
Complainant also stated he was very unhappy with his performance evaluation in June, 1994,
where he was rated a  Level 4 – Exceeds Fully Successful, the second highest rating, just below
outstanding (CX 1a; RX 7, at 2).[12]  In a telling paragraph, complainant states:

We are going down the tubes quite quickly now.  I have tried to identify these
problems in a timely manner.  I suspect that there will be much agony as we miss
one deadline after another.

(RX 7, at 2) After indicating that he is afraid he will be made a scapegoat, he concluded by
saying: "The bottom line is that the job is becoming all but impossible." (*Id.* at 4) In an August 31,
1994 memo to David McQueeney, the Deputy Director of NUWC and Beisswanger's supervisor
(TR 403-04),  complainant again pointed out how he has not been able to "get the job done" and
expressed concerns of "legal jeopardy" (CX 107, at 1).

These memos are very revealing.  Although many of the issues complainant raised were
sound, and merited serious attention by his superiors, it is clear that he was overwhelmed and
completely demoralized by the situation in which he found himself.  These memos show that
complainant constantly perceived himself to be under great, perhaps insurmountable, pressure and
realized he was not getting the job done. Moreover, from the very beginning he believed he was
going to be made to take the blame for any shortcomings in NUWC's environmental management,
putting him in jeopardy of criminal prosecution and civil liability.

Beisswanger testified that he believed complainant was doing a good job in his first few
months at NUWC, which is why he gave him a good performance evaluation in June, but soon
thereafter things changed (TR 842). Complainant had trouble resolving minor day-to-day
problems that a manager should have been able to take care of, and he had trouble getting along
with other people (TR 842-43, 849-50). Beisswanger tried to let the complainant know that
everyone at NUWC believed that they had more to do than was possible for them to get done,

---

[12]Beisswanger believed this was a very good rating. *See* TR 841-42.

10

that no one had enough money or resources, but to do his best under the circumstances (TR 843). Nevertheless, Beisswanger believed things were not going well. He testified that complainant, rather than correcting the deficiencies reported by the ECE, kept finding more problems, so that rather than getting things done the list of things to remedy kept growing (TR 844). A related problem was complainant's inability to prioritize the tasks which had to be addressed (TR 845-46). Beisswanger also testified that he tried to reassure the complainant that there was no reason to be concerned about his personal liability for any environmental deficiencies at NUWC (TR 870).

On September 30, 1994, a joint memo from the Base Commander (Capt. Logue) and Executive Director (J.E. Sirmalis) announced that Jim Vickers had been appointed the Division Environmental Manager "and point of contact on all matters dealing with our environmental compliance posture." (CX 118) Although Vickers' exact role was not well-defined, it appears he had supervisory authority over both the complainant and Beisswanger (TR 875-78). Beisswanger's initial reaction to Vickers' appointment was that it was a criticism of his performance, but he came to realize that Vickers could provide expertise regarding NUWC's product lines (TR 877-78). Beisswanger stated that complainant's initial reaction to Vickers' appointment likewise was negative, but complainant's impression never changed. Rather, he continued to see Vickers as a detriment (TR 878). The stated purpose of Vickers' appointment to this newly created position was that NUWC was not making sufficient progress in its environmental compliance, and there was a "need to further increase our management attention and resources applied to this vital area." The memo concluded by stating that Vickers would have two immediate priorities. First, to prepare for the EPA inspection (the Environmental Management Review - "EMR") to be conducted on October 24. Second, to "[p]repare an aggressive overall Division Plan of Action and Milestones ["POAM"] to come into full compliance with all environmental laws and regulations as soon as practicable." Preparing the POAM had been one of complainant's primary responsibilities, but according to the Base Commander, Capt. Logue, complainant had not been able to come up with a satisfactory plan (TR 412, 416-17). Significantly, there is no contention that the complainant had engaged in any protected activities outside the scope of his normal job duties prior to Vickers' appointment as the Division Environmental Manager.

It is apparent that Vickers believed complainant was not doing a good job. In a very revealing e-mail memo to McQueeney dated November 16, 1994 (CX 78), Vickers states that he has had a chance to catch up on all of complainant's previous correspondence and noted his consistent request for additional staffing. He goes on to state:

I recommend that we should give him the opportunity to sink or swim and propose the following:

a. Assign detailed product line personnel to him to build his staff to the level he requested. Let him use the staff to document and implement the plan he has in his head. I think the documentation trail he has established warrants these assignments even though I question

his ability to utilize them properly [*sic*]. If he continues in the current mode with little change in performance, we would than [*sic*] have info we need to take appropriate administrative action.

Although complainant had gone to EPA by the time this memo was written (*see* below), there is no indication that Vickers or anyone else at NUWC was aware of that contact at this time.

On October 26, 1994, Region I of the Environmental Protection Agency conducted an Environmental Management Review of NUWC (TR 94). According to Ann Fenn, the federal facility program manager of EPA for Region I, an EMR is a technical assistance visit to a federal facility to assist it in building and developing its environmental management program (TR 95). It is voluntary on the part of the facility being visited (TR 125-26). Complainant participated in the EMR for NUWC. Following the EMR, during the week of October 31, 1994, complainant telephoned Fenn to express "a great deal of concern over potential environmental violations at the facility [NUWC]." (TR 96) Complainant related his instigation of this meeting in a very different and much less flattering way. He testified that he was concerned regarding his own liability, and wanted to meet with Fenn to find out EPA's reaction to the EMR. If EPA was satisfied, he would have dropped the matter; but if EPA had concerns about the inspection, he would help EPA out (TR 607). In any event, Fenn set up a meeting with complainant, and after realizing she was troubled by the EMR, he elected to cooperate with EPA (TR 606-07). Fenn stated that complainant raised possible clean air and water and hazardous waste violations, and other violations under the National Environmental Policy Act ("NEPA") (TR 96). Based on what complainant told her on November 8, another meeting was held on November 10, 1994. Attendees at that meeting, in addition to Fenn and complainant, were the clean air inspector, the clean water inspector, and criminal investigators (TR 96). Once again, complainant testified that he was very concerned about his liability -- particularly possible criminal liability -- for any violations that NUWC may have committed, and that this concern, rather than any attempt to harm anyone at NUWC, led to his cooperation with EPA (TR 608-09).

Fenn stated that she met with complainant at least four times between the EMR and December 12, when EPA began a surprise multimedia inspection of NUWC's Newport, Rhode Island and New London, Connecticut facilities (TR 98-99). A multimedia inspection is an inspection "where [EPA] bring[s] a variety of different inspectors, clean water inspectors, clean air inspectors, hazardous waste or RCRA inspectors, Safe Drinking Water Act inspectors ... to a facility to do a comprehensive inspection." (TR 98, 123) The information the EPA received from complainant was a major factor in the decision to conduct the multimedia inspection, and complainant helped plan it (TR 109); but complainant testified that he did not tell anyone at NUWC that he was in any way responsible for the multimedia inspection, and no one had ever asked him if he played a role in it (TR 1380-81). The multimedia inspection was conducted on December 12, 13 and 20, 1994. At that time, Fenn did not disclose to NUWC that she had been meeting with complainant; she was trying to protect his confidentiality (TR 111; 117). During the first two days of the inspection, the inspector from the State of Connecticut, David Stokes, apparently sought but was denied access to NUWC's records from the ECE. At the conclusion of

12

the inspection on December 13, Stokes asked complainant if he would be denied access to those documents when he returned on the 20th to complete the inspection (TR 610-11; CX 99). Complainant told Stokes he would not deny him access to those documents. Complainant reported this exchange to his supervisors, and Vickers passed the information on to McQueeney, Logue and Sirmalis (CX 99). Although Vickers clearly was troubled by the prospect of turning these records over to the inspectors, it does not appear that complainant was instructed to refuse to do so. On December 20, complainant met with Stokes and provided him with the documentation (TR 612).

The multimedia inspection turned up a host of violations under several statutes, but at the time of the investigation EPA did not have the authority to issue penalties against federal facilities for violations of the Clean Air Act, Clean Water Act, or the Safe Drinking Water Act (TR 124). Therefore, EPA's formal actions resulting from the investigation were limited to addressing hazardous waste violations under RCRA (TR 124; RX 25, 29). Sometime in 1996, EPA drafted a complaint seeking over $160,000 in penalties from NUWC for RCRA violations (RX 25). That complaint apparently was not issued. However, a complaint described by Fenn as "a pre-negotiated enforcement action," which sought a total of just over $80,000 in penalties, was issued by EPA on September 12, 1996 (RX 28; TR 124). Those penalties were paid by NUWC (TR 125).

On December 21, 1994, the day after the conclusion of the multimedia inspection, in the aftermath of conversations he had with McQueeny and Vickers, Beisswanger informed the complainant that he had been relieved of his supervisory duties (TR 889). Beisswanger testified that at that time he was unaware that complainant had been providing information to EPA surreptitiously as early as the end of October, although rumors to that effect were circulating (TR 906-07).[13]  On the following day, Vickers wrote a memo to Beisswanger suggesting that complainant's position be split into two because complainant had been spending too much time on administrative matters and not enough time applying his technical expertise to environmental problems (RX 57). Moreover, people did not like working for complainant, and were resistant to his ideas (TR 433-35). Complainant would be reclassified as the chief environmental engineer, and someone else would be brought in to be the environmental manager. Vickers believed this arrangement would make the best use of complainant's expertise (RX 57; TR 891).

However, complainant never became the chief environmental engineer. After some confusion regarding his status, on January 3, 1995 Beisswanger offered complainant a choice of either the chief environmental engineer position or another, unrelated position as the head of the Development Division in the Facilities Department, another area under Beisswanger's supervision that was equivalent in grade to claimant's position as environmental manager (RX 50-51; RX 1; TR 886). Beisswanger believed that it might be best if the complainant left the environmental department, and the Development Division position was similar to a position complainant

---

[13]Capt. Logue testified that he was unaware complainant had any role in initiating the EPA inspection until complainant filed the February, 1995 complaint with DOL (TR 365).

13

previously had held at NETC (TR 886). After taking a few days to think over his options, complainant told Beisswanger on January 6, 1995 that he wanted the position as head of the Development Division (RX 50). But on January 8, after consulting with counsel, complainant informed Beisswanger that he was not agreeing to a reassignment, but if he was going to be reassigned against his will he would leave it to Beisswanger to choose which job to give him (*id.*). So complainant was made head of the Development Division (*id.*), which was the position he held on February 15, 1995 when he filed his first DOL complaint. As was noted above, the settlement agreement was executed exactly four months later. Complainant remained in that position on paper even after the settlement agreement was executed (TR 924-25). The settlement agreement is attached to this decision as Appendix 1.

Under the terms of the settlement, complainant agreed: to resign from the Department of Defense effective September 1, 1997, and that resignation was irrevocable; to never again seek employment with either the Department of Defense or EPA; not to contact any employee or past employee of NUWC without the permission of NUWC's counsel; to return all NUWC documents to NUWC; to inform NUWC of any information within his knowledge regarding environmental problems involving NUWC and assist NUWC in responding to environmental issues; and to never again enter any NUWC site or the Newport Naval Complex without the consent of the Commander of NUWC. In return, respondent agreed to: pay complainant a total of $265,000 tax free;[14] pay complainant his full salary and benefits from June 12, 1995 through September 1, 1997, during which time complainant's only job duty would be to pursue a post-graduate degree; pay up to $40,000 for complainant's educational expenses in pursuing this degree; provide complainant with a letter of recommendation within two weeks of the date of the agreement; give complainant a performance rating of Level IV through September 1, 1997 provided he successfully participates in his degree program; pay complainant's attorney, Thomas J. McAndrew, a fee of $35,000 for his services to the complainant up to the execution of the settlement agreement; and, "upon the advance mutual agreement of the parties, . . . pay Mr. McAndrew attorney fees for the purpose of advising Mr. Beliveau in order to ensure Mr. Beliveau's compliance with the terms and conditions of this agreement."

### c. Actions Subsequent to June 15, 1995

#### 1. Services of Thomas McAndrew

Under the terms of the settlement agreement, complainant had two weeks to return all the NUWC documents in his possession to NUWC. He did so within about two days of entering into the agreement (TR 622; *cf.* CX 7). He also wrote several letters and memos at NUWC's direction, and met with NUWC officials in regard to the environmental violations he believed existed at NUWC (TR 623-24, 627-28). He also agreed to help NUWC convince EPA to

---

[14]Complainant's salary in June, 1995 was approximately $66,000 a year (*see* CX 25). Estimating that his take-home pay was two-thirds of that amount, which is probably on the generous side, $265,000 represented six years net income for the complainant.

14

eliminate any fines against it, and met with EPA for this purpose in the Spring of 1996 (TR 629-30).

As quoted above, the settlement agreement also provided that, upon advance mutual agreement, complainant's counsel, McAndrew, could be paid fees for advising complainant in regard to his compliance with the agreement. Without complainant's knowledge, McAndrew submitted bills to NUWC allegedly for such services every three to four weeks for almost a year, billing at a rate of $190 per hour (CX 50-62). He was paid in full by NUWC for each of these bills. The following table summarizes these bills and payments:

| Dates of Services | Hours Billed | Amount Billed |
|---|---|---|
| 6/19/95-7/10/95 | 90.75 | $17,242.50 |
| 7/11/95-7/26/95 | 81.25 | $15,437.50 |
| 7/31/95-8/21/95 | 95.00 | $18,050.00 |
| 8/22/95-9/17/95 | 87.50 | $16,625.00 |
| 9/18/95-10/12/95 | 96.50 | $18,335.00 |
| 10/16/95-11/14/95 | 92.75 | $17,622.50 |
| 11/15/95-12/18/95 | 98.75 | $18,762.50 |
| 12/19/95-1/11/96 | 117.75 | $22,372.50 |
| 1/12/96-2/2/96 | 128.25 | $24,367.50 |
| 2/3/96-2/27/96 | 141.00 | $26,790.00 |
| 2/28/96-4/3/96 | 149.25 | $28,357.50 |
| 4/4/96-5/5/96 | 144.25 | $27,407.50 |
| 5/6/96-5/24/96 | 156.50 | $29,735.00 |
| **Totals**: | 1479.50 | $281,115.50 |

Give or take a day or two owing to my poor mathematical skills, McAndrew's bills list services performed on 262 of the 340 calendar days (including weekends and holidays) between June 19, 1995 and May 24, 1996. During this period, McAndrew allegedly spent an average of 5.65 hours a day between five and six days each and every week, working on complainant's implementation of the settlement agreement, for which he was paid $281,115.50 by NUWC. If these figures are accurate, it would appear that at least two-thirds of McAndrew's law practice during this period consisted of assisting complainant to comply with the terms of the agreement.

15

McAndrew's bills during this period list at least 97 telephone calls to the complainant and 95 to NUWC (primarily to Dence and Nelligan); 58 meetings with the complainant alone; eight meetings attended by the complainant and NUWC officials; and more than 40 meetings with NUWC officials where complainant is not listed as being present (*see* CX 50-62; *see also* CX 91).[15]  Interestingly, the bills do not mention meetings with Ann Fenn of EPA in January or February 1996 (with complainant) and on April 4, 1996 (without complainant).[16]  None of these bills were ever submitted to the complainant, and he did not find out about them until February, 1997 (TR 704-05).  He was not asked by NUWC to confirm the time billed with by McAndrew or to approve the payment of the sums billed. In fact, through the bill with McAndrew's services ending on May 24, 1996 (the bill is dated June 26, 1996 – CX 62), NUWC never questioned these bills at all (TR 487).

As noted above, complainant testified that he returned all the NUWC documents which were in his possession within two days after the settlement was entered into, and might have met with McAndrew twice in this regard (TR 711, 1577).  McAndrew did attend meetings between the complainant and NUWC sometime between late 1995 and early 1996 (TR 708), and they attended a meeting with the EPA together (TR 1578).  Although he testified initially that he met with McAndrew infrequently in the year following the execution of the settlement agreement (*e.g.*, TR 711), complainant ultimately estimated that from the time the settlement agreement was entered into until June, 1996, he and McAndrew participated in anywhere from 12 to 20 meetings involving the implementation of the settlement agreement (TR 1576-78).  Even if complainant met with McAndrew 20 times during this period, there is still a huge discrepancy between the number of meetings complainant alleges he had with McAndrew and the number indicated by McAndrew's bills.

After the June 26, 1996 bill, McAndrew continued to submit bills for his services to NUWC on an irregular basis (*see* CX 63-66), but NUWC did not pay any of these bills.

McAndrew did not testify at the hearing and he was not deposed.  Due to this Department's lack of subpoena power in environmental whistleblower cases, complainant could not compel McAndrew to testify, and he would not testify voluntarily.  Employer apparently did not seek to have McAndrew testify.

### 2. Reassignment to Human Resources Department

On October 1, 1995, complainant's position as head of the Development Division of the Facilities Department was moved into a newly created organization, the Business Resources

---

[15]These figures for conferences with complainant are undoubtedly on the low side.  I counted entries on a single date listed as "conferences" and "telephone conferences" with the complainant as only one conference or telephone conference.

[16]*See* TR 117-22 and 1392-98 in regard to these meetings.

16

Directorate (CX 25; TR 194-95). This was part of a reorganization that effected 700-800 NUWC employees from the Human Resources, Facilities, Financial and Procurement Departments (*id.*), and was not directed at the complainant personally. Complainant testified that he received a copy of the notice of this change in February, 1997 (TR 632-33). Then, on November 12, 1995, in a move that *was* directed at the complainant personally, he was transferred from the Facilities Department of the Business Resources Directorate to the Human Resources Department in the same Directorate (CX 22; TR 196-97). His job description remained exactly the same (*see* CX 23; TR 1114). This move was made at the request of Roger Lord, the Deputy Department Head of the Facilities Department who also was serving as the Acting Head of the Development Division in complainant's absence (TR 1087). Lord was in the process of trying to fill complainant's position because the two jobs were too much for him to handle on a regular basis (TR 1086-87). He testified that although complainant no longer worked at his previous job he still was listed as occupying this position because he was being paid as if he was working there. Accordingly, on paper there was no vacancy to fill. To create a vacancy on paper as well as in fact, Lord asked McQueeney to have complainant transferred out of the Development Division, and McQueeney directed Joseph Murphy, currently NUWC's Workforce Effectiveness Manager and formerly its Human Resources Director,[17] to make the change. *See* TR 1086-91.

Frederick Hussey, the Head of the Human Resources Services Division of the Human Resources Department, was responsible for processing complainant's transfer to Human Resources (TR 1109-16). He testified that, since complainant was no longer performing engineering duties, it was not inappropriate to move him into Human Resources (TR 1116-17). Moreover, it made sense to move him into that department because the people in Human Resources were familiar with the settlement agreement and administered the long-term training program that complainant was considered to be on (TR 1116-17). Complainant testified that he received a copy of the notice of this change in February, 1996 (TR 630-31). Complainant indicated that he did not expect any change was going to be made to his position after he signed the settlement agreement (TR 633). Hussey also testified that the realignment form dated October 1, 1996 (CX 28) reflects that the Human Resources *Office* was reorganized and had its name changed to the Human Resources *Department (TR 1122-23)*. Every employee in the Human Resources Office received a similar form at that time (TR 1123).

### 3. Educational Expenses

At the time the settlement went into effect, complainant was not enrolled in a graduate degree program. Just prior to the execution of the settlement agreement, complainant had enrolled in a six week course in persuasive communication at Brown University which ran until the end of July (TR 1356; RX 63). Complainant paid the $1400 tuition himself, based on the assumption that he would be reimbursed by NUWC pursuant to the impending settlement agreement (RX 63); and NUWC did pay for the course (TR 1357). He also was considering

---

[17]Murphy was one of the signatories on the settlement agreement for NUWC, along with Logue and Nelligan.

17

several options for the graduate degree contemplated by the settlement agreement, including law school, but he was too late to be considered for a Fall 1995 admission to several programs. But in late August, 1995, he was accepted by the University of Rhode Island ("URI") in a Ph.D. program in Business Management, and he began the program at the beginning of September (TR 635-39). Although he was being paid his regular salary by NUWC in accordance with the terms of the settlement agreement, he performed no job duties of any kind (other than attending the course at Brown and then the Ph.D. program at URI) from June 15 until he left NUWC's employ on September 1, 1997 (*e.g.*, TR 635).

Complainant, through his attorney Thomas McAndrew, submitted bills for reimbursement for his educational expenses at URI on October 4, 1995, January 25, 1996, February 2, 1996, March 25, 1996 and June 5, 1996 (CX 32-36). Ultimately, these bills were paid by NUWC (*see, e.g.*, RX 45-47; *cf.* TR 1872-73). In the summer of 1996, complainant took a course at the Massachusetts Institute of Technology ("MIT"). Through McAndrew, he sought approval from NUWC to take this course as a covered educational expense pursuant to the settlement agreement (TR 1359). NUWC did not respond to McAndrew's request; nevertheless, complainant took the course anyway, contending that the consent agreement did not require prior approval (TR 1359-60). He has not been reimbursed by NUWC for the MIT course (TR 641). In a letter to complainant dated March 31, 1997, Joseph Murphy stated that he needed more information before he could authorize reimbursement for the MIT course. Particularly, he wanted to know whether the MIT course was required for his Ph.D. program at URI and whether he received credit from URI for that course (CX 37). Complainant never provided that information (TR 318-19).

### 4. Teaching Positions

While attending his doctoral program at URI during the period he was still being paid as a NUWC employee, complainant taught some classes at URI both in Kingston, Rhode Island and at the College of Continuing Education in Providence. He testified that he taught marketing at URI in the Fall semester, 1995; a computer course at URI, and two courses – another computer course and a management course – at night at the College of Continuing Education, all in the Fall of 1996; and another course at night at the College of Continuing Education in the Spring of 1997 (TR 672-74). These positions were paid positions for which he received payment either in the form of tuition waivers – which directly reduced the expenses NUWC was required to pay under the settlement agreement (TR 675) – or payments made directly to him, which he kept (TR 1537-38). Complainant also testified that he tutored underprivileged students at URI for a little longer than a year. Although the tutoring was a paid position, complainant stated that he was not interested in getting paid for it, and only rarely submitted bills (TR 672-73). He also accepted a paid graduate assistantship position in January, 1996, but he stated that he gave it up after only a few days (TR 673). Although complainant stated that at a meeting where the issue arose, he "made Mr. McAndrew and Mr. Nelligan and Mr. Dence aware ..." that he was teaching (TR 672), he did not state when this meeting occurred; and it is clear he did not seek permission from NUWC to teach courses for pay prior to doing so (*e.g.*, TR 234, 341, 524). According to

18

Murphy, any outside employment by a NUWC employee must be approved by the employee's supervisor (TR 233, 341).

Questions arose within NUWC in April, 1996, whether it was permissible for complainant to receive his pay from NUWC and at the same time be paid by another employer (*see, e.g.*, CX 42; TR 490-92). It is Nelligan's opinion that claimant violated 18 U.S.C. §209 – *Salary of Government officials and employees payable only by United States* – by accepting pay for his teaching while he was employed by NUWC,[18] but at the time this issue was being discussed he had not made up his mind. In addition to his other duties, Nelligan is the ethics counselor at NUWC (TR 502-04; RX 48). Nelligan also was concerned that complainant may have violated 5 C.F.R. Part 2600 by accepting pay for his teaching (TR 509).[19] Further, as was indicated above, it was NUWC policy that an employee had to obtain permission from his supervisor before accepting outside employment, which presented another issue (TR 510). Nelligan believed NUWC needed more information in order to determine whether complainant's teaching positions violated the law (TR 510-11), so he raised the issue with McAndrew on three occasions between April and August, 1996. Finally, at a meeting on August 23, 1996 attended by Nelligan, Dence and McAndrew, McAndrew agreed to hold off submitting any more education-related bills for reimbursement by NUWC until he had more time to look into this issue (TR 512-14). Rather than provide more information, McAndrew filed a petition with the American Arbitration Association as provided by Paragraph 13 of the settlement agreement for alleged breaches of the agreement (RX 52).

## 5. Performance Evaluations and Letter of Recommendation

Under the settlement agreement, complainant was to receive a performance rating of Level IV - Exceeds Fully Successful, the next to the highest rating at NUWC, through September 1, 1997. In his performance review for the period July 1, 1995 to June 30, 1996, which was filled out by the immediate supervisor on June 30, 1996, and approved by the second level supervisor and activity head designee on October 10, 1996, complainant received that rating (CX 27).

---

[18]18 U.S.C. §209(a) states that it is illegal for a Federal employee to accept compensation from any other source for performing his job duties as a Federal employee.

[19]Specifically, 5 C.F.R. §2635.807(a) states: "Except as permitted by paragraph (a)(3) of this section, an employee ... shall not receive compensation from any source other than the Government for teaching ... that relates to the employee's official duties." Paragraph (a)(3) states: "Notwithstanding that the activity would relate to his official duites ..., an employee may accept compensation for teaching a course requiring multiple presentations by the employee if the course is offered as part of: (i) The regularly established curriculum of : (A) An institution of higher education ...."

19

Complainant was not sent a copy of the performance appraisal form until he requested it in March, 1997 (TR 644-45; CX 27, at 183). He stated that not having a current performance appraisal hindered his ability to apply for certain jobs, such as the Coast Guard position in the announcement contained in CX 31 (TR 648). But he admitted that he never asked anyone at NUWC for a copy of his performance evaluation prior to filing his first complaint on October 10, 1996, nor did he ask McAndrew to obtain it for him prior to that time (TR 1606). On August 5, 1997, complainant was mailed a copy of his performance appraisal for the period July 1, 1996 to June 30, 1997 (RX 47). He also received the agreed rating of Level IV for this period. Claimant also testified that once the settlement agreement was entered into he stopped receiving NUWC's weekly bulletins (*see* CX 30) in which, *inter alia*, job vacancy announcements are posted (TR 645-46). Complainant also contends that he was not furnished with the letter of recommendation he was supposed to receive within two weeks of the date of the settlement agreement until March, 1997 (TR 650).

### 6. Early Retirement/Early Termination

Complainant testified that in February or March, 1997 he attempted to apply for an early retirement from NUWC under the Voluntary Separation Incentive Program ("VSIP") (TR 654-55). He believed he would become eligible for that program on April 8 of that year, when he turned 50 years old. He stated that he received no response to his inquiries regarding VSIP from either Nelligan or Murphy, so he obtained an application on his own and informed Logue that he wanted to retire under VSIP (TR 655). Complainant further stated that Logue told him that NUWC did not participate in VSIP, although he also stated that Logue initially told him that he would not accept his application for VSIP because complainant was in a temporary position (TR 656-57). He subsequently submitted an application for retirement under VSIP, but it was returned to him by Murphy on March 25, 1997 without being processed because complainant's position in Human Resources was "excess" (TR 658; RX 38). Hussey testified that claimant's application for VSIP was turned down because he did not meet the purposes of the program (TR 1127). Under VSIP, an employee is paid a monetary incentive of up to $25,000 to retire from NUWC. The purpose of the program is to create vacancies which can be filled by other employees who are being displaced by reductions in force or for other reasons (TR 1127-28; CX 92; RX 38). There was no reason to offer complainant a $25,000 incentive to retire (or, similarly, grant him an early retirement) since he already was committed to resign under the settlement agreement. Moreover, the vacancy created by his resignation had already been filled (TR 1127-29). For all of these reasons, respondent contended that complainant was ineligible for the VSIP (*see* CX 92).

On August 22, 1997, complainant filed another complaint against NUWC, this time alleging that he was being constructively discharged as a Federal employee by NUWC. This claim was consolidated with the others which are being adjudicated in this case. Essentially, complainant contends that, due to respondent's violations of the June 15, 1995 consent agreement, and the questionable validity of that agreement, respondent should be prohibited from enforcing that provision of this agreement which terminated his position at NUWC on September 1, 1997.

20

Respondent contends that it had a valid reason for refusing to permit complainant to withdraw his resignation, *i.e.,* that complainant and respondent had entered into a contract which, among other things, provided for complainant's resignation effective September 1, 1997.

### 7. Workers' Compensation Claim

Complainant testified that sometime in February, 1997, he asked Dr. David Dence, NUWC's Director of Undersea Weapons, to provide him with a form to file a workers' compensation claim, alleging that his employment at NUWC caused him to suffer from work-related stress (TR 668). When he did not receive the form from Dence, he wrote to Murphy, whom Dence had informed complainant was his supervisor, and asked Murphy to send the form to him. Complainant testified that after two or three weeks, when he still had not received a claim form, he wrote to the Department of Labor's Office of Workers' Compensation Programs, who immediately sent him one (TR 668). Murphy testified that he supplied complainant the form two weeks after it was requested (TR 225).[20] Complainant then filed his compensation claim, which is dated April 12, 1997, with NUWC. Allegedly due to concerns that information provided by complainant on the claim form violated the settlement agreement's confidentiality provision, when Murphy received the claim form he forwarded it to NUWC counsel – probably Mr. Biglin – for his review (TR 226). Within a week NUWC returned the claim form to complainant, to be revised to exclude reference to confidential provisions of the agreement (TR 226, 669, 1370). Complainant did not return the claim form to NUWC until mid-July, 1997 (TR 226, 1371), and when he did not hear from NUWC he also sent his claim directly to OWCP on July 28, 1997 (CX 121). NUWC sent the form to OWCP on August 7, 1997 (CX 131). Less than a week later OWCP posed several questions to NUWC in regard to the claim, but NUWC did not respond for two months (CX 129). There is no evidence in the record of any disposition of the claim.

#### d. Parties' Contentions

It is claimant's position that NUWC took the following retaliatory actions against him:

- Compromised the attorney-client relationship between the complainant and Thomas McAndrew.

- Refused to allow complainant to take an early retirement.

- Tried to pressure complainant "until he broke" and otherwise subjected him to a hostile work environment.

- Obstructed complainant's workers' compensation claim.

---

[20]Complainant stated that he received a claim form from Murphy a week after he filed his claim with OWCP (TR 669).

21

    - Involuntarily transferred complainant to the Human Resources Department.

    - Delayed payments for educational expenses which were due to the complainant under the settlement agreement.

    - Failed to provide complainant with timely performance evaluations, letters of recommendation, weekly bulletins, mail, and ethics training.

    - Threatened complainant with criminal prosecution because he performed some part-time teaching at the University of Rhode Island.

    - Refused to permit complainant to withdraw his resignation effective September 1, 1997.

    - Rescinded the restoration of 98 hours of restored annual leave.

    Respondent either denies that the alleged retaliatory action was taken or contends that the action was justified and unrelated to complainant's protected activity. Respondent also contends that many of complainant's allegations are time-barred

## II. Discussion

### a. Timeliness of the Complaints

    Under each of the statutes at issue in this case, a complaint alleging the occurrence of an adverse employment action relating to an employee's engaging in protected conduct must be filed within 30 days of that adverse employment action. *See* 42 U.S.C. §300j-9(i)(2)(A) (SDWA); 42 U.S.C. §7622(b)(1) (CAA); 42 U.S.C. §6971 (SWCA); 42 U.S.C. §9610(b) (CERCLA); *see also* 29 C.F.R. §24.3. Respondent contends that the complaints regarding many of the actions complainant alleges to be adverse -- transfer to Human Resources, loss of restored annual leave, threat of criminal prosecution, untimely letter of recommendation, tuition reimbursement and his constructive discharge -- were not filed within 30 days of their occurrence, and therefore are untimely.[21] Complainant contends that he filed complaints within 30 days regarding the threat of criminal prosecution and constructive discharge; but he does not allege that complaints were filed within 30 days regarding the transfer to Human Resources, loss of restored annual leave, the untimely letter of recommendation, and tuition reimbursement. Rather, he is relying on the doctrine of equitable tolling and the theory of continuing violations to support the timeliness of his complaint allegations which were not filed within 30 days of the alleged adverse actions.

    Since I find that none of these allegations are meritorious (*see infra*), there is no reason to

---

[21]Respondent has not challenged the timeliness of the complaints regarding its interference with the relationship between complainant and his attorney and with complainant's workers' compensation claim.

22

burden this already lengthy decision with discussions of equitable tolling and the other issues relating to whether these allegations are timely.

   *b. Failure to comply with terms of settlement agreement*

   Complainant's contention that respondent has engaged in adverse actions against him by violating provisions of the June 15, 1995 settlement agreement is defeated by complainant's success in Case No. 1997-SDW-6, his action which is also before me to have that agreement declared null and void. In its decision in *Beliveau v. U. S. Department of Labor,* 170 F.3d 83 (lst Cir. 1999), the First Circuit held that settlement agreements in claims filed pursuant to the Safe Drinking Water Act and other similar environmental whistleblower statutes must be approved by the Secretary of Labor (now the Administrative Review Board) regardless of how early in the proceeding the settlement is reached.  The case was remanded by the First Circuit to the Administrative Review Board, and by the ARB to me, to determine whether the agreement should be approved.

   Since the agreement has not been approved, failing to comply with its terms cannot be an adverse action related to complainant's employment. As the Secretary stated in a case under a related statute, the Energy Reorganization Act, *Gillilan v. TVA*, 91-ERA-31 (Aug. 28, 1995):

>   Violation of a settlement may under some circumstances
>   constitute a separate, independent violation of the ERA. *Blanch v.*
>   *Northeast Nuclear Energy Co.,* Case No. 90-ERA-11, Sec. Order,
>   May 11, 1994, slip op. at 4; *O'Sullivan v. Northeast Nuclear*
>   *Energy Co.,* Case No. 90-ERA-35, Sec. Order, Dec. 10, 1990, slip
>   op. at 3. Here, however, there was no final settlement agreement
>   approved by the Secretary as required by the ERA. Although TVA
>   voluntarily reissued the service review, it was not obligated to do so
>   for purposes of the ERA. *See Macktal v. Brown & Root, Inc.,* Case
>   No. 86-ERA-23, Sec. Dec., Oct. 13, 1993, slip op. at 6 n.3. There
>   is no allegation or indication that reissuing Gillilan's service review
>   falls within the "terms, conditions, or privileges" of Gillilan's
>   employment, independent of the settlement agreement. For these
>   reasons, the delay in reissuing the rating does not constitute an
>   adverse employment action within the purview of the ERA.

*Id.* at 4-5. This holding is equally applicable to this case. Since respondent's obligations to pay for complainant's further education and write him a letter of recommendation arise solely from the still unapproved settlement agreement and were not terms of his employment, allegations that respondent did not reimburse complainant, or reimbursed him in an untimely manner, for his educational expenses, and improperly withheld letters of recommendation, are not adverse employment actions under the statues at issue here. On the other hand, since respondent's obligations to provide complainant with a yearly performance evaluation and to give him a proper

23

job classification do not arise solely from the settlement agreement, but are obligations respondent has for all employees, the failure to provide him with timely performance evaluations and to place him in a proper job classification may be adverse actions subject to the employee protection provisions of the applicable statutes.

   *c. Legal Standards*

Under the SDWA at 42 U.S.C. §300j-9(i):

> (1) No employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to a request of the employee) has -
>
> (A) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this subchapter or a proceeding for the administration or enforcement of drinking water regulations or underground injection control programs of a State;
>
> (B) testified or is about to testify in any such proceeding or;
>
> (C) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this subchapter.[22]

   In cases arising under the Safe Drinking Water Act and other statutes protecting whistleblowers, it is the complainant's burden to prove that:

   1. He or she engaged in conduct protected by the applicable statute;

   2. The party charged with unlawful discrimination knew of his or her protected activity;

   3. He or she was subject to adverse action; and

   4. The adverse action was motivated, in whole or in part, by his or her protected activity.

*See, e.g. Dartey v. Zack Co.,* 82-ERA-2 (April 25, 1983); *McCuiston v. TVA,* 89-ERA-6 (Nov. 13, 1991); *see also Mackowiak v. University Nuclear Systems, Inc.,* 735 F.2d 1159 (9th Cir. 1984). In a decision issued less than two weeks ago, the Supreme Court held that an employee can satisfy his or her burden of proving that the employer's adverse action was motivated by the employee's protected activity where the employer's proffered reasons for taking the adverse

---

[22]The CAA, CERCLA and the WPCA have substantively similar provisions.

action are not believable. In other words, that the employer's explanation is false permits (but does not compel) the trier of fact to conclude without other evidence that the discrimination was intentional. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. ____, 2000 WL 743663 (US 2000) (June 30, 2000).

Complainant clearly engaged in protected activity by informing EPA of suspected environmental violations at NUWC in late 1994 and probably early 1995. Respondent also knew not later than February 1995 that complainant had been meeting with EPA officials. The harder questions are whether complainant was subjected to adverse action and, if so, whether this adverse action was motivated by his protected activity. It must be kept in mind that this case is concerned with adverse actions taken subsequent to June 15, 1995, as any earlier acts of discrimination are covered by the settlement agreement entered into on that date.

Complainant would like to have this case looked at from the perspective that NUWC is a bad guy and he is the white knight in shining armor out to protect the public interest. But although it might not be hard to paint respondent black, the best one could do for the complainant would be to paint him dark gray. For it is clear that he was motivated more to protect his own interests that the public's. As was stated above, complainant agreed to cooperate with EPA because of concern over his liability in the event environmental violations were found at NUWC; and subsequent to the settlement agreement he hypocritically wrote letters (RX 14) and affidavits (RX 26, 27) endorsing NUWC's environmental program (TR 1387-90). He also met with Ann Fenn of EPA in January, 1996 to try to convince her, and EPA, not to levy a fine against NUWC (TR 1392-97). He also shrewdly attempted to obtain every possible benefit from the settlement agreement prior to seeking to have it voided.

Further, when trying to determine whether adverse actions were taken against the complainant, it must be kept in mind that complainant's distrust of respondent is so complete that he believes anything respondent does that effects him is adverse, and is motivated by the events which occurred during the year or so he worked for NUWC in Newport. Because of this, complainant is contending that actions which clearly are not adverse or which just as clearly were not the result of animus violate the whistleblower protection statutes. For example, complainant alleges that: a simple administrative reassignment from one division to another which had absolutely no effect on him; a refusal to let him take advantage of an early retirement option, or conversely to permit him to remain a NUWC employee, after he had already agreed to leave NUWC's employ on September 1, 1997; the refusal to pay for a course at MIT which was not required for his doctoral program at URI and which had not been approved by NUWC; and a reasonable concern on the part of NUWC that his teaching activities might have violated federal employee ethics laws; are all adverse actions motivated by animus against him. In reality, none of these were adverse actions; and even if any of them could be considered to be adverse actions, there is no indication that they were the result of animus.

*d. Discovery Abuses*

25

The complainant has moved for sanctions to be levied against the respondent in this case, up to and including a default judgment, due to respondent's repeated discovery abuses. Specifically, complainant contends that respondent failed to produce documents which were sought in discovery, either failing to disclose the documents' existence or alleging inapplicable privileges, and that these abuses were deliberate. Under the unusual circumstances of this case, I find that respondent failed to produce numerous material documents and failed to provide complete answers to complainant's discovery even after being ordered on several occasions to do so. Accordingly, I hold that the issues regarding which respondent abused the discovery process will be taken as being established adversely to respondent. However, since I find that these abuses did not relate to all the complaint allegations, and further find that some of these allegations are totally lacking in merit, it would be inappropriate to grant a complete default judgment against the respondent.

<u>1. Thomas McAndrew</u>

The most serious and troubling allegation raised by the complainant in this case is that respondent interfered with his legal representation through improper contacts with, and payments to, his previous attorney, Thomas McAndrew. McAndrew represented complainant in connection with his February 15, 1995 complaint against respondent which led to the June 15, 1995 settlement agreement. Under Paragraph 12 of that settlement agreement, McAndrew received an attorney's fee of $35,000, a fee which was reasonable in light of the complainant's sizable recovery. The same paragraph of the agreement also provided that:

> from time to time upon the advance mutual agreement of the parties, NUWC may pay Mr. McAndrew attorney fees for the purpose of advising Mr. Beliveau in order to ensure Mr. Beliveau's compliance with the terms and conditions of this agreement.

It is complainant's position that, through the undisclosed payment to McAndrew by NUWC of $281,115.50 in the year following the execution of the settlement agreement, McAndrew effectively became NUWC's attorney while ostensibly still representing the complainant, to complainant's detriment.

This is an extremely serious charge, and deserves the greatest attention both in regard to the possible ethical violations by McAndrew and perhaps even more egregious misconduct on the part of NUWC that these payments to McAndrew suggest. It clearly overshadows the rest of complainant's contentions, most of which are minor squabbles that complainant has blown completely out of proportion. The problem for the complainant is that he has not been able to clearly articulate how he personally has been harmed by respondent's alleged interference with his relationship with McAndrew. It appears that he is arguing that this unacknowledged switching of sides by his attorney was detrimental to him in virtually every aspect of his relationship with NUWC. In particular, he contends that he relied on assurances from McAndrew that disputes

with NUWC were being resolved when that was not the case, causing him to delay in taking action against NUWC. It is primarily in regard to the issue of respondent's relationship with McAndrew that respondent withheld evidence sought by complainant in discovery.

The record demonstrates that respondent was not cooperating with the discovery process since the time the case was assigned to me for hearing. However, throughout the pre-hearing process I was concerned with the complainant's failure to respond to discovery as well. On several occasions *(see, e. g., TR 78-79; Order Regarding Protective Order, August 26, 1997)*, I had to admonish both parties for their unprofessional conduct which was reflected in their lack of cooperation with each other as well as the frequency with which they sought my assistance to resolve petty discovery disputes. Further, I had to issue orders compelling both parties to comply with discovery on at least five occasions prior to the hearing (July 14, 1997 (issued orally at unrecorded pre-hearing conference in chambers); August 29, 1997, September 9, 1997, September 10, 1997, October 1, 1997).  Accordingly, while I would not say that complainant's contentions of malfeasance by the respondent fell on deaf ears, I also was not as sympathetic to complainant's arguments as I might otherwise have been since it appeared that the complainant was engaging in similar conduct.

But I had no idea that respondent's discovery abuses were so systemic and so greatly exceeded complainant's, and went to the heart of the most troubling aspect of this case -- respondent's undisclosed payments of about $281,000 to complainant's former counsel, Thomas McAndrew, in the year following the execution of the settlement agreement. Respondent's deliberate withholding of discoverable evidence did not come to light until the post-hearing briefs were due to be filed, following a visit by the FBI to the complainant in January 1998, at which time complainant stated that he was shown documents concerning McAndrew responsive to his discovery in this case which had not been produced by the respondent. Learning about the existence of these documents led to the post-hearing proceedings detailed at the beginning of this decision.

As a result of these post-hearing proceedings, it is clear that respondent deliberately failed to produce numerous documents regarding its relationship with McAndrew which were responsive to complainant's discovery. Among these documents are the following:

(a) The so-called "lost bill," an April 24, 1997 bill from McAndrew addressed to the complainant but sent to respondent's counsel, Ms. Brisbin, rather than to Beliveau (*see* ALJX 4), which is different from the other April 24, 1997 bill from McAndrew which had been turned over to complainant during discovery (CX 66). This bill sought payment of $7,505 for 39.5 hours of legal services performed between August 1, 1996 and April 25, 1997 (*see* ALJX 4). What is of obvious significance about this lost bill is that it lists a 2 ½ hour meeting between McAndrew and Ms. Brisbin on April 25, 1997 which is not contained on the other version of this bill (CX 66) and

27

which was not disclosed in response to complainant's discovery.[23] There are other differences as well, as CX 66 lists services performed on August 21, 1996 and March 24, 25 and 31, 1997 which are not on the lost bill; and the lost bill contains a one-hour charge on April 24, 1997 which is not contained on CX 66. Further, CX 66 is addressed to complainant "c/o Dr. David Dence," whereas, as is stated above, the lost bill was addressed in care of Ms. Brisbin. In addition, in contrast to the lost bill, CX 66 lists 47.75 hours of services for which $7,722.50 is billed.

Respondent noted the existence of this bill for the first time in its January 30, 1998 response to complainant's motion to reopen the record ("January 30, 1998 response" - ALJX 7). However, while acknowledging that the bill contained a reference to Ms. Brisbin's meeting with McAndrew on April 25, 1997, respondent stated that it was otherwise identical to CX 66. Respondent also stated that the bill was discovered to be lost in January, 1998. But that is not the reason it was not produced or acknowledged in response to complainant's discovery. Rather, Ms. Brisbin stated that the document was not produced because it was not responsive to complainant's discovery. *See* TR 1999-2002. In a letter dated May 5, 1998, Ms. Brisbin stated that the lost bill was finally located, in a correspondence file in NUWC's Office of Counsel, and it was produced at that time.

Respondent contended in the January 30, 1998 response that the lost bill was not responsive to complainant's discovery because it was written after the discovery was served. This did not stop respondent from producing, although somewhat belatedly, CX 66, which also is dated April 24, 1997, in response to the same discovery. Further, even if the lost bill was not in respondent's possession when complainant's first discovery (ALJX 11-12) was responded to on April 21, 1997, it would have been in respondent's possession when the May 8, 1997 discovery (ALJX 14) and later notices of deposition of the custodian of the records (ALJX 15-17) were answered. Moreover, complainant's requests for production stated that they were continuing and must be supplemented, and no objections to this aspect of the requests were raised.

Complainant's Document Request 31 (*see* ALJX 14), which was identical to the earlier Document Request 13 (*see* ALJX 11), asked respondent to "[p]rovide a copy of all documents transmitted to the Navy from Mr. Thomas McAndrew, from June 16, 1995 to present." If this is not clear enough, Document Request 25 from the May 8, 1997 discovery (ALJX 14) repeated the earlier Document Request 3 (ALJX 11), which asked respondent to "[p]rovide copies of all invoices from Thomas McAndrew to the Navy, from June 16, 1995 to present." Finally, the notice of the September 4, 1997 deposition of respondent's custodian of records (ALJX 17) contains a schedule of documents to be produced, including, at item 12, "[i]f not already provided, all documents provided to NUWC by Thomas McAndrew." Respondent had no excuse for failing to turn over this document in discovery or, if it truly could not be located, of informing complainant of its existence in response to Interrogatory 25 served on May 8, 1997.

---

[23]At this time it is impossible to state whether the fact that a bill dated April **24**, 1997 contains a listing for a service performed on April **25**, 1997 has any significance in the context of this case.

28

It should also be noted that, in a July 11, 1997 pleading entitled *Respondent's Combined Supporting Memorandum and Opposition to Complainant's Motion to Compel, Renewed Motion to Compel, Motion for Discovery Orders and Motion for Sanctions* (ALJX 10), respondent stated that it "has provided Complainant with Mr. McAndrew's submitted bills, which document the instances in which Mr. McAndrew met with NUWC officials." *Id.* at 14. In that same pleading, respondent assured the court that it "has provided Complainant with all non-privileged responses and documents responsive to his discovery requests that exist and are in its possession." *Id.* at 5. Neither of these statements was true.

That McAndrew was still conferring with NUWC counsel and billing NUWC for his services in April, 1997, over two months after complainant and McAndrew severed their attorney-client relationship, would have been of great interest to complainant in attempting to establish that McAndrew and NUWC had an inappropriate relationship during the period McAndrew supposedly was representing the complainant. It is possible that the other differences between CX 66 and the lost bill also have significance.

(b) Ms. Brisbin's notes of the April 25, 1997 conference with McAndrew. According to Ms. Brisbin, this document was not even acknowledged in response to complainant's discovery because neither she nor anyone else involved with this case believed that her files were subject to discovery ( TR 2008-09). One wonders if it ever crossed Navy counsel's minds that if an attorney's files were not subject to discovery, there would be little need for an attorney work-product privilege. Moreover, accepting respondent's argument would mean that documents which are otherwise discoverable could be withheld from discovery by placing them in an attorney's files. This is specious. And although Ms. Brisbin's notes of her April 25, 1997 meeting with McAndrew might have been subject to the attorney work-product privilege, no such privilege was asserted. Rather, the existence of the document was not acknowledged.

It is apparent that respondent was intent on hiding the fact of this meeting from complainant. Respondent's excuses for failing, in a timely manner, to produce the lost bill and, at the least, to disclose the existence of Ms. Brisbin's notes of her April 25, 1997 meeting with McAndrew simply are not believable.

(c) Ms. Brisbin's notes of her telephone conversation with McAndrew on June 23, 1997. This document should have been turned over, or listed as privileged if a work-product privilege was being claimed, in respondent's July 23, 1997 response to Document Request 30 of *Complainant's Third Request for Production of Documents* (ALJX 14), which seeks production of "any and all Naval Undersea Warfare Center documents that refer or relate to Mr. Thomas McAndrew." Respondent first revealed that this conversation took place in an *in camera*, March 18, 1998 affidavit filed by Ms. Brisbin. However, in that affidavit Ms. Brisbin stated that she did not take notes of that conversation *(see* ALJX 3, *Declaration of Andrea Heffernan* [Brisbin] at 6). That notes of this conversation did exist was disclosed by respondent on April 23, 1998, when Ms. Brisbin stated she found them in her files "stuck to the back of another document ...." (ALJX

29

6)

(d) Ms. Brisbin's notes of an October 8, 1997 telephone conversation with McAndrew. Complainant was made aware of this conversation through a letter sent to him by McAndrew on October 10, 1997. However, respondent did not inform complainant that Ms. Brisbin took notes of this conversation, and those notes were not produced as a supplement to respondent's response to complainant's document request 30 *(see* above).

(e) Letters from McAndrew to Ms. Brisbin dated May 2, 1997, May 27, 1997, July 15, 1997 and August 21, 1997, all dealing with McAndrew's fees in connection with complainant's actions against the respondent; a letter from Ms. Brisbin to McAndrew dated May 15, 1997 regarding the same subject matter; and an April 7, 1997 letter from McAndrew to Dr. Dence forwarding a letter McAndrew had received from complainant's current counsel. *See* ALJX 3, at Attachments 2-6. All of these documents were responsive to complainant's discovery and clearly are not privileged. In her March 18, 1998 affidavit, Ms. Brisbin contends that these documents were not produced because she did not consider her litigation files to be subject to discovery (ALJX 3, at 10). As is noted above, this contention is specious.

(f) Differing versions of McAndrew's bills dated August 1, 1995, October 2, 1995, October 30, 1995, December 4, 1995, January 26, 1996, April 29, 1996, and April 7, 1997. Respondent admits that differing versions of the December 4, 1995, January 26, 1996 and April 29, 1996 bills erroneously were not turned over during discovery, but states that the differences from the bills for these dates which were turned over were minor *(see* ALJX 7, at 3). However, that the differences between documents may be minor does not change respondent's obligation to produce each version of the document; and even seemingly minor differences may turn out to be significant. For example, it may be significant to know whether McAndrew's bills had to be signed off by Dence and/or Nelligan before they were paid, or whether Dence or Nelligan was responsible for first approving the bills. It may also be significant if the same bill was signed off on two different occasions.

In addition, complainant's counsel state, and considering respondent's counsel's lack of forthrightness throughout this case[24] I accept complainant's counsel's representation, that they did

---

[24] A prime example of respondent's counsel's duplicitousness concerns how respondent acquired knowledge about a problem complainant's son was having in an unrelated matter. At claimant's deposition on September 12, 1997, he was asked the following question by Ms. Anderson: "During the past two years, has your son had some kind of problem ... at Brown University?" *See* ALJX 2, Volume I at Exhibit 4, p. 144. Complainant immediately surmised that respondent's counsel was informed of this by McAndrew, who had represented complainant's son regarding that matter. In response, Ms. Anderson emphatically stated that she never had any contact or conversations with McAndrew (*id*. at 144, 151). Further, in a letter from Ms. Brisbin to Ms. Levitt dated September 22, 1997, Ms. Brisbin stated that "[r]espondent did not learn ... that Scott Beliveau sought legal assistance from Mr. McAndrew, until Mr. [John] Beliveau

30

not receive differing versions of other bills, bills where the differences clearly were significant. For example, complainant contends he never received the copy of an October 30, 1995 bill from McAndrew which is identified as "Sequence 6b" in Volume II of ALJX 2). In contrast to the other two similarly dated bills which complainant did receive in discovery (Sequence 6 and 6a of Volume II), Sequence 6b omits meetings and telephone conferences with Ann Fenn of EPA on September 18, October 2, October 3, October 5, October 6, October 7, October 9, October 10, October 11 and October 12, 1995; and omits references to time spent in regard to a Providence Journal article concerning NUWC on October 1 and 2, 1995. Despite these omissions, the October 30, 1995 bill in Sequence 6b lists the same number of hours and the same amount billed as the other two October 30, 1995 bills. In addition, the bills contained in sequences 6 and 6a contain Dence and Nelligan's signatures, and the handwritten date of "11/27/95" next to them, on the first page, whereas sequence 6b merely contains Dence and Nelligan's initials and no handwritten date next to them. It is the bill in Sequence 6b which was attached to the voucher indicating that the bill was paid by NUWC.

(g) Photocopies of the cancelled checks issued to McAndrew by the Treasury Department on behalf of NUWC, with accompanying check claims vouchers (ALJX 3, Vol. II at Tab 3). Respondent contends that these documents were not subject to complainant's discovery because they were never in its possession, but rather were in the possession and control of "a non Navy entity under the Department of Defense called `DFAS [Defense Finance and Accounting

---

disclosed such information to Ms. Anderson during his 12 September 1997 deposition." (ALJX 8) Subsequently, at the post-hearing conference, the issue came up again, and Ms. Brisbin expressed outrage when she was accused by complainant's counsel of obtaining this privileged information from McAndrew and providing it to Anderson (TR 2007). Ms. Brisbin went on to imply that respondent had not obtained any information about complainant's son from McAndrew (id. at 85-86).

In fact, as Ms. Anderson admitted in a March 17, 1998 affidavit filed *in camera* with the court, NUWC's Counsel, Nelligan, learned from McAndrew that claimant's son had had a problem at Brown University and passed this information on to Ms. Anderson prior to complainant's deposition (see ALJX 3). Ms. Anderson and Ms. Brisbin's attempts to deceive both complainant's counsel and the court about this matter speak volumes about their credibility and how they see their roles as Officers of the Court.

Other examples of respondent's counsel's untrustworthiness concern an EPA investigator's reports of his interviews of the complainant between January and March, 1995 which were inadvertently provided to NUWC by an EPA attorney in May, 1997 (ALJX 1; TR 40) *(see* p. 5 *supra);* and respondent's claims of privilege for numerous documents which clearly were not privileged, which resulted in those documents not being turned over to complainant until after the hearing had commenced, following my *in camera* review of those allegedly privileged documents; *(see, e.g.,* TR 1054-80).

Agency]." (*See* ALJX 9, at 5-6). Nevertheless, these documents were obtained by NUWC from DFAS at the request of Navsea's Inspector General's Office in connection with the FBI investigation, and were turned over to the Navsea IG on November 17, 1997, about three weeks after the IG requested them from NUWC (ALJX 3, Vol. II, Declaration of Ann Gallagher). Since these documents were readily available to NUWC, for purposes of discovery I hold that they were in NUWC's control and thus subject to complainant's discovery. Since documents reflecting payments made by the Navy to McAndrew were repeatedly sought in discovery (*see, e. g.,* Complainant's *First Request for Production of Documents,* at Document Request No. 7), these cancelled checks and vouchers should have been turned over.

This list encompasses the documents regarding NUWC's relationship with McAndrew which are known not to have been turned over to complainant despite the fact that they were responsive to complainant's discovery. Respondent's representation that all such responsive documents have finally been produced is not reassuring. In fact, it appears that respondent's current counsel, Mr. Crouse, believes that other documents regarding McAndrew may not have been disclosed; for he proposed that the record be reopened and the commanding officer of Navsea issue a directive ordering the preservation of any documentary evidence relating to McAndrew.[25] But even if these are all of the responsive documents which were withheld, the fact remains that the complainant was denied access to evidence which shows significant aspects of respondent's relationship with McAndrew, evidence which would have opened new areas of inquiry for the complainant and strongly suggests that the relationship between McAndrew and respondent is a tangled web. For example, why was McAndrew apparently cooperating with the respondent but not with complainant, his former client? Why were materially different versions of McAndrew's bills prepared, and which were accurate? Was McAndrew being paid by NUWC for services he did not perform, and if so, was NUWC aware that he did not perform these services? What exactly was McAndrew's relationship with EPA? Complainant was entitled to these documents before trial, not after; and by failing to produce them in response to complainant's discovery, respondent prevented complainant from obtaining the evidence he needed to prosecute his case.

The issue which then arises is the appropriate sanction for respondent's withholding of this highly probative evidence. I find that reopening the record is not a viable option. Since the withheld evidence raises far more questions than it answers, it would be insufficient simply to reopen the record to admit the documents produced by respondent since the conclusion of the hearing. Rather, complainant (and perhaps the respondent as well) would be required to reinvestigate the matter, attempt to obtain additional evidence, recall many of the witnesses who testified at the hearing, and attempt to call additional witnesses such as Ms. Brisbin. In addition to the substantial delay this would entail, it would be unfair to ask complainant to endure the additional expense retrying the case would engender. Further, witnesses who previously were subject to compulsory process as employees of NUWC or the Navy, including Ms. Brisbin, Ms.

---

[25]Of course, the commanding officer of Navsea can issue such a directive regardless of whether the record is reopened.

32

Carlson and Capt. Logue, may now be beyond the authority of this tribunal to compel to testify, further prejudicing the complainant. Finally, there is no assurance that respondent has yet produced all the evidence it should have produced in response to complainant's discovery.

Moreover, in light of the nature of respondent's conduct, reopening the record, even if accompanied by an award of costs to complainant, would be a mere slap on the wrist. I have no doubt that respondent's failure to fully respond to complainant's discovery regarding its relationship with McAndrew was deliberate. A party's deliberate failure to withhold material evidence that was properly requested through discovery is an unconscionable perversion of the judicial process. It is reprehensible when it is engaged in by a private party; but I am not sure there is an adjective pejorative enough to describe this conduct when it is engaged in by attorneys representing the United States Government.

Under 29 C.F.R. §18.6(d)(2) of this Office's *Rules of Practice and Procedure,*

If a party ... fails to comply ... with an order, including, but not limited to, an order for ... the production of documents, or the answering of interrogatories, ... the administrative law judge, for the purpose of permitting resolution of the relevant issues and disposition of the proceeding without unnecessary delay despite such failure, may take such action in regard thereto as is just, including but not limited to the following:

(ii) Rule that for the purposes of the proceeding the matter or matters concerning which the order ... was issued be taken as established adversely to the non-complying party;
...

(v) Rule ... that a decision of the proceeding be rendered against the non-complying party ....

I issued an order compelling the respondent to fully reply to complainant's second and third requests for production and sets of interrogatories at an unrecorded prehearing conference on July 14, 1997; granted, on August 29, 1997, complainant's motion to compel, inter alia, "the attendance of the appropriate Custodian(s) of Records and requested documents for deposition at NUWC on September 4, 1997"; issued, on September 9, 1997, an order compelling discovery stating that, *inter alia*, respondent has agreed to turn over all remaining documents responsive to Document Request 31, which requests respondent to "[p]rovide a copy of all documents transmitted to the Navy from Mr. Thomas McAndrew, from June 16, 1995 to the present"; and ordered respondent to "produce all remaining documents responsive to complainant's discovery" in an order issued on September 10, 1997. In failing to provide the documents listed above, respondent violated each of these orders.

Under these circumstances, the appropriate remedy is that set out in §18.6(d)(2)(ii). Therefore, I find that respondent interfered with the attorney-client relationship between

33

complainant and Thomas McAndrew by paying McAndrew $281,115.50 between July, 1995 and June, 1996 without complainant's knowledge or consent, as a result of which McAndrew aided respondent in connection with this case to complainant's detriment. I further find that these payments were not made in accordance with Paragraph 12 of the settlement agreement entered into between the complainant and respondent on June 15, 1995 (Appendix 1 to this decision).

2. Workers' Compensation Claim

Complainant's *Notice of Deposition for the Custodian(s) of Records* ... (ALJX 17) scheduling a September 4, 1997 deposition requested, as item number 2, the production of "[a]11 documents pertaining to the medical condition of Mr. Beliveau, including but not limited to, medical records maintained by the Navy." This request clearly required the production of documents relating to complainant's April 12, 1997 workers' compensation claim, yet no documents regarding that claim were produced. In December, 1997, two months after the conclusion of the hearing, respondent turned over an October 15, 1997 memorandum from Carole James, NUWC's OWCP coordinator, to OWCP in Boston. That document was admitted into evidence as CX 129 during a conference call on January 28, 1998. Respondent claims that this document was not responsive to complainant's discovery because it post-dated the deposition of the custodian of records. However, it should be noted that in *Complaint's [sic] First Request for Production of Documents,* which I have held required supplementation from respondent, complainant sought discovery of all documents which referred to him (ALJX 11, at Document Request 22). CX 129 clearly is responsive to this request. In any event, respondent does not dispute that it should have produced an August 7, 1997 memorandum from Carole James to OWCP (CX 131), which complainant obtained sometime prior to the April 14, 1998 post-hearing conference in response to a Freedom of Information Act request filed with OWCP *(see* TR 1958). That document consists of complainant's workers' compensation claim and NUWC's responses to that claim, and includes complainant's medical records at NUWC.

However, these are not the only documents respondent failed to produce regarding the compensation claim. It should be noted that the October 15, 1997 letter from Carole James to OWCP is a response to an August 13, 1997 letter from an OWCP claims examiner. That letter from OWCP was not produced by respondent. Moreover, it is hard to conceive that no other documents were generated in response to complainant's workers' compensation claim in the four months between the filing of the compensation claim and the deposition of the custodian of the records. Since this case already was in litigation at the time the workers' compensation claim was filed, and respondent's interference with complainant's filing of that claim had been raised as an issue even before the compensation claim was filed, it is inconceivable that no internal memoranda, e-mails or other written communications were created by NUWC regarding the compensation claim. Yet none were produced, nor were claims of privilege asserted for any otherwise responsive documents. Once more, I find that respondent failed to comply with my orders compelling discovery.

34

I again find that the appropriate remedy for respondent's failure to comply with my orders compelling discovery is to rule that the issue for which the discovery was sought is taken as established, as provided by 29 C.F.R. §18.6(d)(2)(ii). Therefore, I find that respondent interfered with complainant's filing of his workers' compensation claim.

### e. Other complaint allegations

Complainant alleges that respondent refused to permit him to take an early retirement under the VSIP when he applied in February or March, 1997, and that this is an adverse action motivated by animus against him. This contention has no merit, as the evidence clearly establishes that he did not meet the qualifications for the program.

The purpose of the VSIP

> is to create vacancies for employees who are scheduled to be
> separated by RIF [reduction in force] at other DoD activities. Cash
> incentives of up to $25,000 will be offered to employees in
> continuing positions who agree to voluntarily retire or resign so
> that surplus employees can be placed in their jobs.

CX 92, at 382. Since the complainant had already agreed to resign effective September 1, 1997, there was no reason for respondent to offer him a cash incentive to retire in April of that year, when he would have reached the minimum age of 50 necessary to retire under VSIP. Moreover, since he was no longer performing an actual job for NUWC, his retirement would not have opened up a slot for another worker who otherwise might be laid off. In short, having complainant retire early would have been of no benefit to NUWC, which explains why complainant did not meet the requirements for that program. It should be noted that by the time complainant met the age and time in service requirements for VSIP, he been receiving his full pay under the settlement agreement for almost two years, and received all of the other financial benefits the settlement agreement provided. He would stop receiving his pay under the agreement at the end of August. After his resignation on September 1, 1997 became effective, complainant would not have been eligible to receive a pension due to his Federal employment until he reached the age of 60, in April, 2007.[26] It does not take a cynic to question why complainant decided to apply for an early retirement under VSIP, and begin receiving a pension immediately, at that time. But he was clearly ineligible despite meeting the age and time in service requirements.

Since complainant was not eligible for an early retirement, denying him permission to take one was not an adverse action. Even if it is considered an adverse action, there is no evidence

---

[26]I take judicial notice that Federal civilian employees can retire at the age of 55 with at least 30 years of service, at the age of 60 with at least 20 years of service, and at the age of 62 with at least five years of service. *See, e.g.*, Department of Labor *Employee Handbook* at 44 (1990 ed.).

35

that he was denied an early retirement due to animus on the part of the respondent. Rather, not permitting him to take part in the VSIP was eminently reasonable.

Next, complainant contends he was subjected to a constructive discharge when on July 25, 1997 NUWC refused to let him disavow his resignation under the settlement agreement and informed him his employment would be terminated on September 1, 1997. Essentially, complainant is contending that he is being constructively discharged because NUWC would not release him from his resignation from the Department of Defense which was to take effect on September 1, 1997 and which complainant unconditionally agreed would not be waived. It is hard to conceive that complainant could make this argument with a straight face. That "Mr. Beliveau did not have final, definitive, unequivocal notice that Respondent would interpret the settlement agreement to prevent any action other that NUWC's discharging him on September 1, 1997 ..." (*Complainant's Post-Hearing Brief* at 87-88) is absurd. The only reasonable interpretation of Paragraphs 1B and 11B of the settlement agreement is that complainant would no longer be in NUWC's employ after September 1, 1997. Requiring the complainant to honor the contract he entered into on June 15, 1995 was not an adverse action.

Complainant next contends that respondent discriminated against him by rescinding the restoration of 98 hours of annual leave.[27] This leave had been restored to the complainant in late 1995, and was rescinded shortly thereafter. The problem with this allegation is that the complainant has not established – or even represented – that he was entitled to have the leave restored, admitting he did not know if he was entitled to it (*see, e.g.*, TR 1243-51). It is respondent's position that claimant was not entitled to have his lost annual leave restored, and when the error made by restoring annual leave to him was noticed, the restored leave was rescinded (TR 250-52; RX 20). Since complainant has not established that he was entitled to have this leave restored, the rescinding of the restored leave cannot be found to have been an adverse action. Accordingly, complainant has failed to establish that he was discriminated against when the restored leave was rescinded.

Another contention by the complainant is that respondent failed to provide him with a timely performance appraisal for the rating period of July 1, 1995 to June 30, 1996. That rating form was not completed until October 10, 1996, and complainant did not receive a copy of it until March, 1997. Under NUWC's procedures, complainant should have received a copy of his performance evaluation for the period ending on June 30, 1996 not later than September 30, 1996 (*see* CX 97). Clearly, he did not receive his performance evaluation in a timely manner. However, there was no question regarding complainant's rating, as this was covered in the settlement agreement. He was to receive a Level IV rating, and that is the rating he received.

Assuming *arguendo* that the failure to provide the complainant with a copy of this preordained performance appraisal in a timely manner is an adverse action, there is no evidence that animus against the respondent played any role in his not being given a copy of the

---

[27]In fact, 136.3 hours of restored leave were rescinded. *See* CX 38, 39.

36

performance appraisal until March, 1997. In his brief, complainant states that "Respondent offered no evidence that it had any reason other than retaliation to take the action." (*Complainant's Post-Hearing Brief* at 66) But even in light of *Reeves v. Sanderson Plumbing Products Inc., supra*, it is not respondent's burden to prove that its action was not retaliatory; rather, complainant must prove that it was. Clearly, giving complainant a copy of his performance appraisal where his rating was dictated by the settlement agreement, essentially a meaningless action, would not have been a high-priority item. Had respondent believed complainant actually needed a copy of his performance appraisal and deliberately had not given it to him, that could have been indicative of animus. But there is no indication that this is what occurred. In fact, complainant did not even bring this matter up with respondent prior to initiating this proceeding by filing a complaint on October 10, 1996; and at that time the performance evaluation was only days late.

Complainant's citation to Capt. Logue's testimony at pages 392-93 of the transcript as support for a finding that respondent deliberately withheld his performance appraisal is a distortion of the record. For one thing, Capt. Logue did not state that he told his subordinates to "stop playing the game" (*see Complainant's Post Hearing Brief* at 66); in fact, no one used that phrase. Complainant's counsel, at pages 392-93 of the transcript, asked Capt. Logue:

> Q. ... And you stated that you advised your staff at one point to no longer hold up Mr. Beliveau's payments as part of the game, isn't that correct?
>
> A. I directed that they no longer be held up.

Second, this testimony had nothing to do with complainant's performance appraisal; it concerned reimbursement of educational expenses.

Next, complainant's allegation that respondent tried to pressure him "until he broke" is based on a statement allegedly made by Dr. Dence. That Dence suggested complainant be pressured until his health was affected was confirmed by Capt. Logue, who stated that he immediately rejected such a strategy (TR 382-83). Complainant has offered no credible evidence that the strategy to pressure him until his health was adversely affected was ever effectuated.

Complainant has tied this contention into a broader one, *i.e.*, that he faced a hostile working environment. But his allegations are specious. He contends that respondent isolated him after the settlement agreement was entered into. Specifically, in his February 28, 1997 complaint, complainant contended that he was denied entry to the Newport Naval Complex, was forbidden to contact current or former NUWC employees, and could not discuss NUWC's activities with other people. The absurdity of these allegations is that these are all things complainant agreed to in the settlement agreement. *See* Appendix 1 at Pargraphs 5B, 6, 11D. Although complainant alleges that these provisions are contrary to public policy, and therefore should not be enforced, the fact remains that the agreement is in effect unless and until the Administrative Review Board

37

invalidates all or part of it. Accordingly, it cannot be held to be an act of discrimination for respondent to seek compliance with the settlement agreement. Similarly, that complainant could not access NUWC e-mail and briefings relate to his agreement to absent himself from NUWC's facilities.

What complainant continuously seeks to ignore, as is obvious from even a cursory review of the settlement agreement, is that respondent's primary purpose in entering into the settlement was to isolate him and have him leave its employ. Complainant had to be aware of respondent's intent, and agreed when he signed the settlement agreement to be bound by the very provisions to which he now objects. Again, complainant is acting in a completely disingenuous manner. He wants all the benefits from the settlement but none of the burdens. He cannot have it both ways.

Complainant next contends that his transfer to the Human Resources Department was part of "a pattern of discrimination designed to aversely impact Mr. Beliveau's ability to secure other employment." *Complainant's Post Hearing Brief* at 76. But the complainant has failed to show how the transfer of his position to the Human Resources Department, which did not change either his job title or job description,[28] was adverse. Although he alleges that the position in Human Resources was less desirable (*id.* at 27), will make it harder for him to secure other employment, and will result in loss of reputation (*id.* at 48-49), he did not provide a shred of evidence in support of any of these contentions. Accordingly, complainant has failed to prove that transferring him to Human Resources was an adverse action.

Even if it was an adverse action, the record reflects that the transfer was not the result of animus. Rather, it was essentially nothing more than a bookkeeping change made for legitimate, business-related reasons, as the testimony of Lord and Hussey make clear. It is another example of complainant making a mountain out of a molehill.

Finally, complainant contends that he was threatened with criminal prosecution because Nelligan expressed concern that, by accepting pay for teaching at URI while an employee of the Federal Government, he may have been engaging in illegal activity. It is interesting that complainant could take Nelligan's conduct in regard to this question and turn it into an allegation of adverse action. For one thing, complainant cannot point to an explicit threat made by Nelligan. Rather, any threat was all in complainant's mind. Second, Nelligan was acting reasonably in alerting complainant to the fact that Federal law may prohibit his teaching activities. As anyone who has had occasion to look into them knows, the conflict of interest laws for Federal employees are complex, and govern many aspects of a federal employee's life outside his or her official duties. As NUWC's ethics officer, it would have been improper for Nelligan to fail to alert claimant to a possible violation of these statutes and regulations. It is beyond the scope of this decision to determine whether claimant was in violation of 18 U.S.C.§ 209(a) by accepting payment from URI for teaching classes at the university when his job duties for NUWC at that

---

[28]Complainant continued to be classified as a supervisory general engineer even after his transfer to the Human Resources Department. *See, e.g.*, RX 19.

38

time consisted solely of going to graduate school to obtain a Ph.D. in Business Administration.[29] But complainant should have realized that, at least in this instance, Nelligan may have had a point which deserved his serious attention rather than his scorn.

Since I find that no threat, either implicit or explicit, was made by Nelligan in raising this issue with the complainant, there was no adverse action taken by respondent.

In summary, complainant is granted a default judgment regarding the issues of respondent's interference with his relationship with McAndrew and its interference with his filing a worker's compensation claim. In all other respects, his complaints are dismissed.

*f. Damages*

Complainant seeks compensatory and exemplary damages resulting from respondent's violations of the several whistleblower statutes at issue in this case. As compensatory damages, he seeks:

    1. $1000 in interest lost on the delayed reimbursement of educational expenses;

    2. $4300 for tuition and travel expenses for the MIT course;

    3. $5000 "as the dollar equivalent of the rescinded annual leave" (*Complainant's Post Hearing Brief* at 95);

    4. $3000 for tuition he will have to pay to complete his Ph.D. program;

    5. Either his pension (paid over time) or a lump sum of $215,000 (the alleged cash value of the pension);

    6. An unspecified sum as "front pay for lost continued employment" (*id.* at 98); and

    7. $100,000 for mental anguish and loss of reputation.

In addition, complainant seeks exemplary damages under the SDWA of at least the same amount paid by respondent to McAndrew subsequent to the settlement agreement.

It is clear that, of the environmental problems at NUWC raised by complainant with the EPA, at least some concerned possible violations of both the CAA and the SDWA. For example, Ann Fenn and John Gauthier of EPA testified that the complainant raised issues falling under both of these statutes (TR 96, 108, 138-39); and according to EPA's memoranda of interviews with

---

[29]It would appear that complainant was not in violation of 5 C.F.R. §2635.807(a), since he was teaching regular courses at an institution of higher education. *See* n.19 *supra*.

the complainant, complainant specifically raised an issue regarding NUWC's failure to test drinking water for contamination by lead and other substances (CX 94, at 5). Accordingly, this case falls within the jurisdiction of both the CAA and the SDWA, and the remedies provided by these statutes can be applied in this case.

As an agency of the United States Government, respondent is only liable for damages in cases where sovereign immunity has been waived. Respondent apparently concedes that sovereign immunity was waived and it is liable for compensatory damages for violations arising under the CAA at any time relevant to this case (*see Respondent's Post-Hearing Brief* at 154-55). However, in regard to the SDWA, the only one of the four statutes under which this case was brought which provides for exemplary damages, *see* 42 U.S.C. §300j-9 (i)(2)(B)(ii), respondent contends that it is liable for damages arising under the SDWA – whether compensatory or exemplary – only since the effective date of P.L. 104-182, the Safe Drinking Water Act Amendments of 1996. That statute became effective on August 6, 1996, and for the first time subjected Federal agencies to the full range of remedies under SDWA. *See* 42 U.S.C. §300j-6(a) and (b).

Respondent's analysis of its liability appears to be correct; and accordingly it is liable for compensatory damages under both the CAA and SDWA, and exemplary damages only under SDWA. Moreover, its liability for any damages under SDWA begins on August 6, 1996. However, since I have found that complainant's complaints to EPA are protected under both the CAA and SDWA, compensatory damages may be awarded if appropriate for any adverse actions alleged in this case without regard to the August 6, 1996 date.

In regard to exemplary damages under the SDWA, since I have issued a default judgment because respondent's discovery abuses impeded complainant's efforts in developing his case, it would be both unfair and ironic to use the August 6, 1996 effective date of the waiver of sovereign immunity under the SDWA to preclude complainant from obtaining exemplary damages. Moreover, although it appears that most, if not all, of the money respondent paid to McAndrew without complainant's knowledge was paid prior to August 6, 1996, there is no reason to conclude that respondent's relationship with Andrew and its deleterious effects on complainant ended when the payments ended. For example, CX 64-66, which are copies of McAndrew's bills dated January 29, 1997, March 24, 1997 and April 24, 1997, list services performed by McAndrew from August 1, 1996 through April 7, 1997, for which he apparently expected to be paid by respondent. It is also known that McAndrew continued to provide information to respondent, including confidential information he obtained in the course of his legal practice, through at least October, 1997.

Although the continuing violation theory usually is invoked in situations where the timeliness of the complaint is at issue, it appears to be just as applicable here, in assessing respondent's liability for exemplary damages. Respondent's interference with complainant's relationship with his attorney was not a single discrete event. Instead, it was a series of events which began after the settlement agreement and continued until at least just before the hearing.

And that is based on the evidence which was produced. It is not known what else complainant would have been able to prove had he been provided with all the evidence he attempted to obtain through discovery. Accordingly, I hold that the respondent's interference with complainant's relationship with his attorney was a continuing violation extending over a year after the SDWA was amended, all of which can be considered in assessing exemplary damages. But even if only the post-August 6, 1996 events can be considered, there is an adequate basis to award exemplary damages.

<u>(i) Compensatory Damages</u>

Items 1-6 in the above list of damages sought by the complainant relate to complaint allegations which were dismissed. Obviously, complainant cannot recover damages where the allegation which supports the damages award has been dismissed. Moreover, complainant's unsupported self-serving testimony that he would have been hired for other Federal jobs starting in June, 1996 (TR 652-53) is insufficient to established his entitlement to what he calls "front pay" even if he had established the other complaint allegations. Also, it is interesting to note that no damages other than mental anguish and loss of reputation are claimed in regard to either of the two allegations which complainant did establish, *i.e.*, that respondent interfered with his relationship with McAndrew and with his workers' compensation claim; and complainant has produced no evidence relevant to damages for loss of reputation.

In regard to the sum he seeks to recover due to mental anguish, complainant relies on the testimony of Dr. Mark Zimmerman, the director of outpatient psychiatry at Rhode Island Hospital and an associate professor of psychiatry at Brown University (TR 731-32). Despite an impressive list of publications and appointments, Dr. Zimmerman had only been practicing for three years (TR 771-72), and was not board-certified, at the time of the hearing.

Although complainant was under treatment at Rhode Island Hospital's outpatient psychiatric program beginning in late December, 1996, Dr. Zimmerman first saw the complainant on March 13, 1997 (TR 736). At that time, he diagnosed panic disorder without agoraphobia and depressive disorder not otherwise specified. Dr. Zimmerman described panic disorder as "unexpected spells of intense anxiety associated with a number of different physical symptoms of anxiety such as heart racing, shortness of breath, sweating, light-heatedness. It's essentially having a fear response when there is no fear stimulus." (TR 738-39) He defined agoraphobia as "the avoidance of anything because of fear of having a panic attack." (TR 741) As to depressive disorder not otherwise specified, Dr. Zimmerman said it is "a mild version of major depression" (TR 739), with fewer manifestations. He agreed that "depressive disorder not otherwise specified" is the DSM-IV[30] catch-all category for minor depression (TR 748).

---

[30]DSM-IV is the fourth edition of the *Diagnostic and Statistical Manual*, which was described by Dr. Zimmerman as "the diagnostic bible of making mental disorder diagnoses." TR 733.

41

Dr. Zimmerman testified that, with panic attacks, complainant had other symptoms including "heart racing, chest tightness, sweating, dizziness, nausea, abdominal pain, diarrhea, a fear that he might be having a heart attack or losing control." (TR 740)  He added that, in regard to "Mr. Beliveau's difficulties that he was expressing regarding the Navy," complainant was exhibiting symptoms of severe headaches, upset stomach, sleep difficulty and difficulty concentrating (TR 742).  Dr. Zimmerman prescribed Paxil, which he stated initially provided "a considerable amount of relief." (TR 743).  Although complainant's condition "has waxed and waned over time ..." (TR 744), he has never met the criteria for major depression (TR 745).  He stated that the stress complainant is under "from his experience with the Navy and his current situation ..." could increase his risk  for cardiac problems (TR 745).

Although Dr. Zimmerman's testimony lends some support to complainant's claim for damages for mental anguish, his testimony is of limited probative value.  For there are major flaws in his opinion.  First, he is not complainant's primary therapist.  That role belongs to Dawn Era, a social worker in Dr. Zimmerman's office (TR 736).  Ms. Era sees complainant much more often than Dr. Zimmerman, and is the person who provides mot of his treatment (TR 743-44, 753).  In fact, in the five times Dr. Zimmerman had seen complainant prior to the hearing, only the initial session was a psychiatric evaluation; other visits were primarily medication management visits of short duration and which consisted of conversation rather than therapy (e.g., TR 751-54).  Yet despite the fact that Ms. Era was complainant's therapist, Dr. Zimmerman was relatively unfamiliar with the treatment she was providing to the complainant (see TR 744, 760).

Second, it appears that Dr. Zimmerman is too accepting of complainant's attribution of his symptoms to his problems with NUWC (e.g., TR 764, 766-67), and made little effort to determine whether other causes, such as his decision to divorce is wife and other family and domestic matters (TR 768-70, 782-84), as well as the pressure of his doctoral program (see TR 931-32, 951-52),[31] caused or contributed to his condition.  Related to this is that, while Dr. Zimmerman readily accepted complainant's self-diagnosis, he rejected the opinion of complainant's treating medical doctor, Dr. Stulick, in regard to diagnoses of anxiety since 1991 (TR 755-59).

Finally, Dr. Zimmerman's opinion regarding the cause of complainant's condition is very non-specific, falling under the umbrella of problems with the Navy.  He did not attempt to, and probably cannot in any event, differentiate between stress arising from the two discriminatory acts found in this case - - respondent's interference with complainant's relationship with McAndrew and with his workers' compensation claim - - and the stress arising from other aspects of complainant's employment NUWC which is not compensable through this case.  These include anything occurring up to June 15, 1995; complainant's false impressions of discriminatory actions by respondent; and other litigation with respondent in which complainant is involved.  Not only does Dr. Zimmerman fail to address this issue, but it does not

---

[31]Complainant experienced a slowdown in his progress for his degree which coincided with the period during which he was undergoing treatment in Dr. Zimmerman's practice.

42

appear that he even realizes that it is an issue. I am not blaming Dr. Zimmerman, for this is probably irrelevant to this diagnosis and treatment (*see, e.g.,* TR 785-88). But it is very relevant here, in attempting to determine whether complainant's mental condition relates to the two acts of discrimination he has proven.

Nevertheless, as opposed to most other whistleblower cases where damages for emotional distress are being sought, at least there is some expert medical evidence on the issue of damages due to emotional distress. The Secretary/ARB have held that expert medical evidence is not necessary to award compensatory damages for emotional distress, that a complainant's testimony by itself is sufficient for a judge to find that emotional distress is due to discrimination and award damages. *See, e.g., Jones v. EG&G Defense Materials, Inc.*, ARB Case No. 97-129, ALJ Case No., 95-CAA-3 (ARB Sept. 29, 1998). Here, although Dr. Zimmerman's testimony is not without it's faults, at least it is clear that complainant has a diagnosed mental condition and that the supervising psychiatrist attributes this condition to the complainant's employment with the respondent.

Other cases without expert evidence either of a diagnosed emotional condition or of causation have nonetheless awarded compensatory damages for emotional distress in amounts of $20,000 (*Assistant Secretary of Labor for Occupational Safety & Health v. Guaranted Overnight Delivery,* ABA Case No. 96-108, ALJ Case No. 95-STA-37 (Sept. 5, 1996), and even $50,000 (*Jones, supra*). Here, there is expert evidence of both a diagnosed condition and causation. Although this expert evidence is entitled to only limited weight, it is far more probative than lay evidence which more often than not is nothing more than a complainant's conjecture. With those cases as a guide, I find it reasonable to award complainant compensatory damages of $50,000 for emotional distress related to the two proven acts of discrimination. Had I believed that all of complainant's mental problems diagnosed by Dr. Zimmerman - - panic disorder without agoraphobia and depressive disorder not otherwise specified - - arose exclusively, or even primarily, from the discrimination I found in this case, I would have awarded compensatory damages of $100,000. But Dr. Zimmerman's evidence is at his weakest in this regard. It appears that complainant's condition preexisted his employment at NUWC, and judging from the various memoranda which complainant wrote shortly after he began working for respondent he was already very anxious at that time because of his fear of civil and criminal liability, fears which certainly were not eased by the EPA inspection late in 1994. Although complainant told Dr. Zimmerman that his condition worsened substantially at the time he started treatment at Rhode Island Hospital, complainant is very manipulative and thus this history may not be credible. However, I do give some weight to Dr. Zimmerman's testimony, and find that at least some degree of the diagnosed conditions relate to respondent's interference with complainant's relationship with McAndrew.

<u>(ii) Exemplary Damages</u>

The leading DOL environmental whistleblower case in regard to exemplary damages is *Johnson v. Old Dominion Security*, 86-CAA-3, 4 and 5 (Sec'y, May 29, 1991), in which the issue

43

was exemplary damages under the TSCA. The TSCA and SDWA provide identical remedies for violations of their respective whistleblower protection provisions. *In Johnson*, the Secretary stated:

> Exemplary awards serve in punishment for wanton or reckless conduct to deter such conduct in the future. The Restatement (Second) of Torts §908 (1979) describes a two-step analysis. The threshold inquiry centers on the wrongdoer's state of mind: did the wrongdoer demonstrate reckless or callous indifference to the legally protected rights of others, and did the wrongdoer engage in conscious action in deliberate disregard of those rights. The "state of mind" thus is comprised of both intent and the resolve actually to take action to effect harm. If this state of mind is present, the inquiry proceeds to whether an award is necessary for deterrence.

*Id.*, slip op at 16-17 (footnote omitted). The Secretary held that the facts in *Johnson*, where there security guards who complained of leaks of hazardous substances were found to have been allegedly discharged under the provisions of the TSCA, were insufficient to merit exemplary damages. The Secretary stated that the respondent manifested "indifference to the public health purposes of the TSCA in its treatment of Complainants .... Its conduct was largely in the nature of omission." (*Id.* at 17). The Secretary added:

> Generally, a bare statutory violation is insufficient to substantiate such an award. While these events may be viewed to exceed somewhat the violation of retaliatory discharge, in my view they fall short of the conduct present in a number of relevant cases. I do not view Respondent's intent and actions as meeting the threshold for an exemplary damages award. Because I do not find the existence of the requisite state [of mind], I need not resolve the question of deterrence.

*Id.* (citation and footnote omitted). Similarly, in *Jones v. EG&G Defense Materials, Inc., supra*, where exemplary damages were sought under the TSCA, the Secretary in denying exemplary damages, once again characterized the respondent's actions as "indifference to the purposes of the environmental acts" *Id.*, slip op at 24. In the *Jones* case, a safety manager who engaged in a variety of protected activities in response to perceived health and safety problems was illegally fired. Yet exemplary damages were found to be inappropriate. In fact, I have been unable to find a single DOL whistleblower case where exemplary damages ultimately were awarded.

Since only two of the many complaint allegations have been established, those are the only allegations to look to in determining whether exemplary damages are appropriate. One of the two - - respondent's interference with complainant's filing of a workers' compensation claim - - clearly does not rise to the level of wanton and reckless conduct needed to establish a predicate

44

for exemplary damages. It may have been childish and vindictive, but all it did was delay complainant's workers' compensation case for a short time. It certainly does not rise to the level of a retaliatory termination or demotion, neither of which routinely produces awards of exemplary damages.

That leaves the claim that respondent subverted the relationship between complainant and his attorney, McAndrew, to the point that McAndrew, while ostensibly working for complainant actually was working for respondent, to complainant's detriment. It has been established that McAndrew abused his position as complainant's attorney by providing respondent with confidential information, including that complainant's son had a problem of some kind at Brown University, and otherwise cooperating with respondent but not complainant during the pendency of this litigation. Due to respondent's failure to provide complainant with documents requested through discovery as well as our lack of subpoena power in whistleblower cases, the full extent of the relationship between respondent and McAndrew is not known. Nevertheless, it is hard to conceive of something as heinous as an agency of the Federal Government surreptitiously paying an opposing party's attorney so much money that the attorney in effect becomes its agent rather than the opposing party's, apparently in an effect to prevent violations of environmental protection statutes from being discovered and/or to mitigate the punishment for those violations. This is conduct that shocks the conscience, and which must be deterred in no uncertain terms.

This conduct on the part of NUWC meets the two-part test set in *Johnson v. Old Dominion Security, supra.* First, respondent demonstrated reckless and callous indifference both to complainant's rights, by leaving him without effective counsel, and to the rights of the public, by apparently attempting to cover up its failure to comply with several statutes designed to protect the environment. Thus respondent had both the intent to do harm and took actions designed to accomplish its intent. Second, respondent's unconscionable conduct must be deterred, and an award of exemplary damages may go a long way to deter such conduct. I find that exemplary damages are appropriate.

Once it is determined that exemplary damages are appropriate, the next issue is the amount of those damages to award to the complainant. Since the standard is the amount necessary to punish and deter the reprehensible conduct, *see, e.g., CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 705-06 (1st Cir. 1995), that Beliveau may not be the most deserving of complainants is essentially irrelevant. Complainant suggests as a minimum an amount equal to that which respondent paid to McAndrew, which I have found to be $281,115.50. I find that to be an appropriate sanction. Considering the size of the respondent - - whether it is considered to be the Navy in general or just NUWC - - anything less would scarcely be noticed, and would have little or no deterrent effect.

## RECOMMENDED ORDER

1. ***IT IS ORDERED*** that Respondent Naval Undersea Warfare Center pay to the complainant, John J. Beliveau:

45

(a) Compensatory damages for emotional distress in the amount of $50,000; and

(b) Exemplary damages in the amount of $281,115.50

2. Complainant's counsel shall file their fee petition within 45 days of this decision. Respondent shall have 30 days from receipt of fee petition to file a response.


JEFFREY TURECK
Administrative Law Judge