as Exhibit E. In my reply to Mr. MacCaffrie, I advised him that I believed that the auditor had all the information he needed in order to complete the audit.

13. **Allegation**: In September 2003, Mr. D'Agostino inquired if there was a contract with Mr. Goulet's auditing firm. I responded immediately to Mr. D'Agostino's request and informed him that I believed the contract included the year 2003 audit.

**Response**: I do not recall this event. In fact, according to Mr. Beliveau's statements to the Electric Commissioners on December 22, 2003, the contract with Mr. Goulet's auditing firm did not include the year 2003 audit. At that meeting, Mr. Beliveau asked the Board to extend Mr. Goulet's contract to include the 2003 audit.

14. **Allegation**: In September 2003, I was deposed by the attorney representing Ms. Stoyle in connection with the Stoyle Charge. My deposition testimony also corroborated many of the allegations of discrimination and retaliation made by Ms. Stoyle and other women against Mr. D'Agostino. Upon information and belief, the transcript of my deposition testimony was made available to Mr. D'Agostino sometime in October 2003.

**Response**: I have not seen a copy of the deposition and I do not know its contents. I have very little information about, or interest in, any support provided to Ms. Stoyle by Mr. Beliveau. The matter has been turned over to insurance counsel and my involvement in the defense of the claim has been minimal. Upon information and belief, no copy of Mr. Beliveau's deposition transcript has been made available to the Selectmen.

15. **Allegation**: In October/November of 2003, Mr. D'Agostino was the subject of an ongoing ethics investigation. I was interviewed in connection with that investigation.

**Response**: I was the subject of an unwarranted complaint to the State Ethics Commission. To date, no finding of wrongdoing has been made against me and I am confident that I will be cleared. Until I read this charge of discrimination, I was unaware that Mr. Beliveau played any role in the State Ethics Commission investigation.

16. **Allegation**: On or about November 15, 2003, the auditor released his report finding no wrongdoing by Ms. Stoyle.

5

**Response:** A copy of the auditor's report, Mr. Beliveau's memo, and the Town Accountant's response, is attached hereto as Exhibit F. All involved agreed that the Electric Department needed to increase the funds on deposit with the Town.

17. **Allegation:** On November 17, 2003, Ms. Stoyle reported to the board of the Light Commissioner's meeting that the auditor had commenced the year end audit.

    **Response:** Ms. Stoyle made no such announcement at the November 17, 2003 meeting. The meeting minutes make no mention of any such announcement and the videotape of the meeting does not show Ms. Stoyle reporting that information to the Light Commissioners. The truth is that I did not know about the audit commencement until Mr. Beliveau told me about it on December 22, 2003.

18. **Allegation:** On December 10, 2003, Mr. D'Agostino fired the auditor without notifying me of his intention to do so.

    **Response:** A copy of my memo dated December 10, 2003 is attached hereto as Exhibit G. The memo makes no mention of "firing" Mr. Goulet. The memo expresses my desire to have the same auditing firm perform both the Town and Light Department audits. In furtherance of this policy, on December 10, 2003 I advised Mr. Beliveau that the Town would not be extending the existing auditor's contract nor entering into a new contract with his firm.

19. **Allegation:** On December 17, 2003, I sent a memo documenting the fact that the auditor had been terminated before the year end audit had been completed and that the termination would likely have serious consequences.

    **Response:** A copy of Mr. Beliveau's memo to me is attached hereto as Exhibit H. Mr. Beliveau's reply notes his reservations about my decision and warns that the Town must proceed without delay in order to give a new auditor enough time to meet the required deadlines. Mr. Beliveau's memo failed to inform me that the auditor's contract expired on December 31, 2003. Further, Mr. Beliveau's memo does not inform me that the 2003 audit had already commenced. Mr. Beliveau did not reveal this information to me until the December 22, 2003 meeting of the Board of Municipal Electric Commissioners.

20. **Allegation:** On December 22, 2003, at my suggestion, the Board of the Light Commission voted to retain Mr. Goulet for another year.

**Response:** The Board of the Light Department voted to retain Mr. Goulet because they were given very little advance notice of the expiration of the auditors' contract and because, unbeknownst to me, Mr. Goulet had already commenced auditing functions for 2003.

21. **Allegation:** On December 23, 2003, Mr. D'Agostino issued a memorandum of reprimand to me accusing me of violating Massachusetts Law by failing to inform him that Mr. Goulet had commenced the Year 2003 audit. This was a false accusation. Mr. D'Agostino was at the Board of Light Commission meeting on November 17, 2003 when Ms. Stoyle reported that the audit had commenced. I received Mr. D'Agostino's memorandum when I returned from vacation on January 5, 2004.

**Response:** Mr. Beliveau's conduct with respect to the issue of the 2003 audit gave rise to my memo. I have found on a number of occasions that Mr. Beliveau has worked at cross-purposes with me. An example of this situation occurred with respect to my desire to have a single auditor conduct the audits of both the Town and the Municipal Electric Department. In furtherance of this policy, on December 10, 2003 I advised Mr. Beliveau that the Town would not be extending the existing auditor's contract nor entering into a new contract with his firm. Mr. Beliveau replied to my memo on December 16, 2003 by noting his reservations about my decision and warning that if the Town wished to hire a new auditor, it needed to proceed without delay in order to give a new auditor enough time to meet the required deadlines. Mr. Beliveau's memo failed to inform me that the auditor's contract expired on December 31, 2003. Further, Mr. Beliveau's memo does not inform me that the 2003 audit had already commenced. Mr. Beliveau did not reveal this information to me until the December 22, 2003, meeting of the Board of Municipal Electric Commissioners. The Board of the Municipal Electric Commissioners voted to defer the process of exploring a transition to a single auditor because they were given very little advance notice of the expiration of the auditors' contract and because, unbeknownst me, the existing auditor had already commenced auditing functions for 2003.

By failing to give me adequate notice of the expiration date of the auditor's contract and by failing to inform me that the 2003 audit had already commenced, Mr. Beliveau interfered with my ability to begin the process of effecting an orderly transition to a single auditor. Withholding this relevant information until the meeting of the Board of Electric Commissioners is an embarrassment to me and undermines my efforts to rationalize and improve municipal operations. Further, it represents an act of insubordination. Mr. Beliveau had received a previous written warning regarding his failure to timely provide important information to me. A copy of the February 14, 2002, memo is attached hereto as Exhibit K.

7

22. **Allegation:** The December 23, 2003 memorandum from Mr. D'Agostino included a directive that has resulted and will continue to result in a significant diminution of my status and responsibilities as Director of the Electric Plant.

   **Response:** Again, Mr. Beliveau's allegation is so vague that I am unable to respond to it. Massachusetts law requires me, as Manager of the Electric Department, to supervise Mr. Beliveau. I require daily, weekly, or monthly reports from municipal department heads as the situation requires. The December 23, 2003 memorandum made no change to Mr. Beliveau's responsibilities as Director of the Electric Plant. A copy of the memorandum is attached hereto as Exhibit I.

23. **Allegation:** Since the filing of the Stoyle Charge and my deposition testimony favorable to Ms. Stoyle, Mr. D'Agostino has made a number of false and disparaging statements concerning my performance and conduct. I believe he knew those statements were false when he made them and that his purpose in making the statements was to injure my professional standing with the members of The Board of Light Commission and members of The Board Of Selectmen as a precursor to and in preparation of my wrongful discharge. Mr. D'Agostino has made no effort to correct the false and disparaging statements although it has been well established that the statements were false when made.

   **Response:** I have never made an intentionally false and disparaging statement concerning Mr. Beliveau's performance or conduct. Mr. Beliveau's general reference to "false and disparaging statements" fails to provide sufficient information which would allow me to respond more specifically to his complaints. I am unaware of what statements form the basis for Mr. Beliveau's complaints. I have very little information about, or interest in, any support provided to Ms. Stoyle by Mr. Beliveau. The matter has been turned over to insurance counsel and my involvement in the defense of the claim has been minimal. Mr. Beliveau continued to receive regular salary increases and no adverse employment action was taken against him as a result of any support he may have provided to Ms. Stoyle.

24. **Allegation:** Recently Mr. D'Agostino has been inundating me with unnecessary, burdensome and time consuming tasks that unnecessarily interfere with my ability to perform my job duties. I believe that Mr. D'Agostino knows that I will be unable to respond to his demands in what he considers to be a timely fashion and will then use my inability to do so as the basis for disciplinary action or discharge.

8

**Response:** I have made only such requests of Mr. Beliveau as are necessary for me to fulfill my responsibilities as Manager of the Light Department. Until I read Mr. Beliveau's affidavit, I was unaware that he felt burdened by "unnecessary and time consuming tasks." Because Mr. Beliveau fails to provide specific information identifying the tasks which he feels are "unnecessary, burdensome and time consuming," I am unable to respond more specifically to his complaints.

25. **Allegation:** I believe that Mr. D'Agostino is attempting to lay the groundwork for my discharge in retaliation for my support of Ms. Stoyle in connection with the Stoyle Charge.

**Response:** The decision to terminate Mr. Beliveau's employment was based on his insubordination and his inability and unwillingness to work cooperatively with other Town employees, particularly the Town Accountant and Town Treasurer, all to the detriment of the Town. A copy of my memorandum to the Board of Selectmen regarding my decision to terminate Mr. Beliveau's employment is attached hereto as Exhibit J.

Based upon information presently reasonably available to the Respondents, I hereby affirm under the pains and penalties of perjury that the facts in this Response to the Allegations Contained in the Charge of Discrimination filed by John Beliveau and the Position Statement filed by the Respondent are true and correct to the best of my present knowledge.

John O. D'Agostino
Date: 2/26/04

## Director of Electric Department

**Position Overview:**

The Director of Electric Department is the appointment of the Town Manager. He or she will assist the Town Manager in the operation of the Electric Department. He or she will assume responsibility for all functional areas and direct the daily activities of the plant.

**Duties:**

By direction of the Manager, supervise and direct all functions and personnel of the Mansfield Electric Department. He or she will perform the duties of the Manager in his or her absence.

He or she will assist the Manager in directing the preparation, review and approval of annual budgets, action plans and policy recommendations for submittal to the Board of Electric Light Commissioners.

He or she will prepare and review power supply forecasts, long and short term contracts and resulting electric rate schedules and then make appropriate recommendations to the Manager regarding submittals to the Board of Electric Light Commissioners.

He or she will assist the Manager in review and approval of bid specifications, bid evaluations, purchasing procedures, acquisition of materials and supplies and warehousing. He or she will review, recommend, coordinate and administer all insurance coverage and associated claims activity.

He or she will provide leadership, motivation and direction to the staff by determining work priorities and assignments and coordinating staff activities and establishing operating policies and procedures. He or she will review, approve, monitor progress and provide direction for all Light Department projects. He or she will monitor and/or supervise outside vendors employed to do substation testing and repairs.

He or she will provide assistance to the Manager in all areas of personnel management.

He or she will assist the Manager with community relations, coordinating communications, presentations and other interfaces with civic groups as well as city, state and/or federal officials. He or she will maintain good working relationships with other electric utility administrators.

He or she must have the ability to perform hi-voltage switching, operations and troubleshooting work on all types of related equipment to ensure continued operations in emergency or unusual conditions.

He or she will serve on call 24 hours/day, 7 days/week to address and respond to emergency situations involving facilities, equipment or personnel.

He or she will perform other related duties as required.

**Qualifications:**

A minimum of ten (10) years of experience in progressively responsible positions in the electric utility field. Must have a minimum of five (5) years experience in a management capacity supervising a work force of at least five (5) employees.

A Bachelor's degree in Electrical Engineering is required.
In addition, a Bachelor's degree in Business Administration is highly desirable.
A Master's degree in either or both disciplines is preferred.

**APPROVED:**   June 15, 1998

# TOWN OF MANSFIELD, MASSACHUSETTS
Office of the Town Treasurer/Collector
6 Park Row, Mansfield, MA 02048
Tel. (508) 261-7340 - Fax. (508) 261-1083

Richard V. Boucher
Treasurer/Collector

## Memo

**To:** Jack Beliveau, Light Dept Manager
Kim Stoyle, Light Dept Accountant

**From:** Richard V. Boucher, Town Treasurer/Collector
Bea Kearney, Town Account

**Date:** February 28, 2003

**Subject:** Light Dept Cash Balances

Both Bea and myself have analyzed the weekly cash balances involving the Light Department and find that they have been a high of 544,000. to a low of negative (1,647,000.) during this fiscal year. This gives us an average of a negative (264,000.) When we are in a negative we are using Town cash to pay for Light Department bills

Please contact Bea or myself to arrange a meeting to review the cash the Light Department keeps with the Town.

Thank you.

Attached: Cash listing.
CC: J D'Agostino

TOWN OF MANSFIELD
Electric cash

| | |
|---|---|
| Balance 6/30/02 | (481,124.46) |
| Receipts 7/3 | 127,262.85 |
| W 7/2/6/30 | 112,680.38 |
| Balance | (466,541.99) |
| Rec 7/10 | |
| w7/9 | 401,920.67 |
| Balance | 1,582,805.80 |
| | (1,647,427.12) |
| Rec 7/17 | |
| w7/16 | 531,181.01 |
| Balance | 30,461.17 |
| | (1,146,707.28) |
| Rec 7/24 | |
| w7/23 | 665,049.17 |
| Balance | 307,392.83 |
| | (789,050.94) |
| Rec 7/31 | |
| w7/30 | 524,325.12 |
| Balance | 44,660.65 |
| | (309,386.47) |
| Rec 8/7 | |
| w8/6 | 279,419.01 |
| Balance | 275,626.68 |
| | (305,594.14) |
| Rec 8/14 | |
| w8/13 | 516,741.85 |
| Balance | 1,661,726.76 |
| | (1,450,579.05) |
| Rec 8/21 | |
| w8/20 | 825,689.08 |
| Balance | 260,166.84 |
| | (885,056.81) |
| Rec 8/28 | |
| w8/27 | 1,357,295.41 |
| Balance | 261,222.03 |
| | 211,016.57 |
| Rec 9/4 | |
| w9/3 | 279,072.66 |
| Balance | 229,423.51 |
| | 260,665.72 |
| Rec 9/11 | |
| w9/10 | 315,559.62 |
| Balance | 32,188.09 |
| | 544,037.25 |
| Rec 9/18 | |
| w9/17 | 469,014.71 |
| Balance | 1,821,171.61 |
| | (808,119.65) |
| Rec 9/25 | |
| w9/24 | 965,592.48 |
| Balance | 97,755.61 |
| | 59,717.22 |
| Rec 10/2 | |
| w10/1 | 302,096.50 |
| Balance | 117,088.75 |
| | 244,724.97 |
| Rec 10/9 | |
| w10/8 | 341,576.93 |
| Balance | 80,720.30 |
| | 505,581.60 |

electriccash

| | |
|---|---|
| Rec 10/16 | 702,093.66 |
| w10/15 | 1,575,713.77 |
| Balance | (368,038.51) |
| | |
| r10/23 | 697,395.43 |
| w10/22 | 193,452.25 |
| Balance | 135,904.67 |
| | |
| r10/30 | 267,175.14 |
| w10/29 | 87,005.61 |
| Balance | 316,074.20 |
| | |
| r11/6 | 292,270.27 |
| w11/5 | 280,895.52 |
| Balance | 327,448.95 |
| | |
| r11/13 | 384,251.88 |
| w11/12 | 228,696.97 |
| Balance | 483,003.86 |
| | |
| r11/20 | 697,072.56 |
| w11/19 | 1,790,477.87 |
| Balance | (610,401.46) |
| | |
| r11/27 | 551,809.74 |
| w11/26 | 124,952.33 |
| Balance | (183,544.05) |
| | |
| r12/4 | 184,622.03 |
| w12/3 | 112,067.84 |
| Balance | (110,989.86) |
| | |
| r12/11 | 363,474.16 |
| w12/10 | 1,571,628.26 |
| Balance | (1,319,143.96) |
| | |
| r12/18 | 834,043.84 |
| w12/17 | 143,070.54 |
| Balance | (628,170.66) |
| | |
| r12/24 | 871,405.97 |
| w12/24 | 173,333.67 |
| Balance | 69,901.64 |
| | |
| r12/31 | 227,462.68 |
| w12/31 | 59,135.80 |
| Balance | 238,228.52 |
| | |
| r1/8 | 330,482.62 |
| w1/7 | 26,862.85 |
| Balance | 541,848.29 |
| | |
| r1/15 | 457,640.40 |
| w1/14 | 1,645,099.61 |
| Balance | (645,610.92) |
| | |
| r1/22 | 565,278.85 |
| w1/21 | 47,188.15 |
| Balance | (127,520.22) |
| | |
| r1/29 | 431,957.93 |
| w1/28 | 226,580.49 |
| Balance | 77,857.22 |

electriccash

| | |
|---|---:|
| r2/5 | 298,133.74 |
| w2/4 | 87,256.64 |
| Balance | 288,734.32 |
| r2/12 | 345,192.36 |
| w2/11 | 1,651,989.52 |
| Balance | (1,018,062.84) |
| r2/19 | 719,023.16 |
| w2/19 | 334,271.71 |
| Balance | (633,311.39) |
| r2/26 | 609,564.71 |
| w2/25 | 60,210.26 |
| Balance | (83,956.94) |