**EXHIBIT H**

```
              VOLUME:   I
              PAGES:    1-75
              EXHIBITS: See Index
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CASE NO. 04-11329-DPW


| | |
|---|---|
| | x |
| DR. JOHN J. BELIVEAU, | x |
|      Plaintiff | x |
| | x |
|     vs. | x |
| | x |
| TOWN OF MANSFIELD MUNICIPAL | x |
| ELECTRIC DEPARTMENT, JOHN O. | x |
| D'AGOSTINO, | x |
|      Defendants | x |
| | x |


DEPOSITION of LOUIS G. COSTA, MIS
DIRECTOR FOR THE TOWN OF MANSFIELD, taken
pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before
Jill Kourafas, Certified Shorthand Reporter
and Notary Public in and for the Commonwealth
of Massachusetts held at the Law Offices of
WOLF, BLOCK, SCHORR, SOLIS & COHEN, LLP, One
Boston Place, Boston, Massachusetts, on
Friday, March 31, 2006, commencing at 10:30
a.m.


_____
REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617.786.7723

Draft Copy

Page 2

APPEARANCES OF COUNSEL:

For the Plaintiff:
  WOLF, BLOCK, SCHORR, SOLIS & COHEN, LLP
  (BY:  JULIANE BALLIRO, ESQ.)
  One Boston Place
  Boston, Massachusetts 02108

For the Defendant Town of Mansfield:
  VOLTERRA, GOLDBERG, MANGIARATTI & JACOBS
  (BY:  BRIAN WINNER, ESQ.)
  Three Mill Street
  Attleboro, Massachusetts 02703

For the Defendant John O. D'Agostino:
  BRODY, HARDOON, PERKINS & KESTEN, LLP
  (BY:  LEONARD H. KESTEN, ESQ.)
  One Exeter Plaza
  Boston, Massachusetts 02116

Also Present:
  Dr. John J. Beliveau

Page 3

INDEX

Testimony of:                    Page

LOUIS G. COSTA
Examination by Ms. Balliro          4

INDEX OF EXHIBITS

Exhibits    Description    Page

(No exhibits marked.)

Page 4

P R O C E E D I N G S

1
2
3    LOUIS G. COSTA, having been first
4  duly sworn, testifies as follows:
5
6
7  EXAMINATION BY MS. BALLIRO:
8  Q.  Mr. Costa, my name is Juliane Balliro.
9      MR. KESTEN:  Shall we reserve all
10  objections, except as to form and motions to
11  strike until the time of trial, and he will
12  read and sign, we'll waive the notary?
13      MS. BALLIRO:  Anything else?
14      MR. KESTEN:  I think that covers it.
15  It's important to say it.
16      MS. BALLIRO:  I wasn't going to
17  forget.
18      You just do things in a little
19  different order than I do.
20  Q.  Mr. Costa, have you ever had your deposition
21  taken before?
22  A.  Never.
23  Q.  As you probably noticed, there's no judge
24  here, so during the course of the deposition,

Page 5

1  you may hear an occasional "objection" from
2  either myself or Mr. Kesten or others.
3      If you do, unless you're instructed
4  not to answer the question, just continue to
5  answer the question.
6      The objections are made just to
7  preserve the party's rights if we need to get
8  before a judge to rule on the objection.
9      If you can't hear my question for
10  any reason, sometimes I have a tendency to
11  drop my voice, let me know, I'll repeat the
12  question.
13      If you don't understand the
14  question, don't guess, let me know and I'll
15  try to rephrase the question so it is
16  understandable to you.
17      You can take a break during the
18  deposition.  The only request I make is if
19  there's a question pending before you, that
20  you answer the question before you take the
21  break.  And you can take a break to visit the
22  men's room or talk to counsel or whatever
23  purpose you consider necessary.
24      If for any reason you don't

Page 6

1  understand the question I'm asking or you're
2  not sure about what it is I'm asking you, let
3  me know, and again I'll try to rephrase it so
4  it is understandable to you.
5       Do you have any questions before we
6  begin? It's your last chance to ask me a
7  question during this deposition.
8  A.  Oh, okay, I'm sorry. I think my wife's a
9  better artist. That's what I was going say.
10 Q.  Than Verley?
11 A.  Yes.
12 Q.  Well, there you go. That's quite a compliment
13 to your wife because Verley is
14 internationally known.
15      What's her medium?
16 A.  She has three mediums.
17      (Discussion off the record.)
18 Q.  Mr. Costa, could you please state your full
19 name and your address for the record?
20 A.  Louis Costa, 93 Cady Avenue, Warwick,
21 Rhode Island.
22 Q.  Is that C-A-D-Y?
23 A.  C-A-D-Y, yep.
24 Q.  Are you married?

Page 7

1  A.  Yes, I am.
2  Q.  What is your wife's name?
3  A.  Dawn Wiskari Costa.
4  Q.  How long have you been married?
5  A.  It will be --
6  Q.  Trick question.
7  A.  I know.
8       -- five years August 31st.
9  Q.  What is your date of birth?
10 A.  July 12, '61.
11 Q.  Don't take offense at this next question: Do
12 you have a criminal record?
13 A.  No.
14      MR. KESTEN:  Don't take offense,
15 Have you beaten your wife?
16 Q.  Some people are proud of it, some people take
17 offense to it.
18 A.  No, I haven't, so I think that's a good
19 thing.
20 Q.  Did you go to college?
21 A.  Yes, I did. Community College of Rhode
22 Island, associates degree, in Warwick,
23 Rhode Island.
24 Q.  When did you graduate?

Page 8

1  A.  More trick questions.
2       (Pause.)
3       In the '80s. Late '80s, maybe. I
4  don't remember the exact date.
5  Q.  You did graduate?
6  A.  With an associates, yes.
7  Q.  And in what area of concentration?
8  A.  Electronics.
9  Q.  What did you do after you got your associates
10 degree?
11 A.  I worked for Unicom in Warwick, Rhode Island.
12 Q.  What did you do for Unicom?
13 A.  Computer repair.
14 Q.  So you're a hardware person as opposed to a
15 software person?
16 A.  I'm both.
17 Q.  When you worked for Unicom, did you do both?
18 A.  I installed operating systems and everything
19 like that, and I did computer repair and I
20 did networking as well.
21 Q.  So you would set up the networks for them?
22 A.  Yep.
23 Q.  You didn't do any programming?
24 A.  I did -- no, I didn't do any programming.

Page 9

1  I'm sorry.
2  Q.  Do you know any of the computer programming
3  languages?
4  A.  When I worked for the Town of North Kingston,
5  I did some Cobalt programming and things like
6  that, but very little on stuff like that.
7  I'm not really a programmer.
8  Q.  How long did you work at Unicom?
9  A.  Five to six years.
10 Q.  So you left sometime in the early '90s,
11 mid-'90s?
12 A.  I wish I had brought my resume.
13      I wanna say in the early -- late --
14 I was working there before I got my
15 associates, so I wanna say right before the
16 end of the '80s.
17 Q.  And where did you go?
18 A.  I went to Dean Junior College.
19 Q.  Why did you leave Unicom?
20 A.  I left to work at Dean Junior College.
21 Q.  So you were not attending as a student, you
22 were working there?
23 A.  I was working there full-time.
24 Q.  What did you do for Dean Junior College?

1   A.   I was -- same thing.  Took care --
2   Q.   Computer repair?
3   A.   Computer repair and set up the computers and
4        took care of all the computers.
5   Q.   Did you consider the position at Dean Junior
6        College --
7   A.   A better position.
8   Q.   Exactly.
9   A.   I figured that's what you were going to say.
10       Yes.
11  Q.   Did they pay more money?
12  A.   No, it was a cut in pay, but I wanted to get
13       my bachelors and they would pay for college
14       and stuff like that.
15  Q.   I see.
16            Did you get your bachelors?
17  A.   Nope.
18  Q.   How long did you stay at Dean Junior College.
19  A.   Three months.
20  Q.   Three months?  That worked out well, didn't
21       it?
22  A.   It might have been two months.
23  Q.   Where did you go from there?
24  A.   (Pause.)

1            I can't think of the name.  It was
2        Medford, Mass.  I did -- I worked on a --
3        Retrofit.  Retrofit.
4   Q.   It was a private company in Medford,
5        Massachusetts?
6   A.   Yep.
7   Q.   What caused you to leave Dean Junior College
8        after only two or three months?
9   A.   Can I talk to him on this issue?
10  Q.   Sure.
11            (Short Recess Taken.)
12            MR. KESTEN:  This is mildly
13       embarrassing.  He'd rather not talk about it.
14            If you press it, I won't tell him
15       not to answer.
16            MS. BALLIRO:  Well, I think he could
17       probably --
18            MR. KESTEN:  He was asked to leave.
19            MS. BALLIRO:  Okay.
20  Q.   Why were you asked to leave?
21  A.   (Pause.)
22  Q.   I have no plans to disseminate this
23       information.
24  A.   No, no.  I was asked to leave because of the

1        comments I made, and I would say I was young
2        and inappropriate at the time, and it wasn't
3        intended to hurt anyone or anything like
4        that, but that's the reason why I left.
5   Q.   Were these comments of a combative nature or
6        were they more sort of sex-related or --
7   A.   It depends whose -- to be honest with you, I
8        feel very -- I learned a lot from it, but I
9        believe they weren't very bad remarks.
10  Q.   Were they to a woman?
11  A.   It was to a woman with another person there
12       and stuff like that.  I had another witness.
13       Nothing was like one-on-one or stuff like
14       that.
15  Q.   I'm trying to find out --
16  A.   I can give you one of the comments.  I'll say
17       it right now.
18  Q.   I don't need the comments.
19  A.   Okay.
20  Q.   Were they accusing you of sexual harassment?
21  A.   Nope.  Put it this way:  I left because of
22       the comments and they didn't want to say that
23       and they said, "We just want you to leave."
24  Q.   So you went to Retrofit?

1   A.   Yes.
2   Q.   Did you take --
3   A.   Well, I collected unemployment and then went
4        to Retrofit.
5   Q.   I was just going to say, did it take you some
6        time to find the job at Retrofit?
7   A.   Yes.
8   Q.   Do you remember when you started at Retrofit?
9   A.   I don't really know the dates, but I want to
10       say early '90s.
11  Q.   Okay.  And what did you do for Retrofit, what
12       was your position?
13  A.   I serviced mini computers, Basic Four models;
14       that's what the brand was.
15  Q.   For how long did you stay at Retrofit?
16  A.   Not long.  I want to say two years at the
17       most.
18  Q.   Why did you leave Retrofit?
19  A.   I left to work for the Town of
20       North Kingston.
21  Q.   Do you feel it was a better position?
22  A.   Oh, yeah.
23  Q.   What did you do for the Town of
24       North Kingston?

Page 14

1   A.   I did everything.  I did computer repair,
2        supported all their PC support and their
3        mainframes, like, you know, backups.  I would
4        take care of the backups and everything like
5        that.
6   Q.   Do you remember when you started for the
7        Town of North Kingston?
8   A.   I gotta do the math right now.  Five years --
9        one year, six.
10            (Pause.)
11       I wanna say almost 18 years ago.
12  Q.   Let me ask you this:  You indicated that you
13       do have a resume?
14  A.   I don't have it on me.
15  Q.   I understand, but you do have one?
16  A.   I have a resume that has all the dates and
17       stuff like that.
18  Q.   Would you be willing to get that to
19       Mr. Kesten?  It will save time.
20  A.   I know.
21  Q.   I know you're searching your memory here.
22            MR. KESTEN:  I agree to get you --
23       if he provides me with the resume, I'll get
24       it to you.

Page 15

1   A.   You'll hire me for more money?
2   Q.   Do you remember about for how long you worked
3        for the Town of Kingston?
4   A.   I worked like five to six years.
5   Q.   And then where did you go?
6   A.   I got laid off there, and I worked -- I went
7        right over to the Air National Guards
8        full-time.
9            I worked part-time for the
10       Air National Guards all through this time.  I
11       forgot to tell you that.
12  Q.   You were not a soldier in the Guards, you
13       were a worker for the Guards?
14  A.   I was a Federal employee for the Guards.
15  Q.   You went to the Air National Guards
16       full-time?
17  A.   Full-time.
18  Q.   After being --
19  A.   I have been in the Air National Guards since
20       '81, part-time.
21  Q.   As a soldier or as a worker?
22  A.   Well, I'm in the Air Force, but we're not
23       considered soldiers.
24  Q.   I'm just trying to find out what your role

Page 16

1        was.
2   A.   I'm a telecommunications technician.
3   Q.   But you're in the Service?
4   A.   Yes, I am, and I still am.
5   Q.   So when you went to the Air National Guards
6        full-time, did you go --
7   A.   As a Federal employee.  It is just like the
8        post office worker.
9   Q.   What was your title or grade?
10  A.   I was a GS-9 and I was the network manager
11       for the State of Rhode Island, for the
12       Rhode Island Air National Guards.
13  Q.   How long did you stay there?
14  A.   I worked there five to six years.
15  Q.   Then what did you do?
16  A.   I went to Pegasus in Marlboro, Mass. and
17       worked there for one year.
18  Q.   What did you do for Pegasus?
19  A.   I was an NT -- yeah, Microsoft network
20       administrator.
21  Q.   You were there for one year?
22  A.   One year.
23  Q.   And why did you leave there?
24  A.   To work for the Town of Mansfield.

Page 17

1   Q.   Were you unhappy at Pegasus?
2   A.   It was -- the company is out of business
3        and everything like that now, but it was not
4        a good place to work.  It was a very sad
5        place.
6   Q.   Why did you leave the Air National Guards?
7   A.   Because I didn't like the management there.
8   Q.   What was the problem with the management?
9   A.   They didn't know anything about networks and
10       they were my bosses, and every time we'd tell
11       them to do something, I had to plead and beg
12       to get something done.
13            You know, I didn't hold the money or
14       anything like that, so every time I needed
15       something, it was just crazy, plus I didn't
16       have -- they never gave me any staff to do
17       the job.
18  Q.   How did you find out about the position at
19       the Town of Mansfield?
20  A.   Providence Journal.
21  Q.   Providence Journal?
22  A.   Journal.
23  Q.   Do you recall when it was that you
24       interviewed for the position?

Page 18

1  A.   I want to say April of 2001, or it might have
2       been March, March or April of 2001.
3  Q.   Who did you interview with?
4  A.   I believe I met with either -- first
5       interview or second interview?  I had two
6       interviews.
7  Q.   Let's go back.
8  A.   Well, I'm trying to think about the dates.
9       I'm trying to figure out what the dates were.
10         I either had a first interview with
11      the Town Manager and a couple of employees,
12      and then the second time I met at the high
13      school and did an interview with their
14      technician, and they gave me simple
15      questions, you know, like a little test.
16 Q.   Who gave you the test?
17 A.   You know, I can't think of his name off the
18      top of my head right now.
19 Q.   Was it a town employee?
20 A.   It was a school employee.
21 Q.   Do you recall when you first met
22      Jack Beliveau?
23 A.   That's what I'm trying to think of.  It was
24      one of the interviews, I believe.  I don't

Page 19

1       know if it was the first or the second one.
2  Q.   Who hired you?
3  A.   The Town Manager.
4  Q.   John D'Agostino.
5  A.   John D'Agostino.
6  Q.   Did you know Mr. D'Agostino before you
7       applied for the position?
8  A.   No, I did not.
9  Q.   You were the MIS Director for the Town of
10      Mansfield?
11 A.   I am still now.
12 Q.   But that's what you were hired for?
13 A.   Yes.
14 Q.   Did you ever do any work for the
15      Light Department?
16 A.   Yes.
17 Q.   Under what circumstances?
18 A.   Whenever they asked for it.
19 Q.   When you say "they," are you talking about
20      the Light Department?
21 A.   Yes.
22 Q.   What types of work did the Light Department
23      ask you to do?
24 A.   Are you talking about now, or are you talking

Page 20

1       about when I first started?
2  Q.   Let's start with throughout the period of
3       your employment for the Town of Mansfield
4       since --
5  A.   It was mostly when they had a problem, I
6       would go over there, if they called me.
7  Q.   Okay.  So, when the Light Department had a
8       problem, you would go over there and try to
9       resolve their computer problems for them, if
10      they called you?
11 A.   Yes.
12 Q.   Did the Light Department have any computer
13      people on its payroll?
14 A.   No, not when I worked there.
15 Q.   Do they today?
16 A.   No, they don't.
17 Q.   Do you have a staff?
18 A.   Yes, I do.
19 Q.   How many people do you have on your staff?
20 A.   When I started, I had none.
21         Now, I have a tech support person
22      that works 30 hours a week, a GIS manager
23      that works full-time, and then I have a
24      secretary that works 19 hours a week, an

Page 21

1       office manager, that's her job.
2  Q.   When did you get your tech support person?
3  A.   I wanna say July 1st after I was hired.
4  Q.   So July of 2001?
5  A.   I wanna say, yeah.  Yes.
6  Q.   When did you get the GIS person?
7  A.   I wanna say 2003, I believe.
8  Q.   Who is that?
9  A.   Well, there's two GIS managers that were
10      hired since then.  Carter Irving was the
11      first one, she only lasted six months because
12      her husband got a new job.  And I have Xia
13      Jin now.
14 Q.   Xia Jin?
15 A.   Yes.
16 Q.   Is that a man or woman?
17 A.   It's a woman.
18 Q.   Who hired her?
19 A.   We had a committee that hired her, but I was
20      part of the committee to hire her.
21 Q.   Who decided that a committee would be set up
22      to hire her?
23 A.   I believe -- well, it was part of my idea,
24      plus the Town Manager.

Page 22

1   Q.   How did it come to pass that a committee
2       would be formed to hire Xia Jin?
3   A.   One from the Electric Department, one from
4       the DPW, one from the Engineering Department
5       and me.
6   Q.   And whose idea was it to set the committee up
7       in that fashion?
8   A.   Well, we wanted to get all the enterprises,
9       one from the Light Department, and Bill Leve
10      (phonetic) because he takes care of the water
11      -- waste water was part of that -- and
12      engineering was because they were part of the
13      influence of GIS, they were just part of it
14      and they understood -- for questions and
15      stuff like that.
16          I guess it was because I think the
17      people that need it the most were GIS at the
18      time.
19  Q.   Is it Carter Long?
20  A.   Carter Irving.
21  Q.   Was there a committee set up to hire Carter
22      Irving?
23  A.   Yes, there was.
24  Q.   Was it the same committee?

Page 23

1   A.   No.  We had a contractor at that time because
2       it was part of the -- engineering had a -- it
3       wasn't a grant, but it was a noninterest loan
4       that it was being paid out of that, so, it
5       was mostly the contractor that we hired and
6       the engineering and me and stuff like that at
7       that time.
8   Q.   That was the committee at that time?
9   A.   Yes, because we used mostly contractors.  We
10      didn't know GIS that well.  So, the
11      contractor was the big influence we were
12      trying to hire at that moment.
13  Q.   How was the office manager hired, was that by
14      committee as well?
15  A.   That was by committee, too.
16  Q.   Is there a policy in place in the Town
17      Manager's office that all hiring take place
18      via committee?
19  A.   Nope.  That was by my choice only.
20  Q.   That was by your choice?
21  A.   Yes.
22  Q.   Do you know if any of the interviews have
23      been conducted by a committee?
24  A.   I can only tell from my department; I can't

Page 24

1       speak for others.
2   Q.   Why do you use a committee?
3   A.   Well, I think it's well-balanced and it's
4       just not giving one perspective.
5   Q.   And has John D'Agostino ever recommended any
6       particular person for hire by any of the
7       committees that you've assembled?
8   A.   No.
9   Q.   Has he ever insisted that you interview any
10      particular person for any of the positions
11      that you had to hire for?
12  A.   No.
13  Q.   Has he ever interfered, in any way, with any
14      of the hiring committees that you put
15      together to hire individuals for the MIS
16      Department?
17  A.   He influenced me on the GIS person because he
18      wanted to make sure that the enterprises had
19      their vote for the GIS manager.
20  Q.   And when you say "he influenced you" --
21  A.   He wanted to make sure I had someone from
22      each, the Light Department and Waste Water
23      Department, for Xia Jin's hiring.
24  Q.   Did you have any problem with that?

Page 25

1   A.   No.
2   Q.   Has Mr. D'Agostino ever attempted to
3       influence you to interview or hire any
4       particular person for any of the positions
5       that have been open?
6   A.   No.  But --
7   Q.   Did you have something you wanted to add?
8   A.   No, I don't.  I'm sorry.
9   Q.   Does the School Department in the Town of
10      Mansfield have its own MIS person?
11  A.   They have a person that works on their
12      system, yes.
13  Q.   Okay.  Who is that?
14  A.   Isabel McKenzie.
15  Q.   What is her title, do you know?
16  A.   I do not know.
17  Q.   Do you know for how long she's been employed
18      by the School Department in that capacity?
19  A.   I wanna say about three years.
20  Q.   Did you hire her?
21  A.   No, I did not.
22  Q.   Do you know if Mr. D'Agostino ever suggested
23      that you take over, if you will,
24      responsibility for the MIS issues in the

1    School Department?
2 A.    They want me to take care of any issues that
3       people -- well, yes, they do, if they have
4       problems, they want me to help out.
5 Q.    My question for you is:  To your knowledge,
6       did John D'Agostino ever propose that you
7       would be the person responsible for the
8       computer system in the School Department?
9 A.    The question is not -- I can't answer that
10      question.
11         I can explain, if you want me to.
12 Q.   Sure, go ahead.
13 A.   There's two sides to the School Department,
14      the academic and administration side.  And I
15      told the Town Manager that I will not take
16      care of the academic side, but I do recommend
17      that the administration side should be taken
18      over.
19 Q.   Why didn't you want to take care of the
20      academic side?
21 A.   Like one of the things I'm doing right now,
22      I'm doing a big fiber product for the Town of
23      Mansfield, and I'm designing the whole
24      network for the school and town, and part of

1       the thing is, so we can share resources, like
2       the internet access, firewalls, those types
3       of resources that we want to utilize and
4       hopefully save the town money and stuff like
5       that.
6 Q.    Did Mr. D'Agostino approach you and ask you
7       if you would be willing to take over
8       responsibilities for the School Department
9       and then you told him "I will for the
10      administrative side, but not for the academic
11      side"?
12 A.   I wanna -- I wanna say -- I can't answer this
13      question either because there's -- the
14      question you're asking I think was -- I wanna
15      say -- I wanna say no because -- I just wanna
16      say no.
17 Q.   Was there --
18         MR. KESTEN:  Let me call -- the
19      chief is in town.  How long do you think
20      you'll be?
21         MS. BALLIRO:  I don't know; a couple
22      of hours.
23         MR. KESTEN:  Two more hours?
24         MS. BALLIRO:  Yeah.  Do you need to

1       take a break?
2          MR. KESTEN:  I just want to call him
3       and tell him.
4          (Short Recess Taken.)
5          MS. BALLIRO:  Let's go back on the
6       record.
7 Q.    Mr. Costa, did you become aware at some point
8       that Mr. D'Agostino had proposed at a
9       Selectmen's meeting that you take over the
10      School Department and Light Department
11      computer responsibilities?
12 A.   No, I don't know.
13 Q.   You never became aware of that?
14 A.   Not in the Selectmen's meeting, no.
15 Q.   How did the issue of you taking more
16      responsibility for the School Department
17      computer issues come up?
18 A.   I think the FinCom Committee, that's the
19      people that really want me to take it over.
20 Q.   When you say "FinCom," you're talking about
21      the Financial Committee?
22 A.   Financial Committee.
23 Q.   How did you come to understand it was the
24      Financial Committee that wanted you to take

1       it over?
2 A.    They said it.  Every time I do my budget,
3       they bring that up.
4 Q.    Who is on the Financial Committee?
5 A.    I don't even know their names, to be honest
6       with you, off the top of my head.
7 Q.    There's a reason, as you stated, that you did
8       not want to take over the academic side of
9       the School Department computer
10      responsibilities, correct?
11 A.   Yes.
12 Q.   What was that reason?
13 A.   I think the school is poorly operated, to be
14      honest with you.
15 Q.   Okay.  And what does the operation of the
16      school have to do with the computer system on
17      the academic side?
18 A.   They've put old, old computers in there.
19      They put just whatever they can get together
20      and just Band-Aid after Band-Aid.  It's not a
21      good environment to work in.
22 Q.   Who's responsible for the installation of
23      computers in the School Department on the
24      academic side?

Page 30

1  A.  Isabel.
2  Q.  Isabel; does she have a budget for that
3      purpose?
4  A.  I believe she does not.  She does not control
5      the money.
6  Q.  Well, who controls the money, I guess, is the
7      question?
8  A.  Lincoln Lynch.
9  Q.  Who is Lincoln Lynch?
10 A.  I believe he's either the assistant
11     superintendent or called the business
12     manager.  I'm not a hundred percent sure what
13     his title is.
14 Q.  Is it fair to say then that you disagree with
15     the investment, or lack of investment, that
16     Mr. Lynch made in the computer system on the
17     academic side in the School Department?
18 A.  I wanna say 50/50 at this point.
19 Q.  You started out by saying that you didn't
20     think the School Department was very well run
21     on the academic side and they had old
22     equipment?
23 A.  Yeah, most of her -- that's -- yes.
24 Q.  You said that Mr. Lynch was the assistant

Page 31

1      superintendent or business manager of the
2      School Department was the one who controls
3      how the money is spent, correct?
4  A.  Yes, I believe, yeah, because he is -- yes.
5  Q.  So, to what extent do you hold Isabel
6      responsible for the lack of adequate
7      computers -- I'll call it for want of a
8      better phrase -- on the academic side?
9  A.  I don't know if she has -- I'm not sure -- I
10     don't know.
11         Put it this way:  I don't have
12     enough information to answer you on that
13     issue.  I don't know how much control she
14     has.  That's what I'm trying to say.
15 Q.  Have you ever had any discussions with
16     Mr. Lynch about your concerns regarding the
17     computers in the school?
18 A.  Nope.
19 Q.  So who have you had these discussions with?
20 A.  No one.
21 Q.  This is just something you've kept to
22     yourself?
23 A.  Because I don't want to support them on the
24     academic side, I want to support them on the

Page 32

1      administration side.
2  Q.  Have you told anyone in town management why
3      it is you don't want to assist the School
4      Department on the academic side?
5  A.  Because I don't think we have the manpower to
6      do it.
7  Q.  So you've told the town management that you
8      don't think you had the manpower to support
9      the academic side, correct?
10 A.  I told FinCom.
11 Q.  And the reason you don't feel you have the
12     manpower is because those computers are old,
13     they need a lot of maintenance and would take
14     a lot of people to maintain them?
15 A.  Yes.
16 Q.  Has your unwillingness or inability to take
17     over the maintenance of the computers on the
18     academic side of the School Department been
19     an area of dispute?
20 A.  When the School Department asks for help, I
21     always support them.
22 Q.  Whose taking care of the computers on the
23     academic side?
24 A.  Isabel.

Page 33

1  Q.  How many people does she have working for
2      her?
3  A.  I think she has herself and a part-timer.
4  Q.  Herself and a part-timer?
5  A.  Uh-huh.
6  Q.  Do you think that is adequate staff to take
7      care of those computers?
8  A.  I don't know enough to answer that.
9  Q.  How many staff people would you have liked to
10     have added to your payroll in order to take
11     over that function?
12 A.  For the --
13 Q.  For the academic side.
14 A.  I would have do an analysis on that.  I don't
15     know.
16 Q.  So you haven't done one?
17 A.  Nope.
18 Q.  What about the Light Department, were you
19     ever asked to assume full responsibility for
20     the computer system at the Light Department?
21 A.  Yes.
22 Q.  Okay.  And when were you asked to do that?
23 A.  Well, I was asked to do it for the whole
24     town, so if anyone had a problem, I was the

Page 34

1    support for the whole town.
2    Q.   The Light Department doesn't have their own
3    MIS person; is that correct?
4    A.   No.
5    Q.   Is the School Department the only department
6    that has its own MIS person?
7    A.   Yes.
8    Q.   What kind of operating system does the Light
9    Department have?
10   A.   We upgraded them to server 2003.
11   Q.   When was that upgrade done?
12   A.   I wanna say nine months ago.
13   Q.   Before that, were they on an UNIX operating
14   system?
15   A.   I'm sorry.  They are still on a -- they have
16   two platforms, they have a billing system
17   that's still on the UNIX platform.
18   Q.   And the billing system has always been on
19   UNIX, at least during the period of time that
20   you've worked there?
21   A.   Yes.  And I don't support that.
22   Q.   You don't support that?
23   A.   I don't support their billing system.
24   Q.   Who supports the billing system?

Page 35

1    A.   I don't know.
2    Q.   And why don't you support their billing
3    system?
4    A.   Because most of the billing system has like a
5    contract and it is supported.  Like, I have
6    Munis.  I have a contract with Munis at the
7    town, and it is supported by the billing
8    system itself.
9    Q.   Are you familiar with the UNIX operating
10   system?
11   A.   Yes, I am.
12   Q.   Is the Electric Department billing system
13   treated any differently, or was it before the
14   upgrade treated any differently than any of
15   the other billing departments in the town?
16   A.   No.
17   Q.   They all have an outside contractor that
18   maintains them?
19   A.   I'm sorry.  Can you rephrase that?
20   Q.   I think you testified that you were not
21   involved in the maintenance of the Light
22   Department's billing system, which was a
23   UNIX-based system, correct?
24   A.   Yes.

Page 36

1    Q.   But there was an outside contractor that did
2    that?
3    A.   Yes.
4    Q.   My question for you is:  Is that true of any
5    other departments in the town that have
6    billing systems, if there are any that have
7    billing systems?
8    A.   Any time there's an upgrade, I assist with
9    their upgrades and stuff like that, but it is
10   usually outside contracted.
11   Q.   Who hires the outside contractors?
12   A.   Well, depending on what department it is, and
13   stuff like that, they evaluate what they need
14   and they go through me to verify that it
15   works and then they usually get it.
16   Q.   Who is responsible for the hiring of the
17   outside contractor for the Light Department?
18   A.   For the billing system?
19   Q.   Yes.
20   A.   I don't know.  I wasn't involved in that.
21   Q.   How about for the rest of their system, is
22   there an outside contractor that --
23   A.   No, we support everything else.
24   Q.   You support everything else?

Page 37

1    A.   Now?
2    Q.   Now.
3    A.   Yes.
4    Q.   Is that different from before?
5    A.   It was either me or Andrews Computers,
6    I believe.
7    Q.   Andrews Computers?
8    A.   Yes.
9    Q.   At some point in time the Light Department
10   also had an outside contractor for the
11   nonbilling-related computer activities?
12   A.   Yes.
13   Q.   Why was that?
14   A.   I don't know.
15   Q.   You have no idea?
16   A.   No.
17   Q.   Were you at all involved in the hiring of
18   Andrews Computers to take care of the
19   computer system in the Light Department?
20   A.   No, no.
21   Q.   So, under what circumstances would you find
22   yourself assisting the Light Department in
23   any of their computer needs?  In other words,
24   if they had an outside --

Page 38

1  A.  I'm not trying -- you've got to say at a
2      certain time because you're giving me
3      questions where it's two different answers
4      now.
5  Q.  Let's back up.
6          During the period of time that the
7      Light Department had an outside contractor
8      for both the billing and its other needs,
9      okay, they had an outside contractor for
10     billing and they had Andrews Computers, were
11     there any occasions on which your services
12     would still be needed to assist the Light
13     Department with any computer problems?
14 A.  If they called me, we would assist their
15     communities.
16 Q.  The question is:  Did they call you?
17 A.  On some occasions.
18 Q.  How often?
19 A.  (Pause.)
20         I wanna say -- God, I'm trying to
21     think.
22         (Pause.)
23         Maybe ten times a year or something
24     like that.  I don't have a good figure.

Page 39

1  Q.  Did you ever perform or attempt to perform
2      any work on the billing system in the
3      Light Department?
4  A.  I'm not trying to give you a hard time.  You
5      have to tell me when.  We do now.
6  Q.  When did the change take place?
7  A.  Ever since the firing, I wanna say, of Jack
8      Beliveau, I believe.
9  Q.  So, when Jack Beliveau was there, who was the
10     Director of the Light Department, you would
11     assist the Light Department with its computer
12     needs about ten times a year; is that
13     correct?
14 A.  Whenever they called me and they needed me,
15     that's the true answer.
16 Q.  After Jack Beliveau left, there was a change,
17     correct?
18 A.  We support them 100 percent now.
19 Q.  When did that begin?
20 A.  Probably when Gary Babin got hired, a couple
21     of months after.
22 Q.  What did you do in order to support the Light
23     Department 100 percent?  Did you personally
24     do it or hire an outside contractor?

Page 40

1  A.  No, we did everything internally.
2  Q.  Did you need extra people to do that?
3  A.  No, they had contracts, like the billing
4      system and stuff like that would -- like
5      Jim's Computer is the person that handles the
6      billing.  We had to work with their billing
7      system and get things working properly, but,
8      yes, we worked -- did everything internally
9      per se.  We don't work per se on the billing
10     system, but we got their data that can go up
11     to their web server.
12 Q.  How often did you come into contact with
13     Mr. Beliveau during the course of a work week
14     during the period of time that you were both
15     working there?
16 A.  Any time there was a department head meeting,
17     any time I was over at the Light Department,
18     I saw him.
19         It was my -- my wife had an art
20     show, I invited him to the art show, and any
21     function that was --
22 Q.  How would you describe your working
23     relationship with him?
24 A.  I believe it was okay.

Page 41

1  Q.  Okay.  Did you have any problems?
2  A.  Relationship, no.  Work relationship -- you
3      mean work-wise?  I didn't know enough about
4      their computer system to support them.
5  Q.  But in terms of your dealings with
6      Mr. Beliveau while you worked there, did
7      you have any difficulties in dealing with
8      him?
9  A.  I wanna say no.  I didn't have any dealings
10     where we had arguments or anything like that,
11     no.
12 Q.  Did you know anything about or did you play
13     any role in the manner in which the town was
14     assigning the cost of MIS services to the
15     Light Department?
16 A.  I would say -- every time I'd go over there,
17     they wanted to have an hourly figure of all
18     the times, and I would have to give that to
19     the accountant and stuff like that.  But I
20     didn't -- I never guessed the hourly wage or
21     something like that.
22 Q.  What do you consider to have been a fair
23     charge, hourly charge, for the services that
24     you rendered to the Light Department during

1    the period of time --
2    A.   I can't answer that.
3    Q.   You have no idea?
4    A.   No.  I just get paid for what I do.  If
5         someone has a computer problem, I just take
6         care of it.
7    Q.   What was your annual salary when you were
8         first hired?
9    A.   $52,000.
10   Q.   $52,000.  What is it now?
11   A.   $65,000, I think.
12   Q.   You work 40 hours a week?
13   A.   37.5.  I shouldn't -- I work more.  I have
14        comp time, too.
15   Q.   Do you know of any outside contractor who has
16        ever charged the Light Department $1,000 an
17        hour for MIS services?
18   A.   No.
19   Q.   Does $1,000 an hour sound reasonable to you?
20   A.   You're asking a question that I need more
21        information.  What were they doing?
22   Q.   Well, how about for your services, do you
23        think $1,000 -- that would be $37,500 a week
24        for your services, do you think that's

1    reasonable?
2    A.   (Pause.)
3    Q.   Do you have a question about that?
4    A.   Yeah.  It depends what I'm doing.  Right now
5         we are doing a fiber project and there's a
6         crew for an hour's time for a thousand
7         dollars.  It's not -- I could get --
8    Q.   I'm talking about per person.
9    A.   Per person, I would say that is way too --
10   Q.   It's way too much money, isn't it?
11   A.   (Pause.)
12   Q.   Let me see if I can make it easy for you.
13        Do you think that $1,000 per hour
14        was reasonable for any of the services that
15        you performed for the Light Department during
16        the period of time that Jack Beliveau was
17        there?
18   A.   I still -- I never saw -- I wanna say no.
19   Q.   Thank you.
20        Do you recall ever having a
21        conversation with Mr. D'Agostino when he
22        informed you that he wanted to put the GIS
23        director for the town or the manager for the
24        town on the Light Department payroll for one

1    or two days a week?
2    A.   Yes.
3    Q.   Tell me what you recall about that
4         conversation with Mr. D'Agostino.
5    A.   Okay.  We hired a person under that grant,
6         Carter Irving, and because of the money, I
7         guess -- I'm trying to remember it, it was so
8         long ago -- one-quarter was going to be paid
9         by the town, one-quarter would be paid by the
10        Light Department and one-quarter would be
11        paid by the waste water and one-quarter would
12        be paid by water, and that's how -- that's
13        all I can tell you.
14   Q.   That's what Mr. D'Agostino proposed to you?
15   A.   Yes.
16   Q.   Did he propose Carter Irving would actually
17        be working one-quarter of her time for the
18        Light Department, one quarter of her time for
19        waste water, one-quarter of her time for
20        water and one-quarter of her time for the
21        town?
22   A.   GIS, as a whole, is a mapping system for the
23        town, and how it works is, the stuff they do
24        for it works for everyone.  So whatever they

1    do percentage-wise, like a map, could be for
2    everyone.
3         But what I'm trying to explain is,
4    the data that's -- she works like at the town
5    hall and she could be working at the Light
6    Department because it's the same thing as the
7    waste water and water, because what she
8    does -- because she does work for them.
9    Q.   How does what she do work for the Light
10        Department?
11   A.   Do you understand what "GIS" is?
12   Q.   Well, no, I guess not.  Tell me what "GIS"
13        is.
14   A.   Maybe that's where I should start.
15   Q.   What does the acronym mean?
16   A.   Geographic information system.
17        What it is, it's layers of the town,
18   which is laid out where it has roads,
19   curbsides, telephone poles, fire hydrants,
20   the parcel layers are laid out and stuff like
21   that, and part of the development of that
22   grant was to get the pole air as well as the
23   fire hydrants, and that was all being
24   developed at the time.  So, there was a

Page 46

1  big job in trying to develop that so the
2  whole town could use it. To this day, all
3  the departments are using it and are
4  widespread and stuff like that.
5      So the breakdown with percentages is
6  tough to say because whatever they do, does
7  it for everyone.
8  Q.  Was her salary then to be divided up among
9      all of the departments in the town that would
10     benefit from the GIS system or just some of
11     the departments?
12 A.  It was supposed to be for everybody.
13 Q.  So you're saying even though there are four
14     different departments in the town, it would
15     benefit from the GIS system?
16 A.  No.
17 Q.  But her salary was only going to be divided
18     up four different ways, correct?
19 A.  Yes.
20 Q.  Did you have a conversation with Mr. Beliveau
21     about that proposal, Mr. D'Agostino's
22     proposal that the Light Department pick up --
23 A.  Repeat the question?
24 Q.  Did you have a conversation with Mr. Beliveau

Page 47

1  about Mr. D'Agostino's proposal that the
2  Light Department pick up 25 percent of the
3  tab for --
4  A.  Before or after?
5  Q.  At any time.
6  A.  After, when the thing was done, that's how it
7      was setup, and I told him that this is what
8      was told by the Town Manager.
9  Q.  And what was his response?
10 A.  That the money was already given.
11 Q.  Given to whom, to what entity?
12 A.  The PILOT program I think they have.
13 Q.  Do you understand how the PILOT program
14     works?
15 A.  No, I don't.
16 Q.  Do you know how much the grant was for?
17 A.  It's not a grant.
18 Q.  A loan?
19 A.  It was a loan.
20 Q.  How much was the loan?
21 A.  It was a million dollars.
22 Q.  Do you know if any portion of that loan went
23     into the Light Department's accounts?
24 A.  No. I don't know.

Page 48

1  Q.  Did anyone talk to you about your deposition
2      testimony before you came here today?
3  A.  I just spoke to --
4  Q.  Mr. Kesten?
5  A.  Yes.
6  Q.  Have you had any conversations with
7      Mr. D'Agostino about this case or about any
8      of the testimony given at deposition in this
9      case before today?
10 A.  No.
11 Q.  Was Mr. D'Agostino aware that you were having
12     your deposition taken today?
13 A.  I believe so.
14 Q.  Did you discuss that fact at all with him?
15     (Pause.)
16 Q.  Did you discuss that with him at all?
17 A.  No.
18 Q.  Did anyone ever ask you, since Mr. Beliveau
19     has left the town, to attempt to identify
20     emails between Mr. D'Agostino and
21     Mr. Beliveau from Mr. D'Agostino's computer?
22 A.  No.
23     (Pause.)
24     Wait a minute. From whom?

Page 49

1  Q.  Mr. D'Agostino's computer?
2  A.  Yes.
3  Q.  When were you asked to do that?
4  A.  I was asked numerous times, that's the reason
5      why the dates are --
6  Q.  Okay.
7  A.  I'm not 100 percent sure on the dates.
8  Q.  All right. In relation to Mr. Beliveau's
9      leaving the town, when was the first time
10     that you were asked to identify or retrieve
11     emails between Mr. Beliveau and
12     Mr. D'Agostino?
13 A.  I wanna say a month, three months later. I'm
14     not 100 percent sure.
15 Q.  Who asked you to do it?
16 A.  I'm not sure. I believe it was from Town
17     Manager.
18 Q.  So, as best you can recall, sometime, a month
19     to three months after Mr. Beliveau left,
20     Mr. D'Agostino asked you if you could go into
21     the system and find all the emails between
22     him and Mr. Beliveau, correct?
23 A.  Yes.
24 Q.  And were you asked to identify any other

Page 50

1    emails?
2  A.   Yes.
3  Q.   What other emails were you asked to identify?
4  A.   Kim -- I think -- (Pause.)
5         Jack Beliveau's to all the other
6    emails throughout the town, I believe.
7  Q.   Including Kim Stoyle?
8  A.   I believe so.
9  Q.   Did you do that?
10  A.   Yes.
11  Q.   And did you identify those emails?
12  A.   Yes.
13  Q.   What did you do with them once you identified
14    them?
15  A.   I put them on a CD and gave them to his
16    secretary, I believe.
17  Q.   Were you asked to identify any emails from
18    Jack Beliveau to other department heads in
19    the town?
20  A.   I wanna say no.
21  Q.   What is it, as best you can recall, that
22    you were asked to do with respect to the
23    emails?
24  A.   I wanna -- any emails that were from Kim

Page 51

1    Stoyle and from Jack Beliveau, put all the
2    emails onto a CD.
3  Q.   Emails from Jack Beliveau and from Kim Stoyle
4    would've been located on the Light Department
5    email server, correct?
6  A.   No.
7  Q.   What server were they located on?
8  A.   They also could've been on the server at the
9    town hall.
10  Q.   How could they be on the server at the town
11    hall?
12  A.   Because emails that he sent or emails that
13    John sent to him were recorded at the
14    town hall.
15  Q.   Do you recall approximately how many emails
16    you located during that first search?
17  A.   I do not know.
18  Q.   How long did it take you?
19  A.   I wanna say a couple of days.
20  Q.   When was the next time that you were asked to
21    conduct a search of emails?
22  A.   Six months later or something like that.
23  Q.   Who asked you about that six months later?
24  A.   I don't know if it was the attorneys at this

Page 52

1    time or not.
2         I'm not sure.
3  Q.   What were you asked to do six months later?
4  A.   See if I had any -- if I had all the emails
5    and research again and verify it and stuff
6    like that.
7  Q.   Again, through the town file server, the town
8    email server?
9  A.   Email server.
10  Q.   Did the town maintain backups of its emails
11    at that time?
12  A.   It did, but we didn't have an archived system
13    which is different.
14  Q.   So the back-up tapes weren't labeled in any
15    way?
16  A.   We have a back-up system that only goes out
17    for three months.
18  Q.   You were only able to search for emails three
19    months back, or if you worked out the system,
20    were you able to search further back than
21    that?
22  A.   No, I did not.
23  Q.   How far back were you able to go looking for
24    emails as of the time that you were asked to

Page 53

1    look for them?
2  A.   I don't know.  I didn't want -- I got
3    whatever I found and just gave them over.  I
4    never did any inquiries on what was in the
5    emails or anything like that.
6  Q.   Did you ever go through the back-up tapes to
7    look for emails?
8  A.   Yes, I did.
9  Q.   And when did you do that?
10  A.   Probably at the same time that the request
11    was in.
12  Q.   So, is it fair to say then you searched, not
13    only on the email server for the town, but
14    you also went through the back-up tapes,
15    correct?
16  A.   Yes.
17  Q.   Do you recall approximately how many back-up
18    tapes the town had?
19  A.   Well, we have a Robotics tape drive that
20    changes 15 tapes out and stuff like that, but
21    I have 30 tapes -- I mean, 45 tapes that it
22    rotates around and stuff like that.
23  Q.   Were there any other occasions where you were
24    asked to go through the town's email server

Page 54

1    to look for certain emails?
2 A.   I was requested emails later on for -- Bea
3    Kearney, Richard Boucher and I believe there
4    was some other person, I can't remember the
5    name, though.
6 Q.   Do you remember whether that request was
7    made?
8 A.   I don't.
9 Q.   Were you able to locate emails involving
10    Bea Kearney, Richard Boucher and Jack
11    Beliveau at that time?
12 A.   I just gave all the emails from their email
13    at the time.
14 Q.   You just gave them everything on their email?
15 A.   Yes.
16 Q.   Were you asked to locate any emails involving
17    Kimberly Stoyle and Richard Boucher and
18    Bea Kearney?
19 A.   No.
20 Q.   You testified that you gave the first disc
21    that you created to Mr. D'Agostino; what did
22    you do with the later emails that you
23    downloaded?
24 A.   I turned them over to Susan Jacobs.  Well, I

Page 55

1    gave them to Eileen to ship to Susan Jacobs.
2 Q.   Who is Eileen?
3 A.   Town Manager's secretary.
4 Q.   If you wanted to go into the town to examine
5    either the emails or back-up tapes that went
6    back, say, four years or so, how would you go
7    about doing that?
8 A.   We had a crash on the server, and if someone
9    had the email in there, it will still be in
10    there, but all the old archive records were
11    destroyed.
12 Q.   Okay.  What do you mean when you say "old
13    archive records were destroyed," what records
14    are those?
15 A.   We used to copy the PST files from older
16    dates and put them on the server and the
17    server crashed.
18 Q.   When did the server crash?
19 A.   About 18 months ago.
20 Q.   So, if you hadn't done a search and located
21    those emails 18 months ago, they would be
22    forever lost, is that correct?
23 A.   If someone kept them in their email, they
24    would still be there.  I didn't have an

Page 56

1    archive of them.
2 Q.   So, how many of the searches that you've
3    described for emails took place prior to the
4    crash of the server?
5 A.   I wanna say three, about.
6 Q.   Now, people in the Town of Mansfield,
7    employees in the Town of Mansfield, send
8    emails from their desktop computer, correct?
9 A.   Well, they use Outlook.
10 Q.   Is that correct?  In other words, there isn't
11    a single location that everybody sends their
12    email out?
13 A.   No.
14 Q.   Under what circumstances would you be able to
15    retrieve an email that was sent from
16    someone's desktop even after the file server
17    crashed?
18 A.   It's not sent from the desktop, it's sent
19    from the exchange server.
20 Q.   Under what circumstances would you still be
21    able to locate the emails sent from someone's
22    personal desktop through Outlook after the
23    server crash?
24 A.   If the person didn't delete the email, the

Page 57

1    email would still be there.
2 Q.   Was there a policy in place in the Town of
3    Mansfield concerning the deletion of emails?
4 A.   If it's not a public record-type of
5    document -- it was up to the individual to
6    archive their own emails.
7 Q.   Was there a policy requiring or requesting
8    that individuals deleted their emails on a
9    periodic or regular basis?
10 A.   No.
11 Q.   Not that you're aware of anyway?
12 A.   Well, yes, I'm sorry.
13       When I first started, the first
14    server we had had only a certain amount of
15    memory and stuff like that, so it could not
16    hold the emails.  Some of the emails -- I did
17    tell people if they had emails that were not
18    important to please delete them because I was
19    running out of room in the server.  That was
20    a year into my job.  And then we switched
21    over to a server that had plenty of room.
22 Q.   And the server that had plenty of room is the
23    one that crashed?
24 A.   Yes.

Page 58

1  Q.  What caused that to crash?
2  A.  The hard drives themselves crashed.
3  Q.  Did you have any responsibility for backing
4      up the emails for the Light Department email
5      server during the period of time Mr. Beliveau
6      worked there?
7  A.  No.
8  Q.  Did you have any responsibility for that
9      after Mr. Beliveau left?
10 A.  No -- well, yes and no.
11 Q.  What is the "yes" part?
12 A.  I set it up, but they changed the tapes out.
13 Q.  When did you set it up?
14 A.  About nine months ago.
15 Q.  Why did you set it up?
16 A.  Because their server crashed, too, and it
17     needed a new system.
18 Q.  When did their server crash?
19 A.  I wanna say about nine months ago.
20 Q.  Did you conduct a search of any of the Light
21     Department emails at any time prior to the
22     crash of that server?
23 A.  No.
24 Q.  Did anyone, to your knowledge, conduct a

Page 59

1      search of the Light Department emails?
2  A.  I don't know.
3  Q.  You were never asked to retain the services
4      of anyone to conduct such a search?
5  A.  No.
6  Q.  You weren't aware that anyone's services had
7      been retained to conduct such a search?
8  A.  They were asked for the CDs, and they did
9      their own archiving and they would turn over,
10     if that's what you mean.
11 Q.  So who was asked for the CDs?
12 A.  I believe it was Susan Jacobs from --
13     (Pause.)
14 Q.  Okay.  Let's go back to before the recent
15     crash of the Light Department server, okay?
16     Is it your testimony that the emails were
17     backed up onto CDs?
18 A.  They had -- they had their own tape unit as
19     well as CDs.
20 Q.  Is it your testimony that at some point
21     those CDs were turned over to Susan Jacobs'
22     office?
23 A.  Yes.
24 Q.  And do you recall or do you know how many CDs

Page 60

1      there were?
2  A.  I don't know.
3  Q.  Did you ever see them?
4  A.  Yes.
5  Q.  When did you see them?
6  A.  I saw them at the Light Department while they
7      were doing them and I saw them at Susan
8      Jacobs' -- I saw them at the office.
9  Q.  When did you first see them at the Light
10     Department when they were doing them?
11 A.  Any time they had problems with them, we
12     would help them out and I saw her burning
13     them.
14 Q.  When did you see them at Susan Jacobs'
15     office?
16 A.  When she needed an assistant to help about
17     three months ago; February.  February.
18 Q.  So you're talking about February of 2006?
19 A.  Yes.
20 Q.  This is the end of March.
21 A.  I think it was the beginning of February.
22 Q.  Beginning of February?
23 A.  Yes.
24 Q.  Is it your testimony that you went to

Page 61

1      Susan Jacobs' office to assist Susan Jacobs
2      with those emails, the Light Department
3      emails?
4  A.  Yes.
5  Q.  What assistance did you provide?
6  A.  Helped her load and read them.
7  Q.  Were you able to help her load and read them?
8  A.  On some.
9  Q.  And how many?
10 A.  I showed her I think two, and she said she
11     would take care of the rest.
12 Q.  So basically you went over there to show her
13     how to upload them and read them, correct?
14 A.  Yes.
15 Q.  And what did that involve?
16 A.  Just showing her how to use Outlook and
17     import the PST files.
18 Q.  How involved a process was that?
19 A.  Took about an hour's time.
20 Q.  Was there anything peculiar about the way the
21     emails were loaded on the discs or kept on
22     the discs?
23 A.  No.
24 Q.  Was the beginning of February of 2006 the

Page 62

1    first time that you were asked to assist in
2    the uploading and opening of the Light
3    Department email files?
4    A.    I think I was called one time and asked some
5        questions but -- maybe a month before or
6        something like that.
7    Q.    Was January or so of 2006 the first time that
8        you were ever contacted for assistance in
9        opening up the Light Department emails?
10   A.    I believe so.
11   Q.    Were Mr. D'Agostino and his secretary on the
12       same computer network?
13   A.    Yes.
14   Q.    Have you ever been asked to remove, destroy,
15       or alter any records of Mr. Beliveau,
16       Ms. Stoyle or Mr. D'Agostino?
17   A.    No.
18   Q.    Were you ever asked to search or locate any
19       information from Mr. Jack Beliveau's
20       computer or laptop after he left the Light
21       Department?
22   A.    No.
23   Q.    Do you know physically what happened to
24       Mr. Beliveau's laptop or computer after he

Page 63

1    left the Light Department?
2    A.    I don't know.
3    Q.    You weren't present when it was removed from
4        the office?
5    A.    No.
6    Q.    Did you learn at some later point in time
7        that it had been removed from the office?
8    A.    Yes.
9    Q.    Where did you learn that from?
10   A.    From the police detective that did it.
11   Q.    When did the police detective remove
12       Mr. Beliveau's computer from his office?
13   A.    I wanna say that day.
14   Q.    The day Mr. Beliveau left?
15   A.    I believe so.
16   Q.    Were you asked to retrieve any information
17       from Kimberly Stoyle's computer after she
18       left?
19   A.    No.
20   Q.    Do you know if the Police Department took
21       possession of her computer?
22   A.    No.
23   Q.    Was there an electronic purchase order system
24       at the Light Department?

Page 64

1    A.    I don't know.
2    Q.    Did you ever have a meeting with
3        Jack D'Agostino about an electronic purchase
4        order system at the Light Department?
5    A.    No.  John D'Agostino?  You said "Jack."
6    Q.    I'm sorry, John D'Agostino.
7            You never had a conversation with
8        him about an electronic purchase order system
9        at the Light Department?
10   A.    No.
11   Q.    Did you ever tell Kimberly Stoyle that you
12       met with John D'Agostino about an electronic
13       purchase order system at the Light
14       Department?
15   A.    No.
16   Q.    Do you ever recall discussing an electronic
17       purchase order system with Jack Beliveau?
18   A.    No.
19   Q.    Did you ever have any conversations with
20       Mr. Beliveau about charging the Light
21       Department for GIS services, in general?
22   A.    No.
23   Q.    Did anyone ever ask you to provide them with
24       information as to how long it would take

Page 65

1    or how many man-hours it would take to
2    respond to a request by Mr. Beliveau for
3    emails?
4    A.    Say that again?
5    Q.    Were you ever aware -- made aware that
6        Mr. Beliveau made a request for emails from
7        the Town of Mansfield?
8    A.    No.
9    Q.    Did anyone in the Town of Mansfield on its
10       behalf ask you to estimate the number of
11       man-hours and the cost associated with
12       complying with any requests by Mr. Beliveau
13       for emails?
14   A.    No.
15   Q.    Did you terminate Mr. Beliveau's email
16       account at the Light Department after he
17       left?
18   A.    I disabled it.
19   Q.    When did you disable it?
20   A.    (Pause.)
21            Maybe about a month.
22   Q.    A month after he left?
23   A.    Maybe, I'm not sure.
24   Q.    What do you mean when you say "disabled it"?

Page 66

1   A.   It's -- you can't log on or do anything.
2   Q.   Okay, would emails continue to come in to
3        Mr. Beliveau's email account that had not
4        been terminated?
5   A.   I'm not sure.  I don't know.
6   Q.   What is the difference between disabling an
7        email account and terminating it, if there is
8        one?
9   A.   It just locks the person out.
10  Q.   So disabling it would keep Mr. Beliveau out
11       of the email system, right?
12  A.   Yes.
13  Q.   Why didn't you terminate it?
14  A.   I don't delete anyone's email because of a
15       public record-type of thing.
16  Q.   When I asked you if you terminated his
17       account, you view that as deleting the
18       emails?
19  A.   Say that again?
20  Q.   You consider the termination of an account
21       the same thing as deleting emails?
22  A.   Yes.
23  Q.   Why?
24  A.   Because it deletes all the emails in their

Page 67

1        thing.  It deletes the emails.
2   Q.   Could you have made a copy of the emails in
3        Mr. Beliveau's system and then terminate the
4        account?
5   A.   Yes.
6   Q.   Why didn't you do that?
7   A.   I was never requested to.
8   Q.   Were you ever asked or did you ever set up a
9        filter or repeater on the Light Department
10       email server that would send copies of the
11       Light Department emails to the email server
12       at the town hall?
13  A.   No.
14  Q.   Did you ever make any modifications to the
15       Light Department's email system so that
16       copies of the emails would go to the town
17       hall?
18  A.   No.
19  Q.   Were you ever asked by Mr. D'Agostino or
20       anyone else to monitor the emails that were
21       going in and out of the Light Department?
22  A.   No.
23  Q.   Were you ever asked to search for emails that
24       had Mr. Dentino's or Mr. Klemmi's name on

Page 68

1        them?
2   A.   Ask that one more time?
3   Q.   Were you ever asked to look for emails that
4        contained references to either a Mr. Dentino
5        or a Mr. Klemmi?
6   A.   No.
7   Q.   What is an "email retriever" as opposed to a
8        Golden Retriever or a Labrador retriever?
9   A.   (Laughing.)  Which you will get a painting
10       of.
11  Q.   What is an "email retriever"?
12  A.   It is called "email archiving."
13  Q.   Okay.
14  A.   I never heard of an "email retriever," but an
15       "email archiving system" is something that
16       collects all the emails.
17  Q.   Was such a system ever budgeted at town
18       meeting?
19  A.   Yes.
20  Q.   When was that?
21  A.   Last year.
22  Q.   Okay, and why the discussion and the
23       budgeting about an email archiving?
24  A.   For public records.

Page 69

1   Q.   Didn't have one before then?
2   A.   Most towns don't.
3   Q.   Does one exist now?
4   A.   I'm in the phase of implementing one now.
5   Q.   Do you know if the town supplies any
6        computers to Mr. D'Agostino other than the
7        one located in his office at town hall?
8   A.   No.
9   Q.   Does he have a laptop at home, for example?
10  A.   No.
11  Q.   Or a PC at his home?
12  A.   He has his personal PC.
13  Q.   Did you ever perform any repairs or services
14       on Mr. D'Agostino's personal PC?
15  A.   Yes.
16  Q.   And did you do that during work hours?
17  A.   Yes.
18  Q.   And on how many occasions?
19  A.   Couple.
20  Q.   When?
21  A.   What?
22  Q.   When?  Over what period of time?
23  A.   I wanna say two months ago and maybe like a
24       year and a half ago.

Page 70

1   Q.   Did you charge him for those services?
2   A.   No.
3          MR. KESTEN:  Back to ethics.
4          MS. BALLIRO:  We can go off the
5   record for a few minutes.  We can take a
6   break.  I'm almost done.
7          (Discussion off the record.)
8          MS. BALLIRO:  Back on the record.
9   Q.   Did you ever conduct a search for emails
10      through Mr. D'Agostino's desktop?
11         Did you ever sit down at his desktop
12      and conduct a search for emails?
13  A.   I can do it anywhere, but I might've.
14  Q.   Did you ever do that at his secretary's work
15      station?
16  A.   I might've.
17  Q.   Were you ever asked to search for or retrieve
18      documents other than emails?
19  A.   No.
20  Q.   Only emails?
21  A.   Only emails.
22         MS. BALLIRO:  Okay.  I have nothing
23  further.  We can go off the record.
24         (Discussion off the record.)

Page 71

1          (Short Recess Taken.)
2          (Whereupon the deposition was
3      concluded at 12:12 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 72

1   ERRATA SHEET DISTRIBUTION INFORMATION
2   DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4
5   ERRATA SHEET DISTRIBUTION INFORMATION
6   When the Errata Sheet has been completed by
7   the deponent and signed, a copy thereof
8   should be delivered to each party of record.
9
10
11  INSTRUCTIONS TO DEPONENT
12  After reading this volume of your deposition,
13  please indicate any corrections or changes to
14  your testimony and the reasons therefor on
15  the Errata Sheet supplied to you and sign it.
16  DO NOT make marks or notations on the
17  transcript volume itself.  Add additional
18  sheets if necessary.  Please refer to the
19  above instruction for Errata Sheet
20  distribution information.
21
22
23
24

Page 73

1          ERRATA SHEET
2   PLEASE ATTACH TO THE DEPOSITION OF
3   LOUIS G. COSTA - VOLUME 1 - 3/31/06
4
5   CASE:  BELIVEAU v. TOWN OF MANSFIELD, et al
6
7
8   INSTRUCTIONS TO WITNESS:  1) Please note
9   desired corrections to your testimony by page
10  and line number.  2) Enter text as it appears
11  in the transcript.  3) Enter text as it
12  should appear.
13  PAGE      LINE          CORRECTION
14
15
16
17
18
19
20
21
22
23
24

Page 74

1         SIGNATURE PAGE
2
3         I, LOUIS G. COSTA, do hereby certify
4    that I have read the foregoing transcript of
5    my testimony, and further certify that said
6    transcript is a true and accurate record of
7    said testimony.
8         Signed under the pains and penalties
9    of perjury this      day of           ,
10   2006.
11
12            LOUIS G. COSTA
13
14
15
16   Subscribed and sworn to before me this
17        day of           2006.
18
19
20
21
22
23
24

Page 75

1    COMMONWEALTH OF MASSACHUSETTS
     MIDDLESEX, ss.
2
         I, Jill Kourafas, Certified
3    Shorthand Reporter and Notary Public duly
     commissioned and qualified in and for the
4    Commonwealth of Massachusetts, do hereby
     certify that:
5
         On the 31st day of March 2006,
6    LOUIS G. COSTA, the witness whose deposition
     is hereinbefore set forth was duly sworn by
7    me and identified by me with photo ID, and
     that the foregoing transcript is a true
8    record of the testimony given by such
     witness, to the best of my knowledge, skill
9    and ability.
10       I further certify that I am neither
     attorney nor counsel for, nor related to or
11   employed by, any of the parties to the action
     in which this deposition is taken, and
12   further that I am not a relative or employee
     of any attorney or counsel employed by the
13   parties hereto or financially interested in
     this action.
14
         In Witness Whereof, I have hereunto
15   set my hand and affixed my seal this 6th day
     of April 2006.
16
17       Notary Public
         My Commission Expires:
18       February 26, 2010
19
20
21   THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY
     REPRODUCTION OF THE SAME IN ANY RESPECT
22   UNLESS UNDER THE DIRECT CONTROL AND/OR

Draft Copy