**EXHIBIT J**

```
              VOLUME:    I
              PAGES:     1-75
              EXHIBITS:  See Index
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CASE NO. 04-11329-DPW

```
                                   x
DR. JOHN J. BELIVEAU,              x
        Plaintiff                  x
                                   x
        vs.                        x
                                   x
TOWN OF MANSFIELD MUNICIPAL        x
ELECTRIC DEPARTMENT, JOHN O.       x
D'AGOSTINO,                        x
        Defendants                 x
                                   x
```

    DEPOSITION of ROBERT GUARALDI, taken

pursuant to the applicable provisions of the

Federal Rules of Civil Procedure, before Jill

Kourafas, Certified Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts held at the LAW OFFICES OF WOLF

BLOCK SCHORR SOLIS & COHEN, LLP, ONE BOSTON

PLACE, BOSTON, MASSACHUSETTS, on Thursday,

March 22, 2007, commencing at 2:00 p.m.

_____
        REPORTERS, INC.
 GENERAL & TECHNICAL COURT REPORTING
 23 MERRYMOUNT ROAD, QUINCY, MA 02169
 617.786.7783/FACSIMILE 617.786.7723

        www.reportersinc.com

Page 2

APPEARANCES OF COUNSEL:
For the Plaintiff Doctor Jack Beliveau:
    WOLF BLOCK SCHORR SOLIS & COHEN, LLP
    (BY:  JULIANE BALLIRO, ESQUIRE)
                and
    (BY:  CHRISTINE GRIFFIN, ESQUIRE)
    One Boston Place
    Boston, Massachusetts 02108
    Telephone:  617.226.4000
        Email:  jballiro@wolfblock.com
                cgriffin@wolfblock.com
For the Plaintiff Kimberly Stoyle:
    LAW OFFICES OF LYNN A. LEONARD
    (BY:  LYNN A. LEONARD, ESQUIRE)
    527 Main Street, Suite S
    Melrose, Massachusetts 02176
    Telephone:  781.622.6161
        Email:  counsel@thelawbench.com

For the Defendant Town of Mansfield:

    VOLTERRA GOLDBERG MANGIARATTI & JACOBS
    (BY:  SUSAN JACOBS, ESQUIRE)
    Three Mill Street
    Attleboro, Massachusetts 02703
    Telephone:  508.222.1463
        Email:  sjacobs@vgmj.com
For the Defendant John O. D'Agostino:
    BRODY HARDOON PERKINS & KESTEN, LLP
    (BY:  SAMUEL PERKINS, ESQUIRE)
    One Exeter Plaza
    Boston, Massachusetts 02116
    Telephone:  617.880.7100
        Email:  sperkins@bhpklaw.com

Also Present:

    Dr. Jack Beliveau

---

Page 3

INDEX

Testimony of:                    Page

ROBERT GUARALDI
Examination by Ms. Balliro              4

INDEX OF EXHIBITS

Exhibits    Description        Page

(No exhibits marked.)

---

Page 4

1                P R O C E E D I N G S
2
3        ROBERT GUARALDI, having been called
4    for examination by counsel, having been
5    satisfactorily identified by the production
6    of a driver's license and being first duly
7    sworn by the Notary Public, was examined and
8    testified as follows:
9
10   EXAMINATION BY MS. BALLIRO:
11   Q.   Mr. Guaraldi, is it?
12   A.   Yes.
13   Q.   My name is Juliane Balliro.  Thank for coming
14   here this afternoon.
15        I represent Jack Beliveau, one of
16   the plaintiffs in this matter.  And seated to
17   Mr. Beliveau's right is Lynn Leonard, who I
18   think just introduced herself to you, and she
19   represents Kimberly Stoyle, the other
20   plaintiff in the case.
21        Could you just spell your name for
22   the court reporter, please?
23   A.   Robert, R-O-B-E-R-T, Guaraldi,
24   G-U-A-R-A-L-D-I.

---

Page 5

1    Q.   Mr. Guaraldi, starting with your college or
2         postsecondary school education, could you
3         tell me what your formal educational
4         background is?
5    A.   Sure.  I have a degree from Boston College.
6    Q.   In what?
7    A.   It's a BA in psychology.  I graduated from
8         the honors program and that's it for formal
9         education.
10   Q.   And when was that?
11   A.   1973.
12   Q.   Do you have any formal training whatsoever in
13        the area of computer forensics or computer
14        science?
15   A.   I have numerous courses and classes taught
16        across a broad spectrum of industry
17        technology.
18   Q.   But no formal education, such as college,
19        masters degree or Ph.D.?
20   A.   That's correct.
21   Q.   So let's start with the courses that you've
22        taken.
23        Doing the best that you can, can you
24        start with the least recent to the most

Page 6

1     recent courses that you've taken in the area
2     of computer science or computer forensics?
3  A.   It's very hard for me to recall them all, but
4     I took many courses from Microsoft in various
5     versions of Windows, Window Server, Exchange,
6     which is their email program --
7  Q.   Uh-huh.
8  A.   -- SQL Server.  I think those would be the
9     bulk of them.
10  Q.   And what did you do after you graduated from
11     BC with your bachelors degree in psychology?
12  A.   I worked for Eastern Mountain Sports.
13  Q.   As a psychologist?
14  A.   No.  I designed, edited and produced a
15     catalog for a years, both while in school and
16     after I graduated.
17  Q.   A catalog for clothing?
18  A.   It's a catalog for technical and nontechnical
19     climbing gear, including clothing.
20  Q.   Anything having to do with computers?
21  A.   They were computerizing their inventory at
22     the time, and I was involved from the catalog
23     perspective in that.
24  Q.   What do you mean that you were involved in

Page 7

1     "the catalog perspective in that"?
2  A.   We had to design the interface systems so
3     figuring out what the part numbers would be,
4     how the part numbering system would work and
5     the categories would work and all of that.
6  Q.   Were you at all involved in the software
7     programming on behalf of Eastern Mountain
8     Sports?
9  A.   No.
10  Q.   How long did you work there?
11  A.   I left there, I think, in 1974.
12  Q.   Then what did you do?
13  A.   I went to work at a company called Bond
14     Research Laboratories.
15  Q.   Bond Research Laboratories, where was that
16     located?
17  A.   Somerville, Massachusetts and then
18     subsequently Chelmsford, Mass.  And they had
19     a division in Lebanon, New Hampshire.
20  Q.   Did you work in the Lebanon, New Hampshire
21     division?
22  A.   I worked in Chelmsford and Somerville.
23  Q.   What did you do for Bond Research
24     Laboratories?

Page 8

1  A.   I had a variety of jobs over the many years I
2     was there including purchasing agent,
3     treasurer, I did computer programming on
4     their NCM computer, Numerical Control
5     Machine, I was head of quality control at one
6     point and interfaced with a program, the
7     Brown & Sharpe coordinate measuring machine,
8     which was run by a PDPA computer made by
9     Digital Equipment, and I worked on their
10     accounting system, which was written by the
11     people at Bond Research Labs, including me,
12     in Fortran.
13  Q.   And when did you leave Bond Research
14     Laboratories?
15  A.   1981.
16  Q.   When say that you were involved in
17     computer programming, can you tell me in what
18     language you were programming?
19  A.   Well, we programmed in numerous languages.
20     We programmed in Fortran, but we also
21     programmed in a version of UniApp.
22  Q.   UniAm?
23  A.   UniApp, U-N-I-A-P-P.
24  Q.   Is Fortran a computer language that is still

Page 9

1     in use today?
2  A.   Yes.
3  Q.   And what about UniApp?
4  A.   I suspect so.
5  Q.   But you don't know?
6  A.   I don't know.
7  Q.   Did you take courses before you began doing
8     computer programming for Bond Research
9     Laboratories?
10  A.   I had taken a course in college in computer
11     programming, two courses in computer
12     programming, but beyond that, no.
13  Q.   What courses did you take in computer
14     programming in college?
15  A.   I think it was basic computer programming.
16  Q.   What language?
17  A.   I did take a subsequent course at the
18     University of Lowell in Fortran programming
19     as well as nighttime classes.
20  Q.   Do you know what language the courses that
21     you took in computer programming in college
22     dealt with?
23  A.   I believe it was Fortran.
24  Q.   You indicated that you had some involvement

Page 10

1    when you were at Bond Research Laboratories
2    in an interface between Brown & Sharpe
3    measuring --
4    A.    Coordinate measuring machine.
5    Q.    What is that?
6    A.    It's a very large piece of highly-polished
7    granite to high tolerance which has a gantry
8    on it, a three-dimensional gantry, and it
9    allows you to bring a pointer down and a
10   probe down and establish a point in space,
11   then move to another point and it will
12   calculate a measure to a very high tolerance
13   the distance in between those spaces.
14   Q.    What is a gantrian?
15   A.    Gantry.
16   Q.    Gantry; how do you spell that?
17   A.    G-A-N-T-R-Y.
18   Q.    And what is a gantry?
19   A.    A gantry is a mechanical device, it's a
20   machine that allows movement in two or three
21   axis.
22   Q.    Did your involvement in working on this
23   interface involve computer programming of
24   some sort?

Page 11

1    A.    We did program the machine to be able to
2    measure certain points.
3    Q.    When you say "you programmed the machine to
4    measure certain parts, what exactly did you
5    do with the machine?
6    A.    I would write a program that would allow us
7    to interface certain points, and then the
8    program would calculate whether the part was
9    in tolerance or not.
10   Q.    What language did you write the program?
11   A.    Honestly, I don't remember.  I believe they
12   had their own language.
13   Q.    When you say "we," who did you work with on
14   that project?
15   A.    There were a couple of part-time MIT
16   students, and other people within the
17   facility.
18   Q.    And what role did you have in connection with
19   this group of people, were you in a
20   supervisory position, or were you part of a
21   working team, what role did you play?
22   A.    I would say part of a working team.
23   Q.    And you also said that you worked on their
24   accounting system in the Fortran language?

Page 12

1    A.    Yes.
2    Q.    What kind of programming work did you do on
3    their accounting system?
4    A.    I helped program and fix the programs for the
5    accounting system.  We wrote our own system
6    in Fortran.
7    Q.    Okay.  Are you saying that you were one of
8    the people that wrote the accounting system?
9    A.    Portions of it, yes.
10   Q.    Now, did any of the computer drive or discs
11   that you examined in this matter, were any of
12   them in the language Fortran?
13   A.    I'm not sure I understand the question.
14   Q.    Probably because it's a stupid question, but
15   let's try it again.
16   A.    Okay.
17   Q.    You looked at a variety of drives in
18   connection with your retainment in this case;
19   is that correct?
20   A.    Yes.
21   Q.    Computer drives?
22   A.    That's correct.
23   Q.    I believe you also examined some discs?
24   A.    That's correct.

Page 13

1    Q.    And did you look at any of the programming in
2    connection with the drives that you examined?
3    A.    No.
4    Q.    Okay.  Did you look at any of the programming
5    in connection with the discs that you
6    examined to the extent that you can look at
7    programming in discs?
8    A.    No.
9    Q.    What did you do after you left Bond Research
10   Laboratories?
11   A.    I started my own company.
12   Q.    Okay.  First of all, what did Bond Research
13   Laboratories research?
14   A.    They did a broad spectrum of machine and
15   optical work so they made parts for the
16   Patriot missile, prototypes and other
17   advanced machinery.
18   Q.    What titles did you hold when you were at
19   Bond Research?
20   A.    I mentioned earlier I was purchasing agent, I
21   was programmer, I was treasurer at one time,
22   I held a number of functions.
23   Q.    How many people worked at Bond Research
24   during the period of time that you were

1  there?
2  A.  I'm not sure.  I would think 60.
3  Q.  And during the period of time that you were
4     there from 1974 to 1981, during how many
5     years did you have a job title of some sort
6     of computer programmer?
7  A.  Even when I had the function of computer
8     programming, I often had other titles as well
9     and would use the highest level title that I
10    had.
11 Q.  So what was the highest level title that you
12    had?
13 A.  Treasurer.
14 Q.  I'm sorry?
15 A.  Treasurer.
16 Q.  Do you have any financial or accounting
17    background?
18 A.  No.  I taught myself just about everything
19    I've done professionally in my life.
20 Q.  Including computer programming and computer
21    analysis?
22 A.  Some portions of it.  I mentioned classes
23    that I had taken.
24 Q.  Okay.  So you left Bond Research Laboratories

1     in 1981 to start your own business?
2  A.  Right.
3  Q.  Is that Ilmarin?
4  A.  No.  I started a company called Valinor.
5  Q.  How do you spell that?
6  A.  V-A-L-I-N-O-R, Inc.
7  Q.  And when did you start Valinor, Inc.?
8  A.  I think it was August of '82.
9  Q.  Was that a Massachusetts corporation?
10 A.  Initially, yes.
11 Q.  What did Valinor, Inc. do?
12 A.  I programmed and system integrated equipment.
13 Q.  What kind of equipment?
14 A.  Micro computer equipment.
15 Q.  What does that mean?
16 A.  That's a reference to the processor type that
17    was used in the equipment, so the systems
18    would include printers, hard drives, memory,
19    system boards, CPUs and CRTs and software.
20 Q.  Were who were your customers?
21 A.  I had a number of customers across a broad
22    range.  I'm not sure I remember them all.
23 Q.  For how long did you operate or own Valinor,
24    Inc.?

1  A.  I owned it, or a portion of it, until we sold
2     it to a purchase larger company, and then I
3     worked for a few years as vice president of
4     that division.
5  Q.  So when did you sell Valinor?
6  A.  I think it was '99.
7  Q.  When you sold Valinor, did you have some
8     partners or other major shareholders that you
9     were working with?
10 A.  I had other shareholders, yes.
11 Q.  And you went to work for what company?
12 A.  Our company was acquired by IKON Office
13    Solutions.
14 Q.  What was your title with IKON?
15 A.  I was the president of the Valinor Division.
16 Q.  What did the Valinor Division do for IKON
17    Office Solutions after you were acquired?
18 A.  System integrators and programmers.  So we
19    continued doing the same business we had done
20    for years.
21 Q.  How much of your time was actually spent
22    doing programming versus doing other
23    administrative and perhaps sales activities?
24 A.  I did much less programming as time went on,

1     but still did a lot of consulting on systems
2     integration, so I directly billed a lot of my
3     time.  I was a working president.
4  Q.  What software programs did you work with
5     during the period of time that you were at
6     Valinor and IKON?
7  A.  We were noted for our experience with
8     Microsoft products, and I personally was
9     deeply involved with some of those products
10    and used virtually all of their products and
11    had a lot of experience with them.
12 Q.  And where did you get your experience from?
13 A.  I acquired the experience because earlier in
14    the industry we were initial adopters and
15    worked with most of the Beta programs and
16    learned an awful lot of what we learned on
17    our own.  And in addition to that, Microsoft
18    often hired us, including me personally, to
19    man their booth at many trade shows, so the
20    people wearing Microsoft shirts often were
21    us, my company, and me specifically.
22        And I also acquired Microsoft
23    credentials, Microsoft certified engineer
24    credentials, and that's from taking courses

Page 18

1  and taking exams with them.
2  Q.  When did you get your Microsoft certified
3     engineer credentials?
4  A.  I think the -- where did I get them?
5  Q.  When?
6  A.  I would say the last ones I bothered with
7     were in the late '90s.
8  Q.  And were they in any particular specialty or
9     area or just generally Microsoft certified
10    engineer credentials?
11 A.  I specialized in electronic mail.  In order
12    to get the electronic mail certification, one
13    needed to have certifications across a broad
14    spectrum of their platform, including
15    Windows, Windows NT, various other versions
16    of Windows Server, and I also was one of the
17    earlier adopters for their data programs, SQL
18    Server program, and attended under
19    nondisclosure the very first SQL Server
20    class.
21 Q.  So how long did you remain with IKON?
22 A.  I think it was a little over two years.
23 Q.  Then what happened?
24 A.  Then I formed another company.

Page 19

1  Q.  Okay.  And when did you form the other
2     company?
3  A.  I think we actually formed it in 2000, but it
4     may have been 2001, and that's Ilmarin LLC.
5  Q.  Why did you leave IKON and form your own
6     company?
7  A.  They fired me.
8  Q.  Why did they fire you?
9  A.  We had entered a lawsuit against them that
10    had to do with a transaction of acquisition
11    and they had sued us and we had sued them.
12 Q.  And where was that lawsuit filed?
13 A.  Pennsylvania.
14 Q.  How was the lawsuit resolved?
15 A.  It was settled amicably.
16 Q.  It doesn't sound too amicable, but I guess
17    anything that stops short of going to trial
18    is amicable in the world of litigation.
19         When was it settled?
20 A.  I'm sorry?
21 Q.  When was it settled?
22 A.  I think it was settled in 2001.
23         THE WITNESS (To Attorney Perkins):
24    You might remember.

Page 20

1         MR. PERKINS:  I don't know.
2  Q.  What were the nature of the allegations going
3     back and forth in connection with that
4     lawsuit?
5  A.  Our allegation was that they did a trade -- a
6     swap for stock, and literally within 30 days
7     their stock dropped 40 percent, and our
8     representation was that they misrepresented
9     the value of the stock.
10        There was also a class action suit
11    against them with many of the same
12    allegations, but we opted out of the class
13    action suit and pursued our own suit.
14 Q.  What were their allegations against you?
15 A.  They were very deep and very broad.  I did
16    everything wrong apparently.
17 Q.  In terms of your job responsibilities?
18 A.  Yes, and they also made allegations
19    surrounding the acquisition.
20 Q.  And what allegations did they make
21    surrounding the acquisition?
22 A.  Honestly, I don't remember.
23 Q.  Did they allege you misrepresented the
24    financial affairs of the corporation or --

Page 21

1  A.  Probably.  They alleged everything they could
2     think of.
3  Q.  Did you collect any monies or stock in
4     connection with the settlement of the IKON
5     litigation?
6  A.  We received numerous -- very large payments.
7  Q.  Over what period of time?
8  A.  A couple years during the litigation and just
9     at the end when we settled it.
10 Q.  So, in, I think you said, 2001, you started
11    Ilmarin?
12 A.  Either 2001 or 2002.
13 Q.  Did you start that alone or with someone
14    else?
15 A.  I started it with a partner.
16 Q.  And who was the partner?
17 A.  Paul Guaraldi.
18 Q.  I take it he's a relative of yours?
19 A.  Yes, he is.
20 Q.  A brother or --
21 A.  My brother.
22 Q.  What does Ilmarin do?
23 A.  We focus on computer technology consulting.
24 Q.  What do you mean when you say "we focus on

1    computer technology consulting"?
2  A.   I mean, that's what we do with our time, and
3       that's what customers pay us for.
4  Q.   Do you do other things?  You say you focus
5       on, are there other things you do other than
6       computer technology consulting?
7  A.   We occasionally are asked to go a little bit
8       beyond that and it's organizational business
9       consulting.
10 Q.   And can you give me some examples of the
11      kinds of projects you've taken on while with
12      Ilmarin in the area of computer technology
13      consulting?
14 A.   Sure.
15            One project involved assisting a
16      litigation effort.  In that particular case,
17      we were asked to recover and search documents
18      from hard drives and other media, and we
19      recovered all of those documents, some of
20      those documents were in Italian, so we found
21      a technological approach to assessing whether
22      the material in the Italian documents was
23      important enough to have an expert witness do
24      a formal translation.

1  Q.   When you say "a technological approach,"
2       you're talking about a computerized
3       translator?
4  A.   You got it.
5  Q.   And did you testify at all in connection with
6       that proceeding?
7  A.   No.
8  Q.   Did you testify at deposition in connection
9       with that proceeding?
10 A.   No.
11 Q.   Who retained you?
12 A.   Brody Hardoon.
13 Q.   You are a client of the firm?
14 A.   I'm not a client of the firm right now.
15 Q.   You were a former client of the firm?
16 A.   Former client.
17 Q.   Have you been retained in connection with any
18      litigation other than by Brody Hardoon?
19 A.   Yes.
20 Q.   Who else has retained you?
21 A.   I don't remember the name of the firm, firms,
22      plural, but one case involved suicide.
23 Q.   What was the nature of your work in
24      connection with that matter?

1  A.   It was to take a computer and disc drive,
2       diskettes and other media, and recover as
3       much evidence as possible and provide that to
4       the attorneys.
5            MR. PERKINS:  Just if this would be
6       helpful, I think it would be Sloane & Walsh;
7       is that right?
8            THE WITNESS:  Yes.
9  Q.   So you had to get into the computer and get
10      the information off the computer?
11 A.   That's correct.
12 Q.   And what was the challenge in getting into
13      the computer?
14 A.   The challenge getting into the computer
15      initially was getting the computer.  Once we
16      had convinced the judge that we should get
17      the entire computer, then I was able to clone
18      the hard drive and unerase the hard drive and
19      make available to the attorneys all files
20      that were on the hard drives and on the
21      diskettes.
22 Q.   So the drive had been erased before you
23      received it?
24 A.   The drives in their natural usage do

1       overwrite sectors and that causes material to
2       be destroyed that's actually present on the
3       drive.
4  Q.   Okay.  Can you think of any other cases that
5       you've worked on?
6  A.   Yes.
7            I was involved in a case that
8       involved assessment of video surveillance.
9  Q.   An assessment of video surveillance?
10 A.   That's correct.
11 Q.   What are you doing in connection with that
12      matter?
13 A.   I am collecting data and verifying whether
14      the files that were produced have been
15      tampered with and whether the process that
16      led to the file creations was -- I'm actually
17      just delineating that process is the best way
18      to say it.
19 Q.   In connection with what matter are you doing
20      that?  What's the name of the case?
21           THE WITNESS:  Can I ask a question?
22      Am I allowed to talk about ongoing cases?
23           MR. PERKINS:  Are you a designated
24      expert yet in that case?

Page 26

1    THE WITNESS: I am. I don't know if
2  they are calling me an expert, so I'm allowed
3  to mention the case?
4    MR. PERKINS: I think that to the
5  extent that you're an undisclosed consulting
6  expert, we'd ask that you not put that on the
7  record.
8    If it's important to you to know, I
9  am sure we can let you know what it is. I
10  don't know if it's --
11    MS. BALLIRO: Well, I can say this:
12  There's no privilege that attaches to the
13  information, but what I can say is, that I
14  won't use it in any way outside this matter
15  without first giving you notice of my
16  intention to do so and giving Mr. Guaraldi an
17  opportunity to respond.
18    MR. PERKINS: Give me a second to
19  check with him about what it is.
20    MS. BALLIRO: Sure.
21    (Short Recess Taken.)
22  A.  Okay. I'm prepared to talk about what I'm
23  doing, but not whom I'm doing it for.
24    MR. PERKINS: The reason for that,

Page 27

1  Ms. Balliro, is because in some case some of
2  the work is being done -- is not disclosed
3  and, in fact, it's not even known by the
4  other side.
5    MS. BALLIRO: But there's no
6  privilege that is attached to it, so what is
7  the privilege that you are asserting?
8    MR. PERKINS: We're not claiming
9  it's privileged, we're saying it's beyond the
10  scope of discovery.
11    MS. BALLIRO: You're saying that
12  your expert witness's work on other matters
13  in the world of computers is not relevant to
14  the discovery in this case?
15    MR. PERKINS: No. I think when
16  I'm --
17    MS. BALLIRO: His experience?
18    MR. PERKINS: No, what I'm saying,
19  so we're clear on it, he's happy to talk with
20  you, as he said, and as I said, about the
21  work he does, but identifying the case so the
22  people on the other side in that particular
23  case might know he's doing that work is the
24  concern.

Page 28

1    MS. BALLIRO: I said I wouldn't
2  disclose it outside this matter. I'm not
3  going to call up the lawyer. I won't do
4  anything like that unless I give you an
5  opportunity to respond. You can get a order
6  from the court or whatever, I think it's a
7  very highly unlikely possibility, but I'm
8  entitled to the information. There's no
9  privilege that bars the information.
10    MR. PERKINS: I'm afraid we
11  disagree. We're happy to have you ask him
12  about the experience in the work he does, but
13  we'll not identify the cases.
14    MS. BALLIRO: You're not asserting
15  any privilege?
16    MR. PERKINS: I told you the grounds
17  for it.
18    MS. BALLIRO: Your basis is
19  relevance?
20    MR. PERKINS: It's actually not
21  relevance. It's the scope of discovery.
22    MS. BALLIRO: And what do you mean
23  by "the scope of discovery"?
24    MR. PERKINS: Well, rather than

Page 29

1  being exhaustive about it, I'll tell you the
2  ground I'm asserting now and I'll reserve my
3  right to assert other grounds later.
4    MS. BALLIRO: Okay. I don't think
5  you can do that. I think if you're
6  instructing your client not to testify, then
7  you need to state clearly on the record the
8  complete basis upon which you've instructed
9  him not to testify.
10    MR. PERKINS: Actually, that's
11  another assertion that you and I disagree
12  with completely.
13    MS. BALLIRO: Do you think you could
14  just do it and then worry about why you're
15  doing it later?
16    MR. PERKINS: I think that when
17  there's ever a dispute that has to go before
18  a judge about whether or not a witness has to
19  answer questions at a deposition, obviously,
20  you can think of new grounds for claiming why
21  it's relevant when you file your motion to
22  compel, and we'll assert whatever grounds
23  there are for resisting a motion to compel.
24    MS. BALLIRO: Okay. Well, tell

1    me --
2        MR. PERKINS:  Right now what's
3    obvious to me is the name of the case is not
4    going to be admissible evidence, and learning
5    the name of the case is not going to lead to
6    the discovery of admissible evidence.
7        What you're asking about is his
8    expert qualifications and experience and
9    we're happy to have him tell you those.
10   Q.   Let me ask you this:  Is this an ongoing
11   matter?
12   A.   Some of the ones that --
13   Q.   The one you won't tell me about is the video
14   surveillance one?
15   A.   Well, there are others ongoing.
16   Q.   There are other others you won't tell me
17   about?
18   A.   I will tell you about them, I won't tell you
19   the name.
20       MS. BALLIRO:  I just want to make
21   the point for the record, without the name,
22   without some sort of identifier, I'm unable
23   to confirm whether, in fact, this witness is
24   consulting on these matters and whether he's

1    consulting in the capacity that he represents
2    he's consulting in.
3        So, I will take, at this point, what
4    I can get, but I'm obviously unable to
5    prepare for adequate cross-examination of
6    this witness at trial without having adequate
7    detailed information concerning his
8    experience, particularly when he doesn't have
9    any formal education in this area.
10       So his experience in the area of
11   forensic computer work is highly relevant,
12   and when all he has is experience to go on, I
13   think I'm entitled to all the information
14   that is available on that point, but let's
15   move on.
16   Q.   So the video surveillance matter is currently
17   pending?
18   A.   Yes.
19   Q.   In other words, you're working on that now?
20   A.   That's correct.
21   Q.   And for how long have you been working on
22   that?
23   A.   Four months.
24   Q.   And is it in the Commonwealth of

1    Massachusetts?
2   A.   Yes.
3   Q.   Is it a criminal matter or civil matter?
4   A.   I believe it's a civil matter.
5   Q.   In other words, the county prosecutor or the
6   Attorney's General office or the US
7   Attorney's office is not a party to that
8   proceeding?
9   A.   To the best of my knowledge, that's correct.
10   Q.   Have you testified in any depositions in
11   connection with that matter?
12   A.   No.
13   Q.   Have you testified in any hearings in that
14   matter?
15   A.   No.
16   Q.   Have you been qualified by any court in
17   connection with that matter?
18   A.   No.
19   Q.   Have you filed any reports in connection with
20   that matter?
21   A.   No.
22   Q.   Can you tell me what other court-related
23   cases you've been involved in since you
24   joined Ilmarin or since you formed Ilmarin?

1   A.   There's another ongoing case in which I was
2   provided hard drives and -- hard drive,
3   singular, and asked to recover data off that
4   hard drive and provide it to the attorneys.
5   Q.   And you won't disclose the parties in that
6   case?
7   A.   That's correct.
8   Q.   Can you at least tell me whether the Town of
9   Mansfield is a party in that case?
10   A.   No, they are not.
11   Q.   They are not?
12   A.   No.
13   Q.   And who were the attorneys that referred you
14   to that case?
15   A.   I would prefer not to say.
16   Q.   Is it your attorney?
17       MR. PERKINS:  I gather his answer is
18   he would prefer not to say.
19       MS. BALLIRO:  I don't see how you
20   can take the position that work that's being
21   done on your behalf for your own client in
22   another matter is not relevant or
23   discoverable in this case.
24       MR. PERKINS:  In this case, I'm not

Page 34

1    sure which case he's referring to, so give me
2    a minute to consult with him.
3         MS. BALLIRO:  Go ahead.
4         (Short Recess Taken.)
5         MR. PERKINS:  To clarify the last
6    situation, it's not work he's doing for
7    Brody, Hardoon, Perkins & Kesten, it's for a
8    firm that we're not aware of, it's an
9    unrelated matter, so Mr. Guaraldi would
10   prefer not to identify the firm or the
11   matter.
12   Q.   And, to your knowledge, in this additional
13        matter what we're talking about, your role,
14        as a consultant has not been disclosed to the
15        other side yet?
16   A.   I don't know whether it has or not.  I have
17        no particular knowledge on that.
18   Q.   Okay.  Then assuming that it has been
19        disclosed, what is the basis of your
20        unwillingness to provide me with the
21        information?
22        MR. PERKINS:  Don't know that we can
23   assume that, can we?  So I don't think
24   there's any basis for that question other

Page 35

1    than speculation.
2    Q.   Well, are you speculating that your name has
3         not been disclosed to the other side?
4         MR. PERKINS:  He says he doesn't
5    know.
6    A.   I don't know.
7    Q.   You don't know whether your name has been
8         disclosed to the other side?
9    A.   That's what I said.
10   Q.   So have you filed a report with the counsel
11        that retained you in connection with that
12        matter?
13   A.   Yes.
14   Q.   And when did you provide that counsel with
15        that report?
16   A.   It was four or five months ago.
17   Q.   In what court is that matter pending?
18   A.   I don't know.
19   Q.   You don't know what court it's in?
20   A.   No.
21   Q.   Do you know what court the video surveillance
22        case is pending in?
23   A.   No.
24   Q.   You do know it's a Massachusetts court?

Page 36

1    A.   Yes.
2    Q.   Do you know if it's a state or federal court?
3    A.   No, I don't.
4    Q.   Have you testified --
5    A.   Some cases I'm brought in before they
6         actually go to court when there are
7         allegations.
8    Q.   Is that the case with respect to the video
9         surveillance matter?
10   A.   I don't know.
11   Q.   What about the second matter?
12   A.   I don't know.
13   Q.   So you don't know if there's even a court
14        case?
15   A.   That's correct.
16   Q.   I guess then if you don't know if there's
17        even a court case, you haven't testified in
18        any deposition in connection with that case
19        and you haven't been qualified as a witness
20        at trial?
21   A.   That's correct, that's correct.
22   Q.   What is the nature of that case?
23   A.   Which case?
24   Q.   The second one that we don't know if it's a

Page 37

1    case or if you've been disclosed.
2    A.   As I said, I've been --
3    Q.   Tell me what you do know about it.
4    A.   I have been given a hard drive and asked to
5         recover all the potential evidence data off
6         the hard drive.
7    Q.   What kind of case is it?  A civil case?  A
8         criminal case?
9    A.   It could potentially be both; initially, it
10        was civil.
11   Q.   What kind of data is it that you've been
12        asked to recover?
13   A.   All data.
14   Q.   And is it your testimony then that you've
15        recovered some data that you think might lead
16        to criminal charges?
17   A.   I'm not qualified to make that assessment.
18        I provided the data to the attorneys
19   and they in the context of what else they
20   know and the other evidence that they have,
21   make decisions about criminality.
22   Q.   What was the basis for your statement that it
23        could be criminal?
24   A.   I was told that the initial allegation could

1    be either or both.
2  Q.    Okay.  Can you think of any other matters
3       that you've been involved in that either have
4       gone to court or might go to court?
5  A.    There are other forensic cases I have been
6       involved in involving the acquisition of
7       data; whether they have gone to court or not,
8       I'm not necessarily aware of.
9  Q.    And how many occasions have you been retained
10      by Mr. Kesten's firm for purposes of
11      acquiring, retrieving or analyzing computer
12      data?
13 A.    In different cases?
14 Q.    Yes.  Let's start in different cases.
15 A.    (Pause.)
16          I'd say at least three.
17 Q.    And over what period of time?
18 A.    Five years.
19 Q.    When you say "at least three," are you
20      including this matter in those three?
21 A.    Which matter is this matter?  This matter?  I
22      thought you meant the last one we were
23      talking about, I'm sorry.
24 Q.    This matter, the matter that you are here to

1    testify for.
2  A.    No.
3  Q.    So this would be the fourth one?
4  A.    I think so.
5  Q.    I think earlier you testified about a suicide
6       case involving a suicide and that you were
7       retained by Mr. Kesten's firm, correct?
8  A.    No.
9  Q.    Tell me what the other three cases are that
10      you've been retained by Mr. Kesten's firm to
11      do work on.
12          MR. PERKINS:  To the extent that you
13      can with the earlier limitations.
14          THE WITNESS:  I'm sorry?
15          MR. PERKINS:  Obviously, there's one
16      of the cases you declined because of the
17      circumstances in the case.  I gather that
18      Ms. Balliro's asking you for the names of the
19      cases, or just to identify the type of work,
20      or the number.
21          MS. BALLIRO:  Well, I don't know if
22      they are cases or not cases.  I don't know if
23      he knows that they are cases or not cases.  I
24      don't know if he knows he's been disclosed or

1    not.
2          I'm presuming since it's one of your
3       cases, you probably have the answer to that
4       and so we could -- we may be able to move on.
5  Q.    Let's just start with:  You've talked about
6       one where you don't know if it's a case or
7       not, where you have not disclosed the name of
8       case, correct, for Mr. Kesten's firm?
9  A.    I think we talked about numerous cases that I
10      have not disclosed the name.
11 Q.    How many have we talked about that had to do
12      with Mr. Kesten's firm?
13 A.    I don't think I should answer that question.
14 Q.    Let's start over again.
15          You just testified that you have had
16      at least three cases that you've handled on
17      behalf of Mr. Kesten's firm in addition to
18      this case over the past five years, correct?
19 A.    I believe that's correct.
20 Q.    Tell me about the first one, what kind of
21      case was it.  `
22 A.    It was a case in which we were asked to
23      collect data and recover data and provide it
24      to attorneys.

1  Q.    From what?
2  A.    From hard drives and various media.
3  Q.    When were you asked to do that?
4  A.    I'm not sure I remember all the dates.  It
5       was a few years ago.
6  Q.    Was your name disclosed to the other party in
7       that matter?
8  A.    I honestly don't know.
9  Q.    Well, perhaps your attorney would know.
10      Since he's sitting right next to you, do you
11      know what matter he's talking about and if
12      his name has been disclosed in this matter?
13          MR. PERKINS:  This one involved the
14      Italian translations?
15          THE WITNESS:  Yes.
16          MR. PERKINS:  He was never
17      designated as an expert.
18 Q.    Do you know if that case ever went to court?
19 A.    I believe it did.
20 Q.    But you were never designated as an expert in
21      that case?
22 A.    That's correct.
23 Q.    Tell me about the next one.
24 A.    I have to think back.

Page 42

```
1            (Pause.)
2            The next one, not including this
3    one?
4    Q.   Yes.  You said there were at least three plus
5    this one, so we're now on No. 2.
6    A.   Right.  Another case that I was involved in
7    was collecting data and assessing it for
8    tampered files.
9    Q.   What kind of files?
10   A.   Video surveillance files.
11   Q.   Is that different from the other video
12   surveillance case that you referred to?
13   A.   No.
14   Q.   So the other video surveillance case that you
15   referred to was a case where you were working
16   on behalf of Mr. Kesten's office?
17   A.   That's correct.
18           MS. BALLIRO:  Counsel, do you know
19   if his name was disclosed in connection with
20   that matter or if he was ever designated as
21   an expert?
22           MR. PERKINS:  I don't know.  Not my
23   case.
24   Q.   Who within the office were you working with,
```

Page 43

```
1    what attorney or attorneys within the office?
2            MR. PERKINS:  You can answer that.
3    A.   Leonard Kesten.
4    Q.   Do you know if that was a case that was ever
5    filed in court?
6    A.   I don't know.
7    Q.   Do you recall when it was that you were
8    retained in that matter?
9    A.   I believe it was about four months ago.
10   Q.   Four months ago?
11   A.   Yes.
12   Q.   Okay.  I think we covered this, but you never
13   testified in connection with that case?
14   A.   That's correct.
15   Q.   You've never been qualified as an expert in
16   connection with that case?
17   A.   That's correct.
18   Q.   How about the next one?
19   A.   I was involved in collecting data and
20   assisting in the collection of data,
21   specifically emails and email attachments.
22   Q.   Which lawyer within your lawyer's firm did
23   you work with on that case?
24   A.   Sam Perkins.
```

Page 44

```
1    Q.   Was your name disclosed to the opposing party
2    in that case?
3    A.   I don't know.
4            MS. BALLIRO:  Mr. Perkins?
5            MR. PERKINS:  Let me have him
6    identify which case it is.
7            Do you want to step outside and tell
8    me which one you're talking about?
9            (Short Recess Taken.)
10           MR. PERKINS:  Mr. Guaraldi has not
11   been designated as an expert in that case.
12           MS. BALLIRO:  Can you tell me
13   whether it's a case that's been filed in any
14   court?
15           MR. PERKINS:  Yep.
16           MS. BALLIRO:  And is it civil or
17   criminal?
18           MR. PERKINS:  Civil.
19   Q.   So, then, I guess, it's fair to say that if
20   you haven't been designated, you haven't
21   testified in connection with that matter
22   either?
23   A.   That's correct.
24   Q.   So, are there any others, other than the
```

Page 45

```
1    three we've already discussed, and, of
2    course, this case, the Beliveau case, where
3    you have been asked to perform
4    forensic-related computer services on behalf
5    of Mr. Kesten or any of the attorneys in his
6    firm?
7    A.   Going way back into the mid-'80s when I was
8    at Valinor, I did forensic data recovery for
9    a vice president of -- we were doing work for
10   PC Week and he asked me to recover an entire
11   database that had been damaged.
12   Q.   Mr. Kesten did?
13   A.   That was forensic recovery.
14   Q.   But I was asking you about Mr. Kesten or
15   other lawyers in his firm.
16   A.   No.
17   Q.   Have you ever testified in a court in the
18   Commonwealth of Massachusetts as an expert?
19   A.   No, not as an expert.
20   Q.   Have you ever testified at all?
21   A.   Yes.
22   Q.   Okay.  And in what kinds of cases?
23   A.   In a civil matter in Superior Court that had
24   to do with a restricted covenant lease -- a
```

---

**Page 46**

1  restricted covenant in a lease.
2  Q.  And what was your role in that case?  What
3     were you called to testify to?
4  A.  I was asked to testify about the financial
5     nature of the company.
6  Q.  Okay.  Can you think of any other cases where
7     you've testified as a fact witness?
8  A.  No.
9  Q.  Have you ever testified or been qualified as
10    an expert in the federal court --
11 A.  No.
12 Q.  -- or in the courts of any other
13    jurisdiction?
14 A.  No.
15 Q.  Have you been asked to make yourself
16    available to testify as an expert witness in
17    this case?
18 A.  Yes.
19        MR. PERKINS:  I have no concerns
20    about disclosing the case that Mr. Guaraldi
21    last mentioned that he worked on with me.
22    He's not a designated expert in that case
23    because the case involved elements both of
24    discovery and of a public records request.

**Page 47**

1  The case that's in litigation there, or was
2  until recently, I was summary judged at, is
3  called Apollo Castro versus the Boston
4  Redevelopment Services, and it involved the
5  mosque being built next to Roxbury Community
6  College, and Mr. Guaraldi worked in that case
7  on helping in Roxbury Community College's
8  recovery of emails in response to both
9  discovery requests and public records
10 request.
11 Q.  When were you retained in connection with
12    this matter?
13 A.  Mid last year.
14 Q.  What was your understanding of the purpose of
15    your assignment?
16 A.  My assignment was to overcome technical
17    obstacles and help collect data and recover
18    data from various media.
19 Q.  Did you encounter technical obstacles?
20 A.  Yes.
21 Q.  What technical obstacles did you encounter?
22 A.  Some of the CDs that were provided by
23    Mansfield as their archive of emails were
24    damaged, and I was not able to copy them, and

**Page 48**

1  some that could be copied, had damaged files
2  on them, and some that had what looked like
3  working files, acceptable files could not be
4  mounted as PST.
5  Q.  What is a "PST"?
6  A.  "PST" stands for "personal system file."
7     It's a data base of Microsoft messages that's
8     used by their Outlook email client.
9  Q.  Now, you referred to CDs provided by
10    Mansfield as their archive of emails; what do
11    you mean by "archive of emails"?
12 A.  The term means storage, a long-term storage
13    solution.
14 Q.  Do you know what it was that caused these CDs
15    or archives of emails to be damaged?
16 A.  I can't speculate on that.  I can only say
17    that the ones I received as originals were
18    not copyable by me on multiple machines using
19    multiple different drives, so I recommended
20    that those be made available to the
21    opposition and if they could access them,
22    then that would be wonderful.
23 Q.  Do you know if they have been made available
24    to us?

**Page 49**

1  A.  It's my understanding that they were.
2  Q.  They were?
3  A.  They were made available to you.
4  Q.  And what was it that you thought that the
5     opposition in this case could do that you
6     were unable to do?
7  A.  I don't speculate about that.
8        My job is to do what I can in an
9     economical and efficient manner, and not
10    damage any opportunities for the opposition
11    to go further or find something that I was
12    unable to find using different tools and
13    techniques.
14 Q.  Did you learn from any source in Mansfield or
15    related to this matter that the file service
16    for both the Town and the Electric Department
17    had, at one point or another, crashed before
18    you were brought into the case?
19 A.  I had never heard that said, no.
20 Q.  Did you have any conversations with Lou Costa
21    from the Town of Mansfield in connection with
22    this matter?
23 A.  I had one conversation with him where he
24    mentioned the server was decommissioned.

Page 50

1  Q.  What does that mean to say a server was
2      decommissioned?
3  A.  Often people will buy -- I'm not sure what he
4      meant.  I can say that often people will
5      replace servers with better hardware, faster
6      hardware.
7  Q.  Can you give me the range of reasons why the
8      archives of the emails would've suffered the
9      type of damage that you observed in this
10     case?
11 A.  That would be speculative, but in my forensic
12     report, which I see right in front of you,
13     there's a table that delineates what I
14     discovered CD by CD.
15 Q.  But you can't tell me what the possible
16     causes of the damage might've been, in other
17     words, what causes damage like that; for
18     example, does excessive heat cause damage
19     like that?
20 A.  It could.
21 Q.  How about flooding?
22 A.  I can't speculate on what might cause the
23     damage.
24 Q.  So you have no idea?

Page 51

1  A.  I'm saying it would be inappropriate for me
2      to speculate.
3  Q.  Well, I'm inviting you to speculate.  I'm
4      asking you to give me all the possible, you
5      know, causes of the kind of damage that you
6      saw to the PST email archive files that you
7      looked at in this case.
8  A.  There's an infinite number of possible
9      causes.
10 Q.  Do you know who had possession of the CDs
11     that you were provided with before they came
12     into your possession?
13 A.  No, I don't.
14 Q.  How did you get them?
15 A.  I was handed them by Len Kesten.
16 Q.  Were you provided with any chain of custody
17     documents in connection with those CDs?
18 A.  No.
19 Q.  Could you tell whether the files were damaged
20     before or after they were placed on the CDs?
21 A.  No, I can't tell that.
22 Q.  Can you tell whether the process of placing
23     them on the CDs might have caused the damage
24     to the files?

Page 52

1  A.  No, I can't.
2  Q.  Can you tell whether the CDs themselves were
3      defective or faulty in some way?
4  A.  No, I can't definitively say, except that if
5      the CD cannot be copied, by definition it's
6      defective.
7  Q.  I guess what I'm asking you is:  Can you tell
8      or offer an opinion as to whether the problem
9      with getting access to the data on the CDs
10     was because the data was damaged before it
11     was placed on the CD or good data was placed
12     on a faulty CD?
13 A.  Again, I can't tell.
14 Q.  You can't tell?
15 A.  No.
16 Q.  Did you receive any materials related to this
17     case that you examined from anyone other than
18     Mr. Kesten or someone in his office?
19 A.  No.
20 Q.  Did you receive any chain of custody
21     documents in connection with any of the
22     materials that you received?
23 A.  No.
24 Q.  Did you receive a list of the individuals who

Page 53

1      had had contact with the evidence that you
2      reviewed prior to your receipt of that
3      evidence?
4  A.  No.
5  Q.  Did you ask any questions about who might
6      have had possession of the materials you
7      received prior to your receipt of them?
8          You received the evidence on March 9
9      of 2006?
10 A.  I believe that's the correct date.
11 Q.  What is a CD-R?
12 A.  That's a, many times, readable/once writable
13     CD media.
14 Q.  Do you know who created that CD, who
15     downloaded the information onto it?
16 A.  No, I don't.
17 Q.  Did you ask?
18 A.  No, I didn't.
19 Q.  Did you care?
20     MR. PERKINS:  Objection.
21 A.  No, not directly.
22 Q.  What is the difference between a CD-R and an
23     email archive?
24 A.  "CD-R" is a media type; "email archive" is a

1    reference to a type of data that may or may
2    not be on the CD or hard drive or anywhere
3    else.
4 Q.   And you reference in your report email
5    archives for the years 2003, 2004, 2005, do
6    you recall that?
7 A.   Yes.
8 Q.   And were those emails on a CD or some other
9    form of media?
10 A.   I was told that the CDs that I received
11    contained the email archives.
12 Q.   So all of the email archives that you
13    received were on CD-Rs?
14 A.   That's correct.
15 Q.   Including the Gary Babin email and the Gary
16    Babin email T-O-M?
17 A.   I listed all the CDs that I received.  On the
18    laptop, there also was a PST, I believe.
19 Q.   In addition to CDs that you received, what
20    else did you get?
21 A.   I received a laptop and a Tungsten Palm Pilot
22    and hard drives.
23 Q.   And you received all of those from
24    Mr. Kesten?

1 A.   Yes.
2 Q.   Without any chain of custody documentation?
3 A.   That's correct.
4 Q.   Do you know who was in possession of the Palm
5    Pilot, the laptops or the hard drives prior
6    to your taking possession of them?
7 A.   No.
8 Q.   You say in your report that you did not take
9    an Imation data cartridge?
10 A.   That's correct.
11 Q.   Why did you not take the Imation data
12    cartridge?
13 A.   I knew I did not have the hardware or
14    software to recover if anything was
15    recoverable on that piece of media.
16 Q.   Do you know when it was that was alleged to
17    have been contained on that hard drive?
18 A.   I only know what the label said and I cited
19    that in my report.
20 Q.   It says "Mansfield Electric Light Department,
21    Wednesday Backup"?
22 A.   That's correct.
23 Q.   No date?
24 A.   No.

1 Q.   Your report indicates that subsequent to
2    March 9th, additional CD-Rs were provided and
3    the same process was followed, and then you
4    list "Town of Mansfield, Email Old, 3/1/06.
5    Eileen email from E Drive.  Mansfield emails
6    from town hall," when did you receive those?
7 A.   I don't remember the precise date.  I may
8    have put it in the report, but it was -- it
9    was a couple months later.
10 Q.   So somewhere mid-2006 or so?
11 A.   Yeah.
12 Q.   What were you told about those CD-Rs?
13 A.   That these were additional email archives and
14    the last of the email archives they could
15    find.
16 Q.   And you indicate in your report that the ones
17    that could be copied were, "the files on the
18    copies were copied to hard drives where
19    possible and the PST files were opened and
20    processed where possible"?
21 A.   That's correct.
22 Q.   And were there files among those CD-Rs, the
23    Town of Mansfield's email, an Eileen email
24    from E Drive and Mansfield emails from town

1    hall that were also damaged?
2 A.   If so, it's in my report.  I don't recall any
3    that were damaged.  I believe those were all
4    fine.
5 Q.   What did you mean when you said "The ones
6    that could be copied were"?
7 A.   Exactly what I said, that I copied any of the
8    copyable CDs, and then I work off of backuped
9    copies, and when I copy them, I also copy the
10    files that are on them to a hard drive.
11        If the media is defective, then I
12    can't copy it and I didn't and I recorded
13    that on my table.
14 Q.   Okay.  So if we look to the table that
15    appears beginning on Page 3 of your report,
16    we'll be able to tell which CDs you were able
17    to copy --
18 A.   Yes.
19 Q.   -- and which CDs you were not able to copy?
20 A.   That's correct.
21 Q.   Some, as I understand it, could be copied,
22    but then once you copied them, you couldn't
23    read them anyway?
24 A.   Some of them I could copy, but then I

Page 58

1    couldn't read the file; others I could copy
2    and see the file, but it would not mount
3    properly as a PST.
4 Q.   Okay. And what does that mean?
5 A.   That means that Outlook said that it was a
6    non-Outlook data file. So what kind of a
7    file it actually was, or whether it was a
8    damaged PST, I did not know.
9 Q.   But you could read those files?
10 A.   I could see the files in the directory, but
11    not access anything in the file.
12 Q.   Okay.
13 A.   And I suggested that they make available all
14    of the originals, the originals that I say in
15    my report are back at Brody Hardoon, and I
16    suggested they make those available in case
17    somebody else could, in fact, access the data
18    or copy those.
19 Q.   You indicate in your report that you copied
20    all of the viable PST files to a local hard
21    drive, altered their attributes and mounted
22    them in Outlook?
23 A.   That's correct.
24 Q.   How did you alter their attributes?

Page 59

1 A.   When they are on a CD-R, which is a
2    write-once device, they obtain a read-only
3    attribute. And in the version of Outlook we
4    were using, one has to copy them back to a
5    hard drive, change the attribute to
6    read-write and then you are able to mount
7    them.
8 Q.   Once you mounted them in Outlook, you were
9    able to open them and look for them?
10 A.   Look through them, yes.
11 Q.   What were you looking for?
12 A.   Mostly I was collecting information and
13    providing the entire PSTs to counsel.
14       We were asked to -- I was asked to
15    assist in redaction, and so I worked through
16    the technical side while the attorneys
17    suggested what to redact and what not to
18    redact.
19 Q.   When you say "assist in redaction," what do
20    you mean?
21 A.   I mean that I ran the computer, banged on the
22    keys while they said what to search for and
23    what to redact.
24 Q.   When you say "redact," what do you mean by

Page 60

1    "redact"? Do you mean erase?
2 A.   No. I mean hold back from the opposition.
3 Q.   So, you were asked to -- using specific
4    search terms, I take it, to look for
5    particular emails; is that correct?
6 A.   I was asked to technically assist in that
7    process.
8 Q.   Were you given search terms in order to
9    locale emails?
10 A.   I was asked to assist in that process, but
11    it's not something I'll be testifying on, as
12    I understand it.
13       MR. PERKINS: We're talking about
14    the redaction process, correct?
15       THE WITNESS: Right.
16       MR. PERKINS: You can certainly --
17 Q.   Tell me exactly what it was that you did when
18    you were sitting next to counsel besides
19    hitting the keys, okay, to go through the
20    information and somehow separate out what was
21    going to be provided from what was not going
22    to be provided?
23 A.   So, for instance, they asked me to search on
24    specific lawyer's names that had worked for

Page 61

1    the Town so those could be redacted.
2 Q.   What names did they ask you to search on?
3 A.   I don't recall all the names.
4 Q.   Did you keep that information anywhere?
5 A.   No, I didn't, we did this real time.
6 Q.   What else did they ask you to do?
7 A.   After the redaction, they asked me to make
8    CDs that included the balance of material and
9    then I was asked to produce a spreadsheet
10    showing the headers of the redacted material,
11    which, I believe, they provided to counsel.
12 Q.   So, all of the materials that had been
13    redacted are contained in a spreadsheet that
14    lists their headers and all of the emails
15    that have not been redacted were put on a CD
16    for production to my office; is that your
17    understanding?
18 A.   Not redacted materials were supplied on a CD.
19    The redacted materials were assembled into an
20    Excel spreadsheet showing headers and, as I
21    understand it, that was provided.
22 Q.   Have you been asked to testify concerning any
23    of the information that was contained on any
24    of the emails that were located in the

Page 62

```
1    materials you reviewed?
2 A.   I had been asked to be prepared to testify
3    about what was found, where it was found and
4    what the attributes of the particular
5    documents are.
6 Q.   Tell me with respect to what documents have
7    you been asked to testify what has been
8    found.
9 A.   I haven't been given any specific lists of
10    documents.
11 Q.   In connection with what attributes have you
12    been asked to testify?
13 A.   Specifically the available attributes, such
14    as data creation, modification, anything --
15    depending on what type of document it is,
16    there may be more information or less
17    information.
18 Q.   You've been asked to be ready to testify
19    about documents that have not been identified
20    for you, their create dates, their
21    modification dates, their access dates, and
22    so on and so forth, for documents that
23    haven't been identified?
24 A.   That's correct.  At this point no documents
```

Page 63

```
1    have been identified that I have been asked
2    to prepare to testify on.
3        But I have been asked, as it says in
4    my report, in the last sentence, to be
5    prepared to speak as an expert on the
6    attributes of the documents when they figure
7    out what documents they intend to use as
8    evidence.
9 Q.   Have they given you any sense of when they
10    are going to figure that out?
11 A.   I keep asking when discovery is going to
12    close, and as I understand it, it's still
13    open.
14 Q.   Well, for less than a week.
15        Were you asked to focus or hone in
16    on any particular types of documents or
17    documents having any particular attributes?
18 A.   No.
19 Q.   What is your understanding of the nature of
20    the dispute in this case?
21 A.   I have a very limited understanding.
22        In general, it's expensive to spend
23    a lot of time explaining to me what the case
24    is all about, so my job is to collect all the
```

Page 64

```
1    data and provide it in a form that it can
2    discern the truth of the matter and that's
3    what I focus on.
4        I don't get involved in trying to
5    understand particular evidence that they are
6    looking for.
7        They are set up to do their own
8    searches and to cull through the materials
9    themselves and figure out what it is that's
10    important and what isn't.  I just basically
11    record.
12 Q.   So, as I understand your testimony, you
13    haven't been shown a single document in this
14    case, either in email, or memoranda, or any
15    other kind of document, and asked to offer
16    your opinion as to when that document was
17    created, when it was last modified, when it
18    was last accessed?
19 A.   I have been asked how one would do that, and
20    I have explained the process of doing that.
21        But, no, I have not looked at
22    specific documents and been asked to testify
23    about them.
24 Q.   Okay.  Did you pull anything off the Palm
```

Page 65

```
1    Pilot?
2 A.   The Palm Pilot batteries had been dead for a
3    long time, so there was no information.  I
4    potentially could've tried to sync it back
5    with the laptop, but it seemed to me that all
6    the information that was there was already on
7    the laptop, so no utility in that.
8        But I believe both the Palm Pilot
9    and the laptop are available for the
10    opposition, if they choose to go that route.
11 Q.   Did you find any damaged files on the Seagate
12    and Western Digital Caviar hard drives?
13 A.   I'm not sure I understand the term "damaged
14    files."  Can you explain that?
15 Q.   Well, were you able to copy the files found
16    on the Seagate and the Western Digital Caviar
17    drives?
18 A.   I was able to copy large numbers of files
19    from it, yes.
20 Q.   Were you unable to copy any of those files on
21    those two drives?
22 A.   I recall one of the drives had virus files,
23    so I ran a virus protection against that,
24    that quarantines it, those files don't go
```

Page 66

1  anywhere, so in a sense they are damaged.  I
2  certainly don't want them on my system.
3  Q.  You copied files off the Gateway laptop?
4  A.  Correct.
5  Q.  You weren't asked to view any files in
6  particular off the Gateway laptop, correct?
7  A.  I have simply collected all the data and made
8  it all available.
9  Q.  Were you unable to copy any files that were
10  contained on the Gateway laptop?
11  A.  I have no memory of not being able to copy
12  files off of the Gateway.
13  Q.  You said in your report that "Screen captures
14  were made of certain areas of the Gateway
15  laptop," correct?
16  A.  That's correct.
17  Q.  Is that the same as a screen shot?
18  A.  Yes.
19  Q.  And what is a "screen shot" or a "screen
20  capture"?
21  A.  In some instances one of the better ways to
22  record what is there is by using a system of
23  capturing the pixels on the screen so you
24  have a visual representation of what was on

Page 67

1  the screen at that time.
2  Q.  How did you decide what areas to make screen
3  captures of?
4  A.  I just tried to go through and document what
5  was there, so I would make a screen capture
6  of anything that would be difficult to see
7  otherwise.
8  Q.  And what happened to the screen captures?
9  A.  I don't know.
10  Q.  And what type of information did you find on
11  the Gateway laptop?
12  A.  I found a variety of files on the laptop that
13  I collected.
14  Q.  Was there a large number of files or small
15  number of files?
16  A.  Well, I deal with very big drives in some
17  cases, so I don't know how to quantify
18  "large" or "small."
19  Q.  Thousands of files?
20  A.  Thousands of files.
21  Q.  Were they email files and word files?
22  A.  There are a variety of files on there.
23  Q.  When you wrote in your report:  "For my
24  review, I will be able to testify when

Page 68

1  documents were created as well as when
2  certain documents contained on the above
3  computers were modified," you weren't
4  referring to any particular documents?
5  A.  That's correct.
6  Q.  You haven't been shown any documents to
7  render that opinion?
8  A.  No, I have not been asked to look at any
9  specific documents to render that type of
10  opinion.
11  Q.  Were you ever given access to the server at
12  the Light Department?
13  A.  No.
14  Q.  Or at the Town Hall?
15  A.  No.
16  Q.  Were you told anything about the Seagate hard
17  drive when it was provided to you?
18  A.  I'm not sure I remember offhand which drive
19  was which, but I was told that the drives
20  that I was provided were from certain
21  individuals' computers at work.
22  Q.  Do you recall the names of any of those
23  individuals?
24  A.  I believe one was Doctor Jack Beliveau, and

Page 69

1  the other was -- and another was Kim Stoyle
2  and the third one, I think, was KYM, K-Y-M.
3  Q.  Do you remember if you were told whose drives
4  were from the Western Digital Caviar drive?
5  A.  I don't remember off the top of my head.
6  Q.  Or the Seagate drive, same thing?
7  A.  I don't remember that.
8  Q.  Do you have notes about that somewhere?
9  A.  I have a designation, yes, so I could tell
10  which one was which.
11  Q.  How about the Gateway laptop, were you told
12  who that belonged to?
13  A.  I believe that was also Doctor Beliveau's.
14  Q.  There's an indication somewhere in your
15  report here that it was something that you
16  did not take, but Northern Data Systems had
17  taken something?
18  A.  I mentioned that there was a tape, the
19  Imation tape that I did not take.  That might
20  be what you're referring to.
21  Q.  Yes.  And why didn't you take that?
22  A.  I already said earlier that I don't have the
23  hardware or the software to recover it, so
24  I'm not sure what I would have done with it

Page 70

1  other than...
2  Q.   Do you recall, as you sit here today,
3  precisely how many hard drives you received
4  in connection with this matter?
5  A.   Including the laptop, four.
6  Q.   So when you say "the laptop," you're talking
7  about the Gateway laptop?
8  A.   Yes.
9  Q.   And you received the Seagate?
10  A.   Yes.
11  Q.   And the Western Digital Caviar?
12  A.   Yes.
13  Q.   That's three, what was the other one?
14  A.   I don't remember the brand.  But it was a KYM
15  drive that belonged to a person at KYM, and
16  it was considered relatively unimportant, so
17  I did very little with it.
18       If you notice the hard drives,
19  plural, bullet is at the same level as the
20  other two listings, the other two were the
21  important focus drives.
22  Q.   The Seagate and the Western?
23  A.   The KYM drive didn't appear that important,
24  but, as I understand it, it's available to

Page 71

1  you if you want to peruse it.
2       MS. BALLIRO:  Okay.  If I could just
3  have one minute.
4       (Short Recess Taken.)
5       MS. BALLIRO:  Okay.  We're done.
6  We're going to suspend this deposition,
7  though, pending the witness's receipt of the
8  documents that he's going to be asked to
9  testify to or offer an opinion of at trial,
10  and we'll address the court on that and other
11  issues that were raised during the
12  deposition.
13       (Whereupon the deposition was
14  suspended at 3:48 p.m.)

Page 72

1  ERRATA SHEET DISTRIBUTION
2  DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
5  ERRATA SHEET DISTRIBUTION INFORMATION
6  When the Errata Sheet has been completed by
7  the deponent and signed, a copy thereof
8  should be delivered to each party of record.
11  INSTRUCTIONS TO DEPONENT
12  After reading this volume of your deposition,
13  please indicate any corrections or changes to
14  your testimony and the reasons therefor on
15  the Errata Sheet supplied to you and sign it.
16  DO NOT make marks or notations on the
17  transcript volume itself.  Add additional
18  sheets if necessary.  Please refer to the
19  above instruction for Errata Sheet
20  distribution information.

Page 73

1       ERRATA SHEET
2  PLEASE ATTACH TO THE DEPOSITION OF
3  ROBERT GUARALDI - VOLUME 1 - 3/22/07
4  CASE:  BELIVEAU v. TOWN OF MANSFIELD, ET
5  AL
7  INSTRUCTIONS TO WITNESS:  1) Please note
8  desired corrections to your testimony by page
9  and line number.  2) Enter text as it appears
10  in the transcript.  3) Enter text as it
11  should appear.
12  PAGE      LINE           CORRECTION

Page 74

```
1            SIGNATURE PAGE
2
3            I, ROBERT GUARALDI, do hereby
4     certify that I have read the foregoing
5     transcript of my testimony, and further
6     certify that said transcript is a true and
7     accurate record of said testimony.
8            Signed under the pains and penalties
9     of perjury this       day of              ,
10    2007.
11
12            ROBERT GUARALDI
13
14
15
16    Subscribed and sworn to before me this
17            day of              2007.
18
19
20
21
22
23
24
```

Page 75

```
1     COMMONWEALTH OF MASSACHUSETTS
      NORFOLK, ss.
2
         I, Jill Kourafas, Certified
3     Shorthand Reporter and Notary Public duly
      commissioned and qualified in and for the
4     Commonwealth of Massachusetts, do hereby
      certify that:
5
         On the 22nd day of March 2007,
6     ROBERT GUARALDI, the witness whose deposition
      is hereinbefore set forth was duly sworn by
7     me and identified by me with photo ID, and
      that the foregoing transcript is a true
8     record of the testimony given by such
      witness, to the best of my knowledge, skill
9     and ability.
10       I further certify that I am neither
      attorney nor counsel for, nor related to or
11    employed by, any of the parties to the action
      in which this deposition is taken, and
12    further that I am not a relative or employee
      of any attorney or counsel employed by the
13    parties hereto or financially interested in
      this action.
14
         In Witness Whereof, I have hereunto
15    set my hand and affixed my seal this 26th day
      of March 2007.
16
17       Notary Public
         My Commission Expires:
18       February 26, 2010
19
20
21    THE FOREGOING CERTIFICATION OF THIS
      TRANSCRIPT DOES NOT APPLY TO ANY
      REPRODUCTION OF THE SAME IN ANY RESPECT
22    UNLESS UNDER THE DIRECT CONTROL AND/OR
      DIRECTION OF THE CERTIFYING REPORTER.
      UNLESS UNDER THE DIRECT CONTROL AND/OR
```