**EXHIBIT O**

Page 1

Volume     IV
Pages    1 - 168
Exhibits per index

UNITED STATES DISTRICT COURT

District of Massachusetts

DR. JOHN J. BELIVEAU,            )
         Plaintiff               )
                                 )
vs.                              )     Civil Action
                                 )     No. 04-11329-BPW
TOWN OF MANSFIELD MUNICIPAL      )
ELECTRIC DEPARTMENT, JOHN O.     )
D'AGOSTINO,                      )
         Defendants              )

CONTINUED DEPOSITION OF JOHN O. D'AGOSTINO, a witness called by and on behalf of the Plaintiff, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Sandra L. Bray, Registered Diplomate Reporter, CSR Number 103593, and Notary Public in and for Commonwealth of Massachusetts, at the offices of Wolf Block, One Boston Place, Boston, Massachusetts, on Tuesday, January 11, 2006, commencing at 10:21 a.m.

REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617/786.7723

Page 2

```
 1   APPEARANCES:
 2      JULIANE BALLIRO, ESQUIRE
        WOLF BLOCK
 3      One Boston Place
        Boston, Massachusetts 02108
 4      on behalf of the Plaintiff
 5
        LEONARD H. KESTEN, ESQUIRE
 6      BRODY, HARDOON, PERKINS & KESTEN, LLP
        One Exeter Place
 7      Boston, Massachusetts 02116
        on behalf of the Defendant Town of Mansfield
 8      Municipal Electric Department
 9
        SUSAN JACOBS, ESQUIRE
10      VOLTERRA, GOLDBERG, MANGIARATTI & JACOBS
        Three Mill Street
11      Attleboro, Massachusetts 02703
        on behalf of the Defendant John O. D'Agostino
12
13   ALSO PRESENT:
14      Dr. John J. Beliveau
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1                INDEX
 2   WITNESS:                     EXAMINATION
 3   JOHN O. D'AGOSTINO
 4      (By Ms. Balliro)           5
 5
 6
                   EXHIBITS
 7
     NO.                      FOR IDENTIFICATION
 8
     No. 33  Ad, dated 2-29-04, and Ad,
 9           dated 6-12-98, and Notes      5
10   No. 34  Notice of Taking the Continued
             Deposition of John O. D'Agostino
11           Pursuant to Federal Rules of
             Civil Procedure 30(b)(6)      9
12
     No. 35  Memorandum to Board of Selectmen
13           from Mr. D'Agostino, dated 1-6-04  25
14   No. 36  Minutes of Light Commissioners
             Meeting, August 11, 2003     32
15
     No. 37  Copy of E-mails             37
16
     No. 38  Copy of E-mail and Reply,
17           dated 4-5-02                 43
18   No. 39  Copy of E-mails              50
19   No. 40  Memorandum to Mr. Beliveau, et
             al., from Mr. D'Agostino, dated
20           5-29-02                      56
21   No. 41  Copy of Greeting Card        63
22   No. 42  Copy of Card Envelope        64
23   No. 43  Copy of E-mail, dated 12-3-03  68
24   No. 44  Copy of E-mail, dated 3-6-00  69
```

Page 4

```
 1              E X H I B I T S, Continued
 2   NO.                       FOR IDENTIFICATION
 3   No. 45  Response of John O. D'Agostino to
             Allegations Contained in Charge
 4           of Discrimination by John J.
             Beliveau                    105
 5
     No. 46  Article                     108
 6
     No. 47  Copy of E-mail, dated 5-9-03  123
 7
     No. 48  Memorandum to Mr. D'Agostino
 8           from Mr. Beliveau, dated 2-25-02  129
 9   No. 49  Memorandum from Mr. D'Agostino,
             dated 1-21-03               130
10
     No. 50  Affidavit of Eileen Plant    133
11
     No. 51  Letter to Mr. Walsh from
12           Mr. D'Agostino, dated 2-23-99  141
13   No. 52  Copy of E-mails              144
14
15
16          (EXHIBITS RETAINED BY COUNSEL.)
17
18
19
20
21
22
23
24
```

Page 5

```
 1                PROCEEDINGS
 2            JOHN O. D'AGOSTINO, having duly
 3   sworn or affirmed that his testimony would be
 4   the truth, the whole truth, and nothing but
 5   the truth, testified as follows:
 6                    * * *
 7        MS. BALLIRO: Why don't we just
 8   mark this?
 9        (Ad, dated February 29, 2004 and Ad,
10        dated June 12, 1998, and Notes were
11        marked Exhibit Number 33 for
12        identification.)
13        CONTINUED EXAMINATION BY MS. BALLIRO:
14   Q.  Mr. D'Agostino, Exhibit 33 is a document that
15       I prepared, just so that you know, but I
16       believe what it is is the ad that was placed
17       for the director of Electric Department
18       position before Mr. Beliveau was hired and
19       then the ad that was placed in February of
20       2004, after he was terminated. You put them
21       both side by side. I don't expect you to
22       recall exactly what the ads are, but take some
23       time to read them. I couldn't locate any
24       other ads, so I believe those are the ads.
```

2 (Pages 2 to 5)

Page 6

1  You'll see a note on the bottom of that
2  document concerning the differences between
3  the two, but please feel free to read both ads
4  if I missed something.
5      MS. JACOBS: Do you need a
6  magnifying glass?
7      THE WITNESS: No, I can see it.
8  A. This one was the '04 one. Okay.
9  Q. I placed each ad under the date that I believe
10    corresponds to the ad.
11 A. I have had a chance to look at it, yes.
12 Q. My question to you is, did you play any role
13    in the drafting or editing or review of either
14    of the ads set forth on Exhibit 33?
15 A. Yes.
16 Q. And was it your decision to include in the
17    second ad the phrase "a P.E. is desirable,"
18    P.E. meaning professional engineer?
19 A. Professional engineer. I must have.
20     MR. KESTEN: Well, do you remember?
21 A. I don't remember.
22 Q. Well, did you -- was it your view that it
23    would be desirable from your perspective for
24    the new Light Department director to be a

Page 7

1  professional engineer?
2  A. Yes.
3  Q. Okay. Why?
4  A. Because I think that at the time that this ad
5     was placed, we had some engineers on staff,
6     and it would be appropriate to have the
7     director in this case also carry those same
8     credentials. That was my thought.
9  Q. Was Mr. Beliveau a professional engineer?
10 A. I believe so.
11 Q. Okay. And who was serving as the director of
12    the Light Department after Mr. Beliveau was
13    terminated but before Mr. Babin was fired --
14    Mr. Babin was hired? Excuse me.
15 A. I believe I indicated yesterday it was Ann
16    Langele.
17 Q. And do you know if Ann Langele was a
18    professional engineer?
19 A. I believe she is.
20 Q. And did you consider Ann Langele for the
21    permanent position?
22 A. I believe she was a candidate for that
23    position, yes.
24 Q. Okay. Did you support her candidacy?

Page 8

1  A. No.
2  Q. Why did you support Mr. Babin over
3     Miss Langele?
4  A. I believe that -- for a couple reasons. I
5     think one dealing primarily with Babin had
6     managerial experience at Wellesley Light &
7     Power. Ann's role with the Light Department
8     in Mansfield and I believe with the Light
9     Department in North Attleboro was more in a
10    supportive role as an engineer, professional
11    engineer, electric engineer. I believe that
12    Ann's knowledge of the electric distribution
13    system is extensive and the position was more
14    suitable and her knowledge is more suitable in
15    a supporting role versus as a director of the
16    Light Department.
17 Q. Had Mr. Babin ever served as a director of a
18    Light Department before he was hired into that
19    position for the Town of Mansfield?
20 A. I believe his position with Wellesley Light &
21    Power before there was a political shakeup, he
22    was the director or the manager of that
23    department in Wellesley. That position fell
24    into the Department of Public Works.

Page 9

1  Q. But was it your understanding --
2  A. So he had some managerial experience.
3  Q. But was it your understanding he headed up the
4     Light Department in Wellesley?
5  A. It was my understanding he had that
6     experience, yes.
7      MS. BALLIRO: Mark this.
8      (Notice of Taking the Continued
9      Deposition of John O. D'Agostino
10     Pursuant to Federal Rules of Civil
11     Procedure 30(b)(6) was marked Exhibit
12     Number 34 for identification.)
13 Q. Okay. Mr. D'Agostino, you have before you the
14    notice of the continued deposition addressed
15    to you for today's deposition, and attached to
16    that notice is a list of documents entitled
17    Schedule A, Documents to be Produced. Do you
18    see that on Page 3?
19 A. Yes.
20 Q. Okay. And just for informational purposes,
21    some of the documents on this list were also
22    contained or set forth on the list attached to
23    your first appearance at deposition. And my
24    question for you is did you make any effort to

Page 10

1  locate additional documents responsive to the
2  schedule contained in Exhibit Number 34?
3  A. No.
4  Q. Okay. And why not?
5  A. I assumed that legal counsel was providing
6  that information to you.
7  Q. Okay.
8  (Cellular telephone call interruption)
9  THE WITNESS: I'm sorry. I'll shut
10  this off.
11  Q. On what basis did you believe that legal
12  counsel was going to provide me with any and
13  all tapes of the Town of Mansfield meetings
14  from 1998 to present?
15  A. Because they had equal access to that
16  information as I did.
17  Q. Okay. Did you have -- okay. Well, let the
18  record note that I have not received any tapes
19  of Town of Mansfield meetings from 1998 to
20  present in response to Number 19.
21  A. The tapes that you're looking for are
22  selectmen tapes, there's town meeting tapes.
23  There's all kinds of tapes that we have.
24  Q. And they exist, correct?

Page 11

1  A. I don't know if all tapes exist because I'm
2  not the custodian of tapes.
3  Q. But you know that some of the tapes exist,
4  correct?
5  A. I'm assuming that they do, yes. When you mean
6  tapes, you're talking about selectmen
7  meetings -- there's town meeting tapes.
8  There's all kinds of different taped meetings,
9  but you're looking for light commissioner or
10  selectmen meetings or both?
11  Q. I'm looking for both. But regardless of what
12  I'm looking for, none have been produced,
13  correct?
14  A. If you say so, I would concur with that.
15  Q. Number 20 was copies of all telephone calls
16  made by you on your work, residential, and
17  cell phones. Did you produce those records in
18  preparation for today's deposition?
19  A. No.
20  Q. And why not?
21  A. Again, I assumed that those records would be
22  produced through counsel.
23  Q. You thought your counsel would have access to
24  your residential phone records?

Page 12

1  A. No, but certainly work and cell phone.
2  Q. So what did you do to attempt to produce the
3  residential records set forth in Number 20?
4  A. I don't have the residential records, all of
5  those phone records from that period of time
6  in my possession.
7  Q. Do you have any of your phone records?
8  A. I have some but not all.
9  Q. And is it your testimony that you turned your
10  work and cell phone records over to your
11  counsel?
12  A. The work records are at Town Hall, and the
13  cell phone records are at Town Hall; and I
14  would assume that the due diligence of counsel
15  would have provided that information.
16  Q. I see. Number 21 are publicly filed records
17  in connection with your divorce, including
18  affidavits filed in connection with your
19  divorce. Did you think your lawyer was going
20  to produce those records as well?
21  A. No.
22  Q. Did you undertake any effort to assemble those
23  records in preparation for today's deposition?
24  A. No.

Page 13

1  Q. Who has the filings made in connection with
2  your divorce? Who has possession of those
3  filings?
4  A. I believe it would be the Court.
5  Q. Did you have a lawyer in connection with that
6  proceeding?
7  A. Yes, I did.
8  Q. And who was your lawyer?
9  A. Jim Goldberg.
10  Q. Jim Goldberg?
11  A. Uh-huh.
12  Q. Do you think Mr. Goldberg might have kept a
13  copy of your divorce documents?
14  A. I believe so.
15  Q. So he would have possession of them, correct?
16  A. That's correct.
17  Q. Did he provide you with any copies of your
18  divorce documents?
19  A. Yes.
20  Q. So you have possession of them?
21  A. I do.
22  Q. You do?
23  A. Yes.
24  Q. You didn't bring them with you to this

Page 14

1  deposition; did you?
2  A. No.
3  Q. And I take it you don't have any e-mail
4     communications between Lou Amoruso, you, and
5     Jack Beliveau that haven't already been
6     produced?
7  A. I don't believe so.
8  Q. And how about Request Number 23? Do you have
9     any of those that you haven't produced?
10 A. It is my understanding that the information
11    that has been produced is -- I don't know what
12    information has been produced versus what new
13    information you're looking for that may not
14    have been produced in Number 23.
15 Q. So you don't know --
16 A. I don't know if there's any different
17    information available.
18 Q. Well, have you provided counsel with copies of
19    any of the e-mails listed in 23, 24, 25 in
20    advance of this deposition?
21 A. I believe that this information was available
22    to counsel.
23 Q. Okay. And when was that information made
24    available to counsel?

Page 15

1  A. I don't know the date.
2  Q. Was it before your first deposition session?
3  A. I believe so.
4  Q. Number 26 was a request for the police logs.
5     I believe those were produced at yesterday's
6     deposition.
7  A. And I will note that that was produced by
8     counsel.
9  Q. And Number 27 as well, more records of copies
10    of police logs, correct?
11 A. I believe so, yes.
12 Q. Do you have any e-mail communications between
13    you and Mr. Babin from January 23 --
14    January 1, 2003 to the present?
15 A. I believe so.
16 Q. Did you produce those?
17 A. No.
18 Q. Why not?
19 A. I believe that those are being assembled.
20 Q. By whom?
21 A. I believe either by counsel or by Mr. Babin or
22    both.
23 Q. Is there any reason why they weren't assembled
24    in advance of today's deposition?

Page 16

1  A. I don't know.
2  Q. You don't know?
3  A. I don't have any reason why. I don't know why
4     they haven't been produced.
5  Q. How about Number 29, which would be all e-mail
6     communications between Gary Babin and members
7     of the Board of Light Commissioners from
8     January of 2003 until present? Are those also
9     being assembled?
10 A. That's my understanding.
11 Q. When you had to come to the deposition
12    yesterday, did you tell Mr. Babin, you know,
13    "Where are those e-mails? I need those
14    e-mails. My deposition is on Tuesday,"
15    anything like that?
16 A. No.
17 Q. Have you had any conversations with Mr. Babin
18    at all about assembling those e-mails?
19 A. Other than a brief discussion that he was
20    working on them.
21 Q. Okay. And when was that discussion?
22 A. A brief discussion. I'd probably say it was a
23    couple weeks ago.
24 Q. A couple weeks ago.

Page 17

1  A. But I'm not sure the time frame.
2  Q. Obviously, you haven't produced Gary Babin's
3     phone records, correct, Number 30?
4  A. His residential and cell phone?
5  Q. Uh-huh.
6  A. No.
7  Q. How about the documents contained in Item
8     Number 31, the studies, analysis, and
9     documents concerning the purchase power cost
10    adjustment made in 2003, 2004, and 2005?
11 A. No.
12 Q. And why not?
13 A. I think Mr. Babin would be able to produce
14    those for you.
15 Q. But you certainly have the authority to
16    produce those documents, correct?
17 A. I believe so, yes.
18 Q. And this is a subpoena that was directed to
19    you, and you haven't produced them?
20 A. No.
21 Q. Okay. What is a PPCA?
22 A. Purchase protocol cost adjustment.
23 Q. I understand what it stands for, but what is
24    it?

5 (Pages 14 to 17)

Page 18

1  A. It is the amount that the utility can charge
2     to capture the cost of -- the increased cost
3     of electricity due to power adjustment, an
4     increase in power costs.
5  Q. So it's the amount --
6  A. That can be passed on to the rate payer.
7  Q. Have there been increases to the PPCA during
8     the years 2003, 2004, and 2005?
9  A. Yes, there has.
10 Q. Do you know what the increases were during
11    2003?
12 A. I'm not quite sure, but it could have been
13    anywhere from half a cent to a penny.
14 Q. And how about 2004?
15 A. I believe the same.
16 Q. And how about 2005?
17 A. I believe there was one increase in 2005.
18 Q. And were you provided with any studies,
19    analyses or documents concerning or supporting
20    the increases?
21 A. I believe the Board of Light Commissioners
22    were.
23 Q. Well, did you receive any copies of those
24    studies?

Page 19

1  A. I may have.
2  Q. Were you satisfied with the studies?
3  A. I didn't have any reason to object to them.
4  Q. Okay. Number 32 is copies of any studies,
5     reports or analyses concerning internal
6     charges received from the Town of Mansfield in
7     2004 and 2005. Do you know if any such
8     studies, reports or analysis of internal
9     charges for 2004 and 2005 exist?
10 A. I don't.
11 Q. Did you undertake any efforts to determine
12    whether they exist prior to your deposition
13    yesterday?
14 A. No.
15 Q. And why not?
16    MR. KESTEN: I'm going to put on
17    the record, Juliane, that counsel have been
18    handling all this. You keep asking him.
19    That's how it's been going.
20    MS. BALLIRO: Well, why didn't
21    counsel do it then? Why don't we have the
22    records?
23    MS. JACOBS: A lot of them, we're
24    working on getting them to you. This is

Page 20

1  incredibly voluminous.
2     MS. BALLIRO: But you didn't even
3  say you weren't going to have them, nothing.
4  This is a subpoena.
5     MS. JACOBS: I understand. A lot
6  of them are duplicates of ones that are
7  directed to other witnesses.
8     MS. BALLIRO: But we subpoenaed
9  this witness, so --
10    MS. JACOBS: I understand.
11    MS. BALLIRO: -- the idea was to
12 try to finish with this witness and not bring
13 this witness back. We don't know what the
14 other witness is going to say about these
15 records. So when do you think you'll have
16 these records for us?
17    MS. JACOBS: We've been working on
18 getting them together. We're working on it.
19 Hopefully, we'll have them to you within the
20 next few weeks. I mean some of them, like the
21 tapes, are -- I mean those are at the cable
22 company. It's not as if we have any special
23 access to them.
24    MR. KESTEN: I will personally

Page 21

1  apologize. I thought this had been dealt
2  with.
3     MS. BALLIRO: You thought what?
4     MR. KESTEN: This had been dealt
5  with. So I apologize. I thought that between
6  Christine and Susan and Deb, they had dealt
7  with the document requests, all of them. I
8  have not been directly involved. John has not
9  been directly involved.
10    MS. JACOBS: I have been.
11    MS. BALLIRO: I'm only going to
12 bring the witness back if I need to.
13    MR. KESTEN: I understand.
14    MS. BALLIRO: But I'm not going to
15 be able to complete the deposition today
16 without the documents. Some of these
17 documents, only he can speak to.
18    MR. KESTEN: I understand the
19 caveat, and I can find out the status. Let's
20 do the deposition.
21    MS. BALLIRO: We're almost through
22 the list. I'll continue through the list just
23 to identify what documents have and haven't
24 been produced, and we'll go from there.

Page 22

1  Q. Number 34 was copies of legal bills charged to
2     or paid by the Mansfield Electric Department
3     from January 1, 2003 through the present. Do
4     you know if those documents have been
5     produced?
6  A. I know they exist. I don't believe they've
7     been produced.
8  Q. But they do exist?
9  A. That's what I said, yes.
10 Q. Do you know where they're kept?
11 A. Usually with the town accountant and with the
12    department here. In this case, it would be
13    the Light Department as well.
14 Q. Okay. Number 35 is copies of bills from PLM,
15    including all detailed summaries charged to or
16    paid by the Mansfield Electric Department from
17    January 1, 2003 through the present. What is
18    PLM?
19 A. I believe it's a consultant firm.
20 Q. What does the acronym stand for? Do you know?
21 A. I have no idea.
22 Q. What kind of consulting firm?
23 A. It may be Mayhew Seavey's here.
24 Q. I see. What do they do?

Page 23

1  A. If this is the acronym for the correct
2     consultant under the circumstances, that
3     individual is the person who provides the
4     analysis for the Light Department on the cost
5     of purchasing power as well as the individual
6     who works with the Light Department in
7     determining how much money is appropriate to
8     be kept in escrow for accounting, power
9     contracts. This is our consultant for that
10    purpose.
11 Q. Do those bills exist?
12 A. I'm assuming they do. I don't have direct
13    knowledge that they do.
14 Q. Do you know where they're maintained?
15 A. I believe at the Light Department.
16 Q. Do you know if any effort has been made to
17    copy the e-mail archives from the Electric
18    Department's e-mail server from February 2004
19    to --
20        MS. JACOBS: I will speak to that.
21    We are making efforts to do that.
22 Q. Number 37 is a copy of rate comparisons
23    published by the MMWAC for typical 500-
24    kilowatt-hours-per-month customers for the

Page 24

1     fourth quarter of 2003 and the most recent
2     quarter of 2005. Do you know if those have
3     been provided?
4  A. I don't believe so, but I'm not quite sure.
5  Q. And do you know if the American Express bills
6     have been provided from January 2000?
7  A. I know that they exist, and I don't know if
8     they have been provided at this point.
9  Q. Okay. Did you have a -- strike that. Did you
10    take issue with Mr. Beliveau's handling of the
11    North Main Street pole project in late 2003 or
12    early 2004?
13 A. I don't know if it was an issue directly with
14    either the Light Department or Mr. Beliveau,
15    but with respect to Verizon. I think there
16    was more of an issue with Verizon than there
17    was with Mr. Beliveau.
18 Q. And what was your understanding of the issue
19    with Verizon?
20 A. I believe there was quite a lengthy delay and
21    difference in costs between what was agreed to
22    and what the actual cost was to remove those
23    poles.
24        MS. BALLIRO: Let's mark this as

Page 25

1     the next exhibit.
2        (Memorandum to Board of Selectmen from
3     Mr. D'Agostino, dated January 6, 2004
4     was marked Exhibit Number 35 for
5     identification.)
6  Q. Mr. D'Agostino, Exhibit Number 35 is a
7     memorandum from you to the Board of Selectmen,
8     dated January 6th, 2004, entitled the Status
9     of the North Main Street Poles. Do you see
10    that?
11 A. Yes, I do.
12 Q. Did you write that memorandum?
13 A. Yes, I believe I did.
14 Q. That's your signature?
15 A. That's my signature.
16 Q. You sent that memorandum from you to the Board
17    of Selectmen, correct?
18 A. It was from me to the Board of Selectmen,
19    that's correct.
20 Q. And you CCed Lee Azinheira and Jack Beliveau?
21 A. That's correct.
22 Q. Who is Lee Azinheira?
23 A. He is the director of the Department of Public
24    Works.