**EXHIBIT P**

Page 1

```
                    Volume   II
                    Pages    1 - 129
                    Exhibits per index
```

UNITED STATES DISTRICT COURT

District of Massachusetts

```
DR. JOHN J. BELIVEAU,           )
          Plaintiff             )
                                )
vs.                             )    Civil Action
                                )    No. 04-11329-BPW
TOWN OF MANSFIELD MUNICIPAL     )
ELECTRIC DEPARTMENT, JOHN O.    )
D'AGOSTINO,                     )
          Defendants            )
```

DEPOSITION OF BEATRICE KEARNEY, a witness called by and on behalf of the Plaintiff, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Sandra L. Bray, Registered Diplomate Reporter, CSR Number 103593, and Notary Public in and for Commonwealth of Massachusetts, at the offices of Wolf Block, One Boston Place, Boston, Massachusetts, on Thursday, January 5, 2006, commencing at 9:25 a.m.

REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617/786.7723

Page 2

1  APPEARANCES:
2    JULIANE BALLIRO, ESQUIRE
     WOLF BLOCK
3    One Boston Place
     Boston, Massachusetts 02108
4    on behalf of the Plaintiff
5
     LEONARD H. KESTEN, ESQUIRE
6    BRODY, HARDOON, PERKINS & KESTEN, LLP
     One Exeter Place
7    Boston, Massachusetts 02116
     on behalf of the Defendant Town of Mansfield
8    Municipal Electric Department
9
     BRIAN J. WINNER, ESQUIRE
10   VOLTERRA, GOLDBERG, MANGIARATTI & JACOBS
     Three Mill Street
11   Attleboro, Massachusetts 02703]
     on behalf of the Defendant John O. D'Agostino
12
13 ALSO PRESENT:
14   Dr. John J. Beliveau
15
16
17
18
19
20
21
22
23
24

Page 3

1              INDEX
2  WITNESS:                   EXAMINATION
3  BEATRICE KEARNEY
4    (By Ms. Balliro)              4
5
            EXHIBITS
6
   NO.                FOR IDENTIFICATION
7
   No. 8   Subpoena                 4
8
   No. 9   Bea Kearney's Response to Document
9          Request Contained in Schedule
           Attached to Notice of Taking
10         Deposition of Bea Kearney Pursuant
           to Federal Rules of Civil Procedure
11         30 and 45                 13
12 No. 10  Copy of E-mail and Reply
13 No. 11  Statement of Account for the Town
           of Mansfield Municipal Electric
14         Depreciation Account, dated
           11-29-02                  42
15
   No. 12  Letter to Mr. Mangiaratti from
16         Ms. Kearney, dated 9-4-03      58
17 No. 13  Statement of Account for the Town
           of Mansfield Municipal Electric
18         Depreciation Account, dated
           11-29-02                  99
19
20
     (EXHIBITS RETAINED BY COUNSEL.)
21
22
23
24

Page 4

1            PROCEEDINGS
2    (The Massachusetts driver's license
3    number as identification of the
4    deponent was noted for the record.)
5    (Subpoena was marked Exhibit Number 8
6    for identification.)
7       BEATRICE KEARNEY, having duly sworn
8    or affirmed that her testimony would be the
9    truth, the whole truth, and nothing but the
10   truth, testified as follows:
11              * * *
12   CONTINUED EXAMINATION BY MS. BALLIRO:
13 Q. Miss Kearney, how are you today?
14 A. I'm okay. Thank you.
15 Q. Lovely winter morning.
16 A. I didn't know it was raining until I got off
17   the train.
18 Q. It might not have been rainy. The same rules
19   will apply to Day 2 of this deposition as
20   applied to Day 1. We had stipulated that we
21   will reserve objections to all questions,
22   except the form, and motions to strike.
23   Again, you have an opportunity to read your
24   transcript and make any corrections before you

Page 5

1    sign it. Do you understand that?
2  A. Yes.
3  Q. And under the rules, if you do not sign the
4    deposition transcript or submit any changes
5    within 30 days of receipt, then it will be
6    deemed signed as written.
7  A. Okay. I didn't realize that.
8  Q. Have you had an opportunity to review the
9    transcript of your first testimony?
10 A. I did review it, and, in fact, I want to raise
11   the issue that one of the statements I made in
12   the deposition -- I believe you asked me about
13   my accounting positions, and I had neglected
14   to mention my last accounting position.
15 Q. You're referring to your history of
16   employment?
17 A. Yes.
18 Q. And you forgot about one of your former
19   positions?
20 A. Yes.
21 Q. Where did you work?
22 A. I worked for a small CPA firm called Meyers &
23   Meyers.
24 Q. And when did you work at Meyers & Meyers?

Page 10

1   documents to be provided, and he basically
2   stated he would, you know, provide them like
3   he had.
4   Q.  Did you have a conversation with Mr. Boucher
5   about Schedule A after you received it?
6   A.  Yes.
7   Q.  Okay.  And is it your testimony -- don't let
8   me put words in your mouth, but is it your
9   testimony that Mr. Boucher said that he would
10  take care of providing any documents
11  responsive to the subpoena that hadn't already
12  been supplied?
13  A.  Anything that was within his possession.
14  Q.  Okay.  And complete copies of the Mansfield
15  Electric Department depreciation accounts for
16  the years 2002 and 2004 are in his possession,
17  correct?
18  A.  Actual bank account statements are.
19  Q.  And how about the item listed in Number 2?  Is
20  that in Mr. Boucher's possession?
21  A.  That would be general ledger accounts, unless
22  there are -- I'm not sure -- the cash is a
23  combined cash, so what I have are general
24  ledger cash accounts.

Page 11

1   Q.  Okay.  But are there any other cash accounts
2   that are described in Number 2 that you don't
3   have that Mr. Boucher would have access to?
4   A.  I mean he would have access to all of the cash
5   account bank statements of the Town, which are
6   combined.  There are various account
7   statements.
8   Q.  Okay.  But this asks for -- Number 2 asks for
9   complete copies of the Mansfield Electric
10  Department cash accounts?
11  A.  Right, which are strictly general ledger
12  accounts because cash is pooled.
13  Q.  So would Mr. Boucher have a copy of that or is
14  it your testimony that by providing the
15  general ledger accounts you've complied with
16  Number 2?
17  A.  It's my testimony that I have complied with
18  Number 2.
19  Q.  Okay.  And are there any documents that you
20  believe Mr. Boucher has that would comply with
21  Number 2 that you haven't already supplied?
22  A.  Only if you're requesting copies of the
23  complete pooled cash.
24  Q.  And would the complete pool of cash include

Page 12

1   Mansfield Electric Department cash?
2   A.  Yes.  It would be included in possibly
3   depository account, in the vendor account.
4   There are a number of different accounts,
5   which I'm not sure what they all are because
6   that's within his jurisdiction, Mr. Boucher's.
7   Q.  Mr. Boucher's.  Okay.  And Mr. Boucher would
8   have custody and possession of the Town of
9   Mansfield cash accounts for the years 2002
10  through 2004?
11  A.  Yes, all the bank statements.
12  Q.  Okay.  And what about copies of the Mansfield
13  reconciliation of cash accounts, complete with
14  variances identified and all order
15  recommendations and management letters from
16  1998 to present?
17  A.  I would have provided those.
18  Q.  And it's your testimony you responded fully to
19  Number 4?
20  A.  Yes, it is.
21  Q.  In your previous production?
22  A.  Yes, it is.
23  Q.  And can you identify for me what documents --
24  well, did you actually assemble the

Page 13

1   production, put the exhibit labels on them and
2   do that?
3   A.  I believe so.
4   Q.  You do.  So if you were to go through your
5   production, would you be able to identify
6   which documents you say you provided that are
7   responsive to Number 4?
8   A.  I believe so.
9   Q.  Let's start with the -- instead of with the
10  documents, let's just start with your written
11  response, and we'll mark that as Exhibit
12  Number 9.  I don't believe it's been marked
13  previously.
14      (Bea Kearney's Response to Document
15      Request Contained in Schedule Attached
16      to Notice of Taking Deposition of Bea
17      Kearney Pursuant to Federal Rules of
18      Civil Procedure 30 and 45 was marked
19      Exhibit Number 9 for identification.)
20  Q.  Miss Kearney, I'm placing a document before
21  you.  It's been marked Exhibit Number 9 to
22  this deposition.  It's entitled Bea Kearney's
23  Response to Document Request Contained in
24  Schedule Attached to Notice of Taking

Page 14

1  Deposition of Bea Kearney Pursuant to Federal
2  Rules of Civil Procedure 30 and 45.
3      Now, I understand this Schedule A you're
4  referring to in this document is the Schedule
5  A attached to your first deposition notice,
6  correct?
7  A. Uh-huh.
8  Q. Because when you sent this in, you didn't even
9  have Exhibit Number 8, correct?
10 A. Yes.
11 Q. Okay. So take a look at Exhibit Number 9, and
12 tell me if you can from reviewing that,
13 identify which category of documents you say
14 are responsive to Number 4 in Schedule A of
15 Exhibit Number 8.
16 A. That would be Number 4 on here.
17 Q. All right. So you're saying Number 4, the
18 first Request Number 4 is the same as the
19 second Number 4?
20 A. I believe so.
21 Q. And you say you have no other documents
22 responsive to that request in your possession,
23 custody or control?
24 A. Excuse me?

Page 15

1  Q. You say you have no other documents -- other
2  than what you've produced --
3  A. Yes. I should have provided copies of the
4  cash reconciliations for those years and then
5  the auditor's management letter for those
6  years.
7  Q. So your testimony is, just so that we're
8  clear, you don't have any documents other than
9  what you've already produced that are
10 responsive to Request Number 4?
11 A. Yes.
12 Q. Okay. Number 5, all memos, documents or other
13 communications regarding cash balance
14 discrepancies between 1998 and 2004.
15 A. Which one are you referring to?
16 Q. Is it the same on both? Is Number 5 the same
17 on both?
18 A. Basically.
19 Q. And it's your testimony you've already
20 produced all documents --
21 A. Yes.
22 Q. -- in your possession, custody or control
23 responsive to Number 5?
24 A. Yes.

Page 16

1  Q. And is that true for Number 6 as well? Is
2  Number 6 the same in both deposition
3  subpoenas?
4  A. I believe so.
5  Q. And you produced all of Number 6 as well,
6  correct?
7  A. Yes.
8  Q. Number 7, all bills with supporting
9  documentation or studies submitted by the Town
10 of Mansfield to the Electric Department for
11 internal charges during the years 1998 to
12 2005. Is Number 7 the same in both documents?
13     MR. KESTEN: Wait a minute. One
14 document's a response. One document's a
15 request. So I don't know what you're talking
16 about.
17     MS. BALLIRO: All right. Good
18 point.
19     MR. KESTEN: Thank you.
20 Q. Are the documents -- is the response contained
21 in Number 7 intended to describe documents
22 that are responsive to Item Number 7 in
23 Exhibit Number 8?
24     MR. KESTEN: What? I don't think

Page 17

1  that question made sense.
2      MS. BALLIRO: Well, since I'm not
3  asking you for the answer --
4      MR. KESTEN: But I think you asked
5  her whether the requests are responsive to the
6  reply.
7  Q. Let me try it again.
8  A. Okay.
9  Q. Exhibit Number 9 is your response to the first
10 document request. And my question for you is,
11 in your response labeled Number 7 in Exhibit
12 Number 9, does it describe documents that are
13 responsive to the request in Number 7 in
14 Exhibit Number 8?
15 A. I believe so.
16 Q. Okay. Number 8 in Exhibit Number 8, which is
17 the deposition subpoena attached to today's
18 deposition -- the Schedule A attached to
19 today's deposition subpoena, can you tell me
20 if the documents described in Category
21 Number 8 in Exhibit Number 9 are responsive,
22 in your view, to the Request Number 8 in
23 Exhibit Number 8?
24 A. I'm a little confused because it states that

Page 18

1    Miss Kearney refers the Plaintiff to documents
2    produced in response to Request Number 5
3    above, which relates to all memos, documents,
4    other communications regarding cash balance
5    discrepancies.
6  Q. Let me ask you this: Do you see anything in
7    Exhibit Number 9, which is your response, that
8    describes documents that are responsive to
9    Request Number 8 in Exhibit Number 8,
10   regardless of the number?
11 A. I believe so. I mean I --
12 Q. Okay. And what?
13 A. I have a feeling the Request Number 6, which
14   is all memos, e-mails or other communications
15   regarding cash balances, cash reconciliations,
16   transfers of funds, budgets, anything related
17   with internal charges would have been included
18   within that type of communication or those
19   types of documents.
20 Q. How do you know that you've produced all of
21   the documents responsive to Number 8 in
22   Exhibit Number 8? How do you know that?
23 A. I can recall producing them.
24 Q. Okay. Let me just -- I'm not going to mark it

Page 19

1    because I don't want to take too much time
2    here, but this is -- I'm going to place a
3    stack of documents before you. They're Bates-
4    stamped 2368 through 2398. And just so you
5    know, they were behind a tab labeled Number 8
6    to the original document response --
7  A. Okay.
8  Q. -- which was rather, as you can see,
9    voluminous. Take a minute. Just thumb
10   through them and tell me if those appear to be
11   all the records in your custody, possession,
12   and control that relate to internal charges
13   and pilot payments as described in Number 8 in
14   Exhibit Number 8.
15 A. It is a portion of the documents.
16 Q. Okay. Do you believe there are additional
17   documents that you've already produced --
18 A. Yes.
19 Q. -- that are responsive? Okay. If you could
20   just look through your document response and
21   identify for me where those documents would
22   appear in your response or a description of
23   additional documents responsive to Number 8
24   would appear in your response.

Page 20

1  A. I am not really sure. However, I do know that
2    I produced the internal charges.
3  Q. You produced the internal charges themselves?
4  A. The documentation regarding the charge because
5    the last one in here is dated July 2001, and
6    that would be for fiscal year 2001. I would
7    have also provided 2002 through 2005, but
8    they're not attached here.
9  Q. Okay. Number 9 was all documents relating to
10   or reflecting costs charged to the Mansfield
11   Electric Department for health insurance with
12   documentation supporting the costs from '98 to
13   present. Have you produced those documents?
14 A. Yes, and they are, in turn, related to Number
15   8.
16 Q. Okay. Were those documents -- by those, I
17   mean the Number 9 documents -- included in the
18   documents you just reviewed or are they
19   somewhere else in your response?
20 A. A portion of them.
21 Q. Okay. In your response, is there anything
22   that indicates where the remainder of those
23   documents described in Number 9 to Exhibit
24   Number 8 might appear in your response? In

Page 21

1    other words, where would we look in your
2    response to find?
3  A. The response always refers to Request
4    Number 5.
5  Q. Request Number 5, we know was the cash.
6  A. Well, there's cash, memos, e-mails or other
7    communications.
8  Q. Well, let's take a look at Number 5.
9       MR. KESTEN: You are aware she
10   didn't prepare the response, right? We do
11   know this?
12      MS. BALLIRO: I assume not, but
13   we're just trying to identify the documents.
14 Q. Again, I'm not going to mark these to save
15   time, but they're Bates-labeled 1970 through
16   2043. These are the documents that were
17   attached to Exhibit Number 5 to your document
18   response. Okay?
19 A. Okay.
20 Q. And I'm going to just hand the documents to
21   you. And, again, take as much time as you
22   need, and tell me if there are any documents
23   in your Response Number 5 that are also
24   responsive to Number 9 of Exhibit Number 8.

Page 22

1  A. No, I do not see anything.
2  Q. So is it your belief, and assuming that the
3     documents you now have in your hand were
4     affixed to Number 5, that it was an error in
5     the response to refer back to Number 5?
6  A. I believe so.
7  Q. Okay. Are you, again, by looking at your
8     response -- let me take those back from you so
9     we don't get them separated.
10        (Documents handed to counsel.)
11 Q. In looking at your response, which is Exhibit
12    Number 9, do you see any documents in there
13    that you think might also be responsive --
14 A. Not in this response.
15 Q. Does every additional response refer back to
16    Exhibit 5? You have the only copy of it, so
17    I'm asking you.
18 A. Number 10 refers back to Number 5. I don't
19    see anything else that refers back to
20    Number 5.
21 Q. Okay. Let's go back to Exhibit Number 8,
22    which is the Schedule A that we were working
23    our way through. You have produced all
24    documents relating to or respecting costs

Page 23

1     charged to the Mansfield Electric Department
2     for pension and documentation supporting that
3     cost, right?
4  A. Yes, I have.
5  Q. And what kinds of documents would those be?
6     What would I be looking for to identify?
7  A. There would have been -- there should have
8     been some Excel schedules with individuals'
9     names on them and dollar amounts for all of
10    these given years, not necessarily for the
11    early portion because health insurance was
12    done on a percentage basis, but I believe from
13    2001, 2002 forward, there should be schedules
14    that basically, you know, will show a dollar
15    amount relating to an individual for that
16    particular year in question in the amount of
17    the expenditure.
18 Q. For the years 1998 through 2004 -- well,
19    actually, we're through 2005 now, so through
20    2005, did the Town charge the Mansfield
21    Electric Department for the actual cost of
22    health insurance or did it use some other
23    method to determine health insurance costs?
24 A. It was charged -- the Electric and Light

Page 24

1     Department was charged for the actual costs
2     the years 2005, 2004, 2003. I'm not sure
3     2002, 2001. I'm not sure of those early
4     years. I'm not sure when it was based upon
5     just an allocation percentage and when we
6     started actually looking at the actual costs.
7  Q. Okay. And what caused you -- well, strike
8     that. What do you mean when you say you used
9     the allocation percentage method?
10 A. A percentage -- a spreadsheet had been set up
11    for many years with allocations based, I
12    believe -- somebody must have done a study at
13    some point in time, and this is what had been
14    used for many years to determine what amount
15    should be allocated to various enterprises.
16 Q. Okay. And was this something that you created
17    or someone other than you?
18 A. No, no, it was in existence before my time.
19 Q. And, for example, during the year 1998, did
20    you undertake a comparison of how the costs
21    that the Mansfield Electric Department was
22    actually charged for health insurance compared
23    to the costs they were charged under the
24    percentage allocation method?

Page 25

1  A. No.
2  Q. Do you know whether the cost charged to the
3     Electric Department in 1998 exceeded actual
4     costs for health insurance?
5  A. I do not know.
6  Q. How about for 1999?
7  A. I do not know.
8  Q. And is that true for every year up to the
9     point where you changed the actual cost
10    method?
11 A. I believe so.
12 Q. Why was the change made from the percentage
13    allocation cost method to the actual cost
14    method?
15 A. It was made because Mr. Beliveau and
16    Miss Stoyle objected to the percentage method.
17 Q. And why has it continued since Mr. Beliveau
18    and Miss Stoyle left the Electric Department?
19 A. Because we now have procedures in place, a
20    spreadsheet in place to calculate those dollar
21    amounts.
22 Q. Well, why didn't you just go back to using the
23    old method after they left?
24 A. Because we had the ability to calculate the