# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-11329-DPW

_____
)
DR. JOHN J. BELIVEAU,                    )
                                         )
                Plaintiff,               )
                                         )
v.                                       )
                                         )
TOWN OF MANSFIELD MUNICIPAL              )
ELECTRIC DEPARTMENT AND                  )
JOHN D'AGOSTINO,                         )
                                         )
                Defendants.              )
_____)


CONSOLIDATED WITH:

_____
)
KIMBERLY STOYLE,                         )
        Plaintiff                        )
                                         )
v.                                       )
                                         )     CIVIL ACTION NO. 05-10354-DPW
THE MANSFIELD MUNICIPAL ELECTRIC         )
DEPARTMENT, JOHN D'AGOSTINO,             )
THE TOWN OF MANSFIELD BOARD OF           )
LIGHT COMMISSIONERS, LOUIS AMORUSO,      )
MICHAEL MCCUE, DAVID MCCARTER,           )
DANIEL DONOVAN, ROGER ACHILLE            )
and STEVEN MACCAFFRIE,                   )
        Defendants                       )
_____

## PLAINTIFFS' JOINT PRE-TRIAL MEMORANDUM

The Plaintiffs, Dr. John J. Beliveau and Kimberly Stoyle, hereby provide the following

joint pre-trial memorandum:

I.      **NAME, ADDRESSES, AND PHONE NUMBERS OF TRIAL COUNSEL**

<u>**Plaintiff Beliveau:**</u>
Juliane Balliro
Christine M. Griffin
One Boston Place
Boston, MA 02108
617-226-4000

<u>**Plaintiff Stoyle:**</u>
Lynn A. Leonard
527 Main Street, Suite 8
Melrose, MA 02176
781-662-6161

<u>**All Defendants:**</u>
Leonard H. Kesten
Deborah I. Ecker
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA  02116
617-880-7100

Susan Jacobs
Volterra, Goldberg, Magiaratti and Jacobs
Three Mill Street
Attleboro, MA  02703
508-222-1463

II.     **WHETHER THE CASE IS TO BE TRIED WITH OR WITHOUT A JURY.**

This case will be tried with a jury.

III.    **SUMMARY OF THE EVIDENCE REGARDING LIABILITY AND DAMAGES.**

<u>**Plaintiff Beliveau:**</u>

Plaintiff, Dr. John J. Beliveau, was the Director of the Town of Mansfield Municipal

Electric Department.  Kimberly Stoyle was also an employee of the Electric Department.  John

D'Agostino is the Town Manager for the Town of Mansfield.  Kimberly Stoyle reported to Dr.

Beliveau that she had been sexually harassed by John D'Agostino.  Stoyle additionally filed a

charge at the MCAD  in which she accused the Town Manager of harassment and retaliation.

Dr. Beliveau supported Ms. Stoyle in reporting and pursuing her claims of sexual harassment and retaliation. Dr. Beliveau additionally notified Town officials regarding irregularities in Town accounting and testified before the State Ethics Commission regarding irregularities in Town hiring.

In early, 2003, the Electric Department conducted an investigation into the Stoyle charge. As part of the investigation, Dr. Beliveau was interviewed by attorney James Lampke. Dr. Beliveau corroborated much of Ms. Stoyle's allegations of sexual harassment and retaliation against Mr. D'Agostino. Mr. Beliveau also corroborated complaints of sexual harassment by other town employees against D'Agostino. Shortly after the filing of the Stoyle Charge and the Electric Department's investigation, Mr. D'Agostino held a press conference denying Ms. Stoyle's allegations and threatening to sue unnamed "other employees" who supported Ms. Stoyle. Dr. Beliveau was one of the employees Mr. D'Agostino was referring to when he made his threat to sue.

In February 2003, Dr. Beliveau received a memorandum from the Town Treasurer and Town Accountant alleging substantial overdrafts in the Electric Plant financial account over a period of nine months. This was a direct assault on Ms. Stoyle's competence as Chief Financial Officer and an attempt to discredit her in the midst of her sexual harassment allegations. In February 2003, as result of the memorandum and given the seriousness of the allegation, Dr. Beliveau notified the Town Treasurer that he was engaging the services of Jim Goulet ("Mr. Goulet") to audit the financial accounts of the Electric Plant. The Town failed to cooperate with Goulet.

In the summer of 2003, Dr. Beliveau was contacted by an attorney from the Massachusetts Ethics Commission in connection with an investigation into Mr. D'Agostino. The

investigation concerned Mr. D'Agostino's insistence on the Electric Department's hiring a certain individual, Ms. Hottleman, despite the hiring committee's failure to rank her in the top five candidates for the position. Ms. Hottleman is the wife of an acquaintance of Mr. D'Agostino. Mr. Hottleman has since admitted to sufficient facts for a charge of bookmaking. Mr. D'Agostino has been made aware of Dr. Beliveau's participation in the ethics commission investigation.

In September 2003, Dr. Beliveau was deposed by the attorney representing Ms. Stoyle in connection with the Stoyle Charge. Dr. Beliveau's deposition testimony corroborated many of the allegations of discrimination and retaliation made by Ms. Stoyle and other women against Mr. D'Agostino. The transcript of Dr. Beliveau's deposition testimony was made available to Mr. D'Agostino sometime in October 2003. In addition, in or around October 2003, Mr. D'Agostino began inundating Dr. Beliveau with unnecessary, burdensome and time consuming tasks and has used Dr. Beliveau's inability to respond to these demands in what Mr. D'Agostino considers a timely fashion as the basis for disciplinary action and discharge. On or about November 12, 2003, the auditor released his report finding no wrongdoing by Ms. Stoyle and that the discrepancies cited by the Town Treasurer were merely due to the timing of recording certain transactions.

On November 17, 2003, Ms. Stoyle reported to the Board of the Light Commissioner's meeting that the auditor had commenced the year end audit. On December 10, 2003, Mr. D'Agostino fired the auditor without notifying Dr. Beliveau of his intention to do so. On December 17, 2003, Dr. Beliveau sent a memorandum documenting the fact that the auditor had been terminated before the year end audit had been completed and that the termination would likely have serious consequences. On December 22, 2003, at Dr. Beliveau's suggestion, the

Board of the Light Commission voted to retain Mr. Goulet for another year. On December 23, 2003, Mr. D'Agostino issued a memorandum of reprimand to Dr. Beliveau accusing him of violating Massachusetts Law by failing to inform Mr. D'Agostino that Mr. Goulet had commenced the Year 2003 audit. This was a false accusation. The December 23, 2003 memorandum from Mr. D'Agostino included a directive that resulted in a significant diminution of Dr. Beliveau's status and responsibilities as Director of the Electric Plant.

On or about January 4, 2004, Dr. Beliveau received Mr. D'Agostino's December 23 memorandum instructing him that he was to have all personnel decisions and purchasing contracts pre-approved by Mr. D'Agostino prior to implementation.

Since the filing of the Stoyle Charge and Dr. Beliveau's deposition testimony favorable to Ms. Stoyle, Mr. D'Agostino has made a number of false and disparaging statements concerning Dr. Beliveau's performance and conduct. Mr. D'Agostino has made no effort to correct the false and disparaging statements although it has been well established that the statements were false when made. On January 13, 2004, Dr. Beliveau filed a Charge of Discrimination with the MCAD and the EEOC. Mr. D'Agostino received the Charge of Discrimination via facsimile transmission on the same day.

On Wednesday, January 14, 2004, Mr. D'Agostino met with the Board of Light Commissioners/Selectmen in an executive session at which time, the filing of Dr. Beliveau's Charge of Discrimination and Dr. Beliveau's termination were discussed.

Mr. D'Agostino terminated Dr. Beliveau's employment on February 12, 2004 without notice. At the time of Dr. Beliveau's termination, Mr. D'Agostino advised Dr. Beliveau that he would be receiving a letter explaining the reasons for his termination.

Immediately following Dr. Beliveau's termination, he was escorted to the town vehicle issued as part of his employment by Lieutenant George Figueredo of the Town of Mansfield Police Department. Dr. Beliveau was instructed to remove his personal belongings from the vehicle and to turn in the keys.

Beliveau seeks in damages, his lost wages, benefits compensation and remuneration lost; costs and attorneys fees, and other damages and relief to be proved at trial.

**Plaintiff Stoyle:**

Plaintiff, Kimberly Stoyle, was the Chief Financial Officer for the Town of Mansfield Municipal Electric Department ("MMED"). MMED Director, Dr. John J. Beliveau, was Ms. Stoyle's direct supervisor. John D'Agostino is the Town Manager for the Town of Mansfield. Michael McCue, David McCarter, Daniel Donovan, Roger Achille and Steven MacCaffrie were members of the Town of Mansfield Board of Light Commissioners (the "Board"). Ms. Stoyle reported to Dr. Beliveau and to the Board sexual harassment and illegal Town accounting and hiring practices. As a result, she was subject to ongoing retaliation by D'Agostino.

Ms. Stoyle first questioned the Town's accounting practices in June 1999. She suspected that the Town's internal charge bill for treasury services was overstated and requested supporting back-up documentation. D'Agostino assured Ms. Stoyle that the charges were actual charges. The Town Accountant, Bea Kearney, and the Town treasurer, Richard, concurred. The subject of the Town's internal charge bill to MMED was an ongoing issue of concern for both Ms. Stoyle and Dr. Beliveau throughout Ms. Stoyle's employment.

In August 1999, D'Agostino propositioned Ms. Stoyle at a professional conference. Ms. Stoyle made it known to D'Agostino that she was offended. In January 2000, one of Ms. Stoyle's subordinates, Carolyn Fitton, complained that D'Agostino was "hitting" on her in the

mailroom.  As a supervisor, Ms. Stoyle was obligated to report Fitton's complaint to Dr.

Beliveau.  In February 2000, D'Agostino illegally exerted his influence over the hiring of a

financial assistant at MMED.  He became enraged when Ms. Stoyle by-passed his favored

candidate and retaliated by criticizing her work performance.  As a result of the

January/February 2000 incidents and D'Agostino's offensive behavior in August 1999, Ms.

Stoyle became increasingly concerned about his motives and ended communications with him

other than as necessary for business purposes.

In June 2000, Ms. Stoyle again questioned the Town's annual bill for treasury services.

Again, D'Agostino assured her that the charges were legitimate.  In October 2000, D'Agostino

forwarded Ms. Stoyle a sexually charged email.  Dr. Beliveau was present when Ms. Stoyle

opened the e-mail and observed that she was offended by it.  In March 2001, D'Agostino was

verbally abusive to Ms. Stoyle after learning that MMED authorized payment for overtime.  Ms.

Stoyle reported his abusive conduct to Dr. Beliveau, who in turn reported it to members of the

Board.

In June 2001, Ms. Stoyle solicited a quote from Century Bank to outsource the processing

of electric payments.  Century Bank quoted Ms. Stoyle a fee of $18,000 to perform the same

services that the Town treasurer performed at an average yearly cost of $140,000.  During a

meeting with bank representatives, Boucher told Ms. Stoyle to "shut up" and that she didn't

know anything.  D'Agostino was present and acquiesced.  Boucher later admitted that the Town

had been overcharging MMED for his services, and Ms. Stoyle refused to pay a false bill.

Several meetings regarding the legitimacy of internal charges continued throughout the summer

of 2001.  Finally, in November 2001, the Board voted to pay actual charges only.

In October 2001, Ms. Stoyle and Dr. Beliveau met with Board Chair, Lou Amoruso.

They reported D'Agostino sexually offensive conduct toward both Ms. Stoyle and her subordinate and Town accounting irregularities. Amoruso acknowledged that D'Agostino's behavior was inappropriate, but no action was taken to remedy the situation. In late December 2001, D'Agostino leered at Ms. Stoyle at an MMED Christmas party. She ignored his stares and later reported the incident to Dr. Beliveau. D'Agostino then attempted to rescind Ms. Stoyle's pay raise, which had been pre-approved on December 11, 2001. D'Agostino continued to question Ms. Stoyle's compensation and employment status for several months. He scrutinized her personnel file, singled her out regarding the approval process for prior pay raises and questioned her job title and the date of her job application. D'Agostino also began referring to Ms. Stoyle as the Office Manager instead of the Chief Financial Officer.

In February 2002, Ms. Stoyle complained about the escalating hostile environment to Dr. Beliveau and via email to Amoruso. In April 2002, during a meeting with Kearney, Boucher and D'Agostino, Ms. Stoyle questioned the Town's pension allocations charged to MMED. Ms. Stoyle indicated that the formula used to calculate the pension allocation was inconsistent with the method used by every other municipality in the state and with accepted accounting principles. She asked why no accounting principles were used in the calculation. D'Agostino responded, "The only accounting I know is a broad plus a brain equal a problem."

In June 2002, D'Agostino approved the overcharge to MMED for pension allocations. At the same time, Ms. Stoyle suspected that the Town's bill to MMED for health insurance costs was also inflated. After review, the Board delayed payment until September 3, 2002, pending a detailed explanation of the inaccuracies she identified. The Town accountant nonetheless transferred $869,000 from MMED's operating account in June 2002 without authorization. Ms. Stoyle complained that the overcharges and the transfer were illegal acts. D'Agostino responded

that she was too pretty and that no one would take her seriously; that maybe people would listen to her if she cut her hair and got fat; and that she should have been a hairdresser because then she could talk as much as she wanted and maybe someone would listen.

In August 2002, at a professional conference, D'Agostino whispered in Ms. Stoyle's ear that she "looked delicious." Ms. Stoyle rebuffed his advance. In a September 2002 Board meeting, D'Agostino shouted at Stoyle in front of her colleagues demanding answers to engineering questions, more appropriately directed to the engineers at the meeting, not the Chief Financial Officer. In October 2002, D'Agostino began a series of contrived accusations against Ms. Stoyle. He alleged falsely that she authorized the installation of a purchase order software upgrade without prior approval from or coordination with the Town MIS manager. He also requested information regarding telephone records from Ms. Stoyle and then purposely ignored and/or misconstrued all attempts by Ms. Stoyle to reasonably respond to his inquiry. D'Agostino intended to create the appearance that Ms. Stoyle was insubordinate by refusing to comply with his request.

In October 2002, Ms. Stoyle requested another meeting with Amoruso to discuss the escalating hostile environment. The focus of the meeting was sexual harassment and retaliation against Ms. Stoyle. Again, no action was taken to remedy the situation. Rather, in November 2002, D'Agostino recommended that Dr. Beliveau take disciplinary action against Ms. Stoyle, despite that she had fully complied with his requests. On December 5, 2002, Ms. Stoyle filed a claim with the Massachusetts Commission Against Discrimination after repeated efforts to resolve the issues informally failed.

Defendant McCarter stated that Ms. Stoyle "should be fired for insubordination" for filing a charge against the Town and bragged that he "could lie with a straight face under oath."

McCarter's statements preceded any internal investigation into Ms. Stoyle's charges.  Despite the charges, the Board voted to renew D'Agostino's contract, six months before they were required to do so and one month before his scheduled performance evaluation.  On January 10, 2003, D'Agostino publicly threatened to sue employees as a result of Ms. Stoyle's charge.  Ms. Stoyle was one of the employees he threatened to sue.  On January 15, 2003, D'Agostino received a glowing performance evaluation before the charges were investigated.  In April 2003, he received a pay raise.

In January 2003, defendant Donovan stated publicly that Ms. Stoyle's discrimination charges were "far-fetched" and "a fabrication."  Donovan's statements were also made prior to the initiation of any internal investigation regarding the matter.  In February 2003, Boucher and Kearney issued a memorandum falsely accusing Ms. Stoyle of substantial overdrafts in the MMED financial account over a period of nine months.  These allegations were a direct attack on Ms. Stoyle's competence as Chief Financial Officer and fabricated to discredit her.  As a result of the memorandum, Dr. Beliveau hired James Goulet to audit the financial accounts of MMED.

In June 2003, Goulet requested copies of the Town audits for 2001-2003 for purposes of his investigation.  D'Agostino intentionally delayed the production of documents requested by the auditor.  In July 2003, the Town attempted to bill MMED for 25% of the Town's GIS Manager's salary, despite a prior vote that all GIS related charges would be covered in the payment in lieu of taxes.  Ms. Stoyle complained that the Town was triple dipping into MMED funds by attempting to recover the GIS salary under three different methods.  In July 2003, Ms. Stoyle notified the Town accountant that expenditures by D'Agostino on an MMED issued American Express card were unrelated to MMED business and therefore illegal.

In July 2003, Ms. Stoyle notified the Board in writing that D'Agostino was fraudulently charging MMED for Town services and that he was engaged in ongoing sexual harassment and retaliation against her.  On July 23, 2003, contrary to the conclusions of the investigation, Board member Michael McCue made a public announcement that D'Agostino was cleared of all charges.  In August 2003, Ms. Stoyle also notified the Massachusetts Office of the Inspector General in writing that the Town had engaged in the misappropriation of public funds.  On August 26, 2003, the Board received written notice from Dr. Beliveau that sexual harassment and retaliation against Ms. Stoyle was ongoing.  No investigation was undertaken.

In December 2003, Goulet's audit concluded that there was a timing difference between the recording of cash between MMED and the Town and that there was no misallocation or misuse of funds.  Ms. Stoyle was cleared of all charges.  The Town accountant acknowledged that she had been aware of the timing difference before accusing Ms. Stoyle of overdrafts.  D'Agostino fired the auditor upon receipt of his conclusions.  In January 2004, D'Agostino rejected Ms. Stoyle's application to become a member of the Professional Union on the basis that Ms. Stoyle was privy to confidential financial information.  At the same time, D'Agostino was aware that the Town accountant and Town treasurer had access to similar financial information and were members of a union.  Ms. Stoyle successfully appealed the denial of her application.

Dr. Beliveau agreed with Ms. Stoyle that the Town was fraudulently overcharging MMED for internal expenses.  Dr. Beliveau also corroborated Ms. Stoyle's complaints of sexual harassment and retaliation.  D'Agostino terminated Dr. Beliveau on February 12, 2004.  In May 2004, D'Agostino hired Gary Babin as the new MMED Director.  Babin immediately diminished Ms. Stoyle's rank as Chief Financial Officer.  Ms. Stoyle was excluded from all meetings, discussions and decisions concerning the financial operations of MMED.  Babin reduced her

financial report from fourteen pages to two pages and ordered Ms. Stoyle to sit in the audience at Board meetings rather than with the Board and other Town officials.

In June 2004, D'Agostino reinstated the Town's illegal overcharges to MMED for pension costs and GIS services. Ms. Stoyle complained to both Babin and to Kearney. D'Agostino directed MMED to pay the overcharges, despite a prior vote by the Board in November 2001 to pay only actual expenses incurred. In June 2004, Ms. Stoyle discovered that Boucher illegally borrowed money from MMED's Depreciation Fund and notified Babin. After reporting the treasurer's activities, Boucher threatened Ms. Stoyle's employment. In a conversation regarding Dr. Beliveau's termination, Boucher stated, "The bitch is next." Boucher admitted that he was referring to Ms. Stoyle.

In September 2004, Ms. Stoyle questioned credit card expenditures by D'Agostino unrelated to MMED business. She also complained again that D'Agostino was illegally exerting his influence over the hiring of a financial assistant. On or about January 10, 2005, Ms. Stoyle notified Union organizer Steve O'Donnell that her job had been diminished, that she was not involved in meetings, discussions and decisions relating to MMED financial operations. On January 18, 2005, O'Donnell related Ms. Stoyle's concerns to Babin, who stated his intent was to reduce Ms. Stoyle's position and to cut her pay.

The Board has supervisory control of MMED and D'Agostino in his role as Manager of MMED. The Board had knowledge of Ms. Stoyle's protected activities, but failed to investigate and remained deliberately indifferent to D'Agostino's continued harassment and retaliation against her. The Board's indifference permitted D'Agostino's harassment and retaliation against Ms. Stoyle to escalate resulting in her constructive discharge on January 18, 2005.

## IV.    STIPULATED FACTS.

The parties have stipulated to the following facts in their prior pre-trial memo:

1.    Dr. John J. Beliveau was the Director of the Town of Mansfield Municipal Electric Department from September 8, 1998 through February 12, 2004.

2.    John D'Agostino was the Town Manager and Manager of the Town of Mansfield Municipal Electric Department throughout the time that Beliveau was the Director of the Electric Department and Stoyle was the Chief Financial Officer of the Electric Department.

3.    On December 5, 2002, Kimberly Stoyle filed a Charge of Discrimination with the MCAD in which she accused the Town Manager, John D'Agostino, of sexual harassment and retaliation.

4.    In early 2003, the Electric Department conducted an investigation into the Stoyle charge.  As part of the investigation, Dr. Beliveau was interviewed by attorney James Lampke.

5.    In September, 2003, Dr. Beliveau was deposed by the attorney representing Ms. Stoyle in connection with the Stoyle charge.

6.    On January 13, 2004 Beliveau filed a Charge of Discrimination against the Electric Department and D'Agostino with the MCAD.

7.    On February 12, 2004, D'Agostino terminated Beliveau's employment with the Electric Department.

## V.    CONTESTED ISSUES OF FACT

Dr. Beliveau supported Ms. Stoyle in reporting and pursuing her claims of sexual harassment and retaliation.  Dr. Beliveau additionally notified Town officials regarding irregularities in Town accounting and testified before the State Ethics Commission regarding irregularities in Town hiring.

Dr. Beliveau corroborated much of Ms. Stoyle's allegations of sexual harassment and retaliation against Mr. D'Agostino.  Mr. Beliveau also corroborated complaints of sexual harassment by other town employees against D'Agostino.  Shortly after the filing of the Stoyle Charge and the Electric Department's investigation, Mr. D'Agostino held a press conference denying Ms. Stoyle's allegations and threatening to sue unnamed "other employees" who supported Ms. Stoyle.  Dr. Beliveau was one of the employees Mr. D'Agostino was referring to when he made his threat to sue.

In February 2003, Dr. Beliveau received a memorandum from the Town Treasurer and Town Accountant alleging substantial overdrafts in the Electric Plant financial account over a period of nine months.  This was a direct assault on Ms. Stoyle's competence as Chief Financial Officer and an attempt to discredit her in the midst of her sexual harassment allegations.  In February 2003, as result of the memorandum and given the seriousness of the allegation, Dr. Beliveau notified the Town Treasurer that he was engaging the services of Jim Goulet ("Mr. Goulet") to audit the financial accounts of the Electric Plant.  The Town failed to cooperate with Goulet.

In the summer of 2003, Dr. Beliveau was contacted by an attorney from the Massachusetts Ethics Commission in connection with an investigation into Mr. D'Agostino.  The investigation concerned Mr. D'Agostino's insistence on the Electric Department's hiring a certain individual, Ms. Hottleman, despite the hiring committee's failure to rank her in the top five candidates for the position.  Ms. Hottleman is the wife of an acquaintance of Mr. D'Agostino.  Mr. Hottleman has since admitted to sufficient facts for a charge of bookmaking.  Mr. D'Agostino has been made aware of Dr. Beliveau's participation in the ethics commission investigation.

Dr. Beliveau's  deposition testimony corroborated many of the allegations of discrimination and retaliation made by Ms. Stoyle and other women against Mr. D'Agostino. The transcript of Dr. Beliveau's deposition testimony was made available to Mr. D'Agostino sometime in October 2003.  In addition, in or around October 2003, Mr. D'Agostino began inundating Dr. Beliveau with unnecessary, burdensome and time consuming tasks and has used Dr. Beliveau's inability to respond to these demands in what Mr. D'Agostino considers a timely fashion as the basis for disciplinary action and discharge.  On or about November 12, 2003, the auditor released his report finding no wrongdoing by Ms. Stoyle and that the discrepancies cited by the Town Treasurer were merely due to the timing of recording certain transactions.

On November 17, 2003, Ms. Stoyle reported to the Board of the Light Commissioner's meeting that the auditor had commenced the year end audit.  On December 10, 2003, Mr. D'Agostino fired the auditor without notifying Dr. Beliveau of his intention to do so.  On December 17, 2003,  Dr. Beliveau sent a memorandum documenting the fact that the auditor had been terminated before the year end audit had been completed and that the termination would likely have serious consequences.  On December 22, 2003, at Dr. Beliveau's suggestion, the Board of the Light Commission voted to retain Mr. Goulet for another year.  On December 23, 2003, Mr. D'Agostino issued a memorandum of reprimand to Dr. Beliveau accusing him of violating Massachusetts Law by failing to inform Mr. D'Agostino that Mr. Goulet had commenced the Year 2003 audit.  This was a false accusation.   The December 23, 2003 memorandum from Mr. D'Agostino included a directive that resulted in a significant diminution of Dr. Beliveau's status and responsibilities as Director of the Electric Plant.

On or about January 4, 2004, Dr. Beliveau received Mr. D'Agostino's December 23 memorandum instructing him that he was to have all personnel decisions and purchasing contracts pre-approved by Mr. D'Agostino prior to implementation.

Since the filing of the Stoyle Charge and Dr. Beliveau's deposition testimony favorable to Ms. Stoyle, Mr. D'Agostino has made a number of false and disparaging statements concerning Dr. Beliveau's performance and conduct.  Mr. D'Agostino has made no effort to correct the false and disparaging statements although it has been well established that the statements were false when made.  On January 13, 2004,  Dr. Beliveau filed a Charge of Discrimination with the MCAD and the EEOC.  Mr. D'Agostino received the Charge of Discrimination via facsimile transmission on the same day.

On Wednesday, January 14, 2004, Mr. D'Agostino met with the Board of Light Commissioners/Selectmen in an executive session at which time, the filing of Dr. Beliveau's Charge of Discrimination and Dr. Beliveau's termination were discussed.

Mr. D'Agostino terminated Dr. Beliveau's employment on February 12, 2004 without notice.  At the time of Dr. Beliveau's termination, Mr. D'Agostino advised Dr. Beliveau that he would be receiving a letter explaining the reasons for his termination.

Immediately following Dr. Beliveau's termination, he was escorted to the town vehicle issued as part of his employment by Lieutenant George Figueredo of the Town of Mansfield Police Department.  Dr. Beliveau was instructed to remove his personal belongings from the vehicle and to turn in the keys.

**Plaintiff Stoyle:**

Plaintiff, Kimberly Stoyle, was the Chief Financial Officer for the Town of Mansfield Municipal Electric Department ("MMED").  MMED Director, Dr. John J. Beliveau, was Ms.

Stoyle's direct supervisor.  John D'Agostino is the Town Manager for the Town of Mansfield.

Michael McCue, David McCarter, Daniel Donovan, Roger Achille and Steven MacCaffrie were

members of the Town of Mansfield Board of Light Commissioners (the "Board").  Ms. Stoyle

reported to Dr. Beliveau and to the Board sexual harassment and illegal Town accounting and

hiring practices.  As a result, she was subject to ongoing retaliation by D'Agostino.

Ms. Stoyle first questioned the Town's accounting practices in June 1999.  She suspected

that the Town's internal charge bill for treasury services was overstated and requested supporting

back-up documentation.  D'Agostino assured Ms. Stoyle that the charges were actual charges.

The Town Accountant, Bea Kearney, and the Town treasurer, Richard, concurred.  The subject

of the Town's internal charge bill to MMED was an ongoing issue of concern for both Ms.

Stoyle and Dr. Beliveau throughout Ms. Stoyle's employment.

In August 1999, D'Agostino propositioned Ms. Stoyle at a professional conference.  Ms.

Stoyle made it known to D'Agostino that she was offended.  In January 2000, one of Ms.

Stoyle's subordinates, Carolyn Fitton, complained that D'Agostino was "hitting" on her in the

mailroom.  As a supervisor, Ms. Stoyle was obligated to report Fitton's complaint to Dr.

Beliveau.  In February 2000, D'Agostino illegally exerted his influence over the hiring of a

financial assistant at MMED.  He became enraged when Ms. Stoyle by-passed his favored

candidate and retaliated by criticizing her work performance.  As a result of the

January/February 2000 incidents and D'Agostino's offensive behavior in August 1999, Ms.

Stoyle became increasingly concerned about his motives and ended communications with him

other than as necessary for business purposes.

In June 2000, Ms. Stoyle again questioned the Town's annual bill for treasury services.

Again, D'Agostino assured her that the charges were legitimate.  In October 2000, D'Agostino

forwarded Ms. Stoyle a sexually charged email. Dr. Beliveau was present when Ms. Stoyle

opened the e-mail and observed that she was offended by it. In March 2001, D'Agostino was

verbally abusive to Ms. Stoyle after learning that MMED authorized payment for overtime. Ms.

Stoyle reported his abusive conduct to Dr. Beliveau, who in turn reported it to members of the

Board.

In June 2001, Ms. Stoyle solicited a quote from Century Bank to outsource the processing

of electric payments. Century Bank quoted Ms. Stoyle a fee of $18,000 to perform the same

services that the Town treasurer performed at an average yearly cost of $140,000. During a

meeting with bank representatives, Boucher told Ms. Stoyle to "shut up" and that she didn't

know anything. D'Agostino was present and acquiesced. Boucher later admitted that the Town

had been overcharging MMED for his services, and Ms. Stoyle refused to pay a false bill.

Several meetings regarding the legitimacy of internal charges continued throughout the summer

of 2001. Finally, in November 2001, the Board voted to pay actual charges only.

In October 2001, Ms. Stoyle and Dr. Beliveau met with Board Chair, Lou Amoruso.

They reported D'Agostino sexually offensive conduct toward both Ms. Stoyle and her

subordinate and Town accounting irregularities. Amoruso acknowledged that D'Agostino's

behavior was inappropriate, but no action was taken to remedy the situation. In late December

2001, D'Agostino leered at Ms. Stoyle at an MMED Christmas party. She ignored his stares and

later reported the incident to Dr. Beliveau. D'Agostino then attempted to rescind Ms. Stoyle's

pay raise, which had been pre-approved on December 11, 2001. D'Agostino continued to

question Ms. Stoyle's compensation and employment status for several months. He scrutinized

her personnel file, singled her out regarding the approval process for prior pay raises and

questioned her job title and the date of her job application. D'Agostino also began referring to

Ms. Stoyle as the Office Manager instead of the Chief Financial Officer.

In February 2002, Ms. Stoyle complained about the escalating hostile environment to Dr. Beliveau and via email to Amoruso.  In April 2002, during a meeting with Kearney, Boucher and D'Agostino, Ms. Stoyle questioned the Town's pension allocations charged to MMED.  Ms. Stoyle indicated that the formula used to calculate the pension allocation was inconsistent with the method used by every other municipality in the state and with accepted accounting principles.  She asked why no accounting principles were used in the calculation.  D'Agostino responded, "The only accounting I know is a broad plus a brain equal a problem."

In June 2002, D'Agostino approved the overcharge to MMED for pension allocations. At the same time, Ms. Stoyle suspected that the Town's bill to MMED for health insurance costs was also inflated.  After review, the Board delayed payment until September 3, 2002, pending a detailed explanation of the inaccuracies she identified.  The Town accountant nonetheless transferred $869,000 from MMED's operating account in June 2002 without authorization.  Ms. Stoyle complained that the overcharges and the transfer were illegal acts.  D'Agostino responded that she was too pretty and that no one would take her seriously; that maybe people would listen to her if she cut her hair and got fat; and that she should have been a hairdresser because then she could talk as much as she wanted and maybe someone would listen.

In August 2002, at a professional conference, D'Agostino whispered in Ms. Stoyle's ear that she "looked delicious."  Ms. Stoyle rebuffed his advance.  In a September 2002 Board meeting, D'Agostino shouted at Stoyle in front of her colleagues demanding answers to engineering questions, more appropriately directed to the engineers at the meeting, not the Chief Financial Officer.  In October 2002, D'Agostino began a series of contrived accusations against Ms. Stoyle.  He alleged falsely that she authorized the installation of a purchase order software

upgrade without prior approval from or coordination with the Town MIS manager. He also
requested information regarding telephone records from Ms. Stoyle and then purposely ignored
and/or misconstrued all attempts by Ms. Stoyle to reasonably respond to his inquiry. D'Agostino
intended to create the appearance that Ms. Stoyle was insubordinate by refusing to comply with
his request.

In October 2002, Ms. Stoyle requested another meeting with Amoruso to discuss the
escalating hostile environment. The focus of the meeting was sexual harassment and retaliation
against Ms. Stoyle. Again, no action was taken to remedy the situation. Rather, in November
2002, D'Agostino recommended that Dr. Beliveau take disciplinary action against Ms. Stoyle,
despite that she had fully complied with his requests. On December 5, 2002, Ms. Stoyle filed a
claim with the Massachusetts Commission Against Discrimination after repeated efforts to
resolve the issues informally failed.

Defendant McCarter stated that Ms. Stoyle "should be fired for insubordination" for
filing a charge against the Town and bragged that he "could lie with a straight face under oath."
McCarter's statements preceded any internal investigation into Ms. Stoyle's charges. Despite the
charges, the Board voted to renew D'Agostino's contract, six months before they were required
to do so and one month before his scheduled performance evaluation. On January 10, 2003,
D'Agostino publicly threatened to sue employees as a result of Ms. Stoyle's charge. Ms. Stoyle
was one of the employees he threatened to sue. On January 15, 2003, D'Agostino received a
glowing performance evaluation before the charges were investigated. In April 2003, he
received a pay raise.

In January 2003, defendant Donovan stated publicly that Ms. Stoyle's discrimination
charges were "far-fetched" and "a fabrication." Donovan's statements were also made prior to

the initiation of any internal investigation regarding the matter. In February 2003, Boucher and Kearney issued a memorandum falsely accusing Ms. Stoyle of substantial overdrafts in the MMED financial account over a period of nine months. These allegations were a direct attack on Ms. Stoyle's competence as Chief Financial Officer and fabricated to discredit her. As a result of the memorandum, Dr. Beliveau hired James Goulet to audit the financial accounts of MMED.

In June 2003, Goulet requested copies of the Town audits for 2001-2003 for purposes of his investigation. D'Agostino intentionally delayed the production of documents requested by the auditor. In July 2003, the Town attempted to bill MMED for 25% of the Town's GIS Manager's salary, despite a prior vote that all GIS related charges would be covered in the payment in lieu of taxes. Ms. Stoyle complained that the Town was triple dipping into MMED funds by attempting to recover the GIS salary under three different methods. In July 2003, Ms. Stoyle notified the Town accountant that expenditures by D'Agostino on an MMED issued American Express card were unrelated to MMED business and therefore illegal.

In July 2003, Ms. Stoyle notified the Board in writing that D'Agostino was fraudulently charging MMED for Town services and that he was engaged in ongoing sexual harassment and retaliation against her. On July 23, 2003, contrary to the conclusions of the investigation, Board member Michael McCue made a public announcement that D'Agostino was cleared of all charges. In August 2003, Ms. Stoyle also notified the Massachusetts Office of the Inspector General in writing that the Town had engaged in the misappropriation of public funds. On August 26, 2003, the Board received written notice from Dr. Beliveau that sexual harassment and retaliation against Ms. Stoyle was ongoing. No investigation was undertaken.

In December 2003, Goulet's audit concluded that there was a timing difference between

the recording of cash between MMED and the Town and that there was no misallocation or misuse of funds. Ms. Stoyle was cleared of all charges. The Town accountant acknowledged that she had been aware of the timing difference before accusing Ms. Stoyle of overdrafts. D'Agostino fired the auditor upon receipt of his conclusions. In January 2004, D'Agostino rejected Ms. Stoyle's application to become a member of the Professional Union on the basis that Ms. Stoyle was privy to confidential financial information. At the same time, D'Agostino was aware that the Town accountant and Town treasurer had access to similar financial information and were members of a union. Ms. Stoyle successfully appealed the denial of her application.

Dr. Beliveau agreed with Ms. Stoyle that the Town was fraudulently overcharging MMED for internal expenses. Dr. Beliveau also corroborated Ms. Stoyle's complaints of sexual harassment and retaliation. D'Agostino terminated Dr. Beliveau on February 12, 2004. In May 2004, D'Agostino hired Gary Babin as the new MMED Director. Babin immediately diminished Ms. Stoyle's rank as Chief Financial Officer. Ms. Stoyle was excluded from all meetings, discussions and decisions concerning the financial operations of MMED. Babin reduced her financial report from fourteen pages to two pages and ordered Ms. Stoyle to sit in the audience at Board meetings rather than with the Board and other Town officials.

In June 2004, D'Agostino reinstated the Town's illegal overcharges to MMED for pension costs and GIS services. Ms. Stoyle complained to both Babin and to Kearney. D'Agostino directed MMED to pay the overcharges, despite a prior vote by the Board in November 2001 to pay only actual expenses incurred. In June 2004, Ms. Stoyle discovered that Boucher illegally borrowed money from MMED's Depreciation Fund and notified Babin. After reporting the treasurer's activities, Boucher threatened Ms. Stoyle's employment. In a conversation regarding Dr. Beliveau's termination, Boucher stated, "The bitch is next." Boucher

admitted that he was referring to Ms. Stoyle.

In September 2004, Ms. Stoyle questioned credit card expenditures by D'Agostino unrelated to MMED business.  She also complained again that D'Agostino was illegally exerting his influence over the hiring of a financial assistant.  On or about January 10, 2005, Ms. Stoyle notified Union organizer Steve O'Donnell that her job had been diminished, that she was not involved in meetings, discussions and decisions relating to MMED financial operations.  On January 18, 2005, O'Donnell related Ms. Stoyle's concerns to Babin, who stated his intent was to reduce Ms. Stoyle's position and to cut her pay.

The Board has supervisory control of MMED and D'Agostino in his role as Manager of MMED.  The Board had knowledge of Ms. Stoyle's protected activities, but failed to investigate and remained deliberately indifferent to D'Agostino's continued harassment and retaliation against her.  The Board's indifference permitted D'Agostino's harassment and retaliation against Ms. Stoyle to escalate resulting in her constructive discharge on January 18, 2005.

## VI.    JURISDICTIONAL QUESTIONS.

None.

## VII.    UNUSUAL ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS.

None.

## VIII.    REQUESTED AMENDMENTS TO THE PLEADINGS.

The Court has granted Plaintiff Beliveau's motion to amend the Complaint.  There are no other amendments to the pleadings currently pending.

## IX.    ADDITIONAL MATTERS.

The following are the motions that are outstanding that have been filed by the parties:

1.      Defendants' Motion for Summary Judgment in the Stoyle matter.

2.      Defendants' Motion for Judgment on the Pleadings in the Beliveau matter.

3.      Plaintiffs' Motion for Sanctions Against Defendants D'Agostino and the MMED

Based on Discovery Violations.

## X.    LENGTH OF TRIAL.

Plaintiff estimates trial will take 2 weeks, assuming trial runs from 9am-1pm each day.

Defendants have estimated that the trial will last six weeks.

## XI.   FACT AND EXPERT WITNESSES.

### PLAINTIFFS' WITNESS LIST:

**1.      Fact Witnesses:**

Roger Achille
44 Warren Ave
Mansfield, MA 02048-1329
(508) 339-5677

Lee Azinheira
5 Farmers Cir
Dartmouth, MA 02747-3574
(508) 997-5747

Gary Babin
83 Norfolk Road
Millis, MA 02054

Dr. John J. Beliveau
230 Blueberry Lane
West Kingston, Rhode Island

John D'Agostino
Town Manager
Town of Mansfield
Mansfield Town Hall
Six Park Row
Mansfield, MA

Gary D'Ambra
210 Balcom St
Mansfield, MA 02048-2025
(508) 339-1472

Ron Decurzio
10 Southwood Drive
Wilbraham, Massachusetts

Daniel Donovan
97 Court Street,
Mansfield, MA 02048

Brian Feeney
28 Topping Road
Andover, MA 01810

George Figueredo
15 Walnut Street
Mansfield, MA

Michael Gelbwasser
160 Cottage Street
Pawtucket, RI

James Johnson
Massachusetts Department of Revenue
100 Cambridge Street
Boston, MA 02114

Mike Lawless

Stephen O'Donnell
I.B.E.W. Local 104
130 West Street
Walpole, MA 02081

James Pender
Associate
Morgan, Brown & Joy LLP
200 State Street
Boston, Massachusetts 02109

Ralph Penney
336 Maple Street
Mansfield, MA

Eileen Plant
Highland Avenue 27
Mansfield, MA

William Richard
905 South Main
Mansfield, MA 02048

Kim Stoyle
138 Old Elm Street
Mansfield, MA

Kara Torman-Cook
119 South Main Street
Mansfield, MA

Brad Wills
105 Thompson Street
Mansfield, MA 02048

**2.**    **Expert Witnesses:**

Kenneth Barna (expert and fact witness)
Rubin & Rudman, LLP
50 Rowes Wharf
Boston, MA 02110
Mr. Barna is a fact witness who will be asked to testify about a legal opinion or opinions
he gave to the defendants during the period Mr. Beliveau was employed with the Electric
Department. Although he is not retained as an expert witness by the Plaintiff, it is
anticipated that, in addition to his knowledge of certain facts, he may be asked to provide
testimony under Rules 702, 703 and 705 of the Federal Rules Of Civil Procedure.

James F. Goulet (expert and fact witness)
357 Sewall Street
Boylston, MA
Mr. Goulet is a fact witness who will be asked to testify about an audit he conducted on
behalf of the Town Of Mansfield Municipal Electric Department for the year ended
December 31, 2000.  Although he is not retained as an expert witness by the Plaintiff, it is
anticipated that, in addition to his knowledge of certain facts, he will be asked to provide
testimony under Rules 702, 703 and 705 of the Federal Rules Of Civil Procedure.

Nicholas Scobbo (expert and fact witness)
125 High Street
Boston, MA 02110
Mr. Scobbo is a fact witness who may be asked to testify about a legal opinion or
opinions he gave to the defendants during the period Mr. Beliveau was employed with
the Electric Department. Although he is not retained as an expert witness by the Plaintiff,
it is anticipated that, in addition to his knowledge of certain facts, he will be asked to
provide testimony under Rules 702, 703 and 705 of the Federal Rules Of Civil Procedure.

Thomas P. Tierney (expert witness)
Consulting Actuary
Tierney Associates, Inc.
Actuaries and Consultants
7 Lomas Drive
Framingham, MA 01701-3950
Telephone: (508)877-3700
Facsimile: (508)877-7578
e-mail: Tptactuary@aol.com
Mr. Tierney is expected to testify regarding the value of Dr. Beliveau's pension benefits
and other employment benefits, including wages, had he not been terminated from his
position with the Mansfield Municipal Electric Department.

3.    **Potential Rebuttal Witnesses:**

Mark G. Spencer (expert witness)
Director, Northeast Region
First Advantage Litigation Consulting
186 South Street, Suite 200
Boston, MA 02111-2701
Telephone: 617.357.6888
Facsimile: 617.357.6840
Mr. Spencer is the computer and electronic data expert recently hired by Plaintiff
Beliveau to review electronic storage media produced and/or maintained by Defendants.
Mr. Spencer's testimony may become relevant in this area.

Marianne Wills (fact witness)
105 Thompson Street
Mansfield, MA 02048


The Plaintiff reserves the right to call any witness or to submit any exhibit listed by

Defendants.  The Plaintiff further reserves the right to supplement this witness.

**XII.    A STATEMENT OF FACTS TO BE SUBMITTED TO THE JURY BY
STIPULATION OR ADMISSION.**

The parties have not yet agreed on such a statement but will provide one shortly.

**XIII.    PORTIONS OF DEPOSITIONS AND INTERROGATORY RESPONSES TO BE
OFFERED AT TRIAL, WITH OBJECTIONS.**

The Plaintiffs may offer portions of the depositions, excluding any colloquy between

counsel, from the depositions of the following witnesses:

John D'Agostino
Richard Boucher
Gary Babin
The Board of Selectmen

## XIV.  PROPOSED JURY INSTRUCTIONS.

Plaintiffs provides the below proposed jury instructions regarding the Massachusetts

Whistleblower Statute.  Plaintiff will supplement these instructions:

### The Massachusetts Whistleblower Act: General

Dr. Beliveau has alleged that Mr. D'Agostino and The Mansfield Municipal Electric Department, have violated the Massachusetts Whistleblower Protection Act.

To prevail on this claim, Beliveau must prove, by a preponderance of the evidence,  the following:

(1) That he was employed by the Mansfield Municipal Electric Department.

(2) That he engaged in one, or more, of the following protected activities:

a.      He disclosed or threatened to disclose to a supervisor or to a public body an activity, policy or practice of the employer that they reasonably believed was  in violation of a law, or a rule or regulation promulgated pursuant to law

b.      That he provided information to, or testified before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law; or

**c.**      That he objected to, or refused to participate in any activity, policy or practice which they reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law.

(3) That the Electric Department, acting through Mr. D'Agostino and/or the Board of Light Commissioners, retaliated against him by discharging him or taking other adverse employment actions against him regarding the terms and conditions of his employment.

*MGL ch. 149, § 185*

**The Massachusetts Whistleblower Act: Written Notice**

Let's start with the first category of protected activities, that is, whether Mr. Beliveau disclosed or threatened to disclose to a supervisor or to a public body an activity, policy or practice of the employer that they reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law

Under this category of protected activities, the employee is required to notify his supervisor(s), in writing, of those activities that he/she believes are against the law so that the employer has a reasonable opportunity to correct the activity, policy or practice before the employee can bring the activities to the attention of a public body

The writing does not have to be in any particular form. It simply has to be in writing. Also, there is no fixed amount of time the employee must give the employer to correct the unlawful activity, policy or practice before public disclosure is made. All that is required is that the opportunity to correct be reasonable under the circumstances. What is reasonable under the circumstances is for you to decide.

Again, under the first category of protected activity, once the written notice is given and the opportunity to correct is provided, the employee may make the disclosure to the public body. In other words, the fact that the employer has corrected the problem does not protect the employer against public disclosure. All that is required is that the employee put the employer on notice, in writing, of the activity so that he may correct the practice before it is disclosed to the public.

If the employee makes a disclosure to a public body without first giving his supervisor written notice and a reasonable opportunity to correct, then that employee is not entitled to the protection of the whistleblower law for this category of activity.

Thus, when considering the first category of activities that are protected under the act, if you find by a preponderance of the evidence that Beliveau disclosed or threatened to disclose, the activities, policy or practice that he reasonably believed were unlawful to a public body, after giving written notice to either Mr. D'Agostino or the board of Light Commissioners sufficiently in advance so that his employer had a reasonable opportunity to correct, then you must find in favor of Beliveau under the Whistleblower Act as to those activities.

However, if you find by a preponderance of the evidence that Beliveau disclosed or threatened to disclose certain activities that he believed to be unlawful to a public body, that he was required to give written notice of the activity to Mr. D'Agostino and/or the Board of Selectmen and that he failed to do so, or that he did not do so sufficiently in advance to give the Electric Department an opportunity to correct, then you must find for the Defendants as to those activities.

The mere fact that Beliveau ultimately brought his complaints to the attention of an outside body does not mean that notice was required. Written notice is only required if the protected activity falls within the first category as I have defined that for you: that is, that he disclosed or threatened to disclose to a supervisor or to a public body an activity, policy or practice of the employer that he reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law.

*ALM GL ch. 149, § 185, ( c)(1)*

**(c)** **(1)** Except as provided in paragraph (2), the protection against retaliatory action provided by subsection (b) (1) shall not apply to an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment, to the attention of a supervisor of the employee by written notice and has afforded the employer a reasonable opportunity to correct the activity, policy or practice.

**The Massachusetts Whistleblower Act: Supervisor, Public Body**

*Supervisor:*

I instruct you that Mr. Beliveau and Mr. D'Agostino and the Board of Light Commissioners were Ms. Stoyle's supervisors for the purposes of giving written notice under the Whistleblower Act.  I further instruct you that Mr. D'Agostino and the Board of Light Commissioners were Mr. Beliveau's supervisors under that act.

*MGL ch. 149, § 185, (a)(4)*

  **(4)** "Supervisor", any individual to whom an employer has given the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under subsection (g).

   *Public Body:*

For purposes of this case, I further instruct you that the Massachusetts Commission Against Discrimination, the State Ethics Commission and the Office of the Inspector General are public bodies under the Massachusetts Whistleblower Protection Action.

*M GL ch. 149, § 185, (a)(3)*

   **(3)** "Public body", (A) the United States Congress, any state legislature, including the general court, or any popularly elected local government body, or any member or employee thereof; (B) any federal, state or local judiciary, or any member or employee thereof, or any grand or petit jury; (C) any federal, state or local regulatory, administrative or public agency or authority, or instrumentality thereof; (D) any federal, state or local law enforcement agency, prosecutorial office, or police or peace officer; or (E) any division, board, bureau, office, committee or commission of any of the public bodies described in the above paragraphs of this subsection.

*M GL ch. 149, § 185, (a)(4)*

  **(4)** "Supervisor", any individual to whom an employer has given the authority to direct and control the work performance of the affected employee, who has authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under subsection (g).

**The Massachusetts Whistleblower Act: No Notice Required**

Mr. Beliveau contends that he provided information to the State Ethics Commission in connection with a pending investigation. Mr. Beliveau was not required to give written notice to his supervisor of his statements to the ethics commission pursuant to their investigation.

Thus, if you find by a preponderance of the evidence that Mr. Beliveau gave a statement or testimony in connection with a pending ethics investigation and that The Electric Department or Mr. D'Agostino retaliated against him for participating in that investigation, then you must find for Mr. Beliveau on Count   of the Complaint.

Finally, Mr. Beliveau contends that he objected to, or refused to participate in certain activities, policies or practices which he reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law.

Mr. Beliveau was not required to give written notice before he could object to, or refuse to participate in any activity, policy or practice which he reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law.

Thus, if you find by a preponderance of the evidence that Mr. Beliveau objected to, or refused to participate in any activity, policy or practice which he reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law then you must find for Mr. Beliveau on Count   of the Complaint.

*MGL ch. 149, § 185, ( c)(1)*

**(c)** **(1)** Except as provided in paragraph (2), the protection against retaliatory action provided by subsection (b) (1) shall not apply to an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment, to the attention of a supervisor of the employee by written notice and has afforded the employer a reasonable opportunity to correct the activity, policy or practice.

**The Massachusetts Whistleblower Act: Reasonable Belief**

Mr. Beliveau is not required to prove that the activity about which he reported, complained or objected to was actually in violation of a law, rule or regulation. He need only establish that he had a reasonable belief that it was. It is for you to determine whether Dr. Beliveau's belief as to the lawfulness of the activities was a reasonable one. If Dr. Beliveau had a reasonable, but mistaken belief that the activity he complained of was unlawful, you may not find against him simply because he may have been wrong about that belief.

*MGL ch. 149, § 185, ( c)(1)*

**(b)** An employer shall not take any retaliatory action against an employee because the employee does any of the following:

**(1)** Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer with whom the employee's employer has a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment;

**(2)** Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law, or activity, policy or practice which the employee reasonably believes poses a risk to public health, safety or the environment by the employer, or by another employer with whom the employee's employer has a business relationship; or

**(3)** Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

**The Massachusetts Whistleblower Act: Various Categories**

Finally, you may find that Mr. Beliveau's activities fell into one category of protected activities or that they fell into two or all three of the categories of protected activities.  The verdict slip contains questions that will require you to indicate which categories of activities apply to Mr. Beliveau's claims in this case.

## XIX.  PROPOSED INTERROGATORIES OR SPECIAL VERDICT FORMS.

Plaintiffs provide the below proposed special verdict form with regard to the

Whistleblower claims.  Plaintiff will supplement this proposed verdict form.

**<u>Special Verdict Form:  Whistleblower Act:</u>**

1.      Did Dr. Beliveau disclose or threaten to disclose to a supervisor or to a public body an activity, policy or practice of the employer that he reasonably believed was  in violation of a law, or a rule or regulation promulgated pursuant to law?

Yes_____No_____

If your answer to the preceding question was "Yes" proceed to the next question. If your answer to the preceding question was No" then please proceed to question # 4.

2.      Did Dr. Beliveau give his supervisor written notice of the protected activities such that his employer had a reasonable opportunity to correct?

Yes_____No_____

If your answer to the preceding question was "Yes" proceed to the next question. If your answer to the preceding question was No" then please proceed to question # 4.

3.      Did Mr. D'Agostino retaliate against Dr. Beliveau by discharging him or taking other adverse employment actions against him regarding the terms and conditions of his employment as a result of his protected activities?

Yes_____No_____

If your answer to the preceding question was "Yes" proceed to the next question. If your answer to the preceding question was No" then please proceed to question # 4.

4.      Did Dr. Beliveau provide information to, or testify before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law?

Yes_____No_____

34

If your answer to the preceding question was "Yes" proceed to the next question. If your answer to the preceding question was "No" then please proceed to question # 6.

5.      Did Mr. D'Agostino retaliate against Dr. Beliveau by discharging him or taking other adverse employment actions against him regarding the terms and conditions of his employment as a result of the protected activity described in the preceding question?

6.

Yes_____No_____

7.Did Dr. Beliveau object to, or refuse to participate in any activity, policy or practice which he reasonably believed was in violation of a law, or a rule or regulation promulgated pursuant to law.

Yes_____No_____

If your answer to the preceding question was "Yes" proceed to the next question.  If your answer to the preceding question was "No" then please proceed to question #.

6.      Did Mr. D'Agostino retaliate against Dr. Beliveau by discharging him or taking other adverse employment actions against him regarding the terms and conditions of his employment as a result of the protected activities described in the preceding question?

Yes_____No_____

## XX.    PROPOSED VOIR DIRE QUESTIONS.

Plaintiffs provide the following proposed voir dire questions:

Have you or any member of your family ever worked for the Commonwealth of Massachusetts?

Have you or any members of your family ever worked for a municipality?

Have you or any member of your family ever worked for a municipal electric department?

Have you or any members of your family ever worked for a utility company?

Have you or any members of your family ever worked as an accountant or as a financial services

professional?

Have you or any members of your family ever been residents of the Town of Mansfield,

Massachusetts?

Have you ever worked as a supervisor?

Have you ever had the power to hire and fire employees for your workplace?

Have you ever been a manager, owner or part-owner of a business entity?

If you have been a manager, owner or part-owner of a business entity, would your experience cause you to tend to believe the testimony of an employer over the testimony of an employee?

If you have ever been a manager, owner or part-owner of a business entity, have you ever had any experience with claims of discrimination by an employee?

Have you ever been part of a lawsuit in which an employee alleged discrimination?

Have you ever been terminated from a position of employment for cause?

Have you ever been discriminated against?

Would you tend to either believe or disbelieve the testimony of a witness based on their gender?

Has anyone ever complained about how you supervise them?

Has anyone ever claimed that you discriminated against a person at work?

Have you ever worked in a Human Resources Department or a Personnel Department?

Is it okay for someone to be punished for getting their boss in trouble?

Is it okay to punish someone for testifying against their boss in a lawsuit?

Is it okay for a boss to punish someone for not being loyal?

Have you ever had to fire anyone?

Should employees be able to sue their employers for job discrimination and retaliation?

Should employees be able to sue their employers for sexual harassment?

Have you ever been accused of harassment at work?

Do you believe that employees who raise concerns about workplace issues are "troublemakers?"

RESPECTFULLY SUBMITTED,
**PLAINTIFF,**
**DR. JOHN J. BELIVEAU,**

By his attorneys,

 /s/ Christine M. Griffin_____
Juliane Balliro (BBO # 028010)
Christine M. Griffin (BBO # 651401)
Wolf, Block, Schorr and Solis-Cohen LLP
One Boston Place
Boston, MA 02108
617-854-4100


**PLAINTIFF,**
**KIMBERLY STOYLE**

By her attorney,

 /s/_Lynn A. Leonard /CMG
Lynn A. Leonard (BBO # 561662)
527 Main Street, Suite 8
Melrose, MA 02176
781-662-6161


June 8, 2007


## CERTIFICATE OF SERVICE

I, Christine M. Griffin, hereby certify that it is my understanding that the foregoing document will be served on all counsel of record via email through the Court's ECF filing system upon the electronic filing of this document with the Court on this the 8th day of June, 2007, and that I am also circulating a copy of the foregoing document to counsel Lynn Leonard by email on this the 8th day of June, 2007.

 /s/ Christine M. Griffin_____
Christine M. Griffin