Stoyle V Mansfield (Clos) 080107

1            UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3      * * * * * * * * * * * * * * * *

4    DR. JOHN J. BELIVEAU
                        Plaintiff
5
        VERSUS                    CA-04-11329-DPW
6
     TOWN OF MANSFIELD MUNICIPAL
7    ELECTRIC DEPARTMENT AND
     JOHN D'AGOSTINO
8
                        Defendants
9
       * * * * * * * * * * * * * * * *

10   KIMBERLY STOYLE

11                     Plaintiff

12       VERSUS                    CA-05-10354-DPW

13   THE MANSFIELD MUNICIPAL ELECTRIC

14   DEPARTMENT, JOHN D'AGOSTINO, ET AL

15     * * * * * * * * * * * * * * * *

16        BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

17          UNITED STATES DISTRICT COURT JUDGE

18      JURY TRIAL - DAY NINETEEN - CLOSING ARGUMENT

19        ON BEHALF OF KIMBERLY STOYLE, PLAINTIFF

20                  AUGUST 1, 2007

21   APPEARANCES:

22   JULIANNE BALLIRO, ESQ. AND CHRISTINE MARIE GRIFFIN, ESQ.,
     Wolf, Block, Schorr & Solis-Cohen, LLP, One Boston Place,
23   40th Floor, Boston, Massachusetts  02108, on behalf of
     Dr. John H. Beliveau, Plaintiff in CA-04-11329-DPW
24

25



1

2    APPEARANCES (CONTINUED):

3    LYNN A. LEONARD, ESQ., 527 Main Street, Suite 8, Melrose,
     Massachusetts  02176, on behalf of Kimberly Stoyle,
4    Plaintiff in CA-05-10354-DPW
                        Page 1

Stoyle V Mansfield (Clos) 080107

5   LEONARD H. KESTEN, ESQ. AND DEBORAH I. ECKER, ESQ.,
    Brody, Hardoon, Perkins & Kesten, One Exeter Plaza,
6   12th Floor, Boston, Massachusetts  02116, on behalf
    of the Defendants
7
    SUSAN L. JACOBS, ESQ., Volterra, Goldberg, Mangiaratti &
8   Jacobs, 3 Mill Street, Attleboro, Massachusetts  02703,
    on behalf of Town of Mansfield Municipal Electric
9   Department, Defendant

10

11

12

13

14

15

16

17

18
                              Courtroom No. 1 - 3rd Floor
19                            1 Courthouse Way
                              Boston, Massachusetts  02210
20                            11:10 A.M. - 12:25 P.M.

21

22

23          Pamela R. Owens - Official Court Reporter
              John Joseph Moakley District Courthouse
24              1 Courthouse Way - Suite 3200
                Boston, Massachusetts  02210
25


1             CLOSING ARGUMENT ON BEHALF OF

2                KIMBERLY STOYLE, PLAINTIFF

3         BY MS. LEONARD:

4             Good morning, ladies and gentlemen.

5             My name is Lynn Leonard and I'm the attorney

6    representing Kimberly Stoyle.

7             And at the outset, I'd just like to thank you for

8    sacrificing -- on behalf of my client, I'd like to thank you

                         Page 2

Stoyle V Mansfield (Clos) 080107

9   for sacrificing your time and for your patience and prompt
10  attention for the last six weeks.
11          Every day when I enter this courthouse, the first
12  thing that draws my attention downstairs in the lobby is the
13  inscription on the wall.  And it says -- I'm sure you've seen
14  it, too -- "Justice is but truth in action."  Whenever I read
15  that, it gives me a sense of pride to feel that I'm part of the
16  judicial system.  But as I put together my closing remarks for
17  today, I realized that it's not about me, it's about you.
18  Because the administration of justice here today is your role.
19  It's your job to find the truth and it's your job to administer
20  justice to Ms. Stoyle.  I can only outline for you the facts
21  that come out during the trial.  This is an awesome task.  And
22  to you, you should be proud and I know that you have taken your
23  role very seriously.
24          Ms. Stoyle has waited a very, very long time for
25  justice.  As you heard her testimony, she started her job with


1   the Mansfield Municipal Electric Department back in March of
2   1999.  And it's after eight long difficult years that she is
3   here before you now asking you to right a terrible wrong.  She
4   brought the case against the electric department for
5   retaliation and she claims that the electric department after
6   its manager, John D'Agostino, and through the Board of Light
7   Commissioners, retaliated against her over a four-year period
8   that she suffered emotional distress because of their conduct
9   for more than six years.
10          Now, a legal claim of retaliation requires that
11  Ms. Stoyle prove that she engaged in what the law refers to as
12  protected activity.  In this case, you have heard about many
13  different kinds of conduct that constitute protected activity.

Page 3

Stoyle V Mansfield (Clos) 080107

14       First, you heard that Ms. Stoyle objected to and

15   refused to participate in financial practices that she

16   reasonably believed to be illegal.  Second, you heard testimony

17   that she rejected the sexual advances of the Town Manager, John

18   D'Agostino.  Third, you heard that she complained to her

19   superiors about sexual harassment by John D'Agostino.  And

20   lastly, you heard that she participated in the investigation

21   conducted by the State Ethics Commission into the conduct of

22   John D'Agostino.  Now, under the law, these are all considered

23   protected activities.  And for standing up for her principles

24   and standing up for what she believed was right and for what

25   she believed was wrong, she was punished by Mr. D'Agostino and


1    the Board of Light Commissioners.  And the legal term for

2    punishment is known as an adverse job action.  You will be

3    hearing that a lot throughout this closing.

4       Now I'll explain to you in a bit more detail what

5    the legal terms mean and the evidence that has been presented

6    during the course of the trial to demonstrate that there has

7    been, in fact, retaliation against Ms. Stoyle.

8       Let's first look at the evidence that Ms. Stoyle

9    refused to or objected to and refused to participate in illegal

10   financial practices.  You heard that from the beginning of her

11   employment, shortly after she started in June of 1999, she was

12   presented by the Town Manager -- now you know she's the Chief

13   Financial Officer.  She was presented by the Town Manager with

14   a bill for internal charges.  And this is a bill that came out

15   every spring and it detailed some charges the town caused the

16   electric department to pay.  And right off the bat, she thought

17   something was fishy about this bill.  She looked at the

18   internal service charges for the Treasurer's services and she

Page 4

Stoyle V Mansfield (Clos) 080107

19   thought they are excessive.  She questioned them.  She asked
20   the Town Manager.  She asked the Town Treasurer.  She asked the
21   Town Accountant.  And she was assured in that early year that,
22   in fact, these were actual charges.  She asked for backup and
23   never received it.
24           Now, the defense has tried to minimize the issue of
25   internal charges, but this is really a very significant issue


1    because you have heard throughout the course of the trial that
2    there are laws that govern internal charges, special laws that
3    pertain to the electric department, laws that Ms. Stoyle, by
4    virtue of her fiduciary responsibility, was charged with
5    fulfilling.  She couldn't pay a fake bill.  Charges on that
6    bill had to be real.  They had to be supported.  They had to be
7    substantiated.  They had to have backup.  So, this issue that
8    came up in 1999 turns out to be a recurring one because you
9    heard testimony that it came up again in June of 2000 and again
10   in June of 2001.  Every spring when the internal charge bill
11   came up, Ms. Stoyle voiced her concerns about the issues, the
12   overcharges, the illegalities.  And each time she raised her
13   concern to the Town Accountant and the Town Manager and the
14   Town Treasurer, she was assured that this was a legitimate
15   charge.  She also reported her concerns to Dr. Beliveau.  And
16   you'll recall a series of documents that are marked as exhibits
17   where Dr. Beliveau documented Ms. Stoyle's concerns.  He
18   documented that he, too, felt that these were overcharges and
19   he also obtained a legal opinion and gave them to the town
20   officials so that they could understand what they were doing
21   wrong and illegal with these bills.
22           Now, one thing I think that has become apparent
23   about Ms. Stoyle during the course of this trial is that she is

Page 5

Stoyle V Mansfield (Clos) 080107

24    unwavering when it comes to her duties and responsibilities as

25    the Chief Financial Officer and in her principles in following


1    the law and doing what's right.  So, in June of 2001, she

2    became increasingly concerned about these charges.  And, so,

3    she decided to go out and get an estimate from a bank to see

4    what it would cost for a bank to do the same thing that the

5    Town Treasurer was doing at a cost -- a yearly cost -- of about

6    $130,000 and $150,000.  She set up a meeting with Century Bank.

7    You heard that she attended that meeting with the Town Manager,

8    with the Town Treasurer, with the Town Accountant, and with

9    bank representatives.  And when the discussion came up and it

10    was revealed that these services could be performed for not

11    $150,000, but more between 18 and 20 thousand dollars, you

12    heard that Mr. Boucher told her in that meeting to shut up.  He

13    told her to shut up and he told her she didn't know anything.

14    But what's worse is the Town Manager, the leader, the person

15    who is supposed to set the example for his subordinates sat

16    silently.  And the message?  The message was that this was

17    okay.  This kind of behavior towards Ms. Stoyle was

18    acceptable.  And I note that tolerating harassment against

19    Ms. Stoyle is a form of adverse action.

20            THE COURT:  Well, I think we have harassment on the

21    basis of some sort of sexual matter.

22            MS. LEONARD:  Yes, yes.

23        BY MS. LEONARD:

24            If you find that comments made towards Ms. Stoyle

25    were directed at her because of her gender, that is considered


1    conduct of a sexual nature.  That is simply the sex

2    discrimination and that is toleration of harassment that would

Stoyle V Mansfield (Clos) 080107

3    be considered an adverse action.

4            Now, there was a lot of hostility that followed

5    that June 2001 revelation that the Town Manager was lying about

6    internal charges.  And throughout the summer of 2001, there

7    were meetings to talk about how to resolve the issue, to talk

8    about whether or not they could find a way to do this legally.

9    It became so hostile that Ms. Stoyle contacted Mr. Amoruso.

10   And you'll see that in the E-mails.  You'll see that she

11   contacted Mr. Amoruso to let him know that there were problems

12   and she was reaching out for help.  She felt that this was an

13   harassing work environment.  Now, contacting Mr. Amoruso in

14   October of 2001 and having a meeting with him, that, too, is

15   protected activity.  Now, during the course of that meeting,

16   she did discuss -- you heard testimony from Ms. Stoyle and also

17   from Dr. Beliveau that she did discuss financial issues.  And

18   when asked by Mr. Amoruso what other problems were going on,

19   she disclosed to him things that had happened up to that point

20   in time.

21           Now, you heard testimony from Gary D'Ambra.  He was

22   present at that meeting, also.  And you heard testimony from

23   Mr. D'Ambra that, in fact, the issue of sexual harassment was

24   raised at that meeting.  You heard testimony from Mr. Beliveau

25   that the issue of sexual harassment was raised at that meeting


1    and you heard that evidence also from Ms. Stoyle.

2            Now, the defendants tried throughout this case to

3    isolate Ms. Stoyle's complaints in time, to characterize them

4    as stale or old in an effort to show that she made her claims

5    in bad faith.  For example, the defense points to the fact that

6    Ms. Stoyle raised since the October of 2001 meeting incidents

7    that had happened in the prior two years.  But the truth is

Stoyle V Mansfield (Clos) 080107

8    that Ms. Stoyle didn't want to complain every time something
9    happened.  She tried to resolve it.  She didn't run to her boss
10   every time something went wrong.  Case in point:  August of
11   1999, early on in her employment, brand new employee, attends a
12   professional conference, also attended by Mr. D'Agostino.  You
13   heard testimony from Ms. Stoyle that during that conference,
14   Mr. D'Agostino invited her up to his room, first to lunch, but
15   first up to his -- invited her to lunch, but first up to his
16   room so that he could retrieve something he needed from his
17   room.  Clearly uncomfortable, didn't want to go.
18   Mr. D'Agostino insisted.  She goes to his room.  She gets
19   there.  He asks her to come up to the room to check out the
20   view.  She gets to his room reluctantly and finds there is no
21   view.  There's no view in his room.  And when she got there,
22   she described for you and she re-lived through her tears in
23   this courtroom how Mr. D'Agostino proceeded to grab his genital
24   and motions his head to the bed.  She was horrified.  She let
25   him know at that time that this was not okay.  This was not


1    okay behavior and this could never happen again.  And she also
2    told you that she then went to lunch.  She decided she was
3    going to sweep this under the rug.  She's a single mom, three
4    children, brand new job.  This is the most powerful man in
5    town.  "I let him know it's not okay.  I'm not going to run and
6    tell anybody.  I know it's not going to happen anymore."
7            Now, you heard from Mr. D'Agostino that he admitted
8    that he did have a discussion with Ms. Stoyle about the deal.
9    He denies going to the room, but he acknowledges that he did
10   have a discussion with Ms. Stoyle about the view in his room.
11           Now, when Ms. Stoyle returned to her job after this
12   event, you heard that yes, she did continue to exchange funny
Page 8

Stoyle V Mansfield (Clos) 080107

13    notes.  She wanted it to return to business as usual.  She told

14    you that she didn't want this incident to detract from her

15    credibility as a professional.  And I note in the E-mails

16    brought to your attention by the defense, clearly Ms. Stoyle

17    states "Can we exchange funny notes, not dirty, funny notes?"

18    Now, Ms. Stoyle is not prudent, but she certainly knows the

19    boundaries in the workplace.  It wasn't long after this

20    conference that soon information came to her attention that

21    made her see Mr. D'Agostino's true colors.  In February or

22    January -- you heard testimony that in January of 2000, a few

23    months after this conference, that an employee, a subordinate

24    of Ms. Stoyle's, came to her and told her that Mr. D'Agostino

25    had cornered her in the mail room and that she felt threatened.


1    Now she soon realized that this was not an isolated incident

2    just against her.

3           In the same time frame, you heard testimony that

4    there was a hiring process and that Ms. Stoyle attempted to

5    utilize the hiring process put in place by the director of the

6    department.  They had a committee.  They used a fair hiring

7    process, and that she was called into a meeting where she was

8    criticized.  Her performance was criticized for not hiring, but

9    interviewing Mr. D'Agostino's favorite candidate.  So now she

10   sees that she's dealing with someone who she fears.  And what

11   does she do?  She ceases to have communications with him.  She

12   ceases funny E-mails with him because she sees that his notes

13   are less than genuine.

14          Now, we did hear from the defense about this hiring

15   process and they'd like you to believe that Ms. Stoyle had an

16   interest in keeping Ms. Holliman out of the process because she

17   feared that Ms. Holliman was after her job.  Well, I remind you

Stoyle V Mansfield (Clos) 080107

18    that the evidence that you heard suggested that there was, in

19    fact, a second interview process.  And that second interview

20    process was put into place to eliminate any appearance of bias

21    or impropriety in the hiring process.  And you heard testimony

22    that the job was readvertised, that officials from the town

23    were on the hiring committee, and that the town representatives

24    like Ms. Stoyle and her committee did not choose to interview

25    Ms. Holliman.


1              Now, in terms of the meeting where you heard

2    testimony that Mr. D'Agostino banged his fist on the table and

3    he raised his voice and he yelled, that testimony came from

4    Ms. Stoyle.  Mr. D'Agostino acknowledged that he was mad at

5    that meeting.  Well, you heard from Laurie Anderson.  You

6    remember Laurie Anderson.  She was an employee that worked at

7    the electric department.  Well, if Laurie Anderson thought that

8    he was upset by that meeting, it must have been pretty bad

9    because we all heard from Laurie Anderson that the kind of

10    negative, derogatory gender-based statements that were leveled

11    against Ms. Stoyle didn't bother her at all.  She wouldn't have

12    cared if someone told her to shut up.  She wouldn't have cared

13    if someone made a gender-based statement like a "A broad who

14    has a brain is a problem."  Yet, she told you when she was in

15    that meeting, she was very upset and she didn't want to be

16    involved in any further hiring processes.

17              Now, after the meeting in December of 2001, we had

18    another incident of protected activity.  Ms. Stoyle goes to a

19    Christmas party.  Now, the defense would like to minimize what

20    happened at that particular time to just fear.  Well, you heard

21    the evidence.  Ms. Stoyle testified that Mr. D'Agostino made an

22    obscene gesture with his tongue and that he stared at her all

Page 10

Stoyle V Mansfield (Clos) 080107

23    night and she did her best to avoid him.  Rejection of sexual

24    advances, I remind you, are protected activity.  Now, in the

25    wake of that incident, she goes back, she reports it to her


1    supervisor, and within days, a pay raise that had already been

2    approved is now being questioned.  But the retaliation against

3    Ms. Stoyle goes beyond the attempt to retract her pay raise.

4    You will recall testimony from Dr. Beliveau that Mr. D'Agostino

5    continued to question her job title, to scrutinize her

6    personnel file, to question her job application.  And for

7    Ms. Stoyle, after that, Mr. D'Agostino began to refer to her as

8    the Office Manager instead of the Chief Financial Officer.

9    Clearly, this type of adverse action leveled against Ms. Stoyle

10    went on for a period of time.

11            The defense would have you believe that the pay

12    raise issue was a small issue.  But the bottom line is

13    Mr. Beliveau testified that he provided those justifications to

14    Mr. D'Agostino before the pay raises were issued.  And you also

15    remember testimony from Mr. D'Agostino that the reason he

16    questioned the raises was because there was an economic climate

17    at that time where funding was being cut.  And he testified on

18    direct examination that he was going to control all of these.

19    But we later heard that, in fact, he got a big fat pay raise

20    that year.  And with those kinds of facts, I ask you to keep in

21    mind when you assess the credibility of the witnesses,

22    Mr. D'Agostino contends that the pay raise became an issue

23    because he wanted to avoid criticism because funding for the

24    town was in crisis.  But what did we hear?  That in the

25    aftermath, he got a large retroactive pay raise that became the

Page 11

Stoyle V Mansfield (Clos) 080107

1   subject of public scrutiny for months.

2           So, the defense would also have you believe that

3   Ms. Stoyle or Mr. Beliveau approved some pay raise for

4   Ms. Stoyle that wasn't justified.  Well, don't forget the

5   testimony that you heard:  That in fact the Town Treasurer,

6   whose obligation it is to sign off on pay raises, it's his

7   responsibility to see to it that the Town Manager gets the pay

8   slip, signs it and reviews it before he cuts the check.  So,

9   this wasn't a situation where Ms. Stoyle and Dr. Beliveau were

10  conspiring, as the defense contends.  This is a situation where

11  the pay slip wasn't put through the process by the Town

12  Treasurer as it was supposed to be.

13          Now, during this same time frame, you will recall

14  that Ms. Stoyle again contacting Mr. Amoruso -- there's an

15  E-mail in February of 2002 -- she's concerned.  She knows

16  what's happening.  She's writes in the E-mail, "I'd like to

17  meet with you," but then decides I'll see if I can make it work

18  out.  Once again, she decides to give it another try.  She's

19  hoping that this can be resolved informally.  And that, ladies

20  and gentlemen of the jury, is why this went on for so long.

21  Because one, Ms. Stoyle didn't run to her boss everytime

22  something happened; and two, she kept giving it a second chance

23  and a third chance.

24          Now, at this point in time, there's retaliation

25  against Ms. Stoyle.  Once again, in the spring of 2002,


1   internal charges came up.  And you will recall testimony that

2   it was in the spring of 2002 and in the early summer that

3   Ms. Stoyle questioned the pension charges.  She thought they

4   were excessive or she thought that there was an improper

5   calculation being utilized that resulted in an overcharge to

Page 12

Stoyle V Mansfield (Clos) 080107

6   the electric company.  So, in a meeting with the Town Manager,

7   she raises the issue.  She questions it.  And his response?

8   She asked him why aren't those (a) generally-accepted

9   accounting principles?  And his reply?  "The only accounting I

10  know is 'A broad with a brain is a problem.'"

11          Now, ladies and gentlemen of the jury, that kind of

12  derogatory, gender-based harassment constitutes an adverse job

13  action.  And it continued in June of 2002.  There was a further

14  discussion again on internal charges, protected activity,

15  complaining about overcharges.  At this time, Mr. D'Agostino

16  says, "Well, you know, maybe if you cut your hair and got fat,

17  someone might take you seriously.  Or better yet, maybe if you

18  became a hairdresser, you could talk all you want and someone

19  would listen."  Again, a negative derogatory gender-based

20  statement.

21          And you can see that Mr. D'Agostino is becoming

22  increasingly hostile by Ms. Stoyle's interfering with his

23  ability to get access to the financial resources of the

24  electric department.

25          Now, we're in the summer of 2002, protected


1   activity.  Ms. Stoyle attends another professional conference.

2   This seems to be the place where Mr. D'Agostino makes his

3   advances.  She's at a conference.  He creeps up behind her and

4   he whispers in her ear, "You look delicious."  Now, you will

5   recall that you heard from Ronald DeCurcio.  He's another

6   professional in the industry who attended the conference who

7   actually witnessed from a distance Mr. D'Agostino approaching

8   Ms. Stoyle, whispering in her ear and Ms. Stoyle scurrying off

9   with no response.  And more than that, you heard Mr. D'Agostino

10  admit that he told Ms. Stoyle she looked delicious, but that he

Page 13

Stoyle V Mansfield (Clos) 080107

11   didn't think this was a comment that was sexual.  What makes

12   this particularly offensive is that she's standing with her

13   11-year-old son.

14           You will also recall that Mr. DeCurcio observed

15   Mr. D'Agostino in an agitated state sitting at the same dinner

16   table as Ms. Stoyle.  She wasn't paying attention to him and he

17   observed him very agitated because she didn't want him.  Again,

18   protected activity.

19           What happens next?  Shortly thereafter, September

20   of 2002, Ms. Stoyle attends the Board of Light Commissioners

21   meeting only to be attacked by Mr. D'Agostino on an issue that

22   is clearly out of her area of expertise, demands information on

23   an engineering question.  She's standing between two engineers,

24   but it's directed at her.  He yells at her.

25           Shortly thereafter, in October of 2002, she gets an


1   E-mail with a false accusation about implementing a software

2   upgrade.  Well, you heard testimony from Ms. Stoyle and you

3   heard testimony from Dr. Beliveau.  There wasn't a software

4   upgrade system.  Now put yourself in Ms. Stoyle's shoes.

5           We spend a lot of time on our job.  More than half

6   our lives are spent on our job and jobs can be stressful enough

7   as it is.  But when you go into work every day and you have to

8   put up with belittling and degrading comments and you have to

9   fear that someone is making something up that you didn't do, it

10   becomes increasingly stressful.

11           Now, in October of 2002, Ms. Stoyle once again

12   reaches out for help.  She calls Mr. Amoruso who sets up

13   another meeting.  This meeting is attended by Ms. Stoyle and

14   Dr. Beliveau.  And again, you heard testimony that issues

15   regarding sexual harassment were raised at this meeting.  Now,

Page 14

Stoyle V Mansfield (Clos) 080107

16    you heard from Mr. Amoruso who denied that sexual harassment

17    was raised at this meeting.  But you also heard that he

18    testified that the driving force behind the meeting was an

19    issue recording telephone records.  Well, you'll recall that

20    there were several exhibits that documented that whole issue

21    regarding the request for telephone records.  And that came

22    after the October 2002 meeting.  So, how could that have

23    happened?  I ask you to consider that in assessing

24    Mr. Amoruso's credibility of what was disclosed to him at that

25    meeting.


1            Now, protected activity, meetings with Mr. Amoruso.

2    Adverse action.  What happens next after the meeting?  We have

3    a request for the phone records.  Now, it's not one request.

4    It's not two requests.  But everytime Ms. Stoyle replied, "do

5    what's asked."  And everytime, Mr. D'Agostino gets a bit more

6    hostile.  And you'll read from those E-mails that, in fact,

7    those records were in his possession the whole time and that

8    Ms. Stoyle told him those records were in his possession the

9    whole time.  But despite that, he'd craft a memorandum

10   threatening her with disciplinary action, again re a

11   disciplinary action, inventing issues, false accusations about

12   her job performance.  These are all adverse actions.

13           Now, as a result of all of this, Ms. Stoyle could

14   stay in contact with Mr. Amoruso.  She wanted him to know what

15   was going on.  And she says to him, "I have no choice but to go

16   to an outside attorney.

17           But there's a very important E-mail within all of

18   that exchange where Ms. Stoyle tells Mr. D'Agostino that she

19   reviewed the sexual harassment policy and she sends that memo

20   to Mr. Amoruso.  So, ask yourselves how could it be that

Page 15

21    Mr. Amoruso and Mr. D'Agostino contend that they had no idea

22    that Ms. Stoyle's complaint involved conduct of a sexual nature

23    when it was put in writing and sent to him through an E-mail.

24           December 2002, Ms. Stoyle finally after trying for

25    three years, files a complaint with the Commission Against


1    Discrimination.  And you heard testimony from Mr. D'Agostino

2    that at least two of the allegations in that complaint he

3    admitted to.  He admitted that he called her delicious.  He

4    admitted to sending her the E-mail.  And when the complaint was

5    filed, what does he do?  He issues a cursory review and he

6    tells the media, "I didn't do any of that stuff."  He denies

7    all of the allegations wholesale.  "This is an attack on my

8    character."  Well, he told you that at least two of the things

9    he was responsible for.

10           Now, when this press release was issued, you have

11    to consider that Ms. Stoyle was in the Town of Mansfield.  And

12    she is active in the community.  Her children are active in the

13    community and now she's being called a liar in the town in

14    which she lives and works.  Her integrity is being put at issue

15    in the media which caused her a considerable amount of anguish.

16           Now, in addition to having knowledge that sexual

17    harassment was an issue because he had an E-mail,

18    Mr. D'Agostino denied on the stand having knowledge that

19    Ms. Stoyle ever made a complaint during the October meeting

20    about harassment of another employee as well as herself,

21    Carolyn Fitton.  But when faced with his own writing

22    characterizing Mr. Fitton in a sexist fashion as a Brit.

23    bomber, suddenly he remembered.  And incredibly, he told you

24    that "bomber" in his mind meant bubbly. He thought she was

25    bubbly.  First, he didn't know who she was, then he

Stoyle V Mansfield (Clos) 080107

1    acknowledged he called her a Brit. bomber, and then he said it
2    mentioned bubbly.  And you'll also recall an E-mail where he
3    referred to her as a "scream of a gal."  Now, Mr. D'Agostino
4    testified that he was embarrased by some of this conduct.  But
5    I represent to you that action taken in anger, you should not
6    follow.  And usually, we regret things when they start to hurt
7    us.  And clearly, having to take the stand and admit to the
8    conduct that caused him pain, anger is followed by regret.
9    However, that doesn't unring the bell.  It's a little bit too
10   late.  His alleged remorse is too late, too late.  He can't
11   take away the anguish that he caused Ms. Stoyle from her years
12   of employment with the electric department.
13          Now, the defense contends that somehow Ms. Stoyle
14   and Dr. Beliveau only kept pertinent E-mails.  But I remind you
15   that the testimony was that after the filing of the MCAD
16   complaint, it was Mr. D'Agostino who created a new E-mail
17   policy.  And that E-mail policy said, "Destroy your E-mails on
18   a monthly basis."  So, if E-mails were purged, it was at his
19   urging.  It wasn't due to some alleged conspiracy on the part
20   of Dr. Beliveau or Ms. Stoyle.
21          And I also ask you this.  Consider this when you
22   consider this alleged conspiracy.  What possible motive would
23   Ms. Stoyle have for fabicating allegations and putting herself
24   through this trial?  What possible motive could she have?
25          Now, I'd like to turn for a moment to the actions


1    by the Board.  What is it that they did wrong and why?  Well,
2    it's hard to forget the testimony from Dan Donovan.  Dan
3    Donovan was Chairman of the Board of Selectmen at the time
4    Ms. Stoyle filed her MCAD complaint.  And remember that

Stoyle V Mansfield (Clos) 080107

5    Mr. Donovan had breakfast with Mr. D'Agostino three days a
6    week.  And he testified that it's the Board that's ultimately
7    responsible for public funds and he testified that he was aware
8    that Ms. Stoyle was complaining about the illegitimate
9    overcharges to the electric company.  And I suggest to you,
10   ladies and gentlemen, that the Board tolerated harassment of
11   Kimberly Stoyle because they approved of the illegal use of
12   electric department funds to balance the town budget.  In fact,
13   this was a long-standing practice.  You heard from Ralph Penny.
14   You recall that Ralph Penny testified that he was a selectman
15   in the early '90s.  In fact, then, there was a scheme to
16   inflate the charges in an effort to balance the town budget,
17   inflate the charges given to the electric department to balance
18   the town budget.  And he referred to MMED back then as the cash
19   cow.  At the time he objected to it, but it was clear that this
20   was a practice that was long-standing.
21           Now, after Ms. Stoyle filed her complaint, you
22   heard from Mr. Donovan that in December of 2002, immediately
23   after the filing of her complaint, there was a board meeting
24   where they renewed the Town Manager contract before he had his
25   daily performance evaluation.  And you heard that within a


1    month, they gave him that performance evaluation and they gave
2    him a glowing evaluation.  And this was before any
3    investigation into Ms. Stoyle's formal charge of discrimination
4    with the MCAD.  And you heard that Mr. Donovan proclaimed to
5    the Mansfield news that Ms. Stoyle's claim was fabricated and
6    far-fetched.  And what you remember is that his testimony was
7    that at the time he made that statement, he never read the
8    complaint, never saw it, never talked to Ms. Stoyle, just
9    talked to his breakfast buddy.  He never gave one thought to
                              Page 18

Stoyle V Mansfield (Clos) 080107

10    what those statements to the media were, what impact that
11    they'd have on Ms. Stoyle and her family.  You also heard from
12    Mr. Donovan that in April 2003, the Board gave him an $11,000
13    pay raise.  And that's in the minutes of the April 2003
14    meeting.  It's an exhibit in the record.  In fact, he stated in
15    the minutes that he wished he could have given the Town Manager
16    more.  And I remind you that after Mr. Donovan left office, the
17    Town Manager hired his daughter-in-law as the new Treasurer.
18            Now, I want to take you back for a moment to the
19    October 2002 meeting with Lou Amoruso where Ms. Stoyle
20    testified and Dr. Beliveau testified that issues of sexual
21    harassment were raised.  You also heard from Ralph Penny that
22    in October of 2002, he saw Lou Amoruso and he had a discussion
23    with Lou Amoruso about that E-mail and that Lou Amoruso said he
24    thought the E-mail was not offensive.  And clearly, his
25    comments indicated that as early as October of 2002, that


1    Mr. Amoruso knew about that E-mail.  But yet when he took the
2    stand, he claimed he had no knowledge until after Ms. Stoyle
3    filed her complaint.
4            Gary D'Ambra, you recall his testimony that
5    Kimberly Stoyle was always a professional, always acted
6    professionally and that she clearly felt threatened by John
7    D'Agostino and that she was upset because he was always asking
8    her for things that she didn't have and that after the meeting
9    in 2001, that as far as he could tell, nothing changed and that
10    he saw her often crying on the job, crying at work because of
11    things that were going on.
12            Now, there's been reference to an investigation.
13    And we heard that the investigator who conducted an
14    investigation at some point in time after Ms. Stoyle's 2002

Stoyle V Mansfield (Clos) 080107

15    MCAD complaint spoke with Ms. Stoyle, spoke with Dr. Beliveau,

16    spoke with Gary D'Ambra, spoke with Ron DeCurcio.  So they had

17    Ms. Stoyle's story and they had the stories of all of the

18    individuals.  The investigator had the story of all of the

19    individuals that supported Ms. Stoyle's claims.

20          And we also heard that Lou Amoruso had an

21    opportunity to review a draft of that complaint.  He read it.

22    In addition, we know that D'Agostino admitted that Ms. Stoyle

23    looked delicious and we know that he admitted the sending of

24    an E-mail.  But despite all of this, there has been no

25    testimony from anyone that any action was ever taken against


1     Mr. D'Agostino either before the investigation or after the

2     investigation for his obvious -- obvious inappropriate

3     conduct.  Rather, if you look through the exhibits, you'll see

4     a newspaper article.  And you heard testimony that the Board

5     cleared him in July 2003 after getting the investigation of all

6     charges.  Despite that the investigator talked to Ms. Stoyle's

7     witnesses and despite Mr. D'Agostino's admissions, in July of

8     2003 he was cleared without even a slap on the wrist.

9          Now, there's also been evidence that in August of

10    2003 after the Board's so-called investigation, that

11    Dr. Beliveau presented a memo that there was continuing sexual

12    harassment in retaliation.  And that, too, is an exhibit, that

13    Ms. Stoyle claimed that it was continuing.  And again, there

14    was no evidence anywhere from anyone that there was any

15    investigation into this new additional complaint.  Now, I

16    remind you that this August 2003 written complaint that's an

17    exhibit in the case is yet another protected activity.

18    Ms. Stoyle complained about sexual harassment.  And I remind

19    you that the Board's failure to act, its sham investigation and

Page 20

Stoyle V Mansfield (Clos) 080107

20    its conduct in the wake of Ms. Stoyle's MCAD complaint amounted
21    to tolerating conduct against Ms. Stoyle which itself is an
22    adverse action.
23          Now, in that August 2003 complaint, you'll read
24    that one of the ongoing issues for Ms. Stoyle was there was a
25    statement from somebody that she walks around town with a


1    mattress on her back.  And you'll recall testimony from Mr.
2    D'Agostino that he knew about that comment, that he knew the
3    employee who made it.  And then what did he do?  The same thing
4    he did when Mr. Boucher told her to shut up.  Nothing.  He took
5    no action.  And I represent to you, ladies and gentlemen of the
6    jury, that employees tend to follow the lead of the person in
7    charge, another instance of tolerating harassment against
8    Ms. Stoyle.
9          Now, protected activity by filing the MCAD
10   complaint.  What else happened after that?  Well, you heard
11   that within two months after that, there were serious
12   allegations leveled against Ms. Stoyle.  She's the Chief
13   Financial Officer.  Her job is to balance the books in the
14   electric department.  And what happened?  Bea Kearney and
15   Richard Boucher, in consultation with the Town Manager you
16   heard, issued a memo accusing her of carrying a negative cash
17   balance in excess of a million dollars.  And when Dr. Beliveau
18   brought in an independent auditor to look into the situation,
19   you heard that Mr. D'Agostino delayed the production of
20   information the auditor needed to get the job done.  There's an
21   E-mail in the record stating "Give him only one year's
22   financial statement."  He asked for three.  And you also heard
23   that this audit took almost a year and that it was months or
24   three to four months before the auditor got the information
Page 21

Stoyle V Mansfield (Clos) 080107

25    that he needed to stop the audit.


1            Now, you heard about this audit from Mr. Goulet.
2    You remember Mr. Goulet.  He was the auditor for the Town of
3    Mansfield Electric Department.  And he came in as a result of
4    these accusations.  And what he found was that Ms. Stoyle was
5    having difficulty balancing the books in the electric
6    department with the town because the town was only providing
7    her the information she needed sporadically at best, I think
8    was his testimony.  Now you'll recall Mr. Goulet has been doing
9    municipal audits of electric departments for a number of years.
10    He's very experienced.  He went through all the records and he
11    found that she wasn't getting the information.  And you'll also
12    recall that there's an E-mail that Ms. Stoyle received --
13    excuse me -- that Ms. Stoyle sent -- and this is an exhibit,
14    too -- to Ms. Kearney right after the accusation asking her for
15    the prior month's cash sheets so that she could be able to
16    reconcile her books against the town's books.  You'll also
17    recall that Mr. Goulet's findings in the audit indicated that
18    the negative cash was not created by Ms. Stoyle, but in fact it
19    was Ms. Kearney who made a withdrawal out of the electric
20    department's account before it was authorized.  And you'll
21    recall Ms. Kearney's testimony.  Because when she answered my
22    question on whether or not that was legal, she said it wasn't
23    legal because it wasn't on the warrant.  But when she answered
24    Ms. Balliro's question on the same issue, she said she didn't
25    need a warrant.  When she answered my question as to when she


1    made a withdrawal, she said it was in June.  When she answered
2    Ms. Balliro's question, she said it was in August.  Well,

Stoyle V Mansfield (Clos) 080107

3    there's a funny thing about the truth, ladies and gentlemen:

4    It usually doesn't change.  So, I ask you to bear that in mind

5    when you assess the credibility of these witnesses.  Mr. Goulet

6    also found that the town or what happened was Mr. Goulet came

7    across a deposit of interest into a depreciation fund.  And

8    you'll recall there's an E-mail in the record from Ms. Stoyle

9    to the existing treasurer saying, "Hey, what is this?  There's

10   a deposit in the depreciation fund that we don't know what it

11   represents."  And Ms. LaRose E-mailed her back and said "Oh, by

12   the way, we borrowed over a million dollars, electric

13   department, from your depreciation fund.  Oh, we didn't tell

14   you, Chief Financial Officer."  And she testified, "We used it

15   to pay bills."  Well, certainly we can't minimize this because

16   we heard from Mr. Goulet that there's only one purpose that you

17   can use money from the depreciation fund.  And that's for

18   capital improvements to the electric department.  You can't use

19   it to pay bills.  In fact, you'll recall testimony that there

20   was a lot of back and forth between town counsel and Mr. Goulet

21   because they didn't want him to use the word "illegal" in his

22   management letter.  But he is a professional doing audits for

23   several years.  In his opinion, this was improper.  And in

24   fact, he told you that he questioned the credibility of the

25   town officials and that he chose not to do any work anymore for


1    the Town of Mansfield because of that.

2              Now, we also heard about an adverse action

3    involving Ms. Stoyle's application to the media.  She wanted to

4    become a member of the Professionals Union like Bea Kearney,

5    like Richard Boucher.  And what happened?  Mr. D'Agostino

6    rejects her application.  He takes it to the Mass. Labor

7    Relations Board.  He says the reason is because she has access

Page 23

Stoyle V Mansfield (Clos) 080107

8   to confidential information.  You'll recall his testimony.  And

9   you'll recall his testimony that Bea Kearney and Richard

10  Boucher have the same access to confidential information, but

11  they are members of the union and not Ms. Stoyle.  So I

12  represent to you, ladies and gentlemen, that the rejection of

13  that application and causing Ms. Stoyle to go through a legal

14  process to rightfully become a member of a union, that she is

15  entitled is another adverse action because you'll recall that

16  she testified she prevailed at that hearing and she did become

17  a member of the union.

18          Now, in February of 2004, Mr. Beliveau is

19  terminated.  But you've heard testimony that before he was

20  terminated that Mr. D'Agostino met with Gary Babin.  And what

21  did they discuss?  They discussed his vision of the electric

22  department.  What was his vision for the electric department?

23  Well, I represent to you, ladies and gentlemen of the jury,

24  that his vision for the electric department was to get rid of

25  the people that made it hard for him to get his hands on the


1   money.  Dr. Beliveau was terminated within a month.  And what

2   happened to Kimberly Stoyle?  She was silenced.  She was

3   silenced.  Mr. Babin came in.  And as soon as he came in, her

4   primary duties and responsibilities were eliminated.  She was

5   the Chief Financial Officer in title only.

6          You'll recall that there are several E-mails,

7   several E-mail exchanges combining the audits of the town and

8   the electric department.  Now, clearly, the audit is something

9   that falls within the realm of responsibility of the Chief

10  Financial Officer.  I want you to direct your attention to

11  those E-mails during your deliberations.  And you'll note that

12  Ms. Stoyle is not included in any of them.  Her opinion didn't

Page 24

Stoyle V Mansfield (Clos) 080107

13    count anymore.  They wanted her out of the picture.  They

14    viewed her as trouble.  She's not involved in anything

15    regarding the audit.  You'll also see that there's E-mail

16    exchanges on the change at the fiscal year.  They wanted the

17    fiscal year to be the same as the town fiscal year.  The town

18    wanted the electric department and MMED to have the same fiscal

19    year, clearly a consideration that involved the Chief Financial

20    Officer.  The fiscal year involves financial preparation.  But

21    you'll see by the E-mail exchanges also that Ms. Stoyle was in

22    the dark.  They didn't want her part of this.  And those

23    E-mails are marked as exhibits.

24           Now, Ms. Stoyle testified that as soon as Mr. Babin

25    arrived, he told her, "I'm running the show now."  And what did


1    she say?  "I never wanted to run the show.  All I want to do is

2    do my job."  She presented her monthly report to him that she

3    had been doing since the inception of her employment and he

4    scrapped it, crossed it out and threw it back.  And when they

5    went to the next meeting, Ms. Stoyle was taken out of the mix.

6    She sat in the audience.  She was no longer a part of the

7    financial team at the board meetings as she had been in the

8    past.  And Lou Amoruso testified that the diminution of her job

9    duties was apparent -- apparent.  Now, Mr. Babin -- and the

10    defense claims that this was just a change of management

11    style.  But Mr. Babin -- I represent to you -- has some

12    credibility issues.  Because we asked him about his

13    participation in the Finance Committee meetings and whether or

14    not Ms. Stoyle was excluded from those meetings after he came

15    on board.  And he said, "I don't know.  I don't attend Finance

16    Committee meetings."  But you'll recall there are exhibits:

17    Number 1, Finance Committee Meeting Minutes and Number 2, Board

Page 25

Stoyle V Mansfield (Clos) 080107

18    of Light Commissioners Meeting Minutes that referenced that, in

19    fact, he did attend Finance Committee meetings.  You'll recall

20    his deposition testimony at his deposition prior to his

21    testimony here was inconsistent with his testimony, that he did

22    attend financial meetings.  There is evidence that he did, in

23    fact, attend Finance Committee meetings and Ms. Stoyle was

24    excluded from those meetings.

25           April 2004, protected activity.  Ms. Stoyle files a


1    second complaint with the Massachusetts Commission Against

2    Discrimination.  This time, she files it against the Board of

3    Light Commissioners because they failed to act.  They failed to

4    help her.  They didn't listen to her when she asked for help.

5           June 2004, adverse job action, a comment by Richard

6    Boucher.  And I note, "We got the Director.  The bitch is

7    next."  "We got the Director.  The bitch is next."  A threat of

8    termination, I represent to you, ladies and gentlemen of the

9    jury, is an adverse action.

10           Now, the defense contends that there was a

11    communication problem, that it was Ms. Stoyle's inability to

12    communicate that gave rise to issues.  But I represent to you

13    that Ms. Stoyle's ability to communicate was affected only by

14    the treatment that she received in the workplace.  If you're

15    told her to shut up, if you're told that a broad with a brain

16    is a problem and you should have been a hairdresser, it does

17    create difficulty in communicating.  And even -- even if it

18    were true that there were communication issues, this did not

19    allow the Town Manager or the Board of Light Commissioners to

20    take retaliatory or adverse action against Ms. Stoyle for not

21    communicating.

22           And you'll recall the testimony of Bea Kearney that

Stoyle V Mansfield (Clos) 080107

23    she always got along with Kimberly Stoyle.  She never had a
24    problem with her.  And you also recall some sarcastic comments
25    that Ms. Stoyle made in a confidential E-mail to Mr. Beliveau.


 1    I represent to you that this was out of utter sheer
 2    frustration.  She tried to get help for three years to stop
 3    what was happening to her in the workplace to no avail.  She
 4    was demeaned.  She was belittled.  Out of utter frustration,
 5    she spoke to the only person through a confidential E-mail who
 6    did anything -- anything to help her.  And the defense is
 7    trying to exploit this to support some sort of conspiracy
 8    theory.
 9            Now, ladies and gentlemen of the jury, it's your
10    duty in this case to award fair and adequate damages to
11    Ms. Stoyle.  And the damages in this case are for emotional
12    distress.  This is for injuries caused to her mental state.  I
13    can tell you that if there were some magic and by your verdict
14    you could just make it so that all of this never happened, that
15    she would much prefer that.  She would much prefer that this
16    never happened, but unfortunately you can't do that and that
17    monetary damages is the only mechanism that our system of
18    justice allows.  It can't make up for what she suffered.  It
19    can't make up for what she lost.  But the defendants must be
20    made to pay a just debt for the harm that they caused her.
21    Now, valuing emotional distress is not an easy task.  You need
22    to put yourself in Ms. Stoyle's shoes as you consider the facts
23    and you need to consider your own experiences.
24            As humble citizens, I know that you understand that
25    things that make a peaceful state of mind are some of the most


 1    precious things in life:  Love, happiness, faith, hope.  From
                              Page 27

Stoyle V Mansfield (Clos) 080107

2    that perspective, a state of mind is priceless.  Now, we've all
3    had emotional burdens at one time or another in our life.  And
4    as you evaluate Ms. Stoyle's emotional distress, think about
5    events in your own life and how they affected your state of
6    mind and ask yourself this question:  What would you pay for
7    peace of mind?  What would you pay to be free from despair,
8    frustration, anger, sadness, guilt, worry, humiliation and
9    security?  What would you pay for peace of mind?  A state of
10   mind can be so powerful and can have such an impact that we
11   can't share willpower and make it go away.  That's why we have
12   a science like psychiatry.
13           Ms. Stoyle has not had peace of mind for six years.
14   You witnessed her pain and the tears as she relived the
15   horrible circumstances of her employment and how the events
16   played out in her small home town after she finally filed a
17   lawsuit.  She described how she was bullied, belittled,
18   degraded, demeaned for trying to do an honest job and standing
19   up for what was right.  You heard her describe her anxiety and
20   her frustration trying to get help and her fear that she would
21   be fired for something that she didn't do.  She wanted someone
22   to fix it and she spent four years trying.
23           Now, after she filed her lawsuit, the media and the
24   paper, the media articles disrupted her life.  She's active in
25   the community.  She's called a liar, her professional integrity


1    was attacked, and this caused her a lot of anguish.  She
2    testified that she was humiliated by the news articles.  She
3    testified that she had to experience cat calls while she was
4    jogging, skull bones on her front lawn, threat through an
5    anonymous phone call in the parking lot by a person telling her
6    "when are you going to give it up?"  This created fear for
                                Page 28

Stoyle V Mansfield (Clos) 080107

7    herself and fear for her children.  She testified to rumors
8    that she was a slut and a whore and that she walked around with
9    a mattress on her back and that no one believed her because she
10   was divorced and that it only got worse after she filed her
11   complaint.  She testified to intimidation and she described her
12   depressed state of mind that she cries all the time, that she
13   never used to cry, but now she can't stop crying.  You saw her
14   yourself as she told her story.  She testified that she's
15   tired, that she's sleepless when she's distracted, and she
16   testified that she got a new job, but she didn't believe in
17   herself anymore.  She said she used to take charge in a
18   conference.  But D'Agostino stole that from her.  Now she says
19   if someone asks her to do something, she's nervous.  She thinks
20   she's stupid.  She's afraid they're going to find out that
21   she's stupid because she was treated like she was stupid for so
22   long.  And that insecurity comes with a lot of fear and
23   anxiety.  This is a scar left.  She told you that the best part
24   of her was her spirit, and that she feels that her spirit has
25   been beaten up and crushed and that she just wants to get it


1    back.
2            Ms. Stoyle's greatest anguish comes from the time
3    that she lost with her children.  She's a mom first.  And you
4    heard her heartfelt testimony that she's Santa Claus, that
5    she's the tooth fairy, that she's the Easter bunny.  For five
6    years now, she's been there for her children in body, but not
7    in mind and spirit.  And the emotional impact of this
8    harassment and retaliation against her has taken her out of the
9    moment with her children.  What's worse is that her children
10   know that she's not paying attention to them.  That's caused a
11   great deal of sadness and guilt.  But at the same time, she's
                                Page 29

Stoyle V Mansfield (Clos) 080107

12    conflicted because she wants to show her children that when

13    they grow up, that mom stood up for what was right.  And she

14    hopes that by taking the difficult road, that this won't happen

15    to her little girls.

16                Kimberly Stoyle has sacrificed dearly for justice.

17    And now at last, she has her day in court.  Ladies and

18    gentlemen, since this all began back in 1999, her girls grew

19    from toddler to 10 and 11 and teenager.  And she can't get back

20    the time that she lost with her children over those years.  But

21    you can make sure that they always remember that her fight was

22    not in vain.

23                Now, you also have the power to award punitive

24    damages in this case.  And punitive damages are not for what

25    happened to Ms. Stoyle, but for what might happen to future


1     Kimberly Stoyles.

2                 THE COURT:  Punitive damages are going to be

3     limited to any wrong that was done to Ms. Stoyle.  They may

4     reflect an effort to provide general deterrence, but we are

5     focused on harm that was done to Ms. Stoyle.

6                 MS. LEONARD:  Okay.

7                BY MS. LEONARD:

8                 Well, the harm that was done to Ms. Stoyle was

9     clear.  And you have the opportunity to award punitive damages

10    for the harm that was done to Ms. Stoyle.  So, I ask you to

11    consider all of these states of mind that she's described to

12    you.  She's described the depression.  She's described her

13    anxiety, her sadness, her guilt, her moments lost with her

14    children, ladies and gentlemen of the jury.  And I ask that you

15    give her the justice that she has waited for for eight years.

16                Thank you.

Stoyle V Mansfield (Clos) 080107

17        THE COURT:  Thank you, Ms. Leonard.  So we'll take

18   our morning break at this point, ladies and gentlemen.

19

20                     END OF TRANSCRIPT

21

22

23

24

25


1

2                     CERTIFICATION

3

4          I certify that the foregoing is a correct

5   transcript of the record of proceedings in the above-entitled

6   matter to the best of my skill and ability.

7

8   _____    _____

9   Pamela R. Owens                     Date

10  Official Court Reporter

11
12

13

14

15

16

17

18

19

20

21

Stoyle V Mansfield (Clos) 080107

22
23
24
25